

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
New York Direct Dial: (929) 506-5270
FAX (212) 336-3625
Website: www.eeoc.gov

**May 12, 2021**

The Hon. Vanessa L. Bryant
Abraham Ribicoff Federal Building
450 Main Street, Annex 135
Hartford, CT 06103

Re:   *EEOC v. Yale New Haven Hospital, Inc.,*
Civil Action No. 3:20-cv-00187-VLB

Dear Judge Bryant:

Pursuant to the Court's Chamber Practices concerning discovery disputes, Plaintiff U.S. Equal Employment Opportunity Commission (the "EEOC" or "Commission") and Defendant Yale New Haven Hospital, Inc. ("YNHH") jointly request a discovery conference to discuss a dispute concerning two discrete legal issues:

1) Whether YNHH may withhold from production documents based on a blanket assertion of "peer review privilege" in this federal civil rights case; and

2) Whether YNHH may withhold from production the battery of required neuropsychological tests administered to Aggrieved Individuals on the basis of the "peer review privilege," and/or on the basis on vagueness and ambiguity objections.

Additionally, Defendant requests a discovery conference to discuss a dispute concerning a third issue, howeverthe EEOC objects to including this issue because the parties have neither conferred in good faith on numerous

aspects of Defendant's assertions nor completed conferral with respect to the one position Defendant briefly shared during conferrral.:

3) Whether YNHH may depose the "Affected Individuals"[1] (including both voluntary and involuntary claimants).

I.   **Relevant Background**

In this litigation, the Commission challenges YNHH's Late Career Practitioner Policy ("the Policy") under the ADEA and ADA. The Policy requires all practitioners age 70 and above to undergo an ophthalmologic and neuropsychological examination at least every two years in order to maintain privileges necessary to practice fully at YNHH.  On January 29, 2021, the EEOC served Phase 2 focused document requests upon YNHH. YNHH served its responses and objections to these requests on March 15, 2021.  The parties exchanged letters outlining areas of discovery in dispute and conferred about these issues by telephone on April 21, 2021. The parties agree that the discrete legal issues identified above are ripe for discussion and decision by the Court at this time.

II.   **Peer Review Privilege**

Defendant YNHH objects to thirty-one of the EEOC's forty Document Requests (Nos. 1-8, 10-26, 30-32, and 38-40) on the basis of "Peer Review Privilege" and has withheld responsive documents as a result.  The Requests at issue include, for example, documents regarding the adoption of the Policy (No.

---

[1] "Affected Individuals" refers to the individuals identified in Exhibit A to the parties' Stipulation Regarding Employer Status of Yale New Haven Hospital, Inc. (Doc. 60-1), as approved by the Court's Order dated January 22, 2021 (Doc. 61).

2), documents concerning the efficacy of the Policy and reviews or studies of the Policy (Nos. 4, 5), the test battery(ies) used to implement the Policy (No. 6), and documents referred to by, or supporting statements made by Defendant in its Answer (Nos. 7, 8, 22, 23, and 24), among many others.

To date, YNNH has not provided a privilege log identifying the specific documents withheld based on this asserted privilege.  However, during the parties' meet and confer on April 21, YNHH confirmed that the documents withheld include "Credentialing Files" for the 115 Aggrieved Individuals in this matter.  Based on Defendant's statements during the parties' meet and confer, Plaintiff understands these files to contain documents regarding the renewal of each individual's credentials to practice at YNHH, as well as documents similar to those one would find in a personnel file.[2]

    **A.** **<u>EEOC's Position</u>:  Objections Based on the "Peer Review Privilege" Should be Overruled Because No Such Privilege Exists in Federal Civil Rights Cases, and Creating Such a Privilege Would Deny the EEOC Key Evidence.**

This Court has repeatedly recognized that "'there appears to be consensus among lower courts and in other circuits that no federal privilege protects

---

[2] During the parties' conferral call, YNHH indicated that it might produce the Credentialing Files for the 26 Aggrieved Individuals who have voluntarily cooperated with EEOC's requests for information ("voluntary claimants") if the EEOC first procured waivers from each of these individuals. The Commission rejected this offer because, in addition to the reasons provided in Section II.A above, such waivers would address only a fraction of the Credentialing Files to which the EEOC is entitled, which include those for involuntary claimants as well as the voluntary claimants. Further, these waivers would not address Defendant's assertion of peer review privilege with respect to documents *other than* the Credentialing Files (*see* Request Nos. 1-8, 10-26, 30-32, 38-40), which would still require Court intervention.

medical peer review materials in civil rights . . . actions.'"  *Grenier v. Stamford Hosp. Stamford Health Sys., Inc.*, No. 3:14-CV-0970 (VLB), 2016 WL 3951045, at *3 (D. Conn. July 20, 2016) (Bryant, J.) (quoting *Francis v. United States*, No. 09 CIV. 4004 GBD KNF, 2011 WL 2224509, at *4 (S.D.N.Y. May 31, 2011) (citing numerous cases)); *Wisconsin Province of Soc'y of Jesus v. Cassem*, 468 F. Supp. 3d 482, 487 (D. Conn. 2020) (Bryant, J.) (same; further stating that "medical peer review privilege is not recognized by federal common law and discoverability in federal cases other than medical malpractice and related actions is common and long-standing," and noting multiple other decisions which "h[eld] that the federal interest in 'fighting discrimination' favored disclosure [of peer review materials] in an employment action").  The consensus on this issue is unsurprising, as the United States Supreme Court in *Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182 (1990), when asked to create a peer review privilege in an employment discrimination matter, declined to do so, noting that "[o]ften . . . disclosure of peer review materials will be necessary in order for the Commission to determine whether illegal discrimination has taken place."  *Id.* at 193.  As case law is well-settled that a federal peer review privilege does not exist in civil rights cases such as ours, no further analysis is required and Defendant's objections should be overruled by the Court.

However, even if this issue were not settled law—which it is—it would be inappropriate here for the Court to create such a privilege under Federal Rule of Evidence 501.  If the Court were to consider this possibility, it would assess: "'(1) whether the privilege serves private and public interests; (2) the evidentiary

benefit that would result from denial of the privilege; and (3) recognition of the privilege among the States.'" *Grenier*, 2016 WL 3951045, at *3 (quoting *Francis*, 2011 WL 2224509, at *4). Though many states do recognize a peer review privilege, the Supreme Court in *Univ. of Pennsylvania* already weighed the relevant interests at issue, and ruled against the creation of such a privilege in employment discrimination cases. 493 U.S. at 585.

Further, the evidentiary benefit from the denial of the privilege here would be great—Defendant has asserted this privilege with respect to 75% of Plaintiff's discovery requests. Upholding the asserted privilege would irreparably undermine the EEOC's ability to litigate this case. For example, under the ADA, where, as here, an employer has a generally applicable policy of requiring medical examinations of a class of employees, the employer must show that the examinations were "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). To do so, Defendant must show that it "'it had some reason for suspecting that the . . . class of employees[] would be unable to perform essential job functions or would pose a danger to the health and safety of the workplace,'" necessitating the implementation of the Policy. *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) (quoting *Fountain v. New York State Dep't of Corr. Servs.*, 190 F. Supp. 2d 335, 339 (N.D.N.Y. 2002). Therefore, documents regarding the adoption of the Policy, sought in Request No. 2, are key to allowing the EEOC to undermine Defendant's stated need to adopt the policy. Further, Defendant must establish that the examination was "a reasonably effective method of achieving the employer's goal." *Id.* at 98.

Therefore, the EEOC must obtain the test itself (Req. No. 6), and any reviews or studies of the efficacy of the test (Nos. 4, 5), to challenge whether the test actually achieves Defendant's stated goals in implementing the Policy.  Finally, any concerns regarding the disclosure of sensitive information are fully addressed by the Standing Protective Order applicable to this matter. *See* Dkt. 004.

As case law is well settled that a federal peer review privilege does not exist in civil rights cases such as this, we ask the Court to overrule Defendant's objections on this basis, and order Defendant to produce all documents withheld based on this objection.  However, even if the Court feels that the application of the aforementioned balancing test is appropriate here, no privilege should be created as the factors weigh strongly in favor of production.

Still, if the Court feels that further briefing is necessary, Plaintiff would be happy to provide additional supporting case law and more detailed analysis on the application of the balancing test to the specific documents at issue. To do so, however, the Commission asks that the Court order Defendant to produce a privilege log identifying the specific documents they have withheld.

B. <u>Defendant's Position</u>:

The EEOC seeks highly confidential, privileged credentialing materials on a hunch that they may later have some connection to its claims.  This cuts against the underpinnings of the peer review privilege and the EEOC's stated needs in this case.

In assessing whether to enforce a privilege in federal matters, federal courts are generally guided by Fed. Rule of Evidence 501 which provides in

pertinent part:  "The privilege of a ….person…shall be governed by the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. Using this rule, courts have indeed compelled production of peer review materials in civil rights cases. However, conversely, this Court has recognized the privilege in other types of cases; *e.g.*, medical malpractice actions as well as the federal Emergency Medical Treatment and Active Labor Act. *See Grenier v. Stamford Hosp. Stamford Health Sys., Inc.*, No. 3:14-cv-0970 (VLB), 2016 WL 3951045 (D. Conn. July 20, 2016).  In that ruling denying a Motion to Compel records otherwise protected by Conn. Gen. Stat. Section 19a-17(b) (peer review privilege statute), Your Honor agreed to apply an analysis given a recognition that district courts are afforded "flexibility to develop rules of privilege on a case-by-case basis."  *Id.* at *3 (*quoting Francis v. United States*, No. 09-Civ. 4004 (GBD) (KNF), 2011 WL 2224509, at *4 (S.D.N.Y. May 31, 2011)).  In that ruling, the Court continued to recognize that "[t]he confidentiality of the peer review process would relieve physicians from the fear of reprisals and the self-preserving instinct to withhold information necessary to achieve the goals of peer review.  It would engender candid and probing reflection and collaborative critical evaluation of not only the attending physicians' actions, but of the hospital's policies and procedures as well."  *Id.* at *4.  Finally, the Court discussed the benefit of the privilege against the probative value of the records sought there, concluding that the effort in obtaining them should be denied. *Grenier* is in accord with the reasoning of sister courts recognizing the peer review privilege. As the Western District explained in

*Woodworth v. United States*, the interest in maintaining the confidentiality of peer review is "as substantial as any that can be imagined: Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations." 287 F. Supp. 3d 345, 350 (W.D.N.Y. Dec. 27, 2017).

One recognized and applied balancing test involves four factors:  (a) the need for the information to enforce federal substantive and procedural policies; (b) the importance of the state policy that supports the rule of privilege and the likelihood that recognizing the privilege will advance the state policy; (c) the special need of the litigant who seeks the information; and (d) the adverse impact on local policy if the privilege is not recognized.  *See Sabharwal v. Mount Sinai Med. Ctr.*, No. 09 CV. 1950 (JBW), 2011 WL 477693, at *2 (E.D.N.Y. Feb. 4, 2011).

Defendants acknowledge that in cases involving direct discrimination claims, and thus, cases triggering a need for discovery of records otherwise protected by the privilege, those Courts generally hold that the probative value of those records outweighs any of the other factors. Nevertheless, what is important is that these Courts go through an initial, multi-factor analysis before concluding that the privilege does not apply.  *See, e.g., Bowling v. Stamford Anesthesiology Services, P.C.*, No. 3:17-cv-642 (AWT)(D. Conn. July 15, 2019) (Dkt. No. 163) (slip op.) (citing Grenier at *2; *Brown v. St. Mary's Hospital*, No. 3:14-cv-228 (DJS) 2015 U.S. Dist. Lexis 179597, at *6 (D. Conn. Aug. 26, 2015)) (declining to apply the peer

review privilege "in the specific factual scenario presented by this case" because it "would not serve its intended public interest (emphasis added)).

In denying application of the privilege in *Bowling*, the Court concluded that since the defense to the plaintiff's ADA based claims was that her fitness to perform her duties was at issue, and further indicating doubt as to whether the specific records at issue were even subject to the privilege, the probative value and need for the records outweighed the policy behind the privilege.  The *Bowling* court also held: "The Court reiterates that this opinion applies only to the factual scenario presented in this matter and is not intended to alter the status of the peer review privilege in other factual scenarios raised in this district."  *Bowling*, at *10.

In other words, the EEOC's position suggesting the denial of application of the privilege is automatic, at least with respect to federal civil rights cases, is not supported by these rulings, even where application of the privilege is denied.

Contrary to the position taken by Plaintiff, the claims in this matter should not result in the same conclusion simply because they are based on federal civil rights statutes.  Specifically, the attack in this action is on a policy, and whether it defies the ADEA and/or ADA because its application involving a physical exam is triggered by age. Unlike the disparate treatment cases in which courts have refused to recognize peer review privilege, Plaintiff does not allege that the peer review process was carried out in a discriminatory manner. *See e.g., Bowling, P.C.*, No. 3:17-cv-642, at *7 ("[T]he Court concludes that there is evidentiary value to the information sought in this matter. The records of the medical review

committee are highly relevant to the question of plaintiff's fitness and ability to perform the essential functions of her position."). Rather, Plaintiff alleges that the existence of the policy itself has a disparate impact on persons over a certain age. In fact, in an earlier submission to the Court, the EEOC stated:

> "It is important to note what this case is <u>not</u> about. It is not about subjecting a physician with YNHH…to neuropsychological or ophthalmologic examination for any legitimate reason other than his or her age. Thus, this case is not about testing a physician for neuropsychological decline when there is evidence specific to that physician that neuropsychological decline may be affecting his or her performance. Rather, the case is solely about a Policy…"

(footnote 1, ECF 31, emphasis in original).

The evidentiary value of the individual files is therefore minimal at best. Moreover, YNHH has already disclosed the identities of Aggrieved Individuals who were required to submit to the exam, as well as the results. The value of production of entire peer review credentialing files, which may contain, among other things, confidential information regarding specific patient incidents and reports by colleagues who were assured confidentiality, is remote, at best. Indeed, many among those identified as potentially Affected Individuals have not been identified as necessarily interested in being part of the prosecution of the claims, yet their files are being requested—they, too, were promised confidentiality so that information regarding their performance would not be subject to broad review, and potentially public access. Of particular concern is the EEOC's statement in footnote 2, ECF 36 that "[a]s a public civil rights agency whose mission includes litigating in the public interest, EEOC maintains that confidentiality designations should be used sparingly. The public should have

10

the ability to review the results of EEOC litigation, including materials produced in discovery that are attached to pleadings and filed with the Court".  In short, the EEOC has made clear its intention to make all of the information sought "public".

Defendant has proposed exploring potential opportunities to narrow the dispute, such as having the EEOC provide waivers of any potential privilege by participating Aggrieved Individuals.  Defendant also offered to explore providing a sampling of files, so that the parties could attempt to agree on more targeted requests, as opposed to wholesale file production.  The EEOC has declined all invitations, continuing to demand entire files be produced for all Affected Individuals identified on the Exhibit A submitted prior hereto, irrespective of whether or not these individuals are active and/or willing participants in this litigation.  To repeat, this action does not concern claims of specific medical professionals whose performance was critiqued in the ordinary course; who were directly terminated based on performance; and/or who claim that like performance issues by younger professionals needs to be compared to establish better treatment of those younger professionals.  The probative value of those records in those situations is clear.  The probative value here is not so apparent and, in fact, is much more remote.

Therefore, whether these records are protected from wholesale production is based on peer review privilege, or simply because the EEOC's requests, as drafted, were overly broad, thus that their confidential nature outweighs their probative value,, the result should be that the EEOC not be provided broad access to any and all records in those credentialing files.

III.    **Neuropsychological Tests Administered Pursuant to the Late Career Practitioner Policy**

It is the EEOC's understanding that the neuropsychological test battery given to Aggrieved Individuals subject to YNHH's Late Career Practitioner Policy includes roughly a dozen different tests. This dispute is based upon the parties' respective positions on the EEOC's Document Request No. 6, seeking "[t]he test battery(ies) used to implement the Late Career Practitioner Policy, including, but not limited to, any alterations to the battery of tests employed over time."

YNHH objected to this Request: "Defendant objects to Request No. 6 to the extent it seeks material protected by the peer review privilege. Defendant further objects to Request No. 6 as vague to the extent the phrases 'test battery(ies)' and 'battery of tests' are vague and undefined." To date, YNHH has not disclosed what these tests are, produced copies of the tests, or disclosed if the tests have changed since 2016 when the Policy went into effect.

A.    **EEOC's Position**:  YNHH's Objections to Producing the Test at the Heart of this Case Should be Overruled.

In its Request No. 6, the EEOC seeks the neuropsychological test administered to practitioners age 70 and above pursuant to YNHH's Late Career Practitioner Policy.  This test is at the heart of this case and must be produced.

As held by the Second Circuit, YNHH must show that its "examination . . . genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary."  *Conroy*, 333 F.3d at 98.  YNHH must also show that "the examination . . . [is] a reasonably effective method of achieving the employer's goal."  *Id.*  As the Second Circuit has explained, the

12

"examination of whether a policy actually contributes to the business necessity is vital." *Id.* at 102.  It is not possible for the EEOC to challenge YNHH's assertion that the test is no broader or more intrusive than necessary, if the EEOC *never even gets the test*.  Similarly, the EEOC, and its experts, must have access to the test so that they can evaluate its effectiveness in achieving YNHH's stated goals, which include evaluating the performance and competence of late career practitioners and protecting patients from harm.  Such an examination is "vital." *Id.*  Instead, in suggesting that a broad description of the test is enough, YNHH asks the EEOC to "take its word for it" that the test measures what they claim it measures, without the opportunity to examine the test itself.

YNHH has objected to producing the tests, asserting that the Commission's use of the phrases "test batteries" or "battery of tests" in Request No. 6 is "vague" or "undefined."  However, the EEOC used these phrases in its Request because both YNHH Drs. Cooney and Balcezak, who are the architect of the Policy and the current chief administrator of the Policy respectively,[3] used this phrasing – "screening battery" and "battery of tests" –  in reference to the tests at issue. *See* Leo Cooney & Thomas Balcezak, *Cognitive Testing of Older Clinicians Prior to Recredentialing*, Journal of the American Medical Association (January 14, 2020) (describing the YNHH test: "A cognitive screening battery of tests was developed and designed to balance brevity with broad coverage of abilities relevant to clinical practice.").  The Commission's request for documents using words YNHH itself uses to describe the same tests cannot be considered

---

[3] Both of whom sit on YNHH's "Late Career Practitioner Committee."  (Defendant's Objections and Answers to EEOC's Phase II Interrogatories.)

either vague or ambiguous.  *See Brown v. McKinley Mall, LLC*, No. 15-CV-1044G(F), 2017 WL 2332330, at *3 (W.D.N.Y. May 30, 2017) (overruling vague and ambiguous objections because terms used were commonly recognized accounting terms applicable to defendant, noting "it is difficult to understand how Defendant . . . would reasonably find such terms vague or ambiguous.").

Defendant also objected to the production of the test due to an asserted peer review privilege.  First, as previously established, no federal peer review privilege exists in civil rights cases.  But even if it did, a peer review privilege applies to *reviews* by *peers*, not to a neuropsychological test battery applied as part of a Late Career Practitioner Policy.

Now, in connection with the preparation of this letter, on May 11, 2021, Defendant asserted for the first time that the test at issue in this case is not in their possession, custody or control, but only in possession of Dr. Hawkins, who they assert is not their employee.

First, Defendant has never before made this objection.  The EEOC first requested this exam in March 2019 during its investigation—YNHH did not assert that it did not possess the test then.  (Defendant's April 12, 2019 Response to EEOC's Request for Information, EEOC_0000799-800).  In the years since, YNHH has never asserted that they did not possess this test, not in response to the EEOC's Document Req. No. 6,[4] nor during the parties April 21, 2021 meet and confer discussion about this request.  This objection is waived.

---

[4] Though YNHH included a general objection to this effect in its responses, after the 2015 amendments to FRCP 34, "incorporating all of the General Objections

**Second**, Defendant must produce these documents because they are within YNHH's control, pursuant to FRCP 34.  "The concept of 'control' has been construed broadly." *Aidoo v. Cela*, No. 3:16-CV-147 (VAB), 2018 WL 6435650, at *15 (D. Conn. Dec. 7, 2018) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180–181 (S.D.N.Y. 2006)). "[C]ourts in the Second Circuit have repeatedly held that Rule 34 'does not require that the party have legal ownership or actual physical possession of the documents at issue." *Id.* (quoting *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007)). Instead, "such Second Circuit decisions suggest that a party cannot evade production when it could gain control of the evidence through reasonable means." *Id.*  "When determining whether a party has the practical ability to obtain access to documents in the possession of a non-party, courts examine such factors as 'the existence of cooperative agreements ... between the responding party and the non-party, the extent to which the non-party has a stake in the outcome of the litigation, and the non-party's history of cooperating with document requests.'" *Allstate Ins. Co. v. Kirshner*, No. 3:12 CV 1262 JBA, 2015 WL 3620234, at *3 (D. Conn. June 9, 2015) (quoting *Alexander Interactive, Inc. v. Adorama, Inc.,* No. 12 Civ. 6608(PKC)(JCF), 2014 WL 61472, at *3 (S.D.N.Y. Jan. 16, 2014)).

All of these factors are present here.  YNHH entered into a contract, the "Cognitive Screening and Neuropsychological Assessment Services Agreement,"

---

into each response violates Rule 34(b)(2)(B)'s specificity requirement as well as Rule 34(b)(2)(C)'s requirement to indicate whether any responsive materials are withheld on the basis of an objection." *Fischer v. Forrest*, No. 14CIV1304PAEAJP, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017).

under which Dr. Hawkins developed and conducted the neuropsychological assessments required by the Late Career Practitioner Policy.  (YNHH000913.)  The budget in connection with this contract provided that YNHH would pay 15% of Dr. Hawkins salary, which would "cover . . . the development of norms and psychometric methods for detecting true status change" and "ongoing evaluation and modification of the assessment process."  ("Budget for Service Contract for the Assessment of Late Career Physicians," YNHH000904).  The contract provided that "the assessment process will be subject to refinement," and "Examining Provider [Dr. Hawkins] will keep the YNHH Chief Medical Officer . . . informed of refinements and the parties agree to meet [on] at least a quarterly basis to discuss such refinements." (YNHH000913.)

Therefore, Dr. Hawkins acted pursuant to a cooperative agreement with YNHH.  He also has a stake in the litigation, as YNHH is paying 15% of his salary in order for him to develop and perform testing under the Late Career Practitioner Policy.  Further, the contract also suggests that YNHH *would* have copies of these tests, as it had quarterly meetings regarding refinements to the assessment process.  YNHH also has a history of producing Dr. Hawkins' documents—during the EEOC's investigation—as its own documents. For example, YNHH produced a fourteen-page document, authored by Dr. Hawkins, (EEOC_0000538-51), which YNHH asserted was a "explanation of the rationale" and "testing procedures . . . under the Neuropsychological Examination portion of the Late Career Practitioner Policy." (EEOC_0000799-800).  Further, YNHH acknowledges that they will be

16

producing Dr. Hawkins to testify regarding the testing protocols.  (*See* infra, pg. 19).

As Defendant exercised control over Dr. Hawkins and has the practical ability to obtain these documents, YNHH must produce the tests at issue, *even if* it does currently physically possess them.  Any concerns Defendant has expressed regarding confidentiality are fully addressed by the Protective Order currently in effect applicable in this case. (Dkt No. 4).  Defendant has no valid objection to withholding the test which lies at the center of this case.  Plaintiff respectfully requests that the Court order Defendant to produce this essential evidence.  Alternatively, because this is a highly fact intensive inquiry, the EEOC requests the opportunity to submit briefing on this issue.

**B.  Defendant's Position:**

YNHH objected to the EEOC's request for the "test battery(ies) used to implement the Late Career Practitioner Policy, including, but not limited to, any alterations to the battery of tests employed over time" as seeking material protected by the peer review privilege and because the request was vague and terms used within it were undefined.  To the extent YNHH now understands this request to seek identification of the specific tests and/or each and every actual test question used in the neuropsychological testing performed pursuant to the Late Career Practitioner Policy, the requested material is not within YNHH's possession, custody, or control.  The testing protocol is in the sole possession of Dr. Keith Hawkins (who is employed by Yale University), who created it and

conducts the neuropsychological screenings pursuant to the Policy.[5]   *See* Fed.

R. Civ. P. 34; *Kestner v. Pratt & Whitney Canada. Inc.*, 1995 WL 598995, at *2 (E.D.

Pa. Oct. 6, 1995) ("when one party seeks to compel production, it is sufficient for

the other party to simply respond that a particular discovery items is not in

existence or not in that party's possession").

Even if YNHH had the testing protocols used by Dr. Hawkins, the specific

names of the tests and actual questions used are likely not relevant or necessary

to an analysis of the claims in this case, and the countervailing interest of

protecting the integrity of the test outweighs the limited value of the material

sought by the EEOC here.  It is critical to maintain the confidentiality of the

precise test names and questions so that clinicians cannot prepare for the tests.

Dissemination of the test questions would negate the purpose of the test

altogether.

Indeed, YNHH has already produced and/or the EEOC already possesses

sufficient detail and context regarding the neuropsychological testing and its

components performed pursuant to the Policy, including but not limited to:

• The Policy itself (EEOC_000428-435): including a general description of (1) the examinations and what they seek to evaluate ("hearing, vision, memory, dexterity, reflex/response time, stamina, technical skills, decision making, and cognitive abilities"); (2) the requirements and procedures pursuant to the Policy; and (3) how results are reviewed and evaluated;

---

[5] YNHH generally objected to the EEOC's Requests for Production "to the extent that they call for information or documents that do not exist within the possession, custody, or control of Defendant.  Defendant does not have possession, custody, or control of certain information and/or documents that may be placed at issue by the EEOC's discovery requests with respect to Yale University ("Yale. U."), Yale University School of Medicine ("YSM"), Northeast Medical Group ("NMG"), and/or other separate entit(ies)." See Defendant's Objections And Responses To EEOC's Phase Ii Request For Production Of Documents And Electronically Stored Information at pp. 3-4.

- **The "Late Career Practitioner Policy: Important Background Information" (EEOC_000436-438): including additional detail regarding the testing protocols, e.g., "[i]t covers skills such as the capacity to mentally track new information, process it efficiently, and recall it later.  Reasoning skills, mental flexibility, and the capacity to 'stop and think' are also assessed."**

- **"Testing Older Clinicians at Yale New Haven Hospital" (EEOC_000538-551): which goes into even more specifics about the tests employed pursuant to the Policy, including descriptions of how the tests assess information processing speed, working memory, visuo-spatial abilities, executive abilities, and memory impairment.**

- **"Cognitive Testing of Older Clinicians Prior to Recredentialing" (Exhibit A): a journal article about the Policy, which provides, e.g.: "the screening battery used consisted of 16 brief tests including rudimentary information processing (two tests), visual scanning and psychomotor efficiency (2 tests), processing speed and accuracy under decision load (1 test), concentration and working memory (1 test), visual analysis and reasoning (2 tests), verbal fluency (2 tests), memory (1 visual test and 1 verbal test), 'prefrontal' self-regulation (1 test), and executive functioning (3 tests)… Time to completion varies from 50 minutes to 90 minutes."**

The EEOC already possesses sufficient information to assess and argue the "job related and consistent with business necessity" issue, and will have the additional opportunity to depose Dr. Hawkins and obtain even more detail regarding the testing protocols.  Requiring YNHH to produce the actual tests and/or questions (which it does not even possess), is not proportional to the needs of the case at this stage in the litigation.  *Conroy*, the case cited by the EEOC, holds the "examination of whether a *policy* actually contributes to the business necessity is vital." 333 F.3d at 102 (emphasis added).  The analysis is of the Policy itself, the details of the testing elements of which the EEOC has long possessed.  The key issue is whether the Late Career Practitioner Policy, requiring practitioners to undergo periodic neuropsychological and ophthalmologic screenings after age 70 to maintain Medical Staff privileges and

the remedial process to address any impairments, is job-related and consistent with business necessity.  Getting into the weeds of which exact test questions were used and when is not necessary.

      III.    <u>Affected Individual Depositions.</u>

      YNHH seeks the Court's authorization to conduct depositions of the Affected Individuals in this case.  The EEOC does not believe this issue is ripe for presentation to the Court, as it believes the parties have not yet sufficiently conferred, but opposes YNHH's request to depose all 115 Affected Individuals in this case.

      A.    <u>Defendant's Position:</u>

      The EEOC's Complaint alleges a claim of unlawful interference with ADA rights.  *See* Complaint (Doc. 1) at ¶¶ 32-36.  Neither the Supreme Court nor the Second Circuit has yet outlined a legal test for an interference claim under the ADA, but "the plain terms of § 12203(b) 'preclude a party from intimidating or coercing another party not to exercise his rights under the ADA, as well as barring interference against a person who has exercised his rights under the ADA.'"  *E.E.O.C. v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 204 (D. Conn. 2017); *see also* 42 U.S.C. § 12203(b) ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA].").  The leading case on

ADA interference claims is *Frakes v. Peoria Sch. Dist. No. 150*, which sets forth

the elements of such claims as follows:

> (1) [plaintiff] engaged in activity statutorily protected by the
> ADA; (2) [plaintiff] was engaged in, or aided or encouraged
> others in, the exercise or enjoyment of ADA protected rights; (3)
> the defendant[ ] coerced, threatened, intimidated, or interfered
> on account of her protected activity; and (4) the defendant[ ]
> were motivated by an intent to discriminate.

872 F.3d 545, 550-51 (7th Cir. 2017).[6]   YNHH is entitled to oral discovery on those

elements.  Indeed, the EEOC has already provided written discovery responses

that vary in detail concerning those central prima facie elements for some, but

not all, of the Affected Individuals.  YNHH is entitled to depose those individuals

who have provided responses to probe those written responses, and to depose

those individuals who have not provided discovery on these issues.

Oral discovery is also needed to determine if the Affected Individuals are

indeed "similarly situated" to Dr. Nash, as the EEOC claims.  *See* Complaint (Doc.

1) at ¶¶ 31, 36.  If they are not, they are not properly part of this case, as will be

demonstrated on summary judgment.  EEOC also claims each provider was a

qualified individual under ADA.  YNHH should be allowed to probe that assertion

in discovery.  Oral testimony could also address various aspects of YNHH's

affirmative defenses, not all of which YNHH is required to outline at this juncture

---

[6] The EEOC does not allege that YNHH interfered with any alleged protected activity (or
assistance to another in engaging in protected activity) by any Affected Individual.
YNHH is unaware of any authority finding an actionable ADA interference claim where
there is no alleged protected activity at issue.  Indeed, the authority in this Circuit is to
the contrary.  *See Robles v. Medisys Health Network, Inc.*, No. 19CV6651ARRRML, 2020
WL 3403191, at *13 (E.D.N.Y. June 19, 2020) (dismissing ADA interference claim where
plaintiff failed to allege he engaged in any protected activity and/or that the employer's
action interfered with any planned or intended protected activity).

as it is attorney work product.  Individual oral discovery could also be considered by YNHH's expert.

If YNHH is blocked from conducting oral discovery of the Affected Individuals, YNHH would face going into summary judgment and perhaps even trial without ever having had a chance to examine those the EEOC claims are victims in this case.  YNHH is not aware of a single case in any Federal District where a defendant would be prejudicially hamstrung in this way.  For example, the EEOC could provide affidavits and trial testimony of these individuals without YNHH ever having an opportunity to cross examine them.  Such a result violates the notion of procedural fairness and the aim of liberal discovery.  *See Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2nd Cir. 2003) ("Discovery rules 'are to be accorded a broad and liberal treatment [ ] to effectuate their purpose that civil trials in the federal courts no longer need be carried on in the dark.'") (internal quotation omitted).  The EEOC chose to file suit with the legal theories it is pursuing in this case, and the EEOC chose to identify the Affected Individuals it has identified in discovery.

If the EEOC will not or cannot produce those individuals for depositions, they are not properly part of this case.

B.    **EEOC's Position:**

The EEOC objects to the presentation of this issue to the Court at this time, as it does not believe the parties have adequately conferred on this issue.

During the parties' April 21 telephone conference, the parties did briefly discuss Defendant's desire to depose all 115 Affected Individuals in this case.

However, during that conversation, Defendant asserted that the EEOC's ADA Interference claim was their sole basis for taking these depositions.  Defendant's counsel confirmed this fact on May 12, stating that the "reasoning behind this request" was "that Defendant contends the ADA interference claim entitles it to individual depositions of claimants as to that particular claim."  However, in its submission to the Court, Defendant asserts that deposition testimony could relate to YNHH's affirmative defenses, and claimed that the EEOC had claimed that each provider was a qualified individual under ADA (it has not).  To the extent Defendant is pursuing these positions, the parties have not conferred about either, and so have not had the opportunity to determine whether it may be possible for Defendant to obtain any information to which it is entitled in a manner more efficient than deposing 115 individuals.

Defendant informed the EEOC on Tuesday, May 11 at 12:27 p.m. that it intended to raise this issue with the Court, and presented the EEOC with its portion of this letter.  The EEOC informed Defendant that it did not believe that the parties had sufficiently conferred on the issues noted above, and that regardless, it would require additional time to review the new case law and arguments Defendant had presented, and therefore could not prepare its position by the end of the following day.  However, Defendant refused to grant the EEOC time to prepare its response, and instead insisted on presenting this issue to the Court today.[7]  The EEOC responds to the best of its ability in the time allowed.

---

[7] In comparison, when the EEOC informed Defendant on Tuesday, May 4 at 12:49 pm that it intended to raise the first two issues in this letter with the Court,

Defendant claims that it is entitled to depose all 115 Affected Individuals on the basis of the EEOC's interference claim, citing Seventh Circuit case law in *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550-51 (7th Cir. 2017), to assert that to assert such a claim, an individual must establish that they have engaged in protected activity, and must show that the Defendant coerced, threatened, intimidated, or interfered with the individual on account of his or her protected activity.  Defendant also asserts depositions are necessary to determine whether the AIs are "similarly situated" for purposes of the interference claim.

However, *Frakes* is not good law in the District of Connecticut.  Instead, *Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179 (D. Conn. 2017) is the seminal case in the Second Circuit regarding claims under 42 U.S.C. § 12203(b).  *Day & Zimmerman NPS,* recognized that, "[o]ther courts have found that the interference provision of the ADA, unlike the retaliation provision, 'does not expressly limit a cause of action to the particular employee that engaged in protected activity.'" *Id.* at 204 (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 570 (3d Cir. 2002).   Further, the plain language of 42 U.S.C. § 12203(b) does not require that an individual engage in "protected activity," as that phrase is generally interpreted by the courts, to assert an interference claim, but prohibits interference with any individual's "enjoyment of . . . any right granted or protected by this chapter," including the right to be free

---

Defendant stated that it would require additional time to prepare its response. The EEOC then provided Defendant with a week to prepare its response, and delayed its submission.

from an unlawful medical exam.  Therefore, no testimony is required as to whether each individual had engaged in affirmative protected activity.

Further, the court in *Day & Zimmerman* found that subjective testimony is not required on the issue of whether an individual was actually intimidated, coerced, or interfered with.  Instead, "the Court f[ound] that 'if, under all the existing circumstances, [Defendant's] conduct has a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced,' then [Defendant] would be liable for interference under the ADA." *Day & Zimmerman*, 265 F. Supp. 3d at 206 (D. Conn. 2017).  "This is an objective test that does not turn on whether any of the affected employees were actually deterred from exercising their rights." *Id.* at 205.[8]

Further, while Defendant asserts that the EEOC has claimed that each Affected Individual is a qualified individual under the ADA, the EEOC has made no such claim, and it is not required to establish such an element under the law. Additionally, while Defendant asserts in its letter that the testimony of Aggrieved Individuals may impact its affirmative defenses, it has not explained how the testimony of individuals would bear those defenses, which relate to YNHH's own test.

---

[8] While a later line in the opinion states that "the subjective impact of the Letter on its recipients is relevant," (*id.*) this is in connection with the retaliation claim that was asserted in that matter, as evidenced by the cited case law, and footnote 8. ("[Defendant] argues that the subjective effect of the letter should be taken into account, but cites only cases discussing retaliation claims in support of this proposition. The interference provision "protects a broader class of persons against less clearly defined wrongs" than the retaliation provision."

The EEOC respectfully requests a telephonic conference with the Court to discuss the first and second matters.  The EEOC presented its position to these matters to Defendant, which contributed its portion to this letter.  The EEOC then added additional material to its sections, to address arguments which Defendant raised for the first time in this letter.  Defendant respectfully requests a telephonic conference with the Court to discuss the third matter.

Respectfully submitted,

s/ Caitlin D. Brown
*Attorney for Plaintiff*
Trial Attorney
Bar No. phv11110
Tel: (929) 506-5277
caitlin.brown@eeoc.gov

Kirsten Peters
Trial Attorney
Tel: (929) 506-5325
kirsten.peters@eeoc.gov

Kimberly A. Cruz
Supervisory Trial Attorney
Tel: (929) 506-5345
kimberly.cruz@eeoc.gov

U.S. Equal Employment
Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004
Fax: (212) 336-3623

Markus L. Penzel
Senior Trial Attorney
U.S. Equal Employment
Opportunity Commission
John F. Kennedy Federal Building, Room 475
Boston, MA 02203

Tel: (617) 565-3193
Fax: (617) 565-3196
Markus.Penzel@eeoc.gov

**<u>Certificate of Service</u>**

I hereby certify that on May 12, 2021, I electronically filed the foregoing with the Clerk of the District Court using its CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


Dated:        May 12, 2021

/s/ *<u>Caitlin D. Brown</u>*
Caitlin D. Brown
Bar No. phv11110
Trial Attorney

U.S. Equal Employment
Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004
Tel: (929) 506-5277
Fax: (212) 336-3623
Email: caitlin.brown@eeoc.gov
