**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** ) ) ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 3:20-cv-00187** |
| ) | **(VLB)** |
| **v.** ) | |
| ) | **June 1, 2021** |
| **YALE NEW HAVEN HOSPITAL, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF THE EEOC'S MOTION TO COMPEL**</u>

## <u>TABLE OF CONTENTS</u>

**Nature of the Case and Background** ........................................................... 1

**Argument** ....................................................................................................... 4

   **I. As No Peer Review Privilege Exists in Federal Civil Rights Cases, the Court Should Overrule Defendant's Objections on that Basis.** ...................... 4

      **A. Court are Unanimous that No Peer Review Privilege Exists in Federal Civil Rights Cases.** ............................................................................... 5

      **B. An Analysis of Factors Under FRE 501 also Compels the Rejection of the "Peer Review Privilege" in this case.** ................................................ 7

   **II. YNHH Must Produce the Neuropsychological Tests Administered Under the Policy.** .................................................................................................. 11

      **A. The Content of these Tests is Directly at Issue in this Litigation.** ........... 12

      **B. YNHH's "Vagueness" and "Peer Review" Objections Also Lack Merit...** 15

      **C. YNHH's Untimely May 11, 2021 Claim - that it Doesn't "Have" the Tests - is Seriously Belied by Evidence that the Tests are Within YNHH's Control, and thus Must Be Produced.** ................................................. 17

**Conclusion** ..................................................................................................... 23

Plaintiff United States Equal Employment Opportunity Commission ("EEOC"), through undersigned counsel and pursuant to Rules 34 and 37 of the Federal Rules of Civil Procedure, hereby files this Motion to Compel the production of documents responsive to the EEOC's Document Request No. 6 and to challenge Defendant Yale New Haven Hospital, Inc.'s ("YNHH") blanket assertion of the "peer review privilege" to withhold critically relevant documents in response to 31 of the EEOC's 40 document requests.

## NATURE OF THE CASE AND BACKGROUND

Yale New Haven Hospital, Inc. ("YNHH") is a hospital with a longstanding and close affiliation with Yale University and Yale School of Medicine. Ex. 3,[1] ¶ 3. Through this affiliation, Yale School of Medicine and YNHH serve as components of an integrated academic medical center. *Id.*

In 2016, YNHH implemented a "Late Career Practitioners Policy" (the "Policy") requiring that any medical practitioner age seventy or older, who seeks or is seeking to retain credentials with the hospital, must undergo and pass neuropsychological and ophthalmological exams, which would be repeated either every one or two years depending on the determination of the relevant committee. *See* Ex. 4. YNHH asserts that "[t]he purpose of the Policy is to: (1)

---

[1] All references herein to exhibits refer to those documents attached to the Declaration of Caitlin D. Brown in Support of Plaintiff's Motion to Compel ("Brown Decl."), filed in support of the EEOC's Motion. As Defendant has marked nearly every Exhibit to the Declaration as confidential pursuant to the effective Standing Protective Order, the EEOC publicly files a redacted version of this Memorandum of Law and Exhibits to the Declaration, so that Defendant may file a motion to seal such documents. The EEOC has served unredacted copies on Defendant, and with the Court's permission, will submit unredacted copies to the Court for *in camera* review while Defendant's motion is pending.

set forth the process by which the performance and competence of late career practitioners can be fairly and adequately evaluated; (2) confirm current competence to perform requested privileges, or an appropriate sub-set of privileges, with acceptable skill and safety; (3) ensure the highest quality of care for patients and protect them from harm; and (4) support late career practitioners who desire to continue to participate in clinical activities to the extent possible based upon current skills and any appropriate limitations." *Id.*

In order to implement the Policy, YNHH entered into a contract under which Dr. Keith Hawkins, a Doctor of Psychology with Yale University, created a battery of 16 neuropsychological tests which he administers to practitioners age 70 or above. *See* Ex. 5; Dkt. 69 at 17; Ex. 6 at 1. Dr. Hawkins determined the tests to be administered, set the threshold beyond which an individual "passed" these exams, and administered them himself. *See* Ex. 5 at YNHH 000914. Dr. Hawkins then sat as one of four members of YNHH's "Late Career Practitioner Screening Sub-Committee," which was organized to "mak[e] recommendations regarding the reappointment of members of the [YNHH] Medical Staff who are subject to the Late Career Practitioner Policy." Ex. 7 at YNHH 00723. Medical practitioners who refused to undergo these medical examinations would no longer be permitted to remain a member of the YNHH Medical Staff, and any privileges with the hospital would be automatically relinquished. *See* Ex. 4 at YNHH 000926.

In this suit, the EEOC alleges that YNHH's Policy violates the Age Discrimination in Employment Act and the Americans with Disabilities Act on its

face, as it discriminates based on age and subjects employees to an unlawful medical examination. *See* Dkt. 1.

At the outset, YNHH disputed whether certain individuals qualified as its employees under the ADA and ADEA, which was the subject of Phase I discovery. However, YNHH later stipulated that, for purposes of this litigation, certain "Affected Individuals" are or were its employees under the ADA and ADEA. Dkt. 60, 60-1. The parties are now engaging in Phase II discovery, regarding liability. *See* Dkt. 61.

On January 29, 2021, the EEOC served its Phase II Requests for the Production of Documents. Ex. 1. YNHH served its responses and objections to these Requests on March 15, 2021. Ex. 2. On April 14, 2021, the EEOC sent YNHH a letter outlining certain deficiencies in YNHH's responses and document production. Brown Decl., ¶ 4. On April 21, 2021, the parties' counsel conferred by phone regarding the disputed issues now raised to the Court. Unfortunately, the parties were unable to resolve them without judicial intervention.[2]

The EEOC now submits this motion seeking resolution of those two issues:

1) Whether YNHH's blanket assertion of the "peer review privilege" in this federal civil rights case should be overruled, where discovery is subject to a protective order; and

2) Whether YNHH may withhold from production the battery of neuropsychological tests actually administered to Aggrieved Individuals under the Policy.

---

[2] The parties' conferral efforts continue as to other disputed discovery issues in the hope that additional discovery disputes can be resolved without involvement of the Court.

## ARGUMENT

**I.   As No Peer Review Privilege Exists in Federal Civil Rights Cases, the Court Should Overrule Defendant's Objections on that Basis.**

The EEOC served forty Requests for Production of documents in Phase II discovery.  Ex. 1.  YNHH objected to <u>thirty-one</u> of these Requests on the basis of "peer review privilege," and stated that it was withholding documents responsive to each Request.  (Ex. 2, Request Nos. 1-8, 10-26, 30-32, and 38-40).  While too numerous to recite each of the 31 requests here in full, the Requests at issue include, for example, documents regarding the adoption of the Policy (No. 2), documents concerning the efficacy of the Policy and reviews or studies of the Policy (Nos. 4, 5), the neuropsychological tests administered to practitioners pursuant to the Policy (No. 6), the personnel files of the Affected Individuals (No. 29), and documents referred to by, or supporting statements made by Defendant in its Answer (Nos. 7, 8, 22, 23, and 24), among many others.  *See* Ex. 2.

YNHH has not provided the EEOC with a privilege log identifying all documents withheld on the basis of the asserted peer review privilege, despite EEOC's requests for the same.  Brown Decl., ¶ 4.  Without having the opportunity to independently assess the nature and types of documents withheld on this basis, the EEOC is disadvantaged in its ability to specifically address for the Court how each of the particular documents withheld relate to the action. However, during the parties' meet and confer discussion on April 21, Defense counsel confirmed that the documents withheld include "credentialing files" for the 115 Aggrieved Individuals in this matter, which defense counsel likened to a

practitioner's "personnel file."[3]  Brown Decl., ¶ 7. The EEOC also understands that the credentialing files would include a practitioner's completed application for credential renewal.  *See* Ex. 8.

The Court should overrule YNHH's objection, interposed in response to EEOC document request Nos. 1-8, 10-26, 30-32, and 38-40, based on the "peer review privilege" because that privilege does not exist in federal civil rights cases such as this one.

**A. Court are Unanimous That No Peer Review Privilege Exists in Federal Civil Rights Cases.**

This Court has repeatedly recognized that "'there appears to be consensus among lower courts and in other circuits that no federal privilege protects medical peer review materials in civil rights . . . actions.'"  *Grenier v. Stamford Hosp. Stamford Health Sys., Inc.*, No. 3:14-CV-0970 (VLB), 2016 WL 3951045, at *3 (D. Conn. July 20, 2016) (Bryant, J.) (quoting *Francis v. United States*, No. 09 CIV. 4004 GBD KNF, 2011 WL 2224509, at *4 (S.D.N.Y. May 31, 2011) (citing numerous cases)); *Wisconsin Province of Soc'y of Jesus v. Cassem*, 468 F.Supp. 3d 482, 487 (D. Conn. 2020) (Bryant, J.) (same; further stating that "medical peer review privilege is not recognized by federal common law and discoverability in federal

---

[3] During the parties' conferral call, YNHH indicated that it might produce the credentialing files for the 26 Aggrieved Individuals who have voluntarily cooperated with EEOC's requests for information ("voluntary claimants"), of the 115 total Aggrieved Individuals identified, if the EEOC first procured waivers from each of these individuals. The Commission rejected this offer because, in addition to the reasons provided herein, such waivers would address only a fraction of the credentialing files to which the EEOC is entitled, which include those for involuntary claimants as well as the voluntary claimants. Further, these waivers would not address Defendant's assertion of peer review privilege with respect to documents *other than* the credentialing files (*see* Ex. 2, Request Nos. 1-8, 10-26, 30-32, 38-40), which would still require Court intervention.

cases other than medical malpractice and related actions is common and long-standing," and noting multiple other decisions which "h[eld] that the federal interest in 'fighting discrimination' favored disclosure [of peer review materials] in an employment action"); *see also Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 561 (S.D.N.Y. 1996) (declining to recognize a federal privilege for medical peer review materials in a race discrimination case brought under Title VII of the Civil Rights Act).  The consensus on this issue is unsurprising, as when the United States Supreme Court was asked to create a peer review privilege in an employment discrimination matter in *Univ. of Pennsylvania v. E.E.O.C.*, 492 U.S.182, 110 S.Ct. 577 (1990), it declined to do so.  Instead, the Court noted that "[o]ften . . . disclosure of peer review materials will be necessary in order for the Commission to determine whether illegal discrimination has taken place."  *Id.* at 579.[4]  As described below, the information sought by EEOC aptly fits this description.

---

[4] Many other courts outside this Circuit have also reached the same conclusion. *See, e.g., Adkins v. Christie*, 488 F.3d 1324, 1326-29 (11th Cir. 2007) (declining to recognize a privilege for documents relating to medical peer review proceedings in federal discrimination cases, noting "the documents that HMC seeks to protect are critical to Adkins' discrimination claims."); *Virmani v. Novant Health, Inc.,* 259 F.3d 284, 289 (4th Cir. 2001) (holding that "the interest in obtaining probative evidence in an action for discrimination outweighs the interest that would be furthered by recognition of a privilege for medical peer review materials"); *Gargiulo v. Baystate Health, Inc.*, 826 F. Supp. 2d 323, 328 (D. Mass. 2011), *objections overruled,* 279 F.R.D. 62 (D. Mass. 2012) ("While it is important to 'promote candor and confidentiality in the review process,' the privilege ought not be used as a shield against violations of federal discrimination law.") (internal citations omitted); *Krolikowski v. Univ. of Massachusetts*, 150 F. Supp. 2d 246, 248–49 (D. Mass. 2001) (declining to adopt the state statutory peer review privileges after balancing the litigants' needs in a discrimination suit with the objectives underlying the medical peer review privilege because "access to relevant information is necessary in order for the plaintiff to attempt to support her alleged claims of discrimination.") (internal citations omitted).

As case law is well-settled that a federal peer review privilege does not exist in civil rights cases such as ours, no further analysis is required.

**B. <u>An Analysis of Factors Under FRE 501 Also Compels the Rejection of the "Peer Review Privilege" in this case.</u>**

However, even if the Court performed the more detailed assessment of whether such a privilege should be created in this situation pursuant to Federal Rule of Evidence 501, the result would be the same.

As described by this Court, such assessment would consider: "'(1) whether the privilege serves private and public interests; (2) the evidentiary benefit that would result from denial of the privilege; and (3) recognition of the privilege among the States.'" *Grenier*, 2016 WL 3951045, at *3 (quoting *Francis*, 2011 WL 2224509, at *4). Several states, including Connecticut, do recognize a peer review privilege on a state level. However, the remaining factors support rejecting the recognition of such a privilege here. As cited above, many courts have already weighed the public and private interests at issue when a party seeks medical peer review materials in connection with a discrimination claim, and have all found that the federal interest in fighting discrimination outweighs the interests served by withholding such documents. *See, e.g., Gargiulo,* 826 F. Supp. 2d at 328; *Krolikowski v. Univ. of Massachusetts*, 150 F. Supp. 2d 246, 248–49 (D. Mass. 2001); *see also Univ. of Pennsylvania*, 110 S.Ct. at 579. That balancing of public and private interests reflected in *EEOC v. Univ. of Pennsylvania* is particularly relevant here where, like in that case, the EEOC has brought this litigation, as an agency of the federal government charged with enforcing federal anti-discrimination laws, to challenge YNHH's systemic policy. *See Univ. of*

*Pennsylvania*, 110 S.Ct. at 579; *General Tel. Co. of the Northwest, Inc. v. E.E.O.C.,* 446 U.S. 318, 326 (1980) (footnote omitted) (In a pattern or practice case, the EEOC acts both for the benefit of specific individuals who are subject to discrimination by the employer and "to vindicate the public interest in preventing employment discrimination.").

Further, "the discovery materials are subject to a protective order to preserve confidentiality, thereby 'any concerns about discouraging rigorous and honest evaluation of physician conduct by public disclosure have been minimized.'" *Wisconsin Province*, 468 F.Supp. 3d at 488–89 (Bryant, J.) (quoting *In re Admin. Subpoena Blue Cross Blue Shield of Massachusetts, Inc.,* 400 F. Supp. 2d 386, 391 (D. Mass. 2005)); *see also Krolikowski*, 150 F. Supp. 2d at 249 ("With a protective order in place, the impact of disclosure of peer review communications is lessened and the balance tips in favor of the plaintiff.") Indeed, the Protective Order already in place in this case is more than sufficient to address any confidentiality concerns.  *See* Dkt. 04.

Finally, the evidentiary benefit from rejecting the privilege here would be great—Defendant has asserted this privilege to deny disclosure of relevant documents in 75% of the EEOC's document requests.  *See* Ex. 2.  Creating a new privilege here would irreparably undermine the EEOC's ability to litigate this case, prove its claims and rebut YNHH's asserted defenses.

For example, where an employer subjects a class of employees to medical examinations, as YNHH does here, the ADA requires that the employer show that

the examinations are "job-related and consistent with business necessity."[5]  42 U.S.C. § 12112(d)(4)(A).  To do so, Defendant must show that "'it had some reason for suspecting that the . . . class of employees[] would be unable to perform essential job functions or would pose a danger to the health and safety of the workplace,'" necessitating the implementation of the Policy. *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) (quoting *Fountain v. New York State Dep't of Corr. Servs.*, 190 F. Supp. 2d 335, 339 (N.D.N.Y. 2002). Therefore, documents regarding the adoption of the Policy, (Req. No. 2), the "statistical data and studies available to Defendant" which purportedly supported the need for such a Policy (No. 7), and documents supporting Defendant's claim that the exams are job-related and consistent with business necessity (No. 8), for example, are key to allowing the EEOC to examine and/or challenge Defendant's stated need to adopt the policy.  *See* Ex. 2, Req. Nos. 2, 7, 8.

Under the ADA, Defendant must also establish that the examinations were "a reasonably effective method of achieving the employer's goal."  *Conroy*, 333 F.3d at 98.  Therefore, the EEOC must obtain the tests themselves (Req. No. 6), and any reviews or studies of the efficacy of implementing the tests (Req. Nos. 4, 5), to examine and/or challenge whether the tests actually achieve Defendant's stated goals in implementing the Policy.  *See* Ex. 2, Req. Nos. 4-6.

The EEOC also requires the production of the credentialing files, *i.e.,* the practitioner personnel files, that YNHH is currently withholding.  Under the ADEA, an employer implementing an age-based policy must establish that the "job

---

[5] YNHH asserts patient safety as a business justification for the Policy. *See* Dkt. 24, p. 8 (Fourth Affirmative Defense); *see also* Ex. 4.

qualifications which the employer invokes to justify his discrimination are '*reasonably necessary* to the essence of his business," and that Defendant "is compelled to rely on age as a proxy for th[ose] safety-related job qualifications." *E.E.O.C. v. City of E. Providence*, 798 F.2d 524, 528 (1st Cir. 1986) (quoting *Western Air Lines v. Criswell*, 105 S.Ct. 2743, 2751–53, (1985)).  YNHH must show that it *had* to use age as a proxy because it would have been "'impossible or highly impractical' to deal with the older employees on an individualized basis."  *Providence*, 798 F.2d at 528.  The EEOC is therefore entitled to evidence indicating that YNHH <u>could</u> have performed individualized assessments—using factors other than age—to identify doctors who posed a risk to patient safety.  For example, the number and nature of patient and coworker complaints may indicate a risk for adverse patient outcomes.[6]  Doctors who are solo practitioners and who lack board certification may also present a higher risk.[7]  Information of this nature would be contained in the credentialing files YNHH is currently withholding.  *See* Ex. 8 at YNHH 000800, 803.  Denying the EEOC access to this critical information will result in the inability to challenge or rebut YNHH's asserted affirmative defenses to the ADA and ADEA claims

---

[6] *See* Cooper WO, Guillamondegui O, Hines OJ, et al., *Use of Unsolicited Patient Observations to Identify Surgeons With Increased Risk for Postoperative Complications*, JAMA Surg. 2017;152(6):522–529, available at https://jamanetwork.com/journals/jamasurgery/fullarticle/2601320?utm_source=Silverchair_Information_Systems&utm_campaign=FTM_02132017&utm_content=news_releases&cmp=1&utm_medium=email.

[7] *See* Ilene N. Moore, *Screening Older Physicians for Cognitive Impairment: Justifiable or Discriminatory?*, 28 Health Matrix 95, 115 (2018) ("[L]ittle is said about well-documented non-age-related factors associated with dyscompetency and impairment. Solo practice and lack of board certification, for example, are repeatedly identified as associated physician characteristics.")

asserted in this action or to test its stated justification for the Policy against the requirements of the law.[8]

As the law is well settled that a federal peer review privilege does not exist in civil rights cases such as this, and the interests weigh in favor of disclosure (particularly given the governing Protective Order), the EEOC requests that the Court overrule YNHH's objections to EEOC Document Requests Nos. 1-8, 10-26, 30-32, and 38-40 based on the peer review privilege.

II.   <u>YNHH Must Produce the Neuropsychological Tests Administered Under the Policy.</u>

YNHH has also refused to produce the actual neuropsychological tests that it applies to older practitioners pursuant to the Policy.

The EEOC's Document Request No. 6 seeks "The test battery(ies) used to implement the Late Career Practitioner Policy, including, but not limited to, any alterations to the battery of tests employed over time."  Ex. 1.  YNHH responded that: "Defendant objects to Request No. 6 to the extent it seeks material protected by the peer review privilege. Defendant further objects to Request No. 6 as vague to the extent the phrases 'test battery(ies)' and 'battery of tests' are vague and undefined." Ex. 2.   Defendant referred the EEOC to other documents it *had* produced, then confirmed that "Defendant is withholding responsive documents based on the foregoing objections."  *Id.*

During the April 21 telephone conference, the parties conferred regarding this Request, and Defense counsel expressed that they understood that the EEOC was seeking "the actual tests" administered pursuant to the Policy.  Brown

---

[8] *See* Dkt. 24, p. 8 (Fourth and Eighth Affirmative Defenses).

Decl. ¶ 8.  However, Defendant still refused to produce the tests, asserting during conferral *for the first time* that the tests were not relevant to the claims at issue, and that Defendant has an interest in keeping them confidential. *Id.*

Following this call, the parties began drafting a joint letter regarding their disputes, believing that this Court's practices regarding submissions of letters regarding discovery disputes remained in effect.  Brown Decl. ¶ 9.  The EEOC provided YNHH with its portions of this letter on May 4.  After reviewing the EEOC's arguments for a week, YNHH sent the EEOC its portions of the letter on May 11, the day before the letter was to be timely submitted to the Court per Chambers' now-discontinued discovery hearing practices.  *Id.*  On the eve of submission to the Court, YNHH asserted <u>for the first time</u> that it did not actually possess the tests at issue.  *See* Dkt. 69 at 17-18.  Instead, YNHH now claims that those tests are in the sole possession of Dr. Keith Hawkins, whom Defendant asserts is employed by Yale University.  *Id.*

YNHH's timely objections should be overruled, and *none* of Defendant's *later*-articulated, untimely reasons for non-disclosure justify its failure to produce the tests at issue.

A. <u>The Content of These Tests is Directly at Issue in this Litigation.</u>

Defendant recently took the verbal position that the tests central to this litigation are not relevant.  While this objection is waived as Defendant failed to include it in response to the EEOC's Request No. 6,[9] (*see* Ex. 2), these tests must

---

[9] *Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 238 F.R.D. 536, 538 (D. Conn. 2006) ("Rule 34, which addresses requests for the production of documents, does not contain an automatic waiver provision for untimely objections as found in

also be produced as they lie at the heart of the legal issues to be decided in this case.

The EEOC has asserted a claim under §12112(d)(4)(A) of the ADA, which provides that "[a] covered entity shall not require a medical examination . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity." As YNHH admits that its neuropsychological test is a medical examination under the ADA (Dkt. 24, ¶ 29), it has the burden of proving that the exam is "job-related and consistent with business necessity." In order to do so, it must first "first show that the asserted 'business necessity' is vital to the business." *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97–98 (2d Cir. 2003). YNHH must then "show that the examination or inquiry genuinely serves the asserted business necessity," that "the examination . . . [is] a reasonably effective method of achieving the employer's goal," and "that the request is no broader or more intrusive than necessary." *Id.* at 98. As the Second Circuit has explained, the "examination of whether a policy actually contributes to the business necessity is vital." *Id.* at 102.

It is not possible for the EEOC to challenge YNHH's necessary assertion that the tests "are no broader or more intrusive than necessary" if the EEOC

---

Rule 33(b)(4). Despite the absence of such a provision, courts have reasoned that a Rule 33(b)(4) type waiver should be implied into all rules involving the use of the various discovery mechanisms."); *Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2016 WL 7340282, at *7 (D. Conn. Dec. 19, 2016) (Bryant, J.) ("[T]his objection was not raised in a timely fashion and is therefore waived."); *Fischer v. Forrest*, No. 14CIV1304PAEAJP, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017) ("[I]ncorporating all of the General Objections into each response violates Rule 34(b)(2)(B)'s specificity requirement as well as Rule 34(b)(2)(C)'s requirement to indicate whether any responsive materials are withheld on the basis of an objection.").

_never even gets to examine the tests_.  Similarly, the EEOC, and its experts, must review the tests to evaluate their effectiveness in achieving YNHH's stated goals, which include – according to YNHH – patient safety.  Def.'s Answer, Dkt. 24 at 8. Such an examination is "vital." *Conroy,* 333 F.3d at 102.

Defendant has recently asserted that the EEOC should be satisfied with generalized descriptions of the nature of the tests, for example, "visual scanning and psychomotor efficiency," or "concentration and working memory."  Dkt. 69 at 19.  However, Defendant's argument asks that the EEOC "take Defendant's word for it" that each test actually measures what Defendant claims, which is tantamount to asking the EEOC to accept its affirmative defense without proof. For example, YNHH could be employing a test which it asserts measures "working memory," but has actually been proven deeply flawed and incapable of delivering reliable results.  It is also impossible to determine whether the exams are "no broader or intrusive than necessary" based on such generalized descriptions—a key question which must be answered to resolve the EEOC's claim under the ADA.  While Defendant has asserted that the EEOC will be able to depose Dr. Hawkins regarding these testing protocols, (*see* Dkt. 69 at 19), pursuant to Federal Rule of Evidence 1002, the EEOC is entitled to the best evidence of the content of these tests—the tests themselves.   This is especially so considering Dr. Hawkins' express caveat about the tests:  that there is no guarantee of accuracy in their results. *See* Ex. 5, ¶ 9(b).

Moreover, in addition to patient safety, YNHH states that another purpose of the policy is to: "confirm current competence to perform requested privileges,

or an appropriate sub-set of privileges, with acceptable skill and safety." Ex. 4. The EEOC is entitled to examine the tests administered to practitioners in varying fields, to assess how the tests are—or are not—geared to the differences in competencies for practitioners in different fields of practice.  For example, a psychologist, a radiologist and a surgeon are all practitioners subject to YNHH's testing, but without the tests themselves, the EEOC has no way to knowing whether the test measures metrics relating to the specific job each practitioner performs.  This is particularly important as YNHH has admitted that "[t]he relevance of particular neuropsychological strengths, or weaknesses, to competence in the practice of medicine will vary across medical specialties, settings, and specific tasks and responsibilities."  Ex. 5, ¶ 9(a).

The tests must be produced so the EEOC can examine and rebut YNHH's asserted affirmative defenses and examine whether the tests administered under the Policy are a "reasonably effective method of achieving" its stated goals and that the tests "are no broader or more intrusive than necessary."

B. **YNHH's "Vagueness" and "Peer Review" Objections Also Lack Merit.**

The two objections that Defendant *did* assert in response to Request No. 6—that the Request is "vague" and barred by the "peer review" privilege—are also meritless.

First, YNHH objected to this Request by asserting that the Commission's use of the phrases "test batteries" or "battery of tests" were "vague" or "undefined."  Ex. 2, Response to Req. No. 6.  However, the EEOC used these phrases in its Request because both Drs. Cooney and Balcezak, each members of

the "Yale New Haven Hospital Late Career Practitioner Committee," and the architect of the Policy and the current chief administrator of the Policy respectively, (Ex. 7), used this phrasing to describe the tests in an article they published describing the tests.  *See* Ex. 6 at 1 (Leo Cooney & Thomas Balcezak, *Cognitive Testing of Older Clinicians Prior to Recredentialing*, Journal of the American Medical Association (January 14, 2020) (describing the YNHH tests: "A cognitive screening <u>battery of tests</u> was developed and designed to balance brevity with broad coverage of abilities relevant to clinical practice.") (emphasis added).  The Commission's request for documents using words YNHH itself uses cannot be considered either vague or ambiguous.  *See Brown v. McKinley Mall, LLC*, No. 15-CV-1044G(F), 2017 WL 2332330, at *3 (W.D.N.Y. May 30, 2017) (overruling vague and ambiguous objections where terms used were commonly recognized accounting terms applicable to defendant, noting "it is difficult to understand how Defendant . . . would reasonably find such terms vague or ambiguous.").  Regardless, this objection has presumably been resolved, as during the parties' meet and confer, Defendant's counsel acknowledged that they understood what was sought.  Brown Decl., ¶ 8.

Second, YNHH also objected to producing these test batteries by asserting the peer review privilege.  As discussed in Section I *supra,* the peer review privilege is not applicable to discovery in federal civil rights cases.  But even if it *were*, it would not protect the tests sought by the EEOC.  The basis of the peer review privilege—where it exists—is that a practitioner's reviews of their peers should remain confidential, to promote candid and detailed evaluations, and

"relieve physicians from the fear of reprisals and the self-preserving instinct to withhold information necessary to achieve the goals of peer review." *Grenier v. Stamford Hosp. Stamford Health Sys., Inc.*, No. 3:14-CV-0970 (VLB), 2016 WL 3951045, at *4 (D. Conn. July 20, 2016) (Bryant, J.); *see Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 196 (1990).  However, the test batteries that were actually administered here—the questions asked, the methods used—do not constitute a *review* of anyone.  Disclosing these tests would not subject *anyone* to a fear of reprisal, and withholding them would not make anyone more candid.  The peer review privilege simply does not apply to the test batteries the EEOC seeks. Further, any concerns Defendant has expressed regarding the need to keep the tests confidential are soundly addressed by the Protective Order in place here. *See* Dkt. 04.

   C. **YNHH's Most Recent May 11, 2021 Claim - that it Doesn't "Have" the Tests is Seriously Belied by the Evidence Showing that the Tests are Within YNHH's Control, and thus Must Be Produced.**

   The EEOC first requested these tests from YNHH in March 2019 during its administrative investigation.  *See* Ex. 9 (Request 1 seeking "A copy of the Neuropsychological Examination conducted pursuant to the Late Career Practitioner Policy").  At no time in connection with that request or anytime in the years since has YNHH advised the EEOC—either in response to the EEOC's discovery requests regarding the tests, or in discussions about them with counsel—did YNHH claim that they didn't have these tests . . . that is, until the EEOC was hours away from bringing this issue to the Court.  It was only then that Defendant claimed for the first time that it did not possess the tests, asserting

they are in the sole possession of Dr. Keith Hawkins, whom YNHH asserts is employed by Yale University.  *See* Dkt. 69 at 17-18.

Neither the facts, nor the law, support Defendant's latest attempt to delay the progress of this case or the production of the requested documents.

Assuming YNHH's most recent contention that it does not actually have copies of the tests at issue is true,[10] Defendant must produce these documents because they are within YNHH's control, pursuant to FRCP 34.

"The concept of 'control' has been construed broadly." *Aidoo v. Cela*, No. 3:16-CV-147 (VAB), 2018 WL 6435650, at *15 (D. Conn. Dec. 7, 2018) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180–181 (S.D.N.Y. 2006)). "[C]ourts in the Second Circuit have repeatedly held that Rule 34 'does not require that the party have legal ownership or actual physical possession of the documents at issue." *Id.* (quoting *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007)).  Instead, "Second Circuit decisions suggest that a party cannot evade production when it could gain control of the evidence through reasonable means."  *Id.*  "When determining whether a party has the practical ability to obtain access to documents in the possession of a non-party, courts examine such factors as 'the existence of cooperative agreements ... between the responding party and the non-party, the extent to which the non-party has a stake in the outcome of the litigation, and the non-party's history of cooperating with

---

[10] The veracity of this assertion is, at best, questionable, as the Agreement pursuant to which Dr. Hawkins developed the tests provided that "[Dr. Hawkins] will keep the YNHH Chief Medical Officer . . . informed of refinements [to the tests] and the parties agree to meet [on] at least a quarterly basis to discuss such refinements." Ex. 5 at YNHH000913.

document requests.'" *Allstate Ins. Co. v. Kirshner*, No. 3:12 CV 1262 JBA, 2015

WL 3620234, at *3 (D. Conn. June 9, 2015) (quoting *Alexander Interactive, Inc. v.

Adorama, Inc.,* No. 12 Civ. 6608(PKC)(JCF), 2014 WL 61472, at *3 (S.D.N.Y. Jan. 16,

2014)).  "To the extent that [Defendant] is able to obtain responsive documents,

[it] must produce them." *Cummings v. Moran Shipping Agencies, Inc.*, No.

3:09CV1393 RNC, 2012 WL 996883, at *1 (D. Conn. Mar. 23, 2012).[11]

Defendant's assertion that it cannot obtain documents from Dr. Hawkins

because he is technically employed by Yale University is a farce.  YNHH

previously described its close integration and affiliation with Yale University:

> The Yale School of Medicine ("YSM") is part of Yale University; it is
> one of Yale University's professional schools. . . . . As detailed in the
> Affiliation agreements attached in Exhibit B, Yale New Haven Hospital
> has had a longstanding and close affiliation with the University . . . that
> dates back to the founding of YNHH in 1826. The affiliation between
> the University and YNHH was first memorialized in a written agreement
> in 1913 and a subsequent affiliation agreement was entered into
> between the University and YNHH on March 22, 1965. Through the
> affiliation, YSM and YNHH serve as components of an *integrated
> academic medical center* . . . .

Ex. 3, ¶ 3 (YNHH Response to Request for Information, dated June 12, 2019); *see

also* Ex. 10 (Agreement titled "Affiliation Between Yale University/Yale School of

Medicine and Yale New Haven Health System").  YNHH also stipulated that many

---

[11] Where, as here, there is no evidence that Defendant even sought the
responsive documents from the third party alleged to have possession, sanctions
are appropriate. *See Scovin v. Great W. Life & Annuity Ins. Co.*, No. 3:02CV1161
AWT, 2006 WL 2828428, at *3 (D. Conn. Sept. 29, 2006) (where Defendant asserted
documents were possessed solely by individual who had not been employed by
Defendant for five years, but had not even asked the individual for the
documents, finding documents were in Defendant's control and awarding
sanctions to Plaintiff).

*other* practitioners who work for Yale University in its School of Medicine are *its* employees for purposes of this lawsuit. *See* Dkt. 60.

With respect to the development and application of the Late Career Practitioner Policy, YNHH and Yale University also acted as a single integrated entity. When asked to identify individuals who participated in the development or formulation of the Policy, YNHH listed certain members of the Yale New Haven Hospital Late Career Practitioner Committee—five were employed by Yale University, while only three were employed by YNHH. Ex. 11 (YNHH Response to Interrogatory No. 1).

Documentary evidence demonstrates that Dr. Hawkins, in particular, played a key role in the development and implementation of the YNHH Policy. A "Final Report" issued by the YNHH Late Practitioner Committee in March 2015 reflected that Dr. Hawkins proposed the process for testing to be performed under the Policy, including its implementation at age 70, the length of the original screening exam, what would constitute a "passing" score for the tests, and what YNHH's response would be based on different test results. Ex. 12 at YNHH 000727-28. It also reflects that Dr. Hawkins would be available after testing to counsel both the tested physician, and the officers of the YNHH Medical Staff. *Id.* at YNHH 000728.

YNHH subsequently entered into a contract, the "Cognitive Screening and Neuropsychological Assessment Services Agreement," under which Dr. Hawkins developed and conducted the neuropsychological assessments required by the Policy. Ex. 5 at YNHH 000913. In turn, YNHH paid 15% of Dr. Hawkins' salary. Ex. 13 ("Budget for Service Contract for the Assessment of Late Career Physicians.").

The District of Connecticut has held that records relating to testing performed by a Defendant's subcontractor are in Defendant's control and must be produced. *Barack v. Am. Honda Motor Co. Inc.*, No. 3:09CV565(AWT), 2010 WL 11417797, at *1 (D. Conn. Nov. 12, 2010).

YNHH also exercised control over Dr. Hawkins as he was a member of YNHH's "Late Career Practitioner Screening Sub-Committee," which was organized to "mak[e] recommendations regarding the reappointment of members of the [YNHH] Medical Staff who are subject to the Late Career Practitioner Policy." Ex. 7.  Meetings of this Sub-Committee were to be "scheduled on a weekly basis and cancelled if there [was] no business to discuss." *Id.* at 2.  Every set of committee meeting minutes produced by Defendants that identified attendees show Dr. Hawkins in attendance. *See* Exs. 7, 14-30.  It appears that this sub-committee may later have replaced the originally established committee, as beginning in July 2019, this group was identified as the "Yale New Haven Hospital Late Career Practitioner Committee." *See* Exs. 19-28.  As of April 2020, the Committee was comprised of three doctors employed by Yale University, and only one employed by YNHH.  Ex. 28.[12]

YNHH has continued to heavily rely on Dr. Hawkins.  During the EEOC's administrative investigation, YNHH produced a fourteen-page document in support of its position which was authored by Dr. Hawkins, (Ex. 31; Brown Decl. ¶

---

[12] Dr. Thomas Balcezak, employed by YNHH (Ex. __ rog responses); Dr. Leo Cooney, employed by Yale University (*id.*), Dr. Keith Hawkins (whom Defendant asserts is employed by Yale University), and Dr. Nina Horowitz, Assistant Professor of Surgery (Oncology) at Yale School of Medicine (https://medicine.yale.edu/profile/nina_horowitz/).

6), and which YNHH described as an "explanation of the rationale" and "testing
procedures . . . under the Neuropsychological Examination portion of the Late
Career Practitioner Policy." Ex. 9.  While disclaiming access to his documents,
YNHH simultaneously offers to produce Dr. Hawkins for deposition, asserting that
the EEOC will have the "opportunity to depose Dr. Hawkins and obtain even more
detail regarding the testing protocols."  Dkt. 69 at 19.  YNHH will presumably
continue to rely on Dr. Hawkins at trial, in seeking to establish that its
examinations "genuinely serve[] [its] asserted business necessity," and that "the
examination . . . is no broader or more intrusive than necessary." *Conroy*, 333
F.3d at 98.

YNHH has control of Dr. Hawkins, and by extension, his documents.  Each
element identified in *Allstate Ins. Co. v. Kirshner,*  2015 WL 3620234, at *3 is
satisfied here.  YNHH has entered into a general cooperative agreement with Yale
University, and a further agreement for Dr. Hawkins' work relating to the Policy.
Exs. 10 and 5.  As YNHH is paying 15% of Dr. Hawkins' salary for his continued
work administering and refining the tests at issue, he has a serious stake in the
outcome of the litigation. *See* Ex. 13.  And YNHH has a history of producing
documents authored by Dr. Hawkins (*see* Ex. 31) in support of its defense, and is
continuing to rely on him in this litigation.

YNHH cannot be permitted to use Dr. Hawkins as both a sword and a
shield, relying on his documents and testimony where it suits them, but denying
the EEOC access to the same.  *See Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D.
199, 237 (E.D.N.Y. 2007) (where plaintiffs refused to grant defendant access to

documents and information of third-party, but "it is likely that the plaintiffs rely on these same sources of information to [establish their case]," "plaintiffs may not use their information and documents both as a sword and, to the extent they seek protection from disclosure, as a shield.").  YNHH disregarded any distinction between itself and Yale University when developing and implementing this Policy. The distinction is not a drawbridge, only to be raised when convenient for defense.  As YNHH exercises control over Dr. Hawkins, and has the practical ability to obtain documents from him, it must produce them in this litigation.

As Defendant has no valid objection to withholding the test batteries which lie at the center of this case, Plaintiff respectfully requests that the Court order Defendant to produce this essential evidence.

## CONCLUSION

For the reasons stated above, the Commission respectfully requests that the Court order Defendant to produce all documents withheld on the basis of peer review privilege, and to produce all documents sought by the Commission's Request for Production No. 6.

Dated:        June 1, 2021

Respectfully submitted,

s/ Caitlin D. Brown

*Attorney for Plaintiff*
Trial Attorney
Bar No. phv11110
Tel: (929) 506-5277
caitlin.brown@eeoc.gov

**Kirsten J. Peters**
**Trial Attorney**
**Bar No. phv10940**
**Tel: (929) 506-5325**
**kirsten.peters@eeoc.gov**

**Kimberly A. Cruz**
**Supervisory Trial Attorney**
**Bar No. phv 10827**
**Tel: (929) 506-5345**
**kimberly.cruz@eeoc.gov**

**U.S. Equal Employment**
**Opportunity Commission**
**New York District Office**
**33 Whitehall Street, 5th Floor**
**New York, NY 10004**
**Fax: (212) 336-3623**

**Markus L. Penzel**
**Senior Trial Attorney**
**U.S. Equal Employment**
**Opportunity Commission**
**John F. Kennedy Federal Building,**
**Room 475**
**Boston, MA 02203**
**Tel: (617) 565-3193**
**Fax: (617) 565-3196**
**Markus.Penzel@eeoc.gov**