# EXHIBIT 10

# AFFILIATION BETWEEN

# YALE UNIVERSITY/YALE SCHOOL OF MEDICINE

# and

# YALE NEW HAVEN HEALTH SYSTEM

**June 25, 1999**

Confidential

*Affiliation between*
*Yale University/Yale School of Medicine*
*and*
*Yale New Haven Health System*

**June 25, 1999**

## TABLE OF CONTENTS

1.   Affiliation Agreement between Yale University/Yale School of Medicine and Yale New Haven Health Services Corporation

2.   New Clinical Program Development Fund Agreement among Yale University/Yale School of Medicine, Yale New Haven Health Services Corporation and Yale-New Haven Hospital

3.   Managed Care Administrative Services Agreement between Yale University/Yale School of Medicine and Yale New Haven Health Services Corporation

4.   Letter Agreement pursuant to Section 7.03(b)(ii)(A) of the Affiliation Agreement regarding affected Clinical Departments

5.   Letter Agreement with respect to Implementation of the Affiliation Agreement

6.   Letter Agreement pursuant to Section 2.02(a) of the Fund Agreement regarding contributions

7.   Letter Agreement with respect to royalty income information related to New Clinical Programs

Confidential

# AFFILIATION AGREEMENT

## BETWEEN

## YALE UNIVERSITY/YALE SCHOOL OF MEDICINE

### AND

## YALE NEW HAVEN HEALTH SYSTEM

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

## TABLE OF CONTENTS

ARTICLE I     PREAMBLE AND GOVERNING PRINCIPLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ARTICLE II    TERMS AND DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        2.01   Academic Enrichment Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        2.02   Affiliate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        2.03   Affiliation Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        2.04   Agreed Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        2.05   Amend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        2.06   Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        2.07   Carve Out Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        2.08   CCO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
        2.09   CME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
        2.10   Clinical Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
        2.11   Clinical Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
        2.12   Consensus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
        2.13   Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
        2.14   Covered Person . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
        2.15   Covered Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.16   Dean . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.17   Dean's Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.18   Department Overhead Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.19   Direct Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.20   Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.21   Entity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.22   Fellow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.23   Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.24   Fund Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        2.25   Government Sponsored Clinical Program . . . . . . . . . . . . . . . . . . . . . . . . .  7
        2.26   Health Care Provider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
        2.27   Health System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
        2.28   Hospital Sponsored Clinical Program . . . . . . . . . . . . . . . . . . . . . . . . . .  7
        2.29   Inflation Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
        2.30   Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
        2.31   Managed Care Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
        2.32   Master System Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
        2.33   Medical Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        2.34   Medical Education Affiliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        2.35   Medical Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        2.36   Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        2.37   Modify . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        2.38   New Clinical Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
        2.39   New Clinical Program Development Fund . . . . . . . . . . . . . . . . . . . . . . . . .  10
        2.40   New Clinical Program Development Fund Agreement . . . . . . . . . . . . . . . . . . . .  10
        2.41   Non-System Affiliate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
        2.42   Non-System Member . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

i

| 2.43 | Outreach Clinical Program | 10 |
| 2.44 | Party | 11 |
| 2.45 | Payor | 11 |
| 2.46 | Plan | 11 |
| 2.47 | President/CEO | 11 |
| 2.48 | Pricing | 11 |
| 2.49 | Primary Health Care Provider | 11 |
| 2.50 | Program Terms | 12 |
| 2.51 | Provided Outside | 12 |
| 2.52 | Rate Preference | 12 |
| 2.53 | Renewal Term | 12 |
| 2.54 | Residency Medical Education Affiliation | 13 |
| 2.55 | Resources | 13 |
| 2.56 | Reviewed Clinical Program | 13 |
| 2.57 | Risk Contract | 13 |
| 2.58 | Secondary Health Care Provider | 13 |
| 2.59 | Service Area | 14 |
| 2.60 | Signal Event | 14 |
| 2.61 | Special Signal Event | 14 |
| 2.62 | State of Connecticut | 15 |
| 2.63 | Subspecialty Resident | 15 |
| 2.64 | System Affiliate | 15 |
| 2.65 | System Member | 15 |
| 2.66 | System Member Medical Education Agreement | 15 |
| 2.67 | System Network Participant | 16 |
| 2.68 | System Network Participant Affiliation Agreement | 16 |
| 2.69 | Telemedicine Services | 16 |
| 2.70 | Yale/YSM | 16 |
| 2.71 | Yale/YSM Best Rate | 16 |
| 2.72 | Yale/YSM Collections | 17 |
| 2.73 | Yale/YSM Right | 17 |
| 2.74 | YNHH President/CEO | 17 |
| 2.75 | YNHPHO | 17 |
| 2.76 | YFPP | 17 |
| ARTICLE III | SCOPE OF AGREEMENT | 17 |
| ARTICLE IV | MEDICAL EDUCATION AFFILIATIONS | 19 |
| 4.01 | Health System/System Member Responsibility | 19 |
| | 4.01(a) – Yale/YSM Participation | 19 |
| | 4.01(b) – Application of Resources and Adverse Effect Tests | 19 |
| | 4.01(c) – Yale/YSM Right of First Refusal and Last Offer | 21 |
| | 4.01(d) – Accredited Medical Schools | 21 |
| | 4.01(e) – System Network Participant Medical Education Affiliations | 22 |
| 4.02 | New System Member | 22 |
| | 4.02(a) – Required Notice as to New System Member | 22 |
| | 4.02(b) – Yale/YSM Election | 22 |

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

ii

YNHH 000185

4.02(c) – Modifications to a New System Member's Medical Education Affiliations . . . . . . . . . . . . . . . . . . . . . . . . 23

4.02(d) – Yale/YSM Responsibility as to New System Member . . . . . . . . . . . . . . . . 23

4.03   Yale/YSM Responsibility as to Primary Health Care Providers . . . . . . . . . . . . . . . 24

4.03(a) – System Member Right of First Refusal and Last Offer . . . . . . . . . . . . . . . . 24

4.04   Yale/YSM Responsibility as to Secondary Health Care Providers . . . . . . . . . . . . . 26

4.05   Treatment of Existing Non-System Member Medical Education Affiliations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

4.06   Yale/YSM Responsibility as to Modifications . . . . . . . . . . . . . . . . . . . . . . . . 27

4.07   Signal Events and Special Signal Events and the Effect on Yale/YSM Medical Education Affiliations . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4.07(a) – Required Notice of Signal Events . . . . . . . . . . . . . . . . . . . . . . . . . . 28

4.07(b) – Signal Event as to Neighboring Entity . . . . . . . . . . . . . . . . . . . . . . . 29

4.07(c) – Signal Event as to Non-Neighboring Entity . . . . . . . . . . . . . . . . . . . . 30

4.07(d) – Special Signal Event . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4.08   Special Provisions as to Former System Members . . . . . . . . . . . . . . . . . . . . 31

4.09   Oversight of Medical Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4.10   Medical Education Performance Standards and Programmatic Criteria . . . . . . . . . 32

4.11   Continuing Medical Education ("CME") . . . . . . . . . . . . . . . . . . . . . . . . . 32

4.12   Yale/YSM Consent as to Chairs/Chiefs; Yale/YSM Participation in Clinical Program Planning for Residency Medical Education Affiliations . . . . . . . . . . . . . . . . . . 33

4.13   Guidelines as to Use of Yale/YSM Name . . . . . . . . . . . . . . . . . . . . . . . . . 35

4.14   Medical Education Affiliations – Nature of Contracts . . . . . . . . . . . . . . . . . . . 35

4.14(a) – Master System Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

4.14(b) – Limited Term for Medical Education Affiliations . . . . . . . . . . . . . . . . . 36

4.15   Dispute Resolution Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

4.15(a) – Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

4.15(b) – Special Administrative Committee . . . . . . . . . . . . . . . . . . . . . . . . . 37

4.15(c) – Referral to Senior Executives . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

4.15(d) – Binding Resolution Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE V   CLINICAL PROGRAMS AND CLINICAL TRIALS . . . . . . . . . . . . . . . . . 39

5.01   Health System Clinical Program Planning; Clinical Program Information Committee . . . . 39

5.01(a) – Health System Clinical Program Planning . . . . . . . . . . . . . . . . . . . . . 39

5.01(b) – Clinical Program Information Committee . . . . . . . . . . . . . . . . . . . . . . 39

5.02   Yale/YSM Responsibility as to Outreach Clinical Programs . . . . . . . . . . . . . . . 39

5.02(a) – Formation and Composition of Outreach Clinical Program Review Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

5.02(b) – Activities of Outreach Clinical Program Review Committee . . . . . . . . . . . 42

5.02(c) – Formation and Composition of Outreach Clinical Program Re-evaluation Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

5.02(d) – Activities of Outreach Clinical Program Re-evaluation Committee . . . . . . . . 43

5.02(e) – Role of the Dean and the President/CEO as to Outreach Clinical Programs; Notice of Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

5.02(f) – Outreach Clinical Program Review Period . . . . . . . . . . . . . . . . . . . . . 44

5.02(g) – Reinstitution of Outreach Clinical Program Review Process . . . . . . . . . . . 44

5.02(h) – Amendment of Existing Outreach Clinical Programs . . . . . . . . . . . . . . . 46

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

iii

YNHH 000186

|  |  | 5.02(i) – Telemedicine Services as an Outreach Clinical Program | 46 |
| 5.03 |  | Limitations on Health System/System Member Outreach Clinical Programs | 47 |
| 5.04 |  | Health System/System Member Responsibility as to Hospital Sponsored Clinical Programs | 47 |
|  |  | 5.04(a) – Yale/YSM Right of First Refusal and Last Offer | 47 |
| 5.05 |  | Yale/YSM Responsibility as to Hospital Sponsored Clinical Programs | 49 |
|  |  | 5.05(a) – Primary Health Care Providers | 49 |
|  |  | 5.05(b) – Secondary Health Care Providers | 49 |
|  |  | 5.05(c) – Amendments to Hospital Sponsored Clinical Programs | 50 |
|  |  | 5.05(d) – Renewal of Certain Hospital Sponsored Clinical Programs | 50 |
|  |  | 5.05(e) – Treatment of Existing Non-System Member Clinical Programs | 50 |
|  |  | 5.05(f) – Signal Events and Special Signal Events and the Effect on Yale/YSM Hospital Sponsored Clinical Programs | 50 |
|  |  | 5.05(g) – Limited Term for Hospital Sponsored Clinical Programs | 53 |
| 5.06 |  | Yale/YSM Responsibility as to Government Sponsored Clinical Programs | 54 |
|  |  | 5.06(a) – Government Sponsored Clinical Programs as Outreach Clinical Programs | 54 |
|  |  | 5.06(b) – Special Rules as to Health Center Outreach Clinical Programs | 54 |
|  |  | 5.06(c) – Government Sponsored Clinical Programs as Hospital Sponsored Clinical Programs | 54 |
| 5.07 |  | Health System Prior Approval Period | 55 |
| 5.08 |  | Review of Telemedicine Provisions | 55 |
| 5.09 |  | Clinical Trials | 56 |
|  |  | 5.09(a) – Health System/System Member Responsibility | 56 |
|  |  | 5.09(b) – Yale/YSM Responsibility | 57 |
|  |  | 5.09(c) – Accelerated Response | 58 |
|  |  | 5.09(d) – Notice and Action | 58 |
| 5.10 |  | Responsibility as to a New Clinical Program Supported by the New Clinical Program Development Fund | 58 |
|  |  | 5.10(a) – Yale/YSM Responsibility | 58 |
|  |  | 5.10(b) – Health System Responsibility | 59 |
|  |  | 5.10(c) – System Members | 59 |
|  |  | 5.10(d) – De minimus Exception | 60 |
| 5.11 |  | Yale Faculty Practice Plan ("YFPP") | 60 |
| 5.12 |  | Single Specialty Physician Networks | 60 |
| 5.13 |  | Yale/YSM Full-Time Faculty Admitting Privileges | 60 |
| 5.14 |  | Dispute Resolution Process | 60 |
| ARTICLE VI | HOSPITAL OF SAINT RAPHAEL |  | 61 |
| 6.01 |  | Treatment of Existing Medical Education Affiliations | 61 |
| 6.02 |  | Yale/YSM Responsibility as to Additional Medical Education Affiliations | 61 |
|  |  | 6.02(a) – Yale-New Haven Hospital Right of First Refusal and Last Offer | 61 |
| 6.03 |  | Yale/YSM Responsibility as to Modifications of Medical Education Affiliations | 63 |
| 6.04 |  | Use of Yale/YSM Name | 63 |
| 6.05 |  | Yale/YSM Responsibility as to CME Services | 63 |
| 6.06 |  | Yale/YSM Responsibility as to Clinical Programs | 63 |
| 6.07 |  | Nonapplicability of Signal Events and Special Signal Events | 64 |

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000187

6.08     Dispute Resolution Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

ARTICLE VII   MANAGED CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
7.01     Grant of Authority as to Single Signature Contracting . . . . . . . . . . . . . . . . . . . . . . 64
7.02     Yale/YSM Central Contracting Organization ("CCO") Participation . . . . . . . . . . . . . 65
7.03     Managed Care Contracts Outside YNHPHO . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
         7.03(a) – Health System Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
         7.03(b) – Carve Out Contracts for Professional Services . . . . . . . . . . . . . . . . . . . . 70
         7.03(c) – Yale/YSM Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
         7.03(d) – Physician and Hospital Global Managed Care Contracts . . . . . . . . . . . . . . . 73
7.04     Yale Behavioral Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
         7.04(a) – Health System Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
         7.04(b) – Yale/YSM Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
7.05     Managed Care Administrative Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
7.06     Medical Management Initiatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
7.07     Other Managed Care Risk Taking Contracting Entities . . . . . . . . . . . . . . . . . . . . . 75

ARTICLE VIII   CORPORATE SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
8.01     Clinical Information Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
8.02     Access to Clinical Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
8.03     Practice Management and Billing Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
8.04     Office Space . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

ARTICLE IX   FINANCIAL ARRANGEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
9.01     Pricing for the Provision of Medical Education, Clinical Program and
         CME Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
9.02     Yale/YSM Financial Support of System Operations . . . . . . . . . . . . . . . . . . . . . . . 81
9.03     New Clinical Program Development Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

ARTICLE X   TERM AND TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
10.01    Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
10.02    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
         10.02(a) – Mutual Termination – Loss of Accreditation, License or
                    Medicare/Medicaid Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
         10.02(b) – Health System – Not Tax-Exempt . . . . . . . . . . . . . . . . . . . . . . . . . . 82
         10.02(c) – Yale University – Not Tax-Exempt . . . . . . . . . . . . . . . . . . . . . . . . . . 83
         10.02(d) – Yale/YSM Termination – Change of Board Composition . . . . . . . . . . . . . . . 83
         10.02(e) – Yale/YSM Right to Terminate Upon Sale of Assets, Merger or
                    Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
         10.02(f) – Health System Right to Terminate Upon Sale of Assets, Merger or
                    Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
         10.02(g) – Yale/YSM Right to Terminate Upon Certain Significant Events . . . . . . . . . . . 84
         10.02(h) – Health System Right to Terminate Upon Certain Significant Events . . . . . . . . 84
         10.02(i) – Mutual Termination Upon Specified Events . . . . . . . . . . . . . . . . . . . . . 84
         10.02(j) – Termination by Board Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
         10.02(k) – Termination for Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
         10.02(l) – Termination of Fund Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

v

YNHH 000188

| 10.03 | Termination as Remedy | 86 |
| 10.04 | Effect of Notice of Termination | 86 |
| 10.05 | Effect of Termination | 86 |
| | | |
| ARTICLE XI | MISCELLANEOUS | 87 |
| 11.01 | Confidentiality | 87 |
| 11.02 | Use of Yale/YSM Name by Non-System Members | 87 |
| 11.03 | Good Faith; Consensus; Consents | 87 |
| 11.04 | Affiliation Procedures | 88 |
| 11.05 | Health System Assurance of System Member Compliance | 88 |
| 11.06 | Assignment | 88 |
| 11.07 | Notices | 88 |
| 11.08 | Strict Compliance | 89 |
| 11.09 | Successors and Assigns | 89 |
| 11.10 | Remedies; Limitation of Damages | 89 |
| 11.11 | Amendment | 89 |
| 11.12 | Captions | 89 |
| 11.13 | Cross References | 90 |
| 11.14 | Construction | 90 |
| 11.15 | Controlling Law | 90 |
| 11.16 | Entire Agreement | 90 |
| 11.17 | Severability | 90 |
| 11.18 | No Third-Party Beneficiaries | 91 |
| 11.19 | Execution in Counterparts | 91 |

EXHIBIT A   NEW CLINICAL PROGRAM DEVELOPMENT FUND AGREEMENT

EXHIBIT B   SELECTED EXAMPLES

EXHIBIT C   PRIMARY HEALTH CARE PROVIDERS

EXHIBIT D   SERVICE AREAS

EXHIBIT E   HOSPITAL SPONSORED CLINICAL PROGRAMS OF SELECTED NON-SYSTEM AFFILIATES

EXHIBIT F   SELECTED NON-SYSTEM MEMBERS

EXHIBIT G   CRITERIA FOR YALE/YSM FULL-TIME FACULTY TO APPLY FOR ADMITTING PRIVILEGES AT HEALTH CARE PROVIDERS PHYSICALLY LOCATED IN THE STATE OF CONNECTICUT OTHER THAN YALE-NEW HAVEN HOSPITAL

EXHIBIT H   MANAGED CARE ADMINISTRATIVE SERVICES AGREEMENT

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

vi

Confidential

## AFFILIATION AGREEMENT

This Affiliation Agreement is entered into this 25th day of June 1999 (the "Effective Date"), between Yale University, acting through its unincorporated unit, the Yale School of Medicine ("Yale/YSM"), and Yale New Haven Health Services Corporation ("Health System").

WHEREAS, the Parties view their planned working relationship as an affiliation, which affiliation should enhance clinical care, medical education and clinical research activities; improve patient care services; reduce duplication of resources; increase efficiencies and decrease health care costs; provide additional patient access to specialized services; and provide more cost effective planning, information systems and selected other services;

WHEREAS, the Parties have worked closely together for many years without a written agreement reflecting their relationship;

WHEREAS, the Parties deem it to be consistent with and in furtherance of their respective charitable purposes and in the best interests of their communities and constituencies to enter into an agreement reflecting their desired working relationship; and

WHEREAS, each Party considers it in its best interest to evidence the affiliation on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the foregoing, the mutual agreements and covenants hereinafter set forth and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## PREAMBLE AND GOVERNING PRINCIPLES

Health System is the parent entity for several organizations that collectively comprise a regional, comprehensive integrated health care delivery and financing system, with an uncompromised commitment to advanced clinical care; to quality, service and cost effectiveness; and to improving the health status of the communities it serves. Yale/YSM is

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

a nationally recognized and world-renowned medical institution with an uncompromised commitment to standards of excellence in clinical care, medical education and medical research. To help the Parties meet each such commitment and to carry out their respective charitable missions, Yale/YSM and Health System have entered into this Affiliation Agreement.

The principal purposes of this Affiliation Agreement are: (i) to enhance the long-standing relationship between Yale/YSM and Health System; and (ii) to align the interests of Yale/YSM and Health System so as to develop better Health System into a health care system that is favorably distinguished from its peers. Such development will occur through the joint efforts of Health System, System Affiliates, the participating medical staffs of System Affiliates, and Yale/YSM to support and contribute to: (A) the delivery and coordination of exemplary, cost-effective clinical care; (B) the provision of exceptional medical education and training; and (C) the development of new medical knowledge through research to improve clinical care.

To carry out these purposes, and subject to the express terms of this Agreement, Yale/YSM and Health System will be guided by the following principles:

1.01   Yale/YSM and Health System, in collaboration with System Affiliates and (to the extent permitted by applicable law) their participating medical staffs, will develop and maintain clinical programs (including, as appropriate, the education and research components thereof) that help maintain and enhance: (i) the preeminence of Yale-New Haven Hospital as a major academic medical center and community hospital, (ii) the standards of excellence for which the Medical Center is nationally recognized, (iii) the reputations of Yale/YSM and Health System for maintaining such standards of excellence, and (iv) the value that System Affiliates derive from affiliating with Health System.

1.02   To develop such programs, Yale/YSM and Health System each commit to provide the resources necessary to help: (i) achieve highly-ranked status and national stature for the various Medical Center clinical departments and, in-turn, (ii) enhance the ability of each such department to disseminate, as appropriate, clinical advances to the clinical programs of System Affiliates.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

2

YNHH 000191

1.03    To ensure such programs provide the highest quality of care and further medical education and clinical research, Yale/YSM will participate, as appropriate, in planning for clinical program development for Health System and with individual System Members as such programs relate to medical education.

1.04    To ensure such programs carry out innovative Clinical Trials and obtain the benefit of such Clinical Trials, on an expedited basis: (i) Yale/YSM will use best efforts to give System Affiliates first opportunity for the conduct of Clinical Trials, provided a particular System Affiliate provides an appropriate environment for such Clinical Trials, and (ii) Health System will use best efforts to cause System Members to give Yale/YSM first opportunity for the conduct of Clinical Trials provided Yale/YSM provides an appropriate environment for such Clinical Trials.

1.05    To ensure their medical education programs: (i) attract outstanding medical students, residents, Fellows and other appropriate medical personnel, and (ii) provide the highest quality of medical education, Yale/YSM and Health System will align their medical education programs, with Yale/YSM overseeing and coordinating, as appropriate, such programs.  In conducting its medical education activities, Yale/YSM will act so as to: (A) support and enhance the preeminence of the Medical Center as a major academic medical center, (B) ensure the standards of medical education excellence for which Yale/YSM is nationally recognized, and (C) address unmet medical education needs of the community in which such medical education activity is proposed.  In so acting, Yale/YSM will take into account each of clauses (A), (B), and (C) and will balance the three in making any decision related to its medical education activities.

1.06    To ensure the continued growth and success of Health System, Yale/YSM and Health System will coordinate activities related to payor relations and, as appropriate, corporate services.

## ARTICLE II
## <u>TERMS AND DEFINITIONS</u>

The following terms will have the meanings specified below:

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

3

Confidential

YNHH 000192

2.01   **"Academic Enrichment Fees"** means the academic enrichment fees regularly charged by Yale/YSM in connection with Medical Education Affiliations, as calculated pursuant to Sections 9.01(c)(ii) and 9.01(d).

2.02   **"Affiliate"** means with respect to any Entity, any other Entity that, at the time Affiliate status is being determined, is directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Entity. **"Affiliated"** means an Entity is an Affiliate of another Entity.

2.03   **"Affiliation Agreement"** or this **"Agreement"** means this document.

2.04   **"Agreed Level"** means the Level of Residency Medical Education Affiliation at which all of Danbury Hospital, Hospital of Saint Raphael, Norwalk Hospital, Saint Mary's Hospital and Waterbury Hospital with such Level of a Residency Medical Education Affiliation have granted Yale/YSM a Yale/YSM Right.

2.05   **"Amend"** means to change a Clinical Program significantly in scope, content, duration or location, provided that in the case of an increase in the volume of services provided through a Clinical Program the fact that such an increase has occurred will not be deemed an Amendment so long as the increase results solely from: (i) an Amendment approved pursuant to Section 5.05(c), (ii) a change in scope, content, duration or location that is not significant, and/or (iii) the conduct of the Clinical Program in its ordinary course of business without change.

2.06   **"Amendment"** means, as applied to a Clinical Program, the change that results in a Clinical Program being Amended or the agreement that evidences such change.

2.07   **"Carve Out Contract"** means a Managed Care Contract for professional services only, under which the services to be provided by Yale/YSM do not include the full range of specialty patient care services offered by Yale/YSM through YFPP at the Medical Center.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

4

YNHH 000193

2.08   **"CCO"** means Central Contracting Organization, LLC established by Health System.

2.09   **"CME"** means continuing medical education services.

2.10   **"Clinical Program"** means any program, effort or undertaking (including, as appropriate, the research and education components thereof) that involves the rendering of patient care services or the supervision thereof. The term "Clinical Program" includes the provision of Telemedicine Services pursuant to a written agreement in accordance with any of Sections 5.02(i), 5.04, 5.05(a) or 5.05(b).

2.11   **"Clinical Trial"** means a form of research methodology designed to test the safety and/or effectiveness of medical drugs, procedures, techniques, and devices used for the care of patients. Under such methodology: (i) research patients participate on a voluntary basis with informed consent, (ii) a predetermined plan of study is followed, and (iii) a common research protocol is used to determine study outcomes.

2.12   **"Consensus"** means the affirmative decision of, as the case may be, either: (i) all members of a committee or other body present at a meeting, provided that at least a majority of all members of such committee or body are present at such meeting, or (ii) both the Dean and the President/CEO.

2.13   **"Control"** means the legal power to: (i) elect or cause the election of a majority of the governing body of the subject Entity, or (ii) direct or cause the direction of the subject Entity's operations or management, whether the foregoing power exists through voting securities, other voting rights, reserved powers, contract rights or other legally enforceable means.

2.14   **"Covered Person"** means a person entitled to benefits under the terms and conditions of a Plan.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

**6/25/99**
**F:\DATA\CLI\AFFIL14.W51**

5

YNHH 000194

2.15   **"Covered Service"** means a health care service performed by a provider that is available to a Covered Person under a Plan for the maintenance of such Covered Person's health or the diagnosis or treatment of illness, disease, injury or other health condition affecting such Covered Person.

2.16   **"Dean"** means the Dean of the Yale School of Medicine.

2.17   **"Dean's Tax"** means the amount of the Dean's tax then in effect, but not to exceed 17.65% of the applicable Direct Costs, for purposes of Sections 9.01(c)(i) and 9.01(c)(ii).

2.18   **"Department Overhead Fees"** means the department overhead fees regularly charged by Yale/YSM in connection with Medical Education Affiliations, calculated pursuant to Sections 9.01(c)(i), 9.01(c)(ii) and 9.01(d).

2.19   **"Direct Costs"** means the costs described in Sections 9.01(a) and/or 9.01(b).

2.20   **"Effective Date"** means the date this Agreement is executed by both Parties, which date is set forth in the first paragraph of this Agreement.

2.21   **"Entity"** means a corporation, association, partnership, trust, limited liability company, limited liability partnership, business or any other entity.

2.22   **"Fellow"** or **"Subspecialty Resident"** means a medical resident who is being trained in a subspecialty following a residency.

2.23   **"Fund"** or **"New Clinical Program Development Fund"** means the fund jointly established by Yale/YSM, Health System and Yale-New Haven Hospital pursuant to Section 2.01(a) of the Fund Agreement.

2.24   **"Fund Agreement"** or **"New Clinical Program Development Fund Agreement"** means the agreement as to the New Clinical Program Development Fund among Yale/YSM, Health System and Yale-New Haven Hospital, a copy of which is attached hereto as **Exhibit A**.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

6

Confidential
YNHH 000195

2.25   **"Government Sponsored Clinical Program"** means a Clinical Program sponsored or initiated by any quasi-public Entity such as a community health center, any local government within the State of Connecticut, the State of Connecticut or the federal government.

2.26   **"Health Care Provider"** means an Entity that:  (i) renders patient care services and is physically located within the State of Connecticut, or (ii) arranges for the rendering of or payment for patient care services and such activity is conducted entirely or substantially on behalf of persons or Entities physically located in the State of Connecticut.  For purposes of this definition, the term "Health Care Provider" does not include an Entity that performs services substantially in the nature of a third-party administrator.

2.27   **"Health System"** means Yale New Haven Health Services Corporation.

2.28   **"Hospital Sponsored Clinical Program"** means a Clinical Program: (i) (A) in which individuals are inpatients or outpatients of an Entity that is a hospital or that is Affiliated with a hospital, or (B) that is owned or managed, directly or indirectly, in whole or in part, by such Entity or such Affiliated Entity; and (ii) that is not Provided Outside Connecticut.  For purposes of this definition, the term "managed" means, as to a Clinical Program, that the Entity has the right in its sole discretion to direct the scope, content, duration and location of the clinical activity of such Clinical Program whether or not that right is exercised.

2.29   **"Inflation Factor"** means, as applicable:

(i) with respect to Section 7.03(a)(v)(B), the amount of inflation to be applied, calculated by reference to the Bureau of Labor Statistics' Consumer Price Index, Medical Costs, Northeast Region (the "CPI") as of the end of the most recently completed contract year following the Effective Date as the base year, and the CPI as of the most recent date such CPI is available prior to the end of the most recently completed contract year; or

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

7

Confidential

YNHH 000196

(ii) with respect to Sections 7.03(a)(v)(C) and (D), the amount of inflation to be applied, calculated by reference to the CPI as of the end of the most recently completed Yale/YSM fiscal year following the Effective Date as the base year, and the CPI as of the most recent date such CPI is available prior to the end of the most recently completed Yale/YSM fiscal year; or

(iii) with respect to Sections 9.01(c)(iv), 9.01(e), 9.01(f)(iv) and 9.01(i)(iii), the amount of inflation to be applied, calculated by reference to the CPI as of the Effective Date as the base year, and the CPI as of the most recent date such CPI is available prior to the date a Medical Education Affiliation transitions to a System Member Medical Education Agreement.

2.30    **"Level"** means one of the following three (3) levels with respect to a program covered by a Medical Education Affiliation: (i) Level 1 – a department or unit of a medical school provides lectures and consults regarding a Health Care Provider's medical education curriculum, may allow resident and/or Fellow rotation to Yale-New Haven Hospital, and does not allow resident or Fellow rotation from the medical school or Yale-New Haven Hospital to the Health Care Provider, (ii) Level 2 – a department or unit of a medical school has a significant role in the design of a Health Care Provider's medical education program, and may allow resident and Fellow rotation to Yale-New Haven Hospital and/or resident and Fellow rotation from the medical school or Yale-New Haven Hospital to the Health Care Provider, and (iii) Level 3 – a department or unit of a medical school provides a medical education program that is integrated between a Health Care Provider and the medical school (*i.e.*, has a unified residency or Fellowship program).

2.31    **"Managed Care Contract"** means any written agreement involving a provider and any Payor, whereby the provider renders Covered Services to Covered Persons on any basis, including a global case rate basis, fee-for-service basis, risk-sharing basis, capitated basis or any other payment basis.

2.32    **"Master System Contract"** means any written agreement among Yale/YSM, Health System and a System Member (other than Yale-New Haven Hospital)

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

9/25/99
DATA\CLI\AFFIL14.W51

8

YNHH 000197

with respect to all Medical Education Affiliations, which agreement: (i) contains the common terms applicable to each Medical Education Affiliation regardless of the System Member and the applicable Yale/YSM department, and (ii) incorporates by reference each System Member Medical Education Agreement.

2.33    **"Medical Center"** means Yale/YSM and Yale-New Haven Hospital working in cooperation.

2.34    **"Medical Education Affiliation"** means any medical education program: (i) with respect to a Health Care Provider (other than Yale-New Haven Hospital), that is expressed in a written agreement relating to the medical education of residents, Fellows, medical students or physician associates whereby: (A) a medical school provides to the Health Care Provider one or more medical education programs, or any Clinical Programs or research necessary to sustain such medical education programs, and (B) payment is provided to such medical school for such programs, and (ii) with respect to Yale-New Haven Hospital, that is expressed in a written or oral agreement, or course of dealing relating to the medical education of residents, Fellows, medical students or physician associates.

2.35    **"Medical Organization"** means an Entity that: (i) provides patient care services, (ii) is not associated with Health System or any System Affiliate, and (iii) is not associated with physicians who are members of the medical staff of a System Member that is seeking to establish a Hospital Sponsored Clinical Program.

2.36    **"Modification"** means, as applied to a Medical Education Affiliation, the change that results in a Medical Education Affiliation being Modified or the agreement that evidences such change.

2.37    **"Modify"** means to change a Medical Education Affiliation: (i) so as to cause the Medical Education Affiliation to change from one Level to another, or (ii) significantly in scope, content, duration or location even if there is no change

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

Confidential

YNHH 000198

in Level, including any change the effect of which is either (A) to significantly affect an existing Clinical Program necessary to sustain the Medical Education Affiliation, or (B) to introduce a new Clinical Program necessary to sustain the Medical Education Affiliation.  Notwithstanding the foregoing, the term "Modify" does not include: (1) the addition of a research component to a Medical Education Affiliation that did not previously have a research component, provided such addition does not otherwise result in a Modification of a Medical Education Affiliation, or (2) a change required as to Yale/YSM (as opposed to a Health Care Provider with whom Yale/YSM has a Medical Education Affiliation) or a System Member by the Accreditation Council for Graduate Medical Education (or any successor accrediting organization), which change is required for accreditation purposes.

2.38   **"New Clinical Program"** means a Clinical Program that is supported by the New Clinical Program Development Fund pursuant to the Fund Agreement.

2.39   **"New Clinical Program Development Fund"** or **"Fund"** means the fund jointly established by Yale/YSM, Health System and Yale-New Haven Hospital pursuant to Section 2.01(a) of the Fund Agreement.

2.40   **"New Clinical Program Development Fund Agreement"** or **"Fund Agreement"** means the agreement as to the New Clinical Program Development Fund among Yale/YSM, Health System and Yale-New Haven Hospital, a copy of which is attached hereto as **Exhibit A**.

2.41   **"Non-System Affiliate"** means an Entity that is not a System Affiliate.

2.42   **"Non-System Member"** means an Entity that is not a System Member.

2.43   **"Outreach Clinical Program"** means a Clinical Program that is not: (i) physically located on the campus of a System Affiliate, (ii) part of a Hospital Sponsored Clinical Program, and (iii) Provided Outside Connecticut. Notwithstanding the foregoing, the term "Outreach Clinical Program": (A) does not include the collection (as opposed to the taking by means of physical

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

10

Confidential

YNHH 000199

presence) of specimens, images or other materials for delivery or transmission to Yale/YSM facilities, (B) includes a physician practice (provided that it otherwise meets the definition of an Outreach Clinical Program), and (C) includes the provision of Telemedicine Services in accordance with Section 5.02(i).

2.44   **"Party"** or **"Parties"** means one or both of Yale/YSM and Health System.

2.45   **"Payor"** means any insurer, self-insured or self-funded employer, labor union, health maintenance organization, preferred provider organization, association, governmental Entity, third-party administrator, intermediary organization (whether acting on behalf of itself, a Payor or any employer), any other organization or Entity that arranges for the delivery of health care services to its enrollees, and any Entity that has entered into a written agreement pursuant to which the Entity assumes financial or administrative responsibility to pay for Covered Services provided to Covered Persons.

2.46   **"Plan"** means any individual or group health benefit plan established from time to time by a Payor.

2.47   **"President/CEO"** means the President/CEO of Health System.

2.48   **"Pricing"** means, as the case may be: (i) the pricing set forth in Section 9.01, which pricing will apply to each Medical Education Affiliation, Clinical Program and CME program with each System Member (other than Yale-New Haven Hospital), or (ii) the pricing then in effect between Yale-New Haven Hospital and Yale/YSM, which pricing will apply to each Medical Education Affiliation, Clinical Program and CME program with Yale-New Haven Hospital.

2.49   **"Primary Health Care Provider"** means each Health Care Provider listed on **Exhibit C** and each System Network Participant, together with each Health Care Provider Affiliate of each such Health Care Provider and each such System Network Participant, provided that a Primary Health Care Provider: (i)

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

11

ceases to be a Primary Health Care Provider upon the occurrence and during the continuation of: (A) a Signal Event affecting the Primary Health Care Provider, or (B) a Special Signal Event, if so determined pursuant to Section 4.07(d) or Section 5.05(f)(vii), and (ii) once again becomes a Primary Health Care Provider upon the discontinuance of the situation that gave rise to the Signal Event or Special Signal Event.

2.50 **"Program Terms"** means the principal contractual terms (including Pricing) and operational requirements for a Medical Education Affiliation or a Clinical Program that describe the Medical Education Affiliation or Clinical Program (as the case may be) in sufficient detail to allow reasonable analysis and decision by the Party receiving notice of such terms and requirements.

2.51 **"Provided Outside"** means that: (i) the person or Entity providing services is doing so entirely from a location or locations outside the State of Connecticut, and (ii) the person or Entity obtaining or receiving services is obtaining or receiving the services at a location or locations entirely outside the State of Connecticut.

2.52 **"Rate Preference"** means the rate at which Yale/YSM will provide medical education, Clinical Program and CME services to System Members, which rate will be at least ten percent (10%) lower than the lowest rate Yale/YSM charges for similar services to any similar Health Care Provider for which Yale/YSM provides such services.

2.53 **"Renewal Term"** means, as applied to a Medical Education Affiliation or an agreement evidencing a Clinical Program:  (i) if the Medical Education Affiliation or such agreement sets forth a renewal term following the expiration of an initial term or the most recent prior renewal term, then such stated renewal term, and (ii) if a Medical Education Affiliation or such agreement does not set forth a renewal term, then the lesser of: (A) three (3) years, or (B) the duration of the most recent term (either the initial term or, if applicable, the most recent prior renewal term).

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000201

2.54  **"Residency Medical Education Affiliation"** means a Medical Education Affiliation that relates to residents, and does not apply solely to Fellows or other medical professionals.

2.55  **"Resources"** means physical space and equipment, appropriate personnel, support services, financial resources, organizational flexibility, competency and experience, provided when such term is used in this Agreement such term will apply in the case of Yale-New Haven Hospital only for purposes of Article VI.

2.56  **"Reviewed Clinical Program"** means an Outreach Clinical Program or Government Sponsored Clinical Program as to which: (i) Consensus has been reached in accordance with Section 5.02 or Section 5.06(a), or (ii) one hundred eighty (180) days after the scheduled date of the first meeting of the Outreach Clinical Program Review Committee have passed in accordance with Section 5.02, or (iii) such one hundred eighty (180) days, or less as provided in Section 5.06(a), have passed as to Government Sponsored Clinical Programs.

2.57  **"Risk Contract"** means a Managed Care Contract pursuant to which Yale/YSM is to be reimbursed for services provided on a capitated basis for a specific type of Payor, as further described in Section 7.03(a)(v).

2.58  **"Secondary Health Care Provider"** means a Non-System Affiliate physically located in the State of Connecticut that is not a Primary Health Care Provider, together with each Affiliate of that Non-System Affiliate, provided that a Secondary Health Care Provider: (i) ceases to be a Secondary Health Care Provider during any period that it is a System Member or a System Network Participant, and (ii) once again becomes a Secondary Health Care Provider upon ceasing to be a System Member or System Network Participant. Notwithstanding the foregoing, a "Secondary Health Care Provider", as such term is used in the definition of the term "Signal Event" and in Sections 4.07 and 5.05(f), has the meaning in this Section 2.58, except the words "physically located in the State of Connecticut" are deleted from the definition.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

13

Confidential

YNHH 000202

2.59    **"Service Area"** means the Service Area of a Health Care Provider as set forth in **Exhibit D**.

2.60    **"Signal Event"** means one of the following events: (i) a Primary Health Care Provider joins a health care system that is not Health System, (ii) a Primary Health Care Provider joins a Secondary Health Care Provider, (iii) a Secondary Health Care Provider joins a Primary Health Care Provider (in which case the Primary Health Care Provider is the subject of the Signal Event); or (iv) a Primary Health Care Provider or Secondary Health Care Provider, or any Health Care Provider Affiliate of such Primary Health Care Provider or Secondary Health Care Provider, within the Service Area of another Primary Health Care Provider, becomes a System Member (in which case the Primary Health Care Provider that is not the System Member is the subject of the Signal Event).   If a Signal Event occurs as to a Health Care Provider (whether such is a Primary Health Care Provider or a Secondary Health Care Provider) that is Affiliated with another Health Care Provider: (A) if the Health Care Provider as to which the Signal Event occurred is a hospital, the Signal Event will be deemed to apply to all Health Care Providers Affiliated with the hospital, and (B) if the Health Care Provider as to which the Signal Event occurred is not a hospital, the Signal Event will only apply to the Health Care Provider as to which the Signal Event occurred.   For purposes of this definition, the term "joins" means:  (1) becomes Controlled by, or (2) either the Primary Health Care Provider, or the health care system or the Secondary Health Care Provider that the Primary Health Care Provider joins, makes public statements indicating a substantially exclusive cooperation between them, or (3) contracts with a health care system or a Primary or Secondary Health Care Provider in a manner that is substantially similar to the relationship between Health System and System Members.   Examples of Signal Events are set forth in **Exhibit B**.

2.61    **"Special Signal Event"** means a Primary Health Care Provider joins another Primary Health Care Provider.   For purposes of this definition, the term "joins" means: (i) becomes Controlled by, or (ii) contracts with a Primary

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

14

YNHH 000203

Health Care Provider in a manner that is substantially similar to the relationship between Health System and System Members.

2.62   **"State of Connecticut"** or **"Connecticut"** means all the land within the exterior borders of the State of Connecticut, including all lands held by Native Americans.

2.63   **"Subspecialty Resident"** or **"Fellow"** means a medical resident who is being trained in a subspecialty following a residency.

2.64   **"System Affiliate"** means either a System Member or a System Network Participant or both.

2.65   **"System Member"** means a Health Care Provider as to which: (i) Health System is or becomes the ultimate parent corporation, (ii) Health System otherwise exercises Control, or (iii) Health System contracts in a manner substantially similar to the relationship between Health System and System Members.  The term "System Member" includes each Health Care Provider covered by the foregoing and each Health Care Provider that is an Affiliate of such Health Care Provider.

2.66   **"System Member Medical Education Agreement"** means, as the case may be: (i) a Medical Education Affiliation among Yale/YSM, Health System and a System Member (other than Yale-New Haven Hospital), or (ii) a Medical Education Affiliation between Yale-New Haven Hospital and Yale/YSM.  A System Member may be a party to more than one System Member Medical Education Agreement.  Except in the case of Yale-New Haven Hospital, such Agreement will include terms relating to medical education programmatic criteria and performance standards, Pricing consistent with Article IX hereof and a provision to the effect that at the time a Master System Contract becomes effective as to a System Member, such Agreement will be incorporated by reference into the Master System Contract.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

15

2.67   **"System Network Participant"** means a Health Care Provider or the ultimate parent Entity thereof, that:  (i) is not a System Member, and (ii) is party to a System Network Participant Affiliation Agreement with Health System.

2.68   **"System Network Participant Affiliation Agreement"** means a written agreement between Health System and a System Network Participant, one or more of the essential provisions of which are that: (i) Health System provides to the System Network Participant some or all of one or more of the System Network Participant's administrative services, physician practice management services, managed care contracting, or managed care administrative services, (ii) Health System is to be consulted as to, or otherwise involved with, any actual or potential relationship that the System Network Participant may pursue with a multi-hospital health system or network other than Health System, and (iii) Health System is to be consulted as to, or otherwise involved with, any actual or potential discussions between the System Network Participant and a medical school concerning a Medical Education Affiliation.

2.69   **"Telemedicine Services"** means the rendering of clinical services or the supervision thereof across distances by way of any telecommunications technology, including interactive video technology, but does not include distance learning/education or research that is not part of a Medical Education Affiliation.  The term **"Diagnostic Telemedicine Services"** means the rendering of Telemedicine Services for diagnostic purposes.  The term **"Therapeutic Telemedicine Services"** means the rendering of Telemedicine Services for therapeutic purposes.

2.70   **"Yale/YSM"** means Yale University, acting through its unincorporated unit, the Yale School of Medicine, together with its Affiliates.

2.71   **"Yale/YSM Best Rate"** means the rate Yale/YSM will provide to Health System for Managed Care Contract purposes that is equal to or lower than the rates for similar services accepted by Yale/YSM from another similar type of Payor, as described in Section 7.03(c)(iii).

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

16

Confidential

YNHH 000205

2.72   **"Yale/YSM Collections"** means Yale/YSM's cash collections in connection with the provision of clinical services, as described in Section 9.02(a).

2.73   **"Yale/YSM Right'** means a right described in Section 4.12.

2.74   **"YNHH President/CEO"** means the President/CEO of Yale-New Haven Hospital.

2.75   **"YNHPHO"** means YNHH-Physicians Corp., and any successor organization that provides Yale/YSM essentially the same effective rights and remedies as Yale/YSM holds in such corporation as of the Effective Date.

2.76   **"YFPP"** means the Yale Faculty Practice Plan and its successors and assigns as well as the individual physicians thereof, acting alone or in groups.

ARTICLE III
**SCOPE OF AGREEMENT**

Except as otherwise specified with respect to Yale-New Haven Hospital, the provisions of this Affiliation Agreement will apply to all System Members.  Such provisions will apply to System Network Participants only where specified.

Except as specified in this Agreement, nothing in this Affiliation Agreement will now or in the future affect or require any change to any of the following agreements or relationships, as such agreements or relationships may develop or change over time:

3.01   The 1965 Affiliation Agreement between Yale/YSM and Yale-New Haven Hospital ("1965 Affiliation Agreement"), which will remain in effect and will continue to serve as the foundation for the structure and operation of the Medical Center by outlining the role of each of Yale/YSM and Yale-New Haven Hospital and their relationship to each other. To the extent there is any inconsistency between this Affiliation Agreement and the 1965 Affiliation Agreement, the provisions of the 1965 Affiliation Agreement will govern.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

3.02    The Medical Staff Bylaws of Yale-New Haven Hospital. To the extent there is any inconsistency between this Affiliation Agreement and such Medical Staff Bylaws, the provisions of the Medical Staff Bylaws will govern.

3.03    The relationship between Yale/YSM's Department of Epidemiology and Public Health and any health care provider located either inside or outside the State of Connecticut.

3.04    The relationship between Yale/YSM (including Yale/YSM's Department of Epidemiology and Public Health) and the Yale School of Nursing or any relationship among Yale/YSM, the Yale School of Nursing and any health care provider located either inside or outside the State of Connecticut.

3.05    The relationship between Yale/YSM and the VA Connecticut Healthcare System so long as such Healthcare System is Controlled by the federal Department of Veterans Affairs (or any successor organization that is a part of the federal or any Connecticut or municipal government).

3.06    The relationship between Yale/YSM and the Connecticut Mental Health Center so long as such Center is Controlled by the State of Connecticut (or any successor organization that is a part of the federal or any Connecticut or municipal government).

3.07    The relationship between Yale/YSM and the Yale Psychiatric Institute so long as such Institute is Controlled by Yale/YSM, and so long as such Institute provides only psychiatric services, except that Article VII will apply to the Yale Psychiatric Institute.

3.08    The relationship between Yale/YSM's Department of Psychiatry and Child Study Center and: (i) each of the Connecticut Department of Social Services, the Connecticut Department of Children and Families, and the Connecticut Department of Mental Health and Addiction Services (or any successor state governmental organization), and (ii) any municipality in the State of Connecticut.

3.09    The relationship between Yale/YSM and the Yale Health Plan so long as such Plan is Controlled by Yale University and provides health care services exclusively to Yale

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

5/25/99
F:\DATA\CLI\AFFIL14.W51

18

Confidential

YNHH 000207

University faculty, students, employees, dependents, retirees, and affiliates who provide services to or through Yale University.

   3.10   The relationship between Health System and any System Affiliate, or the relationship between or among System Affiliates.

   3.11   The relationship between any of: (i) Yale/YSM, (ii) any medical professional of YFPP, (iii) Health System, or (iv) any System Affiliate, with any health care provider or health care professional where clinical services or medical education programs are Provided Outside the State of Connecticut, except that Article VII will apply regardless of location.

ARTICLE IV
**MEDICAL EDUCATION AFFILIATIONS**

   A Medical Education Affiliation alignment will exist among Yale/YSM, Health System and System Members.  The following provisions govern this alignment.

   **4.01   Health System/System Member Responsibility**.  Health System will not, and will ensure that no System Member will, announce, develop, enter into or implement any Medical Education Affiliation without first offering to Yale/YSM the opportunity to enter into such Medical Education Affiliation in accordance with this Section 4.01.  Any such offer will be made by notice from Health System to Yale/YSM which notice will include the proposed Program Terms of such Medical Education Affiliation.

   **4.01(a) – Yale/YSM Participation**.  Yale/YSM will enter into a Medical Education Affiliation with a System Member on substantially the same terms as the proposed Program Terms set forth in the notice described in Section 4.01, provided: (i) the System Member has sufficient Resources to help ensure that such Medical Education Affiliation will meet the standards of medical education excellence for which Yale/YSM is nationally recognized, and (ii) entering into such Medical Education Affiliation would not materially adversely affect the quality of any of Yale/YSM's relevant, then-existing Medical Education Affiliations.

   **4.01(b) – Application of Resources and Adverse Effect Tests**.  Yale/YSM will be solely responsible for determining whether: (i) a System Member has sufficient Resources,

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

19

Confidential

YNHH 000208

and (ii) a proposed Medical Education Affiliation would materially adversely affect the quality of any of Yale/YSM's relevant, then-existing Medical Education Affiliations. Yale/YSM's determination as to each of the sufficiency of Resources and the effect on any relevant, then-existing Medical Education Affiliations will be final and binding as to Health System and any System Member, and will not be subject to the dispute resolution process described in Section 4.15, nor will Health System or any System Member have any legal recourse as to that determination. Yale/YSM will notify Health System of its determination as to the sufficiency of a System Member's Resources and the effect on the quality of any of its relevant, then-existing Medical Education Affiliations within thirty (30) days following Health System's notice to Yale/YSM described in Section 4.01.

**4.01(b)(i)**. If within thirty (30) days following Health System's notice to Yale/YSM described in Section 4.01 Yale/YSM notifies Health System that a System Member has sufficient Resources and that the proposed Medical Education Affiliation will not materially adversely affect the quality of any of its relevant, then-existing Medical Education Affiliations, Health System, the System Member and Yale/YSM will promptly and diligently seek to conclude a System Member Medical Education Agreement as to such Medical Education Affiliation on substantially the same terms as the proposed Program Terms set forth in Health System's notice. If a System Member Medical Education Agreement is not concluded within ninety (90) days following Yale/YSM's notice to Health System that the System Member has sufficient Resources and that the Medical Education Affiliation will not materially adversely affect the quality of any of its relevant, then-existing Medical Education Affiliations, the Parties will memorialize in writing any differences between them and Health System and the System Member may proceed with a Medical Education Affiliation with another medical school, subject to the provisions of Sections 4.01(c) and 4.01(d).

**4.01(b)(ii)**. If within thirty (30) days following Health System's notice to Yale/YSM described in Section 4.01 Yale/YSM notifies Health System that Yale/YSM will not enter into a Medical Education Affiliation with a System Member because such System Member does not have sufficient Resources or that the proposed Medical Education Affiliation will materially adversely affect the quality of any of its relevant, then-existing Medical Education Affiliations, Yale/YSM will, if so requested by Health System, indicate in writing to Health System in what way the System Member does not have sufficient Resources or that the requested Medical Education Affiliation will materially adversely affect the quality of any of

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

20

YNHH 000209

its relevant, then-existing Medical Education Affiliations.  The giving of such stated reasons will not limit or otherwise affect Yale/YSM's rights pursuant to Section 4.01(b).  If Yale/YSM determines that the System Member does not have sufficient Resources, Yale/YSM will assist the System Member, if so requested, in developing a plan for the System Member to acquire or develop sufficient Resources in the future as to such Medical Education Affiliation.  Upon Yale/YSM's notice in accordance with this Section 4.01(b)(ii) that it will not enter into the Medical Education Affiliation, Health System and the System Member may proceed with a Medical Education Affiliation with another medical school, subject to the provisions of Sections 4.01(c) and 4.01(d).

**4.01(b)(iii)**.  If within thirty (30) days following Health System's notice to Yale/YSM described in Section 4.01 Yale/YSM does not give notice as to a System Member's sufficiency of Resources or the effect on the quality of any of Yale/YSM's relevant, then-existing Medical Education Affiliations, Health System and the System Member may proceed with a Medical Education Affiliation with another medical school, subject to the provisions of Sections 4.01(c) and 4.01(d).

**4.01(c) – <u>Yale/YSM Right of First Refusal and Last Offer</u>**.  If the proposed Medical Education Affiliation among Health System, a System Member and a medical school other than Yale/YSM contains Program Terms (except as to Pricing) substantially different from the proposed Program Terms set forth in Health System's notice to Yale/YSM described in Section 4.01, Health System and the System Member will not enter into such Medical Education Affiliation without offering Yale/YSM the opportunity to meet such new Program Terms.  Any such offer will be made by notice to Yale/YSM which notice will include the new Program Terms.  Following such notice, Health System, the System Member and Yale/YSM will have up to sixty (60) days to conclude a System Member Medical Education Agreement on substantially the same terms as the new Program Terms, subject to applicable Pricing.  If such System Member Medical Education Agreement is not so concluded, Health System and the System Member may enter into the Medical Education Affiliation with the other medical school, subject to the provisions of Section 4.01(d).

**4.01(d) – <u>Accredited Medical Schools</u>**.  Health System will not, and will ensure that no System Member will, announce, develop, enter into or implement any Medical Education Affiliation with any medical school not accredited by the Liaison Committee on Medical

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

21

YNHH 000210

Education of the Association of American Medical Colleges, or any successor accrediting organization. Health System will ensure that any new System Member will cease its relationship (if any) with a medical school that does not meet the requirements of this Section 4.01(d) as soon as practicable.

**4.01(e) – System Network Participant Medical Education Affiliations**. Subject to the terms of this Agreement, Health System will encourage each System Network Participant to maintain or seek Medical Education Affiliations with Yale/YSM.

**4.02     New System Member**. Notwithstanding any other provision of this Agreement, Health System may accept a new System Member with one or more then-existing Medical Education Affiliations with medical schools other than Yale/YSM. All such Medical Education Affiliations between such new System Member and medical schools other than Yale/YSM will be subject to the provisions of this Section 4.02.

**4.02(a) – Required Notice as to New System Member**. If a Health Care Provider becomes a new System Member, Health System will promptly notify Yale/YSM of such event, of the designated expiration date of each then-existing Medical Education Affiliation between the new System Member and a medical school other than Yale/YSM and of the Program Terms for each such Medical Education Affiliation. Such designated expiration date will be determined by Health System and the new System Member and will be either: (i) the expiration date specified in each such then-existing Medical Education Affiliation, or (ii) a date ending on or before one (1) Renewal Term after such specified expiration date. Yale/YSM will subsequently notify Health System as to whether Yale/YSM wishes to enter into such Medical Education Affiliation on substantially the same terms (except as to Pricing) as the Program Terms set forth in Health System's notice to Yale/YSM described in this Section 4.02(a). Yale/YSM's notice to Health System will be given on or before four (4) months prior to the designated expiration date of such Medical Education Affiliation, provided if such designated expiration date is less than four (4) months following Health System's notice to Yale/YSM, Yale/YSM's notice to Health System will be given as soon as practicable following such notice from Health System to Yale/YSM.

**4.02(b) – Yale/YSM Election**. If within the relevant time period set forth in Section 4.02(a) Yale/YSM notifies Health System that it wishes to enter into a Medical Education

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

22

YNHH 000211

Affiliation on substantially the same terms (except as to Pricing) as the Program Terms set forth in Health System's notice to Yale/YSM described in Section 4.02(a), Health System, the new System Member and Yale/YSM will promptly and diligently seek to conclude a System Member Medical Education Agreement as to such Medical Education Affiliation on substantially the same terms as such Program Terms, subject to applicable Pricing.  If within the relevant time period set forth in Section 4.02(a) Yale/YSM does not give notice, or notifies Health System that it does not wish to enter into such Medical Education Affiliation, the new System Member may continue such Medical Education Affiliation on substantially the same terms as the Program Terms set forth in Health System's notice to Yale/YSM described in Section 4.02(a), and such Medical Education Affiliation will not thereafter be subject to Section 4.02, except that: (i) Section 4.02(c) as to Modifications will apply, and (ii) no less than four (4) months prior to any renewal of such Medical Education Affiliation, Yale/YSM may notify Health System that it wishes to enter into a Medical Education Affiliation on substantially the same Program Terms, but at whichever of the following pricing is lower: (A) the pricing of the then-existing Medical Education Affiliation, or (B) the Pricing.

**4.02(c) – Modifications to a New System Member's Medical Education Affiliations**.  Health System will ensure that a new System Member does not Modify a Medical Education Affiliation with a medical school other than Yale/YSM without first offering Yale/YSM the opportunity to enter into a System Member Medical Education Agreement covering the Medical Education Affiliation as to which the Modification is proposed.  Any such offer will be made by notice from Health System to Yale/YSM which notice will include the proposed Program Terms.  Yale/YSM will have ten (10) days following Health System's notice to Yale/YSM described in this Section 4.02(c) to notify Health System that Yale/YSM wishes to enter into a System Member Medical Education Agreement covering the Medical Education Affiliation as to which the Modification is proposed.  Health System's and Yale/YSM's rights and obligations in respect of such opportunity will then be governed by Section 4.02(b).

**4.02(d) – Yale/YSM Responsibility as to New System Member**.  With respect to each Medical Education Affiliation existing between Yale/YSM and a Health Care Provider at the time it becomes a System Member, Yale/YSM will amend such Medical Education Affiliation: (i) at the earliest possible time to conform the financial terms of such Medical

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

23

YNHH 000212

Education Affiliation as to the Pricing, and (ii) on or before the expiration of the then-current term of such Medical Education Affiliation so that the terms thereof conform to the applicable Master System Contract.

**4.03    Yale/YSM Responsibility as to Primary Health Care Providers**.  Yale/YSM will not announce, develop, enter into or implement any Medical Education Affiliation with a Primary Health Care Provider without first offering to Health System the opportunity for a System Member to enter into such Medical Education Affiliation in accordance with this Section 4.03.  Any such offer will be made by notice from Yale/YSM to Health System which notice will include the proposed Program Terms of such Medical Education Affiliation.  Yale/YSM will encourage each Primary Health Care Provider with which Yale/YSM has a Medical Education Affiliation to become a System Member or System Network Participant.

**4.03(a) – System Member Right of First Refusal and Last Offer**.

**4.03(a)(i)**.  Health System will have ten (10) days following Yale/YSM's notice to Health System described in Section 4.03 to notify Yale/YSM of one or more System Members' non-binding interest in proceeding with such Medical Education Affiliation on substantially the same terms (except as to Pricing) as the proposed Program Terms set forth in Yale/YSM's notice.  If Health System so notifies Yale/YSM that one or more System Members wishes to proceed, Yale/YSM will determine whether each interested System Member has sufficient Resources pursuant to Section 4.01(b), as such Section applies to Resources, and notify Health System of its determination.

**4.03(a)(ii)**.  If Yale/YSM determines that one or more of the interested System Members has sufficient Resources, or if Yale-New Haven Hospital has expressed such non-binding interest, Yale/YSM will discuss a System Member Medical Education Agreement with respect to the proposed Program Terms with each of such interested System Members, provided that Yale/YSM is obligated to enter into such System Member Medical Education Agreement with only one System Member.  Subject to the last sentence of this Section 4.03(a)(ii) Yale/YSM will give each such interested System Member the opportunity to negotiate a System Member Medical Education Agreement, in such order as Yale/YSM determines, until the earlier of: (A) such time as a System Member Medical Education

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
S:\DATA\CLI\AFFIL14.W51

24

Confidential                                                                                                    YNHH 000213

Agreement is concluded on substantially the same terms as the proposed Program Terms set forth in Yale/YSM's notice to Health System described in Section 4.03, subject to applicable Pricing, or (B) ninety (90) days following the later of Yale/YSM's notice to Health System that at least one System Member has sufficient Resources or Yale-New Haven Hospital's expression of non-binding interest.  Upon Health System's request, Yale/YSM will negotiate simultaneously with each interested System Member that has sufficient Resources and Yale-New Haven Hospital (if it expressed non-binding interest) to conclude a System Member Medical Education Agreement.

**4.03(a)(iii).**  If: (A) within the ten (10) day period set forth in Section 4.03(a)(i) Health System does not give notice or notifies Yale/YSM that no System Member wishes to proceed on such proposed Program Terms, or (B) upon Yale/YSM's notice to Health System that no interested System Member has sufficient Resources and Yale-New Haven Hospital has not expressed such non-binding interest, or (C) a System Member Medical Education Agreement is not concluded within ninety (90) days following the later of: (1) Yale/YSM's notice to Health System that one or more interested System Members has sufficient Resources, or (2) Yale-New Haven Hospital's expression of non-binding interest (in either such case the Parties will memorialize in writing any differences between them), Yale/YSM may proceed with a Medical Education Affiliation with a Primary Health Care Provider, subject to the provisions of Section 4.03(a)(iv).  If clause (B) of this Section 4.03(a)(iii) is applicable, Yale/YSM will, if so requested by Health System, indicate in writing to Health System in what way any interested System Member does not have sufficient Resources.  The giving of such stated reasons will not limit or otherwise affect Yale/YSM's rights pursuant to Section 4.01(b).  If Yale/YSM determines that an interested System Member does not have sufficient Resources, Yale/YSM will assist such interested System Member, if so requested, in developing a plan for the System Member to acquire or develop sufficient Resources in the future as to such Medical Education Affiliation.

**4.03(a)(iv).**  If the proposed agreement between Yale/YSM and such Primary Health Care Provider contains Program Terms (except as to Pricing) substantially different from the proposed Program Terms set forth in Yale/YSM's notice to Health System described in Section 4.03, Yale/YSM will not enter into such Medical Education Affiliation without offering Health System and each such System Member with which Yale/YSM sought to conclude a System Member Medical Education Agreement the opportunity to meet such new

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

25

Confidential                                                                                                      YNHH 000214

Program Terms.  Any such offer will be made by notice to Health System which notice will include the new Program Terms.  Following such notice, Yale/YSM, Health System and each such System Member will have up to sixty (60) days to conclude a System Member Medical Education Agreement on substantially the same terms as the new Program Terms, subject to applicable Pricing.  If such System Member Medical Education Agreement is not so concluded, Yale/YSM may enter into the Medical Education Affiliation with the Primary Health Care Provider.

**4.04    Yale/YSM Responsibility as to Secondary Health Care Providers**.  Except as provided in Article VI with respect to the Hospital of Saint Raphael, Yale/YSM will not announce, develop, enter into or implement any Medical Education Affiliation with a Secondary Health Care Provider prior to January 1, 2010.  Either Yale/YSM or Health System may make a request of the other to review this Section 4.04 in 2009 and each tenth (10th) year thereafter, provided such request is received by the other Party at any time on or before January 1, 2009, or on or before each tenth (10th) anniversary thereafter, as the case may be.  If no such review is timely requested, this Section 4.04 will remain in effect for an additional period of ten (10) years.  If either Yale/YSM or Health System makes a timely request of the other Party to review this Section 4.04, the Dean and the President/CEO will take such action as they deem appropriate.  If no Consensus is reached on or before September 30 of the year in which the review is to take place, the matter will be referred to a governance committee that will be composed of three (3) directors of Yale Corporation's Board of Directors (appointed by the President of Yale University) and three (3) directors of Health System's Board of Directors (appointed by the Chair of the Board).  If such committee does not reach Consensus as to this Section 4.04 on or before December 31 of the year in which the review is to take place, this Agreement may be terminated in accordance with Section 10.02(i).

**4.05    Treatment of Existing Non-System Member Medical Education Affiliations**.

**4.05(a)** – Subject to Sections 4.05(b) and 4.07 and Article VI with respect to the Hospital of Saint Raphael, all Medical Education Affiliations existing at the Effective Date between Yale/YSM and any Non-System Member may continue in force by their terms (including any renewals thereof) until January 1, 2005.  Commencing in January 2004 and

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

26

every five (5) years thereafter, Health System and Yale/YSM will evaluate (including consult with counsel as to appropriate matters) whether each then-existing Medical Education Affiliation may continue for the next five (5) year period.  If the Dean and the President/CEO cannot reach Consensus as to such continuations on or before September 30 of the year in which the evaluation is to take place, the matter will be referred to a governance committee that will be composed of three (3) directors of Yale Corporation's Board of Directors (appointed by the President of Yale University) and three (3) directors of Health System's Board of Directors (appointed by the Chair of the Board).  If such committee does not reach Consensus as to such continuations on or before December 31 of the year in which the evaluation is to be conducted, this Agreement may be terminated in accordance with Section 10.02(i).

**4.05(b)** – Notwithstanding the provisions of Section 4.05(a), and subject to Section 4.07, the Medical Education Affiliations between Yale/YSM and each of Waterbury Hospital and Saint Mary's Hospital as to the Yale/YSM primary care medical education program will continue in force by their terms (including any renewals thereof) until January 1, 2009 at which date such Medical Education Affiliations will be subject to the terms of Section 4.05(a).

**4.06   Yale/YSM Responsibility as to Modifications**.  Yale/YSM may Modify a System Member Medical Education Agreement (other than as to Yale-New Haven Hospital) or a Medical Education Affiliation with a Non-System Member (other than the Hospital of Saint Raphael) only upon the joint agreement of Yale/YSM and Health System as to such Modification.  If a change in a System Member Medical Education Agreement or a Medical Education Affiliation would be a Modification but for clause (2) of the last sentence in the definition of the term "Modify," Yale/YSM may proceed with such change and will give Health System prompt notice of the nature of and reasons for such change.

**4.07   Signal Events and Special Signal Events and the Effect on Yale/YSM Medical Education Affiliations**.  Except as provided in Article VI with respect to the Hospital of Saint Raphael, upon the occurrence of a Signal Event, all then-existing Medical Education Affiliations between Yale/YSM and the Health Care Provider as to which the Signal Event occurred will be subject to the provisions of this Section 4.07.  Upon the occurrence of a Special Signal Event, the provisions of Section 4.07(d) will apply thereto,

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

27

and the remaining provisions of this Section 4.07 will not apply to the Special Signal Event, unless specifically made applicable pursuant to Section 4.07(d). The occurrence of a Signal Event will change the status of a Health Care Provider from Primary Health Care Provider to Secondary Health Care Provider, regardless of whether Health System notifies Yale/YSM of such Signal Event, and regardless of whether Health System notifies Yale/YSM that it wants, or does not want, the provisions of Sections 4.07(a) through (c) and/or Section 4.11(c) to apply. Yale/YSM will not be responsible for knowledge of the change in status upon the occurrence of a Signal Event (and acting in accordance therewith), unless Health System provides Yale/YSM the notice described in Section 4.07(a)(i). Without limiting the generality of the provisions of Section 4.15, Yale/YSM may invoke the dispute resolution process of Section 4.15 if it disagrees with Health System, following Health System's notice to Yale/YSM pursuant to Section 4.07(a) or Section 4.07(d) that a Signal Event or Special Signal Event occurred.

### 4.07(a) – Required Notice of Signal Events.

**4.07(a)(i).** Health System will notify Yale/YSM of the occurrence of a Signal Event, the nature of the Signal Event and whether Health System wants the provisions of Sections 4.07(a) through (c) and/or Section 4.11(c) to apply as a consequence thereof. If Health System notifies Yale/YSM that it does not want the provisions of Sections 4.07(a) through (c) and/or Section 4.11(c) to apply, neither Party will be obligated to take any further action pursuant to each such Section in respect of such Signal Event.

**4.07(a)(ii).** If Health System notifies Yale/YSM that it wants the provisions of Sections 4.07(a) through (c) and/or Section 4.11(c) to apply, within ten (10) days of Health System's notice Yale/YSM will notify Health System of the designated expiration date of each then-existing Medical Education Affiliation between Yale/YSM and the Health Care Provider as to which the Signal Event occurred and of the Program Terms for each such Medical Education Affiliation. Such designated expiration date will be determined by Yale/YSM and will be either: (A) the expiration date specified in each such then-existing Medical Education Affiliation, or (B) a date ending on or before one (1) Renewal Term after such specified expiration date.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
E:\DATA\CLI\AFFIL14.W51

28

**4.07(b) – Signal Event as to Neighboring Entity**.  If the Signal Event occurred as to a Health Care Provider located within ten (10) miles of another Health Care Provider, and the other Health Care Provider is not a System Member, Yale/YSM will assimilate each such Medical Education Agreement into the other Health Care Provider on the designated expiration date if such other Health Care Provider: (i) has sufficient Resources (for purposes of this sentence Resources does not include competency and experience) determined by Yale/YSM in accordance with Section 4.01(b) as such Section applies to Resources, and (ii) concludes a Medical Education Affiliation on substantially the same terms as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 4.07(a)(ii).  If Yale/YSM does not enter into a Medical Education Affiliation pursuant to the foregoing, Yale/YSM may continue such Medical Education Affiliation on substantially the same Program Terms set forth in Yale/YSM's notice to Health System described in Section 4.07(a)(ii), and such Medical Education Affiliation will be subject to the evaluation provisions of Section 4.05.

**4.07(b)(i)**.    If a Signal Event of the type described in Section 4.07(b) occurs but the other Health Care Provider is a System Member, or has become a System Member thereby causing the Signal Event to occur, Health System will subsequently notify Yale/YSM as to whether Health System and the System Member wish to assimilate the Medical Education Affiliations between Yale/YSM and the other Health Care Provider on the designated expiration date on substantially the same terms (except as to Pricing) as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 4.07(a)(ii).  Health System's notice to Yale/YSM described in this Section 4.07(b)(i) will be given on or before four (4) months prior to the designated expiration date of such Medical Education Affiliation, provided if such designated expiration date is less than four (4) months following Yale/YSM's notice to Health System pursuant to Section 4.07(a)(ii), Health System's notice to Yale/YSM will be given as soon as practicable following such notice from Yale/YSM to Health System.

**4.07(b)(ii)**.    If within the relevant time period set forth in Section 4.07(b)(i) Health System notifies Yale/YSM that Health System and the System Member wish to proceed, Yale/YSM will determine whether, as to each such Medical Education Affiliation, such System Member has sufficient Resources pursuant to Section 4.01(b), as such Section applies to Resources (for purposes of this sentence Resources does not include competency and

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000218

experience). If Yale/YSM determines, as to any such Medical Education Affiliation, that the System Member has sufficient Resources, Health System, the System Member and Yale/YSM will promptly and diligently seek to conclude a System Member Medical Education Agreement on substantially the same terms as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 4.07(a)(ii), subject to applicable Pricing.

**4.07(b)(iii)**. If: (A) within the relevant time period set forth in Section 4.07(b)(i) Health System does not give notice or notifies Yale/YSM that the System Member does not wish to proceed on such Program Terms, or (B) upon Yale/YSM's notice to Health System that the System Member does not have sufficient Resources, Yale/YSM may continue its then-existing Medical Education Affiliation on substantially the same terms as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 4.07(a)(ii), and such Medical Education Affiliation will be subject to the evaluation provisions of Section 4.05.

**4.07(c) – Signal Event as to Non-Neighboring Entity**. If the Signal Event occurred as to a Health Care Provider located in any geographic area other than the geographic area described in Section 4.07(b), the Parties will proceed as provided in Sections 4.07(b)(i) through 4.07(b)(iii), except that Health System will have the right as to each System Member to give the notice described in Section 4.07(b)(i) and if such notice is given as to more than one System Member and more than one System Member is determined by Yale/YSM to have sufficient Resources or if Yale-New Haven Hospital expresses non-binding interest, the Parties will proceed with all such System Members in the manner set forth in Section 4.03(a)(ii).

**4.07(d) - Special Signal Event**. The effect (if any) of a Special Signal Event on the status of the Primary Health Care Providers as to which the Special Signal Event occurred, and on any then-existing Yale/YSM Medical Education Affiliations with such Primary Health Care Providers, will be determined in accordance with this Section 4.07(d).

**4.07(d)(i)**. Health System will notify Yale/YSM of the occurrence of a Special Signal Event and of the nature of the Special Signal Event. The Dean and the President/CEO will seek to reach Consensus as to: (A) the consequences (if any) as to then-

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
E:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000219

existing Medical Education Affiliations between Yale/YSM and the Health Care Providers as to which the Special Signal Event occurred, and (B) whether each Primary Health Care Provider as to which the Special Signal Event occurred remains a Primary Health Care Provider or becomes a Secondary Health Care Provider. If the Dean and the President/CEO do not reach Consensus as to both issues within sixty (60) days after Health System's notice to Yale/YSM described in this Section 4.07(d)(i), the matter will be referred to the individual described in Section 4.15(d)(iii). Such individual will conduct an investigation in such scope and procedure as such individual determines (in such individual's sole discretion) to be appropriate, to determine whether the Special Signal Event is likely to give rise to an Entity, system or organization that is then or within three (3) years will be a substantial competitor of Health System or any System Member. If after conducting such investigation the individual determines that such result is likely, the Primary Health Care Providers as to which the Special Signal Event occurred thereby become Secondary Health Care Providers and the Special Signal Event will be treated as provided in Section 4.07. If after conducting such investigation the individual determines that such result is not likely, the Primary Health Care Providers remain Primary Health Care Providers and the Special Signal Event will have no effect on any then-existing Yale/YSM Medical Education Affiliations. The individual's determination is final and binding and none of Health System, any System Member or Yale/YSM will have any legal recourse as to that determination. The individual's determination will be set forth in writing stating the determination and the reasons therefor.

**4.07(d)(ii)**. If it is determined pursuant to Section 4.07(d)(i) that either Primary Health Care Provider (or both) as to which the Special Signal Event occurred is to remain a Primary Health Care Provider, the Parties will review the issues set forth in Section 4.07(d)(i) in accordance with the provisions thereof every three (3) years following such determination, until such time (if ever) that it is determined that both Primary Health Care Providers as to which the Special Signal Event occurred become Secondary Health Care Providers.

**4.08    Special Provisions as to Former System Members**. Notwithstanding any other provision of this Agreement, if a Health Care Provider ceases to be a System Member, Yale/YSM may continue its existing Medical Education Affiliations with the former System Member and may initiate new Medical Education Affiliations with such former System Member, and as to the former System Member the provisions of this Article IV will not

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
C:\DATA\CLI\AFFIL14.W51

31

Confidential                                                                                                    YNHH 000220

apply, provided that Section 4.07 will apply to a former System Member in the case where the former System Member subsequently joins: (i) a health care system that is not Health System, or (ii) a Secondary Health Care Provider, as the term "joins" is defined in the definition of "Signal Event".

**4.09    Oversight of Medical Education**.  Yale/YSM will have the right and responsibility to oversee and coordinate with Health System and System Members the medical education programs and other activities associated with each System Member Medical Educational Agreement.  Yale/YSM will be solely responsible for relevant medical education decisions (including decisions relating to medical education curriculum and programmatic criteria) in the case of each System Member Medical Education Agreement for which Yale/YSM has direct responsibility under such Agreement, and such decisions will be final and binding and will not be subject to the dispute resolution process of Section 4.15 nor will Health System or any System Member have any legal recourse as to any such decision.

**4.10    Medical Education Performance Standards and Programmatic Criteria**. Yale/YSM, Health System and System Members will jointly establish from time to time appropriate medical education performance standards (*e.g.*, appropriate faculty and supervision) and programmatic criteria to be met by Yale/YSM and any System Member pursuant to a System Member Medical Education Agreement.

**4.11    Continuing Medical Education ("CME")**.

**4.11(a)** – Yale/YSM (in consultation with Health System and System Members) will develop CME programs for System Members, which programs will include established performance criteria related to CME accreditation, provided such CME programs are subject to mutually agreed contracts among Yale/YSM, Health System and each System Member.

**4.11(b)** – Yale/YSM may, in its sole discretion:  (i) conduct CME programs on behalf of, in conjunction with, or located at a Primary Health Care Provider, (ii) conduct CME programs in conjunction with a medical society, and/or (iii) be a sponsor of a CME program described in clauses (i) or (ii).  Yale/YSM will not conduct or sponsor a CME program on behalf of or in conjunction with a Secondary Health Care Provider.  This Section

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000221

places no requirements or limitations on any individual Yale/YSM faculty member's participation in any CME program or on any System Member's authority to grant CME credits.

**4.11(c)** – Upon the occurrence of a Signal Event, Health System will provide notice to Yale/YSM in accordance with Section 4.07(a)(i).  If Health System notifies Yale/YSM that it wants this Section 4.11(c) to apply, Yale/YSM will not renew any CME programs it is providing or sponsoring at, or in association with, the Health Care Provider as to which the Signal Event occurred.

**4.12   Yale/YSM Consent as to Chairs/Chiefs; Yale/YSM Participation in Clinical Program Planning for Residency Medical Education Affiliations**.  As to each System Member, Yale/YSM will have the right: (i) acting through the Dean, to consent to the appointment of the chair/chief of each clinical department through which a Residency Medical Education Affiliation is to be carried out after consultation with the Yale/YSM chair of the affected clinical department, and (ii) to participate in the planning for Clinical Program development related to medical education activities for each clinical department through which a Residency Medical Education Affiliation is to be carried out, provided the Yale/YSM Rights will each be effective as to System Members only in the case where Section 4.12(a) and Section 4.12(b) apply as to the particular Yale/YSM Right, and Section 4.12(d) does not apply as to the particular Yale/YSM Right.  Examples of the application of Yale/YSM Rights are set forth in **Exhibit B**.

**4.12(a)** – Subject to Section 4.12(c), if all of Danbury Hospital, Hospital of Saint Raphael, Norwalk Hospital, Saint Mary's Hospital and Waterbury Hospital have granted Yale/YSM a Yale/YSM Right on an unrestricted and continuing basis for all Residency Medical Education Affiliations with Yale/YSM at an Agreed Level, Yale/YSM may exercise such Yale/YSM Right as to each clinical department through which a Residency Medical Education Affiliation with a System Member is carried out at the Agreed Level.  If any of those hospitals granted Yale/YSM such Yale/YSM Right at both the Agreed Level and at a higher Level, Yale/YSM may exercise the Yale/YSM Right with respect to System Members only at the Agreed Level.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

33

Confidential

YNHH 000222

**4.12(b)** – For purposes of Sections 4.12(a), each of the Yale/YSM Rights may be exercised when: (i) Yale/YSM is exercising as to at least one (1) of the hospitals identified in Section 4.12(a) such Yale/YSM Right as described in Section 4.12(a), and (ii) (A) none of the grants of such Yale/YSM Right as to any of the other hospitals is to become exercisable more than three (3) years after the first of such grants becomes exercisable, or (B) if any of such grants is to become exercisable more than three (3) years after the first of such grants becomes exercisable, then when the last of such grants is exercisable.

**4.12(c)** – If Section 4.12(a) would apply except that one or more of the hospitals referred to in Section 4.12(a) does not have a Residency Medical Education Affiliation with Yale/YSM at the Agreed Level at which the other hospitals referred to in Section 4.12(a) have granted Yale/YSM a Yale/YSM Right, Yale/YSM may nonetheless exercise the Yale/YSM Right with System Members at the Agreed Level, and as to each hospital without a Residency Medical Education Affiliation at the relevant Agreed Level, Yale/YSM will, if it enters into a Residency Medical Education Affiliation with such hospital, provide that Yale/YSM will exercise such Yale/YSM Right as to that clinical department through which such Residency Medical Education Affiliation is to be carried out at such relevant Agreed Level.

**4.12(d)** – If, at any time after the date that Yale/YSM may exercise a Yale/YSM Right as to a System Member pursuant to Section 4.12, Yale/YSM does not satisfy the conditions of Sections 4.12(a), (b) and (c), such Right will be revoked at the time of and during the period that such conditions are not satisfied. Notwithstanding the foregoing, if a hospital identified in Section 4.12(a) ceases all Residency Medical Education Affiliations with Yale/YSM as to an Agreed Level as to which Yale/YSM received a Yale/YSM Right in respect to System Members, Yale/YSM will nonetheless maintain its Yale/YSM Right as to System Members.

**4.12(e)** – In the event any of the hospitals identified in Section 4.12(a) becomes a System Member prior to the effective date of a Yale/YSM Right provided for in Section 4.12(b), the definition of Agreed Level and Section 4.12(a) will be deemed not to include such hospital.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

34

YNHH 000223

**4.13   Guidelines as to Use of Yale/YSM Name.**  Yale/YSM will promulgate guidelines with respect to the use of its name by any Health Care Provider not Affiliated with Yale/YSM in connection with any Residency Medical Education Affiliation existing as of the Effective Date.  Health System will comply and will ensure that each System Member (other than Yale-New Haven Hospital) will comply, upon reasonable notice, with any such guidelines, provided such obligations will only arise in the case where Sections 4.13(a) and 4.13(b) apply, and Section 4.13(c) does not apply:

**4.13(a)** – If Danbury Hospital, Hospital of Saint Raphael, Norwalk Hospital, St. Mary's Hospital and Waterbury Hospital are subject to such guidelines.

**4.13(b)** – When (i) Yale/YSM has the right to enforce as to at least one (1) of the hospitals identified in Section 4.13(a) the use of such guidelines, and (ii) (A) the right to enforce the guidelines as to any of the other hospitals is in no case to become exercisable more than three (3) years after the first of such rights becomes exercisable, or (B) if such right is to become exercisable more than three (3) years after the first right becomes exercisable, then when the last of such rights is exercisable.

**4.13(c)** – If at any time after the effective date of Yale/YSM's right to enforce the name guidelines as to System Members pursuant to this Section 4.13, Yale/YSM does not satisfy the conditions of Sections 4.13(a) and (b), such right to enforce will be revoked at the time of and during the period that such conditions are not satisfied.

**4.13(d)** – In the event any of the hospitals identified in Section 4.13(a) becomes a System Member prior to the effective date of compliance as provided in Section 4.13(b), Section 4.13(a) will be deemed not to include such hospital.

**4.14   Medical Education Affiliations – Nature of Contracts.**

**4.14(a) – Master System Contract.**

**4.14(a)(i).**  Yale/YSM and Health System will use best efforts to create a standard form of Master System Contract by July 1, 1999.  Each Medical Education Affiliation between Yale/YSM and a System Member (other than Yale-New Haven Hospital) will

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

/25/99
DATA\CLI\AFFIL14.W51

35

Confidential

YNHH 000224

transition to a System Member Medical Education Agreement incorporated by reference to such a Master System Contract upon the earlier of: (A) the expiration of each such Medical Education Affiliation; or (B) July 1, 2001.

**4.14(a)(ii)**.  Each Master System Contract will include a dispute resolution process substantially similar to the provisions of Section 4.15 of this Agreement.

**4.14(a)(iii)**.  Each Master System Contract will contain a statement that in the event of conflict between a provision in the Master System Contract and a provision in: (A) a System Member Medical Education Agreement, the Master System Contract provision will prevail, unless the System Member Medical Education Agreement makes specific reference to the conflicting provisions and indicates that it is the joint intention of Health System, the System Member and Yale/YSM for such System Member Medical Education Agreement provision to prevail, and (B) this Agreement, this Agreement will prevail, unless the Master System Contract makes specific reference to the conflicting provisions and indicates that it is the joint intention of Health System, the System Member and Yale/YSM for such Master System Contract provision to prevail.

**4.14(b) – Limited Term for Medical Education Affiliations**.  Health System, on behalf of itself and each System Member, and Yale/YSM will each ensure that the duration of any Medical Education Affiliation (including any renewal thereof), to which either of them (or in the case of Health System, a System Member) is a party, will not exceed: (i) the shorter of: (A) three (3) years, or (B) one (1) Renewal Term following the Effective Date, or (ii) such longer term as may be required as to Yale/YSM (as opposed to a Health Care Provider with which Yale/YSM has a Medical Education Affiliation) by a licensing or accreditation organization.

**4.15**   **Dispute Resolution Process**.  Except as otherwise specifically provided in this Article IV, all controversies and disputes as to this Article IV, including the interpretation hereof and the Parties' performances hereunder, will be resolved solely by means of the following dispute resolution process:

**4.15(a) – Notice**.  The Party seeking relief will provide notice of a dispute (the "first notice") to the other Party.  The first notice will specify in reasonable detail the nature of the

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

36

dispute and the notifying Party's position as to the dispute. If the Party receiving the first notice believes that such dispute is not subject to the dispute resolution process of Section 4.15, within ten (10) days following the first notice such Party may give notice (the "second notice") of such belief to the Party that sent the first notice. If the second notice is not timely provided, the dispute will be decided as set forth in Section 4.15. If a second notice is timely provided, the question as to whether the dispute identified in the first notice is subject to the dispute resolution process of Section 4.15 will be decided solely by the individual described in Section 4.15(d)(iii). The decision of such individual will be set forth in writing and will be final and binding and none of Health System, any System Member or Yale/YSM will have any legal recourse as to that decision.

**4.15(b) – Special Administrative Committee**. If a dispute is to be resolved pursuant to Section 4.15, the Dean and the President/CEO will appoint a special administrative committee consisting of six (6) to eight (8) members (whose membership will be divided equally between representatives of Yale/YSM and Health System and which will be co-chaired by a representative of Yale/YSM and a representative of Health System) to use best efforts to resolve such dispute. The special administrative committee will be appointed within fifteen (15) days following the first notice unless a second notice is given, in which case the special administrative committee will be appointed within ten (10) days following a decision by the individual described in Section 4.15(d)(iii) that the dispute is subject to the dispute resolution process of Section 4.15. If the dispute relates to one or more System Members, the President/CEO may include among the President/CEO's representatives to the special administrative committee a representative from the affected System Members. If either Party fails to timely appoint all of its representatives to the special administrative committee, the matter will be decided by the binding resolution committee described in Section 4.15(d). The co-chairs of the special administrative committee will promptly schedule an initial meeting of the special administrative committee to take place as soon as reasonably practicable. The special administrative committee will use best efforts to resolve the dispute by Consensus no later than sixty (60) days following the end of either the ten (10) day period if a second notice was given, or the fifteen (15) day period if no second notice was given.

**4.15(c) – Referral to Senior Executives**. If the special administrative committee cannot resolve a dispute by Consensus within such sixty (60) day period, the co-chairs of the

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential                                                                  YNHH 000226

special administrative committee will so notify the Dean and the President/CEO within three (3) days after the expiration of such sixty (60) day period. Such notice will be accompanied by a joint written statement (or separate written statements if a joint statement cannot be agreed upon), of the findings of such special administrative committee stating in reasonable detail the reasons why the dispute could not be resolved. The Dean and the President/CEO will use best efforts to reach Consensus within fifteen (15) days (including the three (3) day period) after such sixty (60) day period, using any form of assistance they believe necessary.

**4.15(d) – Binding Resolution Committee**. If the Dean and the President/CEO cannot reach Consensus within such fifteen (15) day period, they will so notify the binding resolution committee described in this Section 4.15(d) within three (3) days after the expiration of such fifteen (15) day period. Such notice will be accompanied by a joint written statement (or separate written statements if a joint statement cannot be agreed upon), of the Dean's and the President/CEO's findings stating in reasonable detail the reasons why the dispute could not be resolved. The binding resolution committee will consist of five (5) standing members. The members of the binding resolution committee will include: (i) two (2) directors of Yale Corporation's Board of Directors (appointed by the President of Yale University); (ii) two (2) directors of Health System's Board of Directors (appointed by the Chair of the Board); and (iii) an individual and his/her alternate (jointly appointed by the President of Yale University and the President/CEO) whom the President of Yale University and the President/CEO believe to be fair and judicious, who will be guided by the intent, principles and terms of this Agreement, and who agree to serve as and when requested during his/her period of appointment. The initial standing members of such committee will be appointed immediately following the Effective Date. The four (4) standing members identified in clauses (i) and (ii) of this Section 4.15(d) will be appointed for an initial term to end in January 2001, and thereafter will be appointed annually in the month of January. The fifth (5th) standing member and his/her alternate, identified in clause (iii) of this Section 4.15(d), will be appointed for an initial term of up to five (5) years, and will be appointed for subsequent terms thereafter of up to five (5) years each. Upon the vacancy of any member position of the binding resolution committee or of the alternate position identified in clause (iii) of this Section 4.15(d), a person will be appointed immediately to complete the current term of the vacated appointment. The binding resolution committee will use best efforts to reach its decision within thirty (30) days (including the three (3) day period) after the fifteen (15) day period described in Section 4.15(c). The binding resolution committee

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

38

YNHH 000227

will reach a decision by a majority vote of all five (5) members. A decision reached by a majority vote of the binding resolution committee is final and binding and none of Health System, any System Member or Yale/YSM will have any legal recourse as to that decision. All decisions of the committee will be set forth in writing stating the decision and the reasons therefor.

ARTICLE V
**CLINICAL PROGRAMS AND CLINICAL TRIALS**

A Clinical Program alignment will exist among Yale/YSM, Health System and System Affiliates. The following provisions govern this alignment.

**5.01    Health System Clinical Program Planning; Clinical Program Information Committee**.

**5.01(a) – Health System Clinical Program Planning**. Yale/YSM will participate in all planning and coordination of planning of Health System Clinical Programs. Such participation will include representation of Yale/YSM on any task force or similar body organized by Health System to plan such Clinical Programs.

**5.01(b) – Clinical Program Information Committee**. In accordance with applicable law, a Clinical Program Information Committee will be jointly established by Yale/YSM and Health System (in cooperation with System Members) to exchange information among Yale/YSM, Health System and System Members about Clinical Programs being developed by any of Yale/YSM, Health System or a System Member. Such committee will meet on a quarterly basis. The members of the committee will be one (1) officer or senior level employee from each of Yale/YSM, Health System, and each System Member, each of whom holds a position with substantial responsibility for his/her respective organization's Clinical Program planning activities.

**5.02    Yale/YSM Responsibility as to Outreach Clinical Programs**. Yale/YSM will not participate in, support, announce, develop, enter into, implement, acquire, operate or manage any Outreach Clinical Program without first submitting a written proposal as to such Outreach Clinical Program to the co-chairs of the Outreach Clinical Program Review

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

/25/99
:\DATA\CLI\AFFIL14.W51

39

Confidential

YNHH 000228

Committee in accordance with this Section 5.02. Each such written proposal will provide that it is being submitted with the approval of the Dean, and will address the scope, content, duration and location of, and third-party involvement with, the Outreach Clinical Program in sufficient detail to permit an informed review and analysis of such Program.

In developing each Outreach Clinical Program, Yale/YSM will take into account the following program criteria:

(i)     Strengthening the clinical activities of the Medical Center and the medical education and clinical research activities of Yale/YSM.

(ii)    Strengthening the relationship between Yale/YSM and community physicians so as to encourage such physicians to participate in appropriate medical education, CME, clinical research, and patient care activities.

(iii)   Supplementing local physician practices in areas where subspecialty expertise is unavailable.

(iv)    Existing referral practices and patterns in the Service Areas in which an Outreach Clinical Program is to be located to preserve continuity of care within the Clinical Programs of the Medical Center and System Affiliates.

Yale/YSM will consider any reasonable alternative to an Outreach Clinical Program that Health System or a System Member suggests would better meet the needs of such System Member or its community.

**5.02(a) – Formation and Composition of Outreach Clinical Program Review Committee.** The Dean and the President/CEO will appoint an Outreach Clinical Program Review Committee consisting of four (4) to six (6) standing members to act as provided in Section 5.02(b). The committee will be a standing committee whose initial members will be appointed immediately following the Effective Date, and thereafter such members will be appointed annually in the month of January. The standing members will be divided equally between representatives of Yale/YSM (appointed by the Dean) and Yale-New Haven Hospital (appointed by the YNHH President/CEO) with the Yale-New Haven Hospital representatives

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

40

Confidential                                              YNHH 000229

to include one or more members of such Hospital's medical staff leadership, provided that any such representative who has a direct interest in a matter before the committee will recuse himself or herself from participating in the committee's proceedings as to such matter, in which case the Dean or the YNHH President/CEO, as the case may be, may appoint a substitute as to such matter.

Such committee may also include non-standing members who will be appointed as follows:

**5.02(a)(i)**.  If an Outreach Clinical Program will be located in the Service Area of any System Member other than Yale-New Haven Hospital, the President/CEO will designate one or more additional persons to be a non-standing member to represent Health System and the System Member in whose Service Area the Outreach Clinical Program will be located, and who will include at least one member of the medical staff leadership of each such System Member, provided no such representative will have a direct interest in the matter before the committee.

**5.02(a)(ii)**.  If an Outreach Clinical Program will be located outside the Service Areas of all System Members, the President/CEO will designate one or more additional persons to be a non-standing member to represent Health System, provided no such representative will have a direct interest in the matter before the committee.

**5.02(a)(iii)**.  If an Outreach Clinical Program will be located in the Service Area of Yale-New Haven Hospital only, no additional non-standing members will be designated.

**5.02(a)(iv)**.  The Dean will appoint additional non-standing members so that, regardless of the size of such committee, representatives of Yale/YSM will comprise fifty percent (50%) of its membership, provided no such non-standing member will have a direct interest in the matter before the committee.

The committee will be co-chaired by a representative of Yale/YSM and a representative of Health System, except in those instances in which the matter before such committee involves an Outreach Clinical Program located in the Service Area of Yale-New

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

5/25/99
S:\DATA\CLI\AFFIL14.W51

41

Confidential                                                                                                    YNHH 000230

Haven Hospital only, in which case such committee will be co-chaired by representatives of Yale-New Haven Hospital and Yale/YSM only.

### 5.02(b) – Activities of Outreach Clinical Program Review Committee. Upon

receipt by the co-chairs of the Outreach Clinical Program Review Committee of a written proposal for an Outreach Clinical Program, the co-chairs will schedule an initial meeting of the Committee to take place as soon as reasonably practicable. The Outreach Clinical Program Review Committee will use best efforts to reach Consensus about the proposed Outreach Clinical Program no later than ninety (90) days after the scheduled date of the first meeting of such committee. If at any time within such ninety (90) day period the Outreach Clinical Program Review Committee reaches Consensus as to an Outreach Clinical Program, such Consensus will be implemented as to such Outreach Clinical Program and the remaining steps contemplated by Sections 5.02(c) through (e) need not be taken as to that Program. If the Outreach Clinical Program Review Committee cannot reach Consensus as to an Outreach Clinical Program within such ninety (90) day period, a joint written statement (or separate written statements if a joint statement cannot be agreed upon), of the findings of such committee stating in reasonable detail the reasons why Consensus on such Outreach Clinical Program could not be reached, will be presented to the Outreach Clinical Program Re-evaluation Committee described in Section 5.02(c).

### 5.02(c) – Formation and Composition of Outreach Clinical Program Re-evaluation Committee. The Dean and the President/CEO will appoint an Outreach Clinical

Program Re-evaluation Committee consisting of four (4) standing members to act as provided in Section 5.02(d). The committee will be a standing committee whose initial members will be appointed immediately following the Effective Date, and thereafter such members will be appointed annually in the month of January. All members will be different from the members of the Outreach Clinical Program Review Committee described in Section 5.02(a). The standing members will be divided equally between representatives of Yale/YSM (appointed by the Dean) and Yale-New Haven Hospital (appointed by the YNHH President/CEO), provided that any such representative who has a direct interest in a matter before the committee will recuse himself or herself from participating in the committee's proceedings as to such matter, in which case the Dean or the YNHH President/CEO, as the case may be, may appoint a substitute as to such matter. Non-standing members of the

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

Confidential

reach Clinical Program Re-evaluation Committee will be appointed and the committee be co-chaired as provided in Section 5.02(a).

**5.02(d) – Activities of Outreach Clinical Program Re-evaluation Committee**.  The reach Clinical Program Re-evaluation Committee will use best efforts to reach Consensus proposed Outreach Clinical Program no later than sixty (60) days after the ninety (90) period described in Section 5.02(b).  If at any time within such sixty (60) day period the reach Clinical Program Re-evaluation Committee reaches Consensus on such Outreach Clinical Program, such Consensus will be implemented as to such Outreach Clinical Program the remaining steps contemplated by this Section 5.02(d) and Section 5.02(e) need not be en as to that Program.  If the Outreach Clinical Program Re-evaluation Committee cannot ch Consensus as to an Outreach Clinical Program within such sixty (60) day period, a nt written statement (or separate written statements if a joint statement cannot be agreed on), of the findings of such committee stating in reasonable detail the reason why nsensus on such Outreach Clinical Program could not be reached, will be presented to the an and to the President/CEO.

**5.02(e) – Role of the Dean and the President/CEO as to Outreach Clinical grams; Notice of Program**.

**5.02(e)(i)**.  The Dean and the President/CEO will use best efforts to reach Consensus proposed Outreach Clinical Program no later than thirty (30) days after the sixty (60) period described in Section 5.02(d), using any form of assistance they believe necessary. he Dean and the President/CEO cannot reach Consensus as to the Outreach Clinical gram within such thirty (30) day period, Yale/YSM may proceed with such Outreach ical Program.

**5.02(e)(ii)**.  At the time that an Outreach Clinical Program becomes a Reviewed ical Program, Yale/YSM will notify Health System in reasonable detail of the scope, ut, duration and location of, and third-party involvement with, such Reviewed Clinical am, and such notice will reflect either the Consensus reached (if any) as to such wed Clinical Program, or the information described in Section 5.02(e)(iii).

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

AFFIL14.W51

43

YNHH 000232

**5.02(e)(iii)**.  If no Consensus as to a Reviewed Clinical Program is reached, Yale/YSM's notice to Health System described in Section 5.02(e)(ii) will set forth either the Reviewed Clinical Program as originally proposed or the Reviewed Clinical Program as it has been changed to reflect the substantive discussions about the Reviewed Clinical Program during the review process described in Sections 5.02(b) through (e)(i).  If Health System disagrees with the manner in which Yale/YSM characterizes the Reviewed Clinical Program pursuant to this Section 5.02(e)(iii), Health System will refer the matter to the individual described in Section 4.15(d)(iii).  Such individual will conduct an investigation in such scope and procedure as such individual determines (in such individual's sole discretion) to be appropriate.  The individual's determination as to Yale/YSM's characterization of the Reviewed Clinical Program is final and binding and neither Yale/YSM nor Health System will have any legal recourse as to that determination.  The individual's determination will be set forth in writing stating the determination and the reasons therefor.

**5.02(e)(iv)**.  If Yale/YSM implements the Reviewed Clinical Program, it will do so in a manner consistent with Yale/YSM's notice to Health System pursuant to Section 5.02(e)(ii) or (e)(iii).

**5.02(f) – Outreach Clinical Program Review Period**.  Unless the Dean and the President/CEO mutually agree otherwise, the review process described in Sections 5.02(b) through (e) will under no circumstances take more than one hundred eighty (180) days after the scheduled date of the first meeting of the Outreach Clinical Program Review Committee.

**5.02(g) – Reinstitution of Outreach Clinical Program Review Process**.  Notwithstanding that an Outreach Clinical Program has become a Reviewed Clinical Program, any such Reviewed Clinical Program may again be subject to the review process described in Sections 5.02(b) through (e), subject to the following provisions and limitations:

**5.02(g)(i)**.  In the event that a Reviewed Clinical Program has not commenced day-to-day operations within eighteen (18) months of the date that it became a Reviewed Clinical Program, as to that Reviewed Clinical Program Yale/YSM will undertake the review process described in Sections 5.02(b) through (e) if the reason for the failure to commence such day-to-day operations within that time period is the failure of Yale/YSM at any time in such

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

Confidential                                                                                                          YNHH 000233

eighteen (18) month period to make continuous, substantial efforts to commence such Reviewed Clinical Program within such time period.

**5.02(g)(ii).**  In the event that a Reviewed Clinical Program has not commenced day-to-day operations and such Reviewed Clinical Program is to be operated on a basis that is substantially different in scope, content or duration from the Reviewed Clinical Program as originally reviewed, or if its location is changed and such change is significant, as to that Reviewed Clinical Program Yale/YSM will undertake the review process described in Sections 5.02(b) through (e).  For purposes of this Section 5.02(g)(ii), the term "Reviewed Clinical Program as originally reviewed" means the scope, content, duration and location of the Reviewed Clinical Program as reflected in the notice referred to in Section 5.02(e)(ii) or (e)(iii).

**5.02(g)(iii).**  In the event that a Reviewed Clinical Program has not commenced day-to-day operations, and such Program was originally reviewed: (A) for operation or management by Yale/YSM alone and Yale/YSM subsequently wants to involve a Health Care Provider or any Affiliate of a Health Care Provider that is not an Affiliate of Yale/YSM in such operation or management, or (B) for operation or management by Yale/YSM in conjunction with a Health Care Provider or any Affiliate of a Health Care Provider that is not Affiliated with Yale/YSM and Yale/YSM wants to eliminate or change such Health Care Provider or that Affiliate, as to that Reviewed Clinical Program Yale/YSM will undertake the review process set forth in Sections 5.02(b) through (e), unless the Outreach Clinical Program became a Reviewed Clinical Program because the 180 day review period expired, in which case the review process will be modified as follows:  The review process will be restricted to the Outreach Clinical Program Review Committee's reviewing only the proposed change to the Reviewed Clinical Program contemplated by clause (A) or (B) above for a thirty (30) day period after the scheduled date of the first meeting of such committee.  If at any time within such thirty (30) day period the Outreach Clinical Program Review Committee reaches Consensus as to the proposed change, such Consensus will be implemented as to such change and the remaining steps contemplated by Section 5.02(b) through (e) need not be taken as to such change.  If the Outreach Clinical Program Review Committee cannot reach Consensus as to the proposed change within such thirty (30) day period, the joint written statement (or separate written statements if a joint statement cannot be agreed upon) described in Section 5.02(d) will be prepared and presented to the Dean and

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

45

Confidential                                                                                                              YNHH 000234

the President/CEO.  The Dean and the President/CEO will use best efforts to reach Consensus as to the proposed change within fifteen (15) days after such thirty (30) day period, and otherwise in accordance with Section 5.02(e)(i).  If the Dean and the President/CEO cannot reach Consensus as to the proposed change within such fifteen (15) day period, Yale/YSM may proceed with the proposed change in the Reviewed Clinical Program.

**5.02(g)(iv)**.  In the event that a Reviewed Clinical Program has commenced day-to-day operations and such Reviewed Clinical Program is to be Amended: (A) if Yale/YSM controls or otherwise has the ability to direct in its discretion such Reviewed Clinical Program, Yale/YSM will undertake the review process described in Sections 5.02(b) through (g), and (B) if Yale/YSM does not control and does not have the ability to direct in its discretion such Reviewed Clinical Program, Yale/YSM will undertake the review process described in Sections 5.02(b) through (e), provided the time periods in such Sections will each be reduced by one-half.

**5.02(h) – Amendment of Existing Outreach Clinical Programs**.  In the event that an Outreach Clinical Program existing at the Effective Date and involving Yale/YSM is to be Amended: (i) if Yale/YSM controls or otherwise has the ability to direct in its discretion such Outreach Clinical Program, Yale/YSM will undertake the review process described in Sections 5.02(b) through (g), and (ii) if Yale/YSM does not control and does not have the ability to direct in its discretion such Outreach Clinical Program, Yale/YSM will undertake the review process described in Sections 5.02(b) through (e), provided the time periods in such Sections will each be reduced by one-half.

**5.02(i) – Telemedicine Services as an Outreach Clinical Program**.  Provided that the provision of Telemedicine Services otherwise meets the definition of an Outreach Clinical Program, the following Telemedicine Services will be deemed an Outreach Clinical Program and subject to the provisions of Section 5.02: (i) all Diagnostic Telemedicine Services in connection with which (A) there is a written agreement between Yale/YSM and a Health Care Provider or any Affiliate of a Health Care Provider that is not Affiliated with Yale/YSM, or (B) Yale/YSM uses or authorizes the use of its name, and (ii) all Therapeutic Telemedicine Services.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

25/99
\DATA\CLI\AFFIL14.W51

46

**5.03    Limitations on Health System/System Member Outreach Clinical Programs.**  Health System will not, and will ensure that no System Member will, participate in, support, announce, develop, enter into, implement, acquire, operate, manage or Amend any Outreach Clinical Program that would be competitive with an Outreach Clinical Program proposed by Yale/YSM to the Outreach Clinical Program Review Committee, until the Outreach Clinical Program so proposed has become a Reviewed Clinical Program or has been withdrawn from consideration.  This prohibition will not apply to an Outreach Clinical Program that is: (i) under consideration, development, or otherwise in process by Health System or a System Member as of the date the Outreach Clinical Program Review Committee receives a proposal from Yale/YSM pursuant to Section 5.02, and (ii) evidenced by a writing that addresses the scope, content, duration and location of, and third-party involvement with, such Program in sufficient detail to permit an informed review and analysis of Health System's or a System Member's Outreach Clinical Program.

**5.04    Health System/System Member Responsibility as to Hospital Sponsored Clinical Programs.**  Health System will not, and will ensure that no System Member will, participate in, support, announce, develop, enter into, implement, acquire, operate or manage any Hospital Sponsored Clinical Program (including any Hospital Sponsored Clinical Program that involves Telemedicine Services) with any Medical Organization without first offering to Yale/YSM the opportunity to proceed with such Program in accordance with this Section 5.04.  Any such offer will be made by notice from Health System to Yale/YSM which notice will include the proposed Program Terms of such Hospital Sponsored Clinical Program.

**5.04(a) – Yale/YSM Right of First Refusal and Last Offer.**  Yale/YSM will have ten (10) days following Health System's notice described in Section 5.04 to notify Health System of Yale/YSM's non-binding interest in proceeding with such Hospital Sponsored Clinical Program on substantially the same terms as the proposed Program Terms set forth in Health System's notice.  If Yale/YSM so notifies Health System that Yale/YSM wishes to proceed, Health System will determine whether Yale/YSM has sufficient Resources pursuant to the provisions of Section 4.01(b) as such Section applies to Resources and as if such Section applied to a determination by Health System, and notify Yale/YSM of its determination.  If Health System determines that Yale/YSM has sufficient Resources, Health System, the System Member and Yale/YSM will promptly and diligently seek to conclude an

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

9/25/99
F:\DATA\CLI\AFFIL14.W51

47

Confidential

YNHH 000236

agreement as to such Hospital Sponsored Clinical Program on substantially the same terms as the proposed Program Terms set forth in Health System's notice to Yale/YSM described in Section 5.04.

**5.04(a)(i)**.  If:  (A) within the ten (10) day period set forth in Section 5.04(a) Yale/YSM does not give notice or notifies Health System that it does not wish to proceed on such proposed Program Terms, or (B) upon Health System's notice to Yale/YSM that Yale/YSM does not have sufficient Resources, or (C) an agreement with respect to the Hospital Sponsored Clinical Program is not concluded within ninety (90) days following Health System's notice to Yale/YSM that Yale/YSM has sufficient Resources (in which case the Parties will memorialize any differences between them), Health System and the System Member may proceed with the Hospital Sponsored Clinical Program with a Medical Organization, subject to the provisions of Section 5.04(a)(ii).  If clause (B) of this Section 5.04(a)(i) is applicable, Health System will, if so requested by Yale/YSM, indicate in writing to Yale/YSM in what way Yale/YSM does not have sufficient Resources.  The giving of such stated reasons will not limit or otherwise affect Health System's rights pursuant to Section 4.01(b), as it is made applicable by Section 5.04(a).

**5.04(a)(ii)**.  If the proposed agreement among Health System, a System Member and such Medical Organization contains Program Terms substantially different from the proposed Program Terms set forth in Health System's notice to Yale/YSM described in Section 5.04, Health System and the System Member will not enter into such Hospital Sponsored Clinical Program without offering Yale/YSM the opportunity to meet such new Program Terms.  Any such offer will be made by notice to Yale/YSM which notice will include the new Program Terms.  Following such notice, Yale/YSM, Health System and the System Member will have up to sixty (60) days to conclude an agreement as to such Hospital Sponsored Clinical Program on substantially the same terms as the new Program Terms.  If such agreement is not so concluded, Health System and the System Member may enter into the agreement as to the Hospital Sponsored Clinical Program with the Medical Organization, and such Hospital Sponsored Clinical Program will not thereafter be subject to Section 5.04.

**5.04(a)(iii)**.  In the case where a Medical Organization or a System Member requires a response as to a Hospital Sponsored Clinical Program within fewer than one hundred fifty

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
E:\DATA\CLI\AFFIL14.W51

48

YNHH 000237

(150) days, the time frames set forth in Section 5.04(a) through 5.04(a)(ii) will be reduced proportionately so that the process is completed within such time frame.

### 5.05   Yale/YSM Responsibility as to Hospital Sponsored Clinical Programs.

**5.05(a) – Primary Health Care Providers.**  Except as provided in Section 5.07, Yale/YSM will not participate in, support, announce, develop, enter into, implement, acquire, operate or manage any Hospital Sponsored Clinical Program (including any Hospital Sponsored Clinical Program that involves Telemedicine Services) with a Primary Health Care Provider without first offering to Health System the opportunity for a System Member to enter into such Hospital Sponsored Clinical Program.  Any such offer will be made in accordance with the provisions of Section 4.03 as if such Section applied to a Hospital Sponsored Clinical Program and not to a Medical Education Affiliation.

**5.05(b) – Secondary Health Care Providers.**  Except as provided in Section 5.06(c)(ii), Yale/YSM will not participate in, support, announce, develop, enter into, implement, acquire, operate, manage or Amend any Hospital Sponsored Clinical Program (including any Hospital Sponsored Clinical Program that involves Telemedicine Services) with any Secondary Health Care Provider prior to January 1, 2010.  Either Yale/YSM or Health System may make a request of the other to review this Section 5.05(b) in 2009 and each tenth (10th) year thereafter, provided such request is received by the other Party at any time on or before January 1, 2009, or on or before each tenth (10th) anniversary thereafter, as the case may be.  If no such review is timely requested, this Section 5.05(b) will remain in effect for an additional period of ten (10) years.  If either Yale/YSM or Health System makes a timely request of the other Party to review this Section 5.05(b), the Dean and the President/CEO will take such action as they deem appropriate.  If no Consensus is reached on or before September 30 of the year in which the review is to take place, the matter will be referred to a governance committee that will be composed of three (3) directors of Yale Corporation's Board of Directors (appointed by the President of Yale University) and three (3) directors of Health System's Board of Directors (appointed by the Chair of the Board). If such committee does not reach Consensus as to this Section 5.05(b) on or before December 31 of the year in which the review is to take place, this Agreement may be terminated in accordance with Section 10.02(i).

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

**5.05(c) – Amendments to Hospital Sponsored Clinical Programs**.  Yale/YSM may Amend a Hospital Sponsored Clinical Program with a System Member (other than Yale-New Haven Hospital) or a Non-System Member only upon the joint agreement of Yale/YSM and Health System as to such Amendment.

**5.05(d) – Renewal of Certain Hospital Sponsored Clinical Programs**.  Yale/YSM may periodically renew each Hospital Sponsored Clinical Program identified in **Exhibit E**, provided any such renewal does not constitute an Amendment.

**5.05(e) – Treatment of Existing Non-System Member Clinical Programs**.  Subject to Section 5.05(f), all Hospital Sponsored Clinical Programs existing at the Effective Date between Yale/YSM and any Non-System Member (except those identified on **Exhibit E**) may continue in force by their terms (including any renewals thereof) until January 1, 2005. Commencing in January 2004 and every five (5) years thereafter, Health System and Yale/YSM will evaluate whether each then-existing Hospital Sponsored Clinical Program (except for any identified on **Exhibit E**) may continue for the next five (5) year period.  If the Dean and the President/CEO cannot reach Consensus as to such continuations on or before September 30 of the year in which the evaluation is to take place, the matter will be referred to a governance committee that will be composed of three (3) directors of Yale Corporation's Board of Directors (appointed by the President of Yale University) and three (3) directors of Health System's Board of Directors (appointed by the Chair of the Board). If such committee does not reach Consensus as to such continuations on or before December 31 of the year in which the evaluation is to be conducted, this Agreement may be terminated in accordance with Section 10.02(i).

**5.05(f) – Signal Events and Special Signal Events and the Effect on Yale/YSM Hospital Sponsored Clinical Programs**.  Except as provided in Article VI with respect to the Hospital of Saint Raphael, upon the occurrence of a Signal Event, all then-existing Hospital Sponsored Clinical Programs between Yale/YSM and the Health Care Provider as to which the Signal Event occurred will be subject to the provisions of this Section 5.05(f). Upon the occurrence of a Special Signal Event, the provisions of Sections 5.05(f)(vii) and 5.05(f)(viii) will apply thereto and the remaining provisions of this Section 5.05(f) will not apply to the Special Signal Event, unless specifically made applicable pursuant to Section 5.05(f)(vii).  The occurrence of a Signal Event will change the status of a Health Care

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

/25/99
:\DATA\CLI\AFFIL14.W51

50

Confidential

YNHH 000239

Provider from Primary Health Care Provider to Secondary Health Care Provider, regardless of whether Health System notifies Yale/YSM of such Signal Event, and regardless of whether Health System notifies Yale/YSM that it wants, or does not want, the provisions of Section 5.05(f) to apply.  Yale/YSM will not be responsible for knowledge of the change in status upon the occurrence of a Signal Event (and acting in accordance therewith), unless Health System provides Yale/YSM the notice described in Section 5.05(f)(i)(A).  Without limiting the generality of the provisions of Section 5.14, Yale/YSM may invoke the dispute resolution process of Section 5.14 if it disagrees with Health System, following Health System's notice to Yale/YSM pursuant to Section 5.05(f)(i) or Section 5.05(f)(vii) that a Signal Event or Special Signal Event occurred.

**5.05(f)(i)(A)**.  Health System will notify Yale/YSM of the occurrence of a Signal Event, the nature of the Signal Event, and whether Health System wants the provisions of Section 5.05(f) to apply as a consequence thereof.  If Health System notifies Yale/YSM that it does not want the provisions of Section 5.05(f) to apply, neither Party will be obligated to take any further action pursuant to Section 5.05(f) in respect of such Signal Event.

**5.05(f)(i)(B)**.  If Health System notifies Yale/YSM that it wants the provisions of Section 5.05(f) to apply, within ten (10) days of Health System's notice Yale/YSM will notify Health System of the designated expiration date of each then-existing Hospital Sponsored Clinical Program between Yale/YSM and the Health Care Provider as to which the Signal Event occurred and of the Program Terms for each such Hospital Sponsored Clinical Program.  Such designated expiration date will be determined by Yale/YSM and will be either: (1) the expiration date specified in each such then-existing Hospital Sponsored Clinical Program, or (2) a date ending on or before one (1) Renewal Term after such specified expiration date.

**5.05(f)(ii)**.  If the Signal Event occurred as to a Health Care Provider located within ten (10) miles of another Health Care Provider, and the other Health Care Provider is not a System Member, Yale/YSM will assimilate each such Hospital Sponsored Clinical Program into the other Health Care Provider on the designated expiration date if such other Health Care Provider: (A) has sufficient Resources (for purposes of this sentence Resources does not include competency and experience) determined by Yale/YSM in accordance with Section 4.01(b) as such Section applies to Resources, and (B) agrees to execute an agreement as to a

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

51

Confidential
YNHH 000240

Hospital Sponsored Clinical Program on substantially the same terms as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 5.05(f)(i)(B). If Yale/YSM does not enter into an agreement as to a Hospital Sponsored Clinical Program pursuant to the foregoing, Yale/YSM may continue such Hospital Sponsored Clinical Program on substantially the same terms as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 5.05(f)(i)(B), and such Hospital Sponsored Clinical Program will be subject to the evaluation provisions of Section 5.05(e).

**5.05(f)(iii).**    If a Signal Event of the type described in Section 5.05(f)(ii) occurs but the other Health Care Provider is a System Member, or has become a System Member thereby causing the Signal Event to occur, Health System will subsequently notify Yale/YSM as to whether Health System and the System Member wish to assimilate the Hospital Sponsored Clinical Programs between Yale/YSM and the other Health Care Provider on the designated expiration date on substantially the same terms (except as to Pricing) as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 5.05(f)(i)(B). Health System's notice to Yale/YSM described in this Section 5.05(f)(iii) will be given on or before four (4) months prior to the designated expiration date of such Hospital Sponsored Clinical Program, provided if such designated expiration date is less than four (4) months following Yale/YSM's notice to Health System pursuant to Section 5.05(f)(i)(B), Health System's notice to Yale/YSM will be given as soon as practicable following such notice from Yale/YSM to Health System.

**5.05(f)(iv).**    If within the relevant time period set forth in Section 5.05(f)(iii) Health System notifies Yale/YSM that Health System and the System Member wish to proceed, Yale/YSM will determine whether, as to each such Hospital Sponsored Clinical Program, such System Member has sufficient Resources pursuant to Section 4.01(b), as such Section applies to Resources (for purposes of this sentence Resources does not include competency and experience). If Yale/YSM determines, as to any such Hospital Sponsored Clinical Program, that the System Member has sufficient Resources, Health System, the System Member and Yale/YSM will promptly and diligently seek to conclude an agreement as to such Hospital Sponsored Clinical Program on substantially the same terms as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 5.05(f)(i)(B), subject to applicable Pricing.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

8/25/99
F:\DATA\CLI\AFFIL14.W51

52

YNHH 000241

**5.05(f)(v)**.  If: (A) within the relevant time period set forth in Section 5.05(f)(iii) Health System does not give notice or notifies Yale/YSM that the System Member does not wish to proceed on such Program Terms, or (B) upon Yale/YSM's notice to Health System that the System Member does not have sufficient Resources, Yale/YSM may continue its then-existing Hospital Sponsored Clinical Program on substantially the same terms as the Program Terms set forth in Yale/YSM's notice to Health System described in Section 5.05(f)(i)(B), and such Hospital Sponsored Clinical Program will be subject to the evaluation provisions of Section 5.05(e).

**5.05(f)(vi)**.  If the Signal Event occurred as to a Health Care Provider located in any geographic area other than the geographic area described in Section 5.05(f)(ii), the Parties will proceed as provided in Sections 5.05(f)(iii) through (f)(v), except that Health System will have the right as to each System Member to give the notice described in Section 5.05(f)(iii).  If such notice is given as to more than one System Member and more than one System Member is determined by Yale/YSM to have sufficient Resources or if Yale-New Haven Hospital expresses non-binding interest, the Parties will proceed with all such System Members in the manner set forth in Section 4.03(a)(ii), as if such Section applied to a Hospital Sponsored Clinical Program.

**5.05(f)(vii)**.  If a Special Signal Event occurs, the Parties will apply the provisions of Section 4.07(d) to all then-existing Hospital Sponsored Clinical Programs between Yale/YSM and each Health Care Provider as to which the Special Signal Event occurred, as if such Section applied to a Hospital Sponsored Clinical Program.

**5.05(f)(viii)**.  Signal Events and Special Signal Events will have no effect on any Hospital Sponsored Clinical Program identified in **Exhibit E**.

**5.05(g) – Limited Term for Hospital Sponsored Clinical Programs**.  Health System, on behalf of itself and each System Member, and Yale/YSM, will each ensure that the duration of any Clinical Program service agreement (as opposed to a joint venture or other similar cooperative agreement) in respect of a Hospital Sponsored Clinical Program (including any renewal thereof), to which either of them (or in the case of Health System, a System Member), is a party, will not exceed: (i) the shorter of: (A) three (3) years or (B) one (1) Renewal Term following the Effective Date, or (ii) such longer term as may be

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000242

required as to Yale/YSM (as opposed to a Health Care Provider with which Yale/YSM has an agreement in respect of a Hospital Sponsored Clinical Program) by a licensing or accreditation organization. In the case of Health System and System Members, this Section 5.05(g) applies only to Hospital Sponsored Clinical Programs with a Medical Organization, and in the case of Yale/YSM, this Section 5.05(g) does not apply to the Hospital Sponsored Clinical Programs identified in **Exhibit E**.

### 5.06    Yale/YSM Responsibility as to Government Sponsored Clinical Programs.

### 5.06(a) – Government Sponsored Clinical Programs as Outreach Clinical Programs.
A Government Sponsored Clinical Program that is an Outreach Clinical Program is subject to the provisions of Sections 5.02(a) through (g) except in the case where a quasi-public or governmental Entity requires a response within fewer than 180 days, in which case the time frames set forth in Sections 5.02(b) through (e) will be reduced proportionately so that the process is completed within such Entity's time frame.

### 5.06(b) – Special Rules as to Health Center Outreach Clinical Programs.
Yale/YSM's Outreach Clinical Programs at Hill Health Center in New Haven, Connecticut and Fair Haven Community Health Center in Fair Haven, Connecticut are not subject to the provisions of Sections 5.02(a) through (g), except as such Sections are made applicable by Section 5.02(h) in the event either Program is to be Amended.

### 5.06(c) – Government Sponsored Clinical Programs as Hospital Sponsored Clinical Programs.
A Government Sponsored Clinical Program that is a Hospital Sponsored Clinical Program is subject to the provisions of Sections 5.06(c)(i) through (c)(iii):

**5.06(c)(i)**.  If such Government Sponsored Hospital Sponsored Clinical Program involves a Primary Health Care Provider, the provisions of Section 5.05(a) apply.

**5.06(c)(ii)**.  If such Government Sponsored Hospital Sponsored Clinical Program involves a Secondary Health Care Provider, the provisions of Section 5.05(b) apply, except in the case where: (A) the City of New Haven, the State of Connecticut or the federal government requests that Yale/YSM participate in, support, develop, enter into, implement, acquire, operate, manage or Amend such Government Sponsored Hospital Sponsored Clinical

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

Program; and (B)(1) the request is made directly to Yale/YSM and does not involve a general solicitation, bid or other similar process, (2) Yale/YSM gives Health System prompt notice of such request, and (3) Yale/YSM uses best efforts to cause one or more System Members to be involved with such Hospital Sponsored Clinical Program in place of any proposed Secondary Health Care Provider.

**5.06(c)(iii)**.  In the case of any Government Sponsored Hospital Sponsored Clinical Program that Yale/YSM was requested (as opposed to Yale/YSM's proposing) to develop or otherwise participate in as described in Section 5.06, the provisions of Section 5.05(g) will not apply.

**5.07    Health System Prior Approval Period**.  With respect to any Non-System Member identified in **Exhibit F**, Health System may at any time prior to January 1, 2005, in its sole discretion, give Yale/YSM written notice that for a period not to exceed two and one-half (2½) years following such notice, Yale/YSM may participate in, support, announce, develop, enter into, implement, acquire, operate or manage a Hospital Sponsored Clinical Program with any such Non-System Member only with the prior approval of Health System. Such notice may be given only once as to any one Non-System Member.  The notice will be applicable for the full period of two and one-half (2½) years (subject to the termination of this Agreement in accordance with Article X prior to the end of such period) no matter when the notice is given in the period ending December 31, 2004.  Yale/YSM may proceed with a Hospital Sponsored Clinical Program notwithstanding Health System's giving notice pursuant to this Section 5.07, unless Health System gave such notice within ten (10) days following Yale/YSM's notice to Health System described in Section 4.03, as made applicable by Section 5.05(a).

**5.08    Review of Telemedicine Provisions**.    The Parties anticipate revolutionary advancements in Telemedicine Services and recognize that the provisions set forth in Sections 5.02(i), 5.04, 5.05(a) and 5.05(b) may cease to fairly represent such advancements.  To ensure that such provisions reflect those advancements, either Yale/YSM or Health System may make a request of the other to review any such provisions in 2002 and each fifth (5th) year thereafter, provided such request is received by the other Party at any time on or before January 1, 2002, or on or before each fifth (5th) anniversary thereafter, as the case may be. If no such review is timely requested, all such provisions will remain in effect for an

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000244

additional period of five (5) years.  If either Yale/YSM or Health System makes a timely request of the other Party for such review, the Dean and the President/CEO will take such action as they deem appropriate.  If no Consensus is reached on or before September 30 of the year in which the review is to take place, this Agreement, including the foregoing Sections, will remain in effect in accordance with its terms.

    **5.09**   **Clinical Trials**.  In support of the Parties' objectives to: (i) carry out Clinical Trials, (ii) obtain the advantages of proximity to its Clinical Trials partners, (iii) enhance the quality control, Clinical Trials management, continuity and efficiencies that come from working regularly with a select group of qualified Health Care Providers, (iv) provide one point of contact for sponsors of Clinical Trials, (v) have access to and continuously expand the faculty base of a larger and more diverse patient population, (vi) coordinate data collection analysis, and (vii) contribute to the clinical distinctiveness of System Affiliates and their associated medical staffs by assuring the availability of new therapies and technologies to patients through participation in innovative Clinical Trials: (A) subject to Section 5.09(a), Health System will use best efforts to cause a System Member to first use Yale/YSM for the conduct of such Clinical Trials, and (B) subject to Section 5.09(b), Yale/YSM will use best efforts to first use System Affiliates for the conduct of such Clinical Trials.

    **5.09(a) – Health System/System Member Responsibility**.  Subject to a System Member's electing to direct Clinical Trials under its control first to the System Member's associated medical staff and to the provisions of Section 5.09(c), Health System will use best efforts to cause a System Member to next direct Clinical Trials under the System Member's control to Yale/YSM, provided in each case:  (i) with respect to Clinical Trials under the control of any System Member (including Yale-New Haven Hospital), Yale/YSM meets the scientific and applicable legal requirements for a specific Clinical Trial, and (ii) with respect to Clinical Trials under the control of any System Member (other than Yale-New Haven Hospital), Yale/YSM has sufficient Resources to support such Clinical Trial.

    **5.09(a)(i)**.  Health System or the System Member will give Yale/YSM notice of a pending Clinical Trial in sufficient detail to allow reasonable analysis and decision by Yale/YSM as to whether or not to seek to participate in such Clinical Trial.  Yale/YSM will have three (3) business days following Health System's or the System Member's notice to notify it of Yale/YSM's non-binding interest in participating in such Clinical Trial.  Within

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

56

YNHH 000245

ten (10) business days following Yale/YSM's notice of its non-binding interest Health System or the System Member will notify Yale/YSM whether Yale/YSM meets the applicable requirements set forth in this Section 5.09(a). Nothing in this Section 5.09(a) limits a System Member's ability to conduct Clinical Trials with Entities other than Yale/YSM if the provisions of this Section 5.09(a) are first satisfied and/or Yale/YSM does not timely notify Health System or the System Member of its interest. Health System and the System Member's determination as to meeting the scientific and applicable legal requirements and the sufficiency of Resources will be final and binding as to Yale/YSM, and will not be subject to the dispute resolution process described in Section 5.14, nor will Yale/YSM have any legal recourse as to that determination.

   **5.09(b) – Yale/YSM Responsibility.** Subject to Yale/YSM's electing to direct Clinical Trials under its control first to Yale/YSM's faculty, and to the provisions of Sections 5.09(b)(i) and (ii) and 5.09(c), Yale/YSM will use best efforts to next direct Clinical Trials under its control as follows: (A) first to Yale-New Haven Hospital provided that Yale-New Haven Hospital can meet the scientific and applicable legal requirements for a specific Clinical Trial, (B) then, if additional sites are needed to conduct the Clinical Trial, to other System Members provided each System Member meets the scientific and applicable legal requirements and the ethical research standards for a specific Clinical Trial and has sufficient Resources to support such Clinical Trial, and (C) then, if additional sites are needed to conduct the Clinical Trial, to System Network Participants, provided each System Network Participant meets the conditions set forth in clause (B).

   **5.09(b)(i).** Yale/YSM will give Health System notice of a pending Clinical Trial in sufficient detail to allow reasonable analysis and decision by a System Member or System Network Participant as to whether or not to seek to participate in such Clinical Trial. Health System will have three (3) business days following Yale/YSM's notice to notify Yale/YSM of one or more System Affiliates' non-binding interest in participating in such Clinical Trial. Within ten (10) business days following Health System's notice of any System Affiliate's non-binding interest Yale/YSM will notify Health System whether each such interested System Affiliate meets the applicable requirements set forth in Section 5.09(b). Nothing in Section 5.09(b) limits Yale/YSM's ability to conduct Clinical Trials with Entities other than System Affiliates if the provisions of Section 5.09(b) are first satisfied and/or Health System does not timely notify Yale/YSM of any System Affiliate's interest. Yale/YSM's

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000246

determination as to meeting the scientific and applicable legal requirements and ethical standards, and the sufficiency of Resources, will be final and binding as to Health System and any System Affiliate, and will not be subject to the dispute resolution process described in Section 5.14, nor will Health System or any System Affiliate have any legal recourse as to that determination.

**5.09(b)(ii)**.   Notwithstanding the provisions of Section 5.09(b), if a Yale/YSM full-time faculty member who is located full-time at a Non-System Affiliate wants to conduct a Clinical Trial at such Non-System Affiliate, such faculty member may do so before following the priorities of Section 5.09(b), provided Yale/YSM so notifies Health System.

**5.09(c) – Accelerated Response**.   If the Entity seeking participants for a Clinical Trial requires a response within fewer than the number of days provided in Section 5.09(a) or 5.09(b), such time frames will be reduced proportionately so that a response can be made within such Entity's time frame.

**5.09(d) – Notice and Action**.   In the event that either Party learns of a Clinical Trial being conducted in a manner or at a location inconsistent with Section 5.09, it will promptly notify the other Party.  The Dean or the President/CEO, as the case may be, will investigate the matter and will take appropriate action to support the objectives set forth in Section 5.09.

**5.10**   **Responsibility as to a New Clinical Program Supported by the New Clinical Program Development Fund**.

**5.10(a) – Yale/YSM Responsibility**.   In support of the Parties' objective to develop and maintain Clinical Programs designed to support and enhance the preeminence and distinction of the Medical Center as a major academic health center, and subject to Sections 5.10(c) and (d), Yale/YSM will: (i) participate in, support, announce, develop, enter into, implement, acquire, operate or manage an Outreach Clinical Program or a Hospital Sponsored Clinical Program that is substantially similar to any New Clinical Program outside the Medical Center only upon the mutual agreement of the Dean and the YNHH President/CEO, (ii) use best efforts to ensure that the clinical procedures, techniques, technologies, and methods of treatment developed as a direct result of a New Clinical Program will be provided by Yale/YSM full-time faculty at the Medical Center, and (iii) use

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000247

best efforts to ensure that such procedures, techniques, technologies, and methods of treatment will be provided outside the Medical Center by Yale/YSM full-time faculty only: (A) in support of a Medical Education Affiliation, or (B) when such procedure, technique, technology or method of treatment has often been provided outside the Medical Center but within the State of Connecticut, or (C) when the provision of such procedure, technique, technology or method of treatment outside the Medical Center would be in the best medical interest of a particular patient.

**5.10(b) – Health System Responsibility**.  In support of the Parties' objective to develop and maintain Clinical Programs designed to support and enhance the preeminence and distinction of the Medical Center as a major academic health center, and subject to Sections 5.10(c) and (d), Health System will, and will ensure that Yale-New Haven Hospital will: (i) participate in, support, announce, develop, enter into, implement, acquire, operate or manage a Hospital Sponsored Clinical Program that is substantially similar to any New Clinical Program outside the Medical Center only upon the mutual agreement of the Dean and the YNHH President/CEO, (ii) use best efforts to ensure that any procedure, technique, technology or method of treatment developed as a direct result of a New Clinical Program will be provided outside the Medical Center only: (A) in support of a Medical Education Affiliation, or (B) when such procedure, technique, technology or method of treatment has often been provided outside the Medical Center but within the State of Connecticut, or (C) when the provision of such procedure, technique, technology or method of treatment outside the Medical Center would be in the best medical interest of a particular patient.

**5.10(c) – System Members**.  Notwithstanding Sections 5.10(a) and (b), in furtherance of the Parties' commitment to enhance the ability of the Medical Center to disseminate, as appropriate, clinical advances to the Clinical Programs of System Affiliates, upon the mutual agreement of the Dean and the YNHH President/CEO, a System Member may participate in, support, announce, develop, enter into, implement, acquire, operate or manage a Hospital Sponsored Clinical Program that is substantially similar to any New Clinical Program (including the provision of any procedure, technique, technology or method of treatment developed as a direct result of a New Clinical Program) prior to its having been provided often outside the Medical Center but within the State of Connecticut.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000248

**5.10(d) – *De minimus* Exception**.  Sections 5.10(a) through (c) shall not apply in respect of any New Clinical Program that received only *de minimus* support from the Fund.

**5.11    Yale Faculty Practice Plan ("YFPP")**.  The President/CEO will appoint two (2) voting representatives to the Board of Governors of YFPP, one of whom will serve on any executive committee or similar body of such Board.

**5.12    Single Specialty Physician Networks**.  Yale/YSM and Health System may establish (in accordance with applicable law), single specialty networks of community physicians and Yale/YSM full time faculty to support the development and enhancement of coordinated Clinical Programs.  In carrying out such efforts, Yale/YSM and Health System will each participate, as they may mutually agree, in the governance and financing of each such network.  If either Party receives an offer or other inquiry to join, contract with or otherwise be involved with any network of physician specialists that operates or will operate in whole or in part in the State of Connecticut, it will notify the other Party to discuss the possibility of mutual action in respect thereto.

**5.13    Yale/YSM Full-Time Faculty Admitting Privileges**.  Subject to the exclusions contained in Sections 3.03 through 3.11 (related to the scope of this Agreement), Yale/YSM full-time faculty may seek and maintain admitting privileges only at Yale-New Haven Hospital, except that such physicians may seek and maintain admitting privileges at any other Health Care Provider pursuant to the criteria specified in **Exhibit G**, which criteria are designed to maintain the clinical care, medical education and medical research pre-eminence of the Medical Center.  Nothing in this Section 5.13 or in **Exhibit G** will require any System Member to change its Medical Staff Bylaws.

**5.14    Dispute Resolution Process**.  Except with respect to either Party's: (i) actions during the 180-day process as described in Sections 5.02, 5.02(b), 5.02(d), 5.02(e)(i) and 5.02(e)(iii); (ii) determination as to the sufficiency of Resources pursuant to Sections 5.04(a), 5.05(f)(ii), 5.05(f)(iv), 5.05(f)(vi), 5.09(a)(i) and 5.09(b)(i); and (iii) determination as to scientific and applicable legal requirements and ethical standards pursuant to Sections 5.09(a)(i) and 5.09(b)(i), all controversies and disputes as to this Article V, including the interpretation hereof and the Parties' performances hereunder, will be resolved solely by

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

60

Confidential                                                                                                              YNHH 000249

means of the dispute resolution process set forth in Section 4.15, as if such Section applied to this Article V.

ARTICLE VI
**HOSPITAL OF SAINT RAPHAEL**

Yale/YSM has had a medical education relationship with the Hospital of Saint Raphael for many years and as of the Effective Date does not have any Hospital Sponsored Clinical Programs with the Hospital of Saint Raphael.  While this Agreement will not affect that relationship as it exists at the Effective Date, Yale/YSM and Health System want to set forth certain understandings as to potential future Yale/YSM initiatives with the Hospital of Saint Raphael so as to help ensure that Yale/YSM, Health System and Yale-New Haven Hospital work together to help enhance and ensure the preeminence of the Medical Center and receive the benefits of the alignments and agreements evidenced by this Agreement. Accordingly, notwithstanding any other provisions contained in this Agreement, Yale/YSM's relationship with the Hospital of St. Raphael, as such relationship relates to the establishment of any Medical Education Affiliation or Hospital Sponsored Clinical Program, will be governed by the provisions of this Article VI in lieu of Articles IV and V.

**6.01    Treatment of Existing Medical Education Affiliations**.  All Medical Education Affiliations existing at the Effective Date between Yale/YSM and the Hospital of Saint Raphael may continue in force in accordance with their terms (including any renewals thereof) as such exist as of the Effective Date.

**6.02    Yale/YSM Responsibility as to Additional Medical Education Affiliations**. Yale/YSM will not announce, develop, enter into or implement any additional Medical Education Affiliations with the Hospital of Saint Raphael without first offering to Yale-New Haven Hospital the opportunity to enter into or otherwise conclude such Medical Education Affiliations in accordance with this Section 6.02.  Any such offer will be made by notice to Yale-New Haven Hospital which notice will include, subject to applicable law, the Program Terms of such Medical Education Affiliation.

**6.02(a) – Yale-New Haven Hospital Right of First Refusal and Last Offer**.  Yale-New Haven Hospital will have ten (10) days following Yale/YSM's notice described in

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential                                                                                                                      YNHH 000250

Section 6.02 to notify Yale/YSM of Yale-New Haven Hospital's non-binding interest in proceeding with such Medical Education Affiliation on substantially the same terms (except as to Pricing) as the proposed Program Terms set forth in Yale/YSM's notice. If Yale-New Haven Hospital so notifies Yale/YSM that Yale-New Haven Hospital wishes to proceed, Yale/YSM will determine whether Yale-New Haven Hospital has sufficient Resources pursuant to the provisions of Section 4.01(b), as such provisions apply to Resources and will give Yale-New Haven Hospital notice as to such determination. If Yale/YSM determines that Yale-New Haven Hospital has sufficient Resources, Yale-New Haven Hospital and Yale/YSM will promptly and diligently seek to conclude an agreement as to such Medical Education Affiliation on substantially the same terms as the proposed Program Terms set forth in Yale/YSM's notice to Yale-New Haven Hospital described in Section 6.02, subject to applicable Pricing.

**6.02(a)(i).** If: (A) within the ten (10) day period set forth in Section 6.02(a) Yale-New Haven Hospital does not give notice or notifies Yale/YSM that it does not wish to proceed on such proposed Program Terms, or (B) upon Yale/YSM's notice to Yale-New Haven Hospital that the Hospital does not have sufficient Resources, or (C) no agreement as to such Medical Education Affiliation is concluded within ninety (90) days following Yale/YSM's notice to Yale-New Haven Hospital that it has sufficient Resources (in which case Yale/YSM and Yale-New Haven Hospital will memorialize in writing any differences between them), Yale/YSM may proceed with the Medical Education Affiliation with the Hospital of Saint Raphael, subject to the provisions of Section 6.02(a)(ii). If clause (B) of this Section 6.02(a)(i) is applicable, Yale/YSM will, if so requested by Yale-New Haven Hospital, indicate in writing to Yale-New Haven Hospital in what way Yale-New Haven Hospital does not have sufficient Resources. The giving of such stated reasons will not limit or otherwise affect Yale/YSM's rights pursuant to Section 4.01(b). If Yale/YSM determines that Yale-New Haven Hospital does not have sufficient Resources, Yale/YSM will assist Yale-New Haven Hospital, if so requested, in developing a plan for Yale-New Haven Hospital to acquire or develop sufficient Resources in the future as to such Medical Education Affiliation.

**6.02(a)(ii).** If the proposed agreement between Yale/YSM and the Hospital of Saint Raphael contains Program Terms (except as to Pricing) substantially different from the proposed Program Terms set forth in Yale/YSM's notice described in Section 6.02,

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

62

Yale/YSM will not enter into or otherwise conclude such Medical Education Affiliation without offering Yale-New Haven Hospital the opportunity to meet such new Program Terms. Any such offer will be made by notice to Yale-New Haven Hospital which notice will include the new Program Terms. Following such notice, Yale/YSM and Yale-New Haven Hospital will have up to sixty (60) days to conclude an agreement as to such Medical Education Affiliation consistent with the new Program Terms, subject to applicable Pricing. If such agreement is not so concluded, Yale/YSM may enter into the Medical Education Affiliation with the Hospital of Saint Raphael.

**6.03    Yale/YSM Responsibility as to Modifications of Medical Education Affiliations**.  Yale/YSM will not Modify a Medical Education Affiliation with the Hospital of Saint Raphael without first offering to Yale-New Haven Hospital the opportunity to enter into a Medical Education Affiliation or otherwise conclude an agreement covering the Medical Education Affiliation as to which the Modification is proposed. Yale/YSM's and Yale-New Haven Hospital's rights and obligations in respect of such opportunity will be as provided in Sections 6.02 through 6.02(a)(ii). If a change in a Medical Education Affiliation would be a Modification of such Medical Education Affiliation but for clause (2) of the last sentence in the definition of the term "Modify," Yale/YSM may proceed with such change and will give Health System prompt notice of the nature of and reasons for such change.

**6.04    Use of Yale/YSM Name**.  Yale/YSM will ensure that with respect to the use of the Yale/YSM name in any Medical Education Affiliation with the Hospital of Saint Raphael: (i) the Yale/YSM name may be used in a manner no more extensive or prominent than is the case at the Effective Date for Medical Education Affiliations existing at the Effective Date, and (ii) the Yale/YSM name may be used only as provided in Section 11.02 for any additional Medical Education Affiliations between Yale/YSM and the Hospital of Saint Raphael.

**6.05    Yale/YSM Responsibility as to CME Services**.  The provisions of Section 4.11(b) as they affect Secondary Health Care Providers are applicable by their terms to the Hospital of Saint Raphael.

**6.06    Yale/YSM Responsibility as to Clinical Programs**.  The provisions of Sections 5.05(b), 5.05(c), 5.05(e), 5.06(c)(ii), 5.09(b), 5.10(a) and 5.13 as they affect

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

63

YNHH 000252

Secondary Health Care Providers and Non-System Members are applicable by their terms to the Hospital of Saint Raphael.

**6.07    Nonapplicability of Signal Events and Special Signal Events.**  Signal Events and Special Signal Events will have no effect on Yale/YSM's relationship with the Hospital of Saint Raphael or on either the Medical Education Affiliations or Hospital Sponsored Clinical Programs between Yale/YSM and the Hospital of Saint Raphael.

**6.08    Dispute Resolution Process.**  Except with respect to either Party's determination as to the sufficiency of Resources pursuant to Section 6.02(a) and Section 6.06, all controversies and disputes as to this Article VI, including the interpretation hereof and the Parties' performances hereunder, will be resolved solely by means of the dispute resolution process set forth in Section 4.15 (with respect to Medical Education Affiliations) and Section 5.14 (with respect to Clinical Programs and Clinical Trials), as if such Sections applied to this Article VI.

## ARTICLE VII
## MANAGED CARE

A managed care alignment will exist between Health System and Yale/YSM.  The provisions of this Article VII will govern this alignment.

**7.01    Grant of Authority as to Single Signature Contracting.**

**7.01(a)** – Yale/YSM grants to Health System, as agent for Yale/YSM, the exclusive right to negotiate and, subject to the provisions of this Article VII, the exclusive right to enter into on behalf of Yale/YSM all Managed Care Contracts pursuant to which Yale/YSM provides professional and/or technical services.  This grant of authority by Yale/YSM to Health System is referred to in this Article as "single signature contracting authority" on behalf of Yale/YSM.  The grant in the first sentence of this Section 7.01(a) of the exclusive right to negotiate is applicable even in circumstances where this Article VII does not give Health System the exclusive right to enter into a Managed Care Contract on behalf of Yale/YSM.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

64

YNHH 000253

**7.01(b)** – With respect to all Managed Care Contracts affecting Yale/YSM, Yale/YSM will continue to participate in YNHPHO to the same extent it participates in YNHPHO as of the Effective Date with respect to corporate membership, managed care contracting, and adherence to the YNHPHO contracting guidelines. Health System will contract on behalf of Yale/YSM through YNHPHO consistent with YNHPHO contracting guidelines and parameters then in effect.

**7.01(c)** – If YNHPHO: (i) is no longer engaged in negotiating and entering into Managed Care Contracts, or (ii) is engaged in negotiating and entering into Managed Care Contracts but a proposed Managed Care Contract is not consistent with YNHPHO contracting guidelines and parameters then in effect, Health System will negotiate such Managed Care Contract on behalf of Yale/YSM directly with a Payor. In each such circumstance and subject to Section 7.03, Health System will, at Yale/YSM's request, keep Yale/YSM informed as to such negotiations.

**7.01(d)** – Upon not less than sixty (60) days prior notice, Yale/YSM may terminate Health System's single signature contracting authority on behalf of Yale/YSM in the event Health System does not have single signature contracting authority on behalf of Yale-New Haven Hospital and at least one additional System Member.

**7.02    Yale/YSM Central Contracting Organization ("CCO") Participation.**

**7.02(a)** – For so long as YNHPHO has a contract with the CCO, Yale/YSM will have no independent contract with the CCO, but instead will rely solely on YNHPHO to exercise the powers set forth in the contract between YNHPHO and the CCO.

**7.02(b)** – In addition to its representation on the CCO Board of Managers through YNHPHO, Yale/YSM may directly appoint two additional representatives to the Board of Managers of the CCO. One such representative will be appointed on the Effective Date. The other such representative will be appointed when representation on the CCO's Board of Managers is granted to a managed care contracting organization that is associated with a Health Care Provider that becomes a System Affiliate after the Effective Date.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

65

YNHH 000254

**7.03**   **Managed Care Contracts Outside YNHPHO.**   The following provisions (and the terms defined in this Section 7.03) apply only to Managed Care Contracts negotiated by Health System on behalf of Yale/YSM outside YNHPHO.

**7.03(a) – Health System Responsibility.**

**7.03(a)(i).**   Health System will promptly notify Yale/YSM of each Managed Care Contract opportunity that arises and as to which Health System can negotiate on behalf of Yale/YSM.

**7.03(a)(ii).**   Health System will not enter into a Managed Care Contract on behalf of Yale/YSM with a term of less than one (1) year or greater than three (3) years.

**7.03(a)(iii).**   Health System will not enter into a Managed Care Contract on behalf of Yale/YSM that includes rates from a Payor for professional and/or technical services provided by Yale/YSM that are lower than the Yale/YSM Best Rate.   In determining whether a Managed Care Contract provides for reimbursement to Yale/YSM of at least the Yale/YSM Best Rate, Health System may make such determination: (A) by reference to the rate structures set forth in the then-applicable fee schedule guidelines delivered by Yale/YSM to Health System on the Effective Date and from time to time thereafter in accordance with Section 7.03(c)(iii), or (B) in Health System's sole discretion, by obtaining from Health System's actuary a statement that the reimbursement arrangement provided for in such Managed Care Contract, when taken as a whole, is actuarially equivalent to or greater than the Yale/YSM Best Rate, even if one or more components of the rate structure is less than the Yale/YSM Best Rate.   Health System will provide Yale/YSM with a copy of each actuary's statement and related workpapers.

**7.03(a)(iv).**   Health System will not enter into a Managed Care Contract on behalf of Yale/YSM that reimburses Yale/YSM for services provided on a fee-for-service or modified fee-for-service basis if the Managed Care Contract provides for a Withhold with a Withhold Percentage that is greater than the greater of: (A) twenty-five percent (25%), or (B) the percentage specified as the "risk threshold" percentage in 42 C.F.R. Section 417.479(e), as amended from time to time.   For purposes of this Section 7.03(a)(iv), the term "Withhold" means a  provision under which a portion of the claim payments otherwise due to Yale/YSM

6/25/99
F:\DATA\CLI\AFFIL14.W51

66

Confidential                                                                                                    YNHH 000255

under the Managed Care Contract is deducted and withheld from immediate payment as an incentive for appropriate utilization and quality of care, and the term "Withhold Percentage" means the percentage of each claim payment to be deducted pursuant to the Withhold.

**7.03(a)(v)**.  Health System may enter into a Risk Contract on behalf of Yale/YSM pursuant to which Yale/YSM is to be reimbursed for services provided on a capitated basis (whether calculated on a per member per month basis or a percentage of premium basis) for a specific type of Payor subject to the provisions of Section 7.03 and the following limitations:

**7.03(a)(v)(A)**.  For purposes of Section 7.03(a)(v):

(1)     "Contract Revenues" means the aggregate amount of payments for professional and/or technical services received by Yale/YSM during the relevant period under the Risk Contract, including coordination of benefits and subrogation payments.

(2)     "Contract Expenses" means the amount of reimbursement Yale/YSM would have received under a Risk Contract for professional and/or technical services provided by Yale/YSM if the Risk Contract were a fee-for-service contract providing for reimbursement at the Yale/YSM Best Rate applicable at the time such services are provided.  For a Risk Contract under which Yale/YSM is at risk for services provided by non-Yale/YSM providers, Contract Expenses also include the aggregate amount of Yale/YSM's actual payments to such other providers for services provided.

(3)     "Loss" means, with respect to a particular Risk Contract, the circumstance of Contract Revenues being less than Contract Expenses.  Yale/YSM will be deemed to have experienced a Loss in the amount of such difference.

(4)     "Aggregate Net Loss" means the sum of Losses experienced by Yale/YSM under all Risk Contracts netted against the aggregate amount of gains (*i.e.*, Contract Revenues less Contract Expenses) generated under Risk Contracts under which Yale/YSM did not experience a Loss.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

67

**7.03(a)(v)(B)**.  If Yale/YSM notifies Health System that Yale/YSM has experienced a Loss under a particular Risk Contract in excess of Two Million Five Hundred Thousand Dollars ($2,500,000) in the most recently completed contract year, Health System will not renew such Risk Contract.  In calculating such Loss, the Two Million Five Hundred Thousand Dollar ($2,500,000) threshold will be increased each contract year by the Inflation Factor.

**7.03(a)(v)(C)**.  If Yale/YSM notifies Health System that Yale/YSM has experienced an Aggregate Net Loss under all Risk Contracts in excess of Ten Million Dollars ($10,000,000) in the most recently completed Yale/YSM fiscal year, Health System will not renew any Risk Contract under which Yale/YSM has experienced a Loss in such fiscal year and will not enter into any new Risk Contracts on behalf of Yale/YSM.  Health System may renew a Risk Contract under which Yale/YSM has not experienced a Loss.  In calculating such Loss, the Ten Million Dollar ($10,000,000) threshold will be increased each fiscal year by the Inflation Factor.

**7.03(a)(v)(D)**.  If Yale/YSM notifies Health System that Yale/YSM has experienced an Aggregate Net Loss under all Risk Contracts in excess of Twenty-Five Million Dollars ($25,000,000) over a three (3) year period, Health System will not renew any Risk Contract under which Yale/YSM has experienced a Loss in any such period and will not enter into any new Risk Contracts on behalf of Yale/YSM.  The initial three (3) year period subject to this Section 7.03(a)(v)(D) will begin with Yale/YSM's fiscal year 2000.  Health System may renew a Risk Contract under which Yale/YSM has not experienced a Loss in any such period.  In calculating such Loss, the Twenty Five Million Dollar ($25,000,000) threshold will be increased each fiscal year by the Inflation Factor.

**7.03(a)(v)(E)**.  Notices by Yale/YSM pursuant to Sections 7.03(a)(v)(B) through (D) will be given within one hundred eighty (180) days after the end of the relevant contract year or fiscal year, as the case may be.  Notwithstanding the preceding sentence, if Health System is responsible under the Managed Care Administrative Services Agreement (set forth in **Exhibit H**) for providing financial reports to Yale/YSM for a particular Risk Contract, Yale/YSM will have one hundred twenty (120) days after the receipt of the financial report to notify Health System of a Loss under such Risk Contract, or of an Aggregate Net Loss that includes such Risk Contract.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000257

**7.03(a)(vi)**.  Health System will not enter into a Managed Care Contract on behalf of Yale/YSM that, at the time such Managed Care Contract would be executed, is expected to obligate Yale/YSM to provide on an exclusive basis Primary Care physician services for more than 20,000 Covered Persons at any given time during the term of the Managed Care Contract.  For purposes of this Section 7.03(a)(vi), the term "Primary Care" means general internal medicine, general pediatrics and general obstetrics and gynecology.

**7.03(a)(vii)**.  If a Managed Care Contract is offered by a Payor in the New Haven area and such Managed Care Contract has both a hospital component and a non-hospital physician specialist component, Health System will not enter into such Managed Care Contract on behalf of Yale-New Haven Hospital unless such Managed Care Contract for the physician specialist component has been offered by such Payor to Yale/YSM.   A Managed Care Contract that is a Carve Out Contract and that is negotiated pursuant to Section 7.03(b), satisfies the condition of this Section 7.03(a)(vii).  For purposes of this Section 7.03(a)(vii), the term "physician specialist" means any physician except for a Primary Care physician (as defined in Section 7.03(a)(vi)).

**7.03(a)(viii)**.  If Health System serves as a direct Payor as to a Managed Care Contract entered into by Health System, and under such Managed Care Contract Health System has provider contracts for physician services with both Yale/YSM and physicians who are not employees of Yale/YSM, the payments from Health System to Yale/YSM for physician services provided pursuant to such Managed Care Contract will not be less than the payments made by Health System pursuant to such Managed Care Contract to physicians of similar specialties who: (A) provide services similar to the services provided by Yale/YSM, and (B) hold active admitting privileges at Yale-New Haven Hospital.

**7.03(a)(ix)**.  If: (A) Health System does not offer to provide to Yale/YSM any of claims processing, risk pool administration, concurrent review or preauthorization services, and (B) Yale/YSM notifies Health System that Yale/YSM cannot itself provide, or cannot contract on commercially reasonable terms with a third-party to provide, one or more of such services not offered by Health System, Health System will not enter into a Managed Care Contract on behalf of Yale/YSM that requires Yale/YSM to provide the services specified in Yale/YSM's notice to Health System.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

69

YNHH 000258

**7.03(a)(x).**  Within fifteen (15) days after the execution of each Managed Care Contract entered into by Health System on behalf of Yale/YSM, Health System will provide to Yale/YSM a written comparison of the contracted rates under such Managed Care Contract to the Yale/YSM Best Rate, such comparison to be in a format reasonably requested by Yale/YSM.

**7.03(a)(xi).**  Health System will not enter into a Managed Care Contract on behalf of Yale/YSM or accept a change to a Managed Care Contract on behalf of Yale/YSM that would cause any of Sections 7.03(a)(ii), (iii), (iv), (vi) or (ix) or Section 7.03(b) to not be met as of the date the new Managed Care Contract or the change would otherwise become effective.

**7.03(a)(xii).**  Notwithstanding Health System's single signature contracting authority on behalf of Yale/YSM, with respect to Managed Care Contracts subject to Section 7.03, Yale/YSM may direct Health System in writing to take action not otherwise permitted to be taken by Health System pursuant to Section 7.03(a), including: (A) requesting Health System to consider a particular Managed Care Contract on behalf of Yale/YSM, and (B) notifying Health System at any time to enter into a Managed Care Contract on behalf of Yale/YSM.

**7.03(b) – Carve Out Contracts for Professional Services.**

**7.03(b)(i)(A).**  Health System will use best efforts to include all Clinical Departments of YFPP in all Managed Care Contracts negotiated by Health System on behalf of Yale/YSM, if practicable given Payor contractual requirements.  For purposes of Section 7.03(b), the term "Clinical Department" means a clinical department of YFPP, any section within such a department, or any specific services provided within such department.

**7.03(b)(i)(B).**  Subject to the provisions of Sections 7.03(a)(ii), (iii), (iv), (v), (vi) and (ix) and Section 7.03(b), Health System may enter into a Carve Out Contract on behalf of Yale/YSM.  A Managed Care Contract described in Section 7.03(d) will not be deemed to be a Carve Out Contract.  Health System and Yale/YSM will meet on a monthly basis to discuss Carve Out Contracts under consideration by Health System.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

70

YNHH 000259

**7.03(b)(ii)**.  Health System may enter into a Carve Out Contract on behalf of Yale/YSM only:  (A) for Clinical Departments agreed to by the Parties as of the Effective Date, or (B) if the Carve Out Contract represents an expansion or a move towards exclusivity of an existing full-service managed care contractual relationship between Yale/YSM and a particular Payor, or (C) if the Carve Out Contract represents an expansion or a move towards exclusivity for a particular Clinical Department of an existing managed care contractual relationship between such Clinical Department and a particular Payor, or (D) with a Payor that is entering into a contract to provide physician services on a basis that does not create a general physician network in the Service Area of Yale-New Haven Hospital, and (E) if the Carve Out Contract is consistent with the requirements of Sections 7.03(a)(ii), (iii), (iv), (v), (vi) and (ix).

**7.03(b)(iii)**.  Except as otherwise provided in Section 7.03(b)(ii) or (iv), Health System may not enter into a Carve Out Contract on behalf of Yale/YSM without the prior written approval of Yale/YSM.  Health System will exclusively negotiate with Payors on behalf of Yale/YSM and present to Yale/YSM for its review and approval Carve Out Contracts (other than Carve Out Contracts described in Sections 7.03(b)(ii) and (iv)).  Yale/YSM will use best efforts to review and make decisions regarding such Carve Out Contracts within ten (10) days from Health System's request for action.

**7.03(b)(iv)**.  With respect to Carve Out Contracts (other than the Carve Out Contracts described in Section 7.03(b)(ii)), the parties will conduct the following review:

**7.03(b)(iv)(A)**.  For each Clinical Department, the Parties will jointly determine at least annually whether: (1) Yale/YSM has approved seventy-five percent (75%) or more of the Carve Out Contracts presented by Health System to Yale/YSM for the services of such Clinical Department, provided that for a Carve Out Contract to count toward such seventy-five percent (75%) the final Carve Out Contract must cover substantially the same scope of services as were included in such Carve Out Contract as originally presented to Yale/YSM, and (2) Yale/YSM is provided access to 60,000 or more Covered Persons in the aggregate under the approved Carve Out Contracts for such Clinical Department (including both exclusive and non-exclusive arrangements in determining such total), or is provided access on an exclusive basis to 20,000 or more Covered Persons in the aggregate under the approved Carve Out Contracts for such Clinical Department.  If the conditions of this Section

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

71

YNHH 000260

7.03(b)(iv)(A) are satisfied for a Clinical Department, Health System may enter into a Carve Out Contract for such Clinical Department if: (1) such services to be provided by the Clinical Department under the Carve Out Contract are of the same or greater scope as the clinical services offered by the Clinical Department under previously approved Carve Out Contracts; and (2) the Carve Out Contract satisfies the requirements of Sections 7.03(a)(ii), (iii), (iv), (v), (vi) and (ix).

**7.03(b)(iv)(B)**.  If at any time Yale/YSM is provided access to fewer than 5,000 Covered Persons for a particular Clinical Department for which Health System has single signature contracting authority on behalf of Yale/YSM with respect to Carve Out Contracts under Section 7.03(b)(iii), such authority will be revoked as to such Clinical Department and the provisions of Section 7.03(b)(iv)(A) will become immediately effective.

**7.03(b)(iv)(C)**.  Every three (3) years the Parties will review the appropriateness of the numbers of Covered Persons referred to in Section 7.03(b)(iv)(A).  Until such time as the Parties agree to any change, the numbers of Covered Persons referred to in Section 7.03(b)(iv)(A) will remain the same.  Any mutually agreed upward adjustment in such numbers will apply only to Carve Out Contracts for Clinical Departments as to which no Carve Out Contract is then in existence pursuant to Section 7.03(b)(iv)(A).  Any mutually agreed downward adjustment in such numbers will apply to all then-existing and all future Carve Out Contracts covered by Section 7.03(b)(iv)(A).

**7.03(b)(v)**.  All controversies and disputes as to whether the conditions of Section 7.03(b) are satisfied will be resolved solely by means of the dispute resolution process set forth in Section 4.15, as if such Section applied to this Section 7.03(b), and neither Party will have any legal recourse as to a decision reached pursuant to such process.

**7.03(c) – Yale/YSM Responsibility**.

**7.03(c)(i)**.  Yale/YSM will promptly notify Health System of each Managed Care Contract opportunity that arises and each inquiry made with respect to any negotiation, execution, or modification of a Managed Care Contract as to which Health System may act pursuant to its exclusive single signature contracting authority.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

72

**7.03(c)(ii)**.  Promptly following the Effective Date, Yale/YSM will provide to Health System access to all Managed Care Contracts as to which Yale/YSM is a party or as to which Yale/YSM is currently negotiating, and Health System may make copies thereof.

**7.03(c)(iii)**.  In connection with professional and/or technical services provided by Yale/YSM, Yale/YSM will provide the Yale/YSM Best Rate (*e.g.*, CPT 4 fee schedule, case rates, per diem rates, and/or capitation rates) to Health System for Managed Care Contract purposes that is equal to or lower than rates for similar services (*e.g.*, cardiology or anesthesiology) accepted by Yale/YSM from another similar type (*e.g.*, commercial or Medicaid) of Payor.  Yale/YSM will promptly notify Health System of any change in the Yale/YSM Best Rate.  The Yale/YSM Best Rate as of the Effective Date is set forth in the fee schedule guidelines delivered by Yale/YSM to Health System on the Effective Date. Notwithstanding the provisions of Section 7.03(a)(iii), in the event Yale/YSM enters into a Managed Care Contract providing for reimbursement at a rate lower than the previously established Yale/YSM Best Rate, the Yale/YSM Best Rate will be automatically and immediately reduced to such lower rate, provided that in the case where a Managed Care Contract involves bundled rates for a particular type of physician service ("component physician service"): (A) the Yale/YSM Best Rate for a Managed Care Contract that covers the same component physician service as is covered by an earlier Managed Care Contract will be the bundled rate for the earlier Managed Care Contract, and (B) if the payment to Yale/YSM for any component physician service in a Managed Care Contract is less than the then-existing Yale/YSM Best Rate for such component physician service, the lower rate for such component physician service will not establish a new Yale/YSM Best Rate for such component physician service.

**7.03(c)(iv)**.  Yale/YSM will determine the amount and method by which any global, capitation, case and other similarly aggregated rates that are paid to Yale/YSM for professional and/or technical services provided by Yale/YSM are allocated among Yale/YSM full-time faculty.

**7.03(d) – Physician and Hospital Global Managed Care Contracts**.  Health System may enter into a Managed Care Contract on behalf of Yale/YSM, provided: (i) the Managed Care Contract provides for reimbursement based on a combined physician and hospital global capitation, case rate or other similarly aggregated rate for a single specialty or

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

73

Confidential

service, and (ii) Health System obtains a statement from an unaffiliated actuary, given with a confidence level of eighty-five percent (85%) or higher, that the relevant reimbursement from the Payor will be actuarially equivalent to or greater than the rate that would be necessary to compensate: (A) Yale/YSM at the Yale/YSM Best Rate, and (B) Yale-New Haven Hospital at the YNHH Best Rate, in each case on a fee-for-service basis assuming utilization of services consistent with Yale/YSM and Yale-New Haven Hospital past performance.  Such past performance will be determined by using data and utilization statistics for the relevant service at Yale-New Haven Hospital involving Yale/YSM full-time faculty provided on a comparable basis which data and statistics are in Health System's possession or made available to Health System by Yale/YSM.  For purposes of this Section 7.03(d), the term "YNHH Best Rate" means Yale-New Haven Hospital's lowest rate for contracting purposes (*e.g.*, case rates, per diem rates, and/or capitation rates) that are equal to or lower than rates for similar services (*e.g.*, medical/surgical or maternity) accepted by Yale-New Haven Hospital from another similar type (*e.g.*, commercial or Medicaid) of Payor.  If clause (ii) of this Section 7.03(d) cannot be satisfied, Yale/YSM and Yale-New Haven Hospital will jointly allocate the distribution of professional and hospital components of global, capitation, case and other similarly aggregated rates being paid by the same Payor under the same Managed Care Contract.

**7.04   Yale Behavioral Health**.   For purposes of Sections 7.04(a) and (b), the term "Yale Behavioral Health" means the managed behavioral health program organized and operated by Yale/YSM that: (i) provides clinical behavioral health services through a statewide network of individual practitioners, clinics, agencies and treatment programs, and (ii) offers administrative services for managing and containing the costs of behavioral health patient care.

**7.04(a) – Health System Responsibility**.  Health System will use best efforts to use Yale Behavioral Health for behavioral health medical management, managed care contracting and other administrative services relating to behavioral health.  Health System will use Yale Behavioral Health to lead, with Health System participation, all contract negotiations on behalf of Yale Behavioral Health in cases where a Managed Care Contract for behavioral health is the sole or primary subject of such negotiations.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000263

**7.04(b) – Yale/YSM Responsibility**.  Yale/YSM will use Yale Behavioral Health to coordinate managed care behavioral health contracting on behalf of Yale Behavioral Health with Health System.  Yale/YSM will use Health System to lead all negotiations for managed care behavioral health contracting, with Yale Behavioral Health participation, in cases where a Managed Care Contract for behavioral health is not the sole or primary subject of such negotiations.

**7.05   Managed Care Administrative Services**.  Simultaneously with the execution of this Affiliation Agreement, Health System and Yale/YSM will enter into a Managed Care Administrative Services Agreement, a copy of which is set forth in **Exhibit H**.

**7.06   Medical Management Initiatives**.  Yale/YSM and Health System will jointly participate in the development of disease protocols, clinical pathways and other medical management initiatives for the purpose of providing more efficient and effective patient care by System Members.  Yale/YSM will participate in any such medical management initiatives.

**7.07   Other Managed Care Risk Taking Contracting Entities**.  If an Entity is established by Health System to incur financial risk for the provision of clinical services:  (i) Health System will offer Yale/YSM the opportunity to participate in the ownership of such Entity on terms at least as favorable as those offered to other potential owners, and (ii) Yale/YSM will have the right to appoint one (1) voting representative to the governing board of such Entity if Yale/YSM has an equity interest in such Entity, which representative will serve on any executive committee or similar body of such Entity.  Any such Entity may preserve the role of YNHPHO.  Except as provided in this Section 7.07 and except for Yale/YSM's interest in HealthChoice (or any successor organization), Yale/YSM does not (as of the Effective Date) and will not, directly or indirectly, have an equity or other financial interest in any Entity that incurs risk.  This prohibition does not apply to an individual physician's interest in any such Entity.

ARTICLE VIII
**CORPORATE SERVICES**

**8.01   Clinical Information Systems**.  Yale/YSM and Yale-New Haven Hospital will jointly plan for the coordination of clinical information systems designed to improve the

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000264

effectiveness and efficiency of providing clinical care services, provided Yale/YSM has no obligation to invest in any such systems.  Health System, in turn, will coordinate and, as appropriate, integrate such systems with other clinical information systems of Health System and System Affiliates.

**8.02    Access to Clinical Data**.  Yale/YSM will have access (in accordance with applicable law) to clinical data in Health System's possession and as to which Health System is under no obligation of confidentiality, which data are relevant to Yale/YSM's medical education and clinical research activities.  Such access will be on a "most favored nations" rate arrangement, pursuant to which Health System will provide to Yale/YSM rates for such access that are ten percent (10%) lower than rates provided to any other medical school or similar medical education organization for similar access.  To the extent that a System Member has clinical data that are not in Health System's possession or as to which Health System is under an obligation of confidentiality and such data would be relevant to Yale/YSM's medical education and clinical research activities, Health System will use best efforts to obtain for Yale/YSM access to such data for such activities.  All clinical data provided to Yale/YSM will be provided in a format readily available to others that have access to such data through Health System.

**8.03    Practice Management and Billing Services**.  Yale/YSM may provide practice management and billing services to physicians who are members of YFPP and to physicians who are participants in Yale/YSM-sponsored joint ventures.  Yale/YSM will not directly or indirectly offer such services to other physicians for a period of five (5) years following the Effective Date.

**8.04    Office Space**.  Yale/YSM will use off-campus office space owned or operated under a long-term lease by either Health System or Yale-New Haven Hospital if:  (i) Yale/YSM is in need of additional space, (ii) such space meets the needs and requirements of Yale/YSM, (iii) such space is made available at competitive rates, and (iv) Yale/YSM and Health System or Yale-New Haven Hospital, as the case may be, jointly agree on the terms, provisions, and conditions of a lease arrangement.  Yale/YSM's determination with respect to the leasing of office space pursuant to this Section 8.04 will be final and binding as to Health System and Yale-New Haven Hospital, nor will Health System or Yale-New Haven Hospital have any legal recourse as to that determination.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

76

Confidential

YNHH 000265

## ARTICLE IX
## **FINANCIAL ARRANGEMENTS**

**9.01   Pricing for the Provision of Medical Education, Clinical Program and CME Services**.  For the medical education, Clinical Program and CME services that Yale/YSM provides to System Members (other than Yale-New Haven Hospital), Yale/YSM will charge, and Health System will ensure that each System Member will pay, rates that are calculated in accordance with the Pricing provisions of this Section 9.01 and subject to the Rate Preference:

**9.01(a)** – The Direct Costs for specific individuals who are identified to provide any such services are the salary costs and related fringe benefits related to such individuals, and any costs uniquely and directly related to such services.

**9.01(b)** – The Direct Costs for any of such services that will be provided by a category of employees (*e.g.*, technicians) but no specific individuals are identified within that category, are the average of the salary costs and related fringe benefits of the individuals in that category who perform such services, weighted as nearly as possible by the relative amount of time spent by those individuals.  Yale/YSM will provide Health System annually with such documentation or certification as Health System may reasonably request to demonstrate how such average is determined.

**9.01(c)** – In the case of a Level 1 System Member Medical Education Agreement, Yale/YSM will charge, and Health System will ensure that each System Member will pay, only the Direct Costs associated with such System Member Medical Education Agreement. In the case of a Level 2 or Level 3 System Member Medical Education Agreement, Yale/YSM will charge, and Health System will ensure that each System Member will pay, in addition to the Direct Costs associated with such System Member Medical Education Agreement, the following amounts determined in accordance with Sections 9.01(c)(i), (ii), (iii) and (iv), Section 9.01(d) and Section 9.01(e).

**9.01(c)(i)**.  In the case of each Level 2 System Member Medical Education Agreement as to which the annual charges for the Direct Costs are One Hundred Twenty-Five Thousand Dollars ($125,000) or less: (A) Department Overhead Fees of between zero

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000266

(-0-) and fifteen percent (15%) of the Direct Costs for such System Member Medical Education Agreement, and (B) the Dean's Tax;

**9.01(c)(ii)**. In the case of each Level 2 System Member Medical Education Agreement as to which the annual charges for the Direct Costs exceed One Hundred Twenty-Five Thousand Dollars ($125,000): (A) Department Overhead Fees of between zero (-0-) and fifteen percent (15%) of the Direct Costs for such System Member Medical Education Agreement, (B) Academic Enrichment Fees of between zero (-0-) and forty percent (40%) of such Direct Costs, and (C) the Dean's Tax;

**9.01(c)(iii)**. In the case of each Level 3 System Member Medical Education Agreement, the amounts described in Section 9.01(c)(ii) apply; and

**9.01(c)(iv)**. The One Hundred Twenty Five Thousand Dollar ($125,000) threshold in Sections 9.01(c)(i) and (ii) will be increased periodically by the Inflation Factor.

**9.01(d)** – The Parties will determine the applicable percentage for the Department Overhead Fees and Academic Enrichment Fees described in Section 9.01(c) by good faith negotiation.

**9.01(e)** – Notwithstanding any other provision of this Agreement, for so long as the scope of a System Member Medical Education Agreement remains substantially the same, Yale/YSM may only increase its rate for such System Member Medical Education Agreement periodically by the Inflation Factor.

**9.01(f)** – In the case of a Clinical Program involving Yale/YSM and a System Member, Yale/YSM will charge, and Health System will ensure that the System Member will pay Yale/YSM, in accordance with this Section 9.01(f):

**9.01(f)(i)**. Except with respect to a Clinical Program instituted pursuant to Section 5.04(a)(ii), if a Clinical Program involving the rendering or supervision of a particular type of clinical service is first implemented by Yale/YSM after the Effective Date with a System Member (other than Yale-New Haven Hospital), the financial arrangements negotiated as to that Clinical Program will apply to any subsequent Clinical Program: (A) between Yale/YSM

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

25/99
R\DATA\CLI\AFFIL14.W51

Confidential YNHH 000267

and a System Member which Clinical Program involves the rendering or supervision of comparable clinical services, provided such financial arrangements will be subject to appropriate adjustments based on the respective sizes of the Clinical Programs, and (B) between Yale/YSM and a Non-System Member which Clinical Program involves the rendering or supervision of comparable clinical services, provided the financial arrangements with such Non-System Member will be more generous to Yale/YSM so as to reflect the Rate Preference for System Members.

**9.01(f)(ii)**.  If a Clinical Program involving the rendering or supervision of a particular type of clinical service is first implemented by Yale/YSM after the Effective Date with a Non-System Member, the financial arrangements negotiated as to that Clinical Program will apply to any subsequent Clinical Program between Yale/YSM and a System Member which Clinical Program involves the rendering or supervision of comparable clinical services, provided such financial arrangements will be subject to appropriate adjustment based on the respective sizes of the Clinical Programs.

**9.01(f)(iii)**.  Except with respect to a Clinical Program instituted pursuant to Section 5.04(a)(ii), if Yale/YSM conducts a Clinical Program with two or more System Members, and such Clinical Program involves the rendering or supervision of comparable clinical services, Yale/YSM will charge each such System Member comparable rates, provided such financial arrangements will be subject to appropriate adjustments based on the respective sizes of the Clinical Programs.

**9.01(f)(iv)**.  Notwithstanding any other provision of this Agreement, for so long as a Clinical Program remains substantially the same, Yale/YSM may only increase its rate for such Clinical Program periodically by the Inflation Factor.

**9.01(g)** – In the case of CME services involving Yale/YSM and a System Member, Yale/YSM will charge, and Health System will ensure that the System Member will pay, in accordance with a rate schedule to be negotiated by the Parties at the time such CME services are to be provided.

**9.01(h)** – In support of the Parties' objectives set forth in this Agreement, the Parties will increase their integration through shared planning and coordination of clinical care,

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000268

medical education and other services (which are anticipated to increase efficiencies and decrease health care costs) by, among other things: (i) Health System's entering into Master System Contracts and ensuring that System Members will comply with the provisions of this Agreement that are applicable to them, and (ii) Yale/YSM's providing medical education, Clinical Program and CME services to System Members at the Rate Preference.  Yale/YSM will provide Health System annually with such documentation or certification as Health System may reasonably request to verify that the Rate Preference has been properly applied.

**9.01(i)** – The payment rates set forth in Sections 9.01(c), 9.01(f) and 9.01(g) will take effect in accordance with the following transition schedule:

**9.01(i)(i).**  The methodology for determining the rates for medical education services will take effect at the time that each Medical Education Affiliation between Yale/YSM and each System Member transitions to a System Member Medical Education Agreement incorporated by reference to a Master System Contract as provided in Section 4.14(a)(i).

**9.01(i)(ii).**  The methodology for determining the rates for Clinical Program services and CME services will take effect on the Effective Date, provided the rates charged to a System Member for Clinical Program services or CME services may not be increased until the next renewal of the agreement evidencing such Clinical Program or CME services.

**9.01(i)(iii).**  Yale/YSM will not increase any rates charged to a System Member pursuant to any existing Medical Education Affiliation until such Medical Education Affiliation transitions to a System Member Medical Education Agreement as provided in Section 4.14(a)(i).  At the time each Medical Education Affiliation so transitions, the rates Yale/YSM charges in connection with such Medical Education Affiliation will be the same or lower than the rates charged in connection with such Medical Education Affiliation as of the Effective Date, except that the rates may be increased by the Inflation Factor.

**9.01(i)(iv).**  Subject to the transition schedule described in Sections 9.01(i)(i) through (iii), the Rate Preference will be applied to all Medical Education Affiliations and all Clinical Program services and CME services existing at the Effective Date.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

80

YNHH 000269

**9.02**    **Yale/YSM Financial Support of System Operations**.

**9.02(a)** – Yale/YSM will pay Health System one quarter of one percent (0.25%) of Yale/YSM Collections in connection with the provision of clinical services (which in the case of joint ventures and other investment vehicles will mean Yale/YSM's share of the venture's or other investment vehicle's cash collections), whether such services are provided to patients cared for by YFPP or through such ventures or other investment vehicles, such payment to be made to support the general operations of Health System.

**9.02(b)** – Yale/YSM will make such payments to Health System quarterly on an estimated basis by no later than the forty-fifth (45th) day after the start of each calendar quarter, and will make a final calculation as to the amounts actually due by no later than the forty-fifth (45th) day after the start of the next calendar quarter.  At that time, Yale/YSM will pay any shortfall to Health System and Health System will credit any overage against amounts owed by Yale/YSM, such credit to be made in the next calendar quarter and then in any successive calendar quarter if the overpayment is greater than the amount owed in the next calendar quarter.  Such credits and payments will be applied independently of and without offset as to any other obligations between Yale/YSM and Health System.

**9.02(c)** – Commencing in January 2004 and every five (5) years thereafter, the Dean and the President/CEO will review the then-current percentage being applied to Yale/YSM Collections and determine what percentage of Yale/YSM Collections will be paid by Yale/YSM during the next five (5) year period.  If the Dean and the President/CEO cannot reach Consensus as to the percentage for the next five (5) calendar year period on or before September 30 of the year in which the review is to take place, the matter will be referred to a governance committee that will be composed of three (3) directors of Yale Corporation's Board of Directors (appointed by the President of Yale University) and three (3) directors of Health System's Board of Directors (appointed by the Chair of the Board).  If such committee does not reach Consensus as to such percentage on or before December 31 of the year in which the review is to be conducted, this Agreement may be terminated in accordance with Section 10.02(i).

**9.03**    **New Clinical Program Development Fund**.  Health System, Yale-New Haven Hospital and Yale/YSM will jointly establish the New Clinical Program Development Fund

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

81

Confidential

YNHH 000270

to support New Clinical Programs pursuant to the terms of the Fund Agreement, a copy of which is set forth in **Exhibit A**.  During any notice period specified in the Fund Agreement as being required prior to termination of the Fund Agreement, the amounts (if any) that Yale/YSM and Health System will contribute to the Fund will be as set forth in the Fund Agreement.

## ARTICLE X
## TERM AND TERMINATION

**10.01  Term**.  This Agreement will remain in effect unless it is terminated as provided in Section 10.02.

**10.02  Termination**.  This Agreement may be terminated in the following circumstances:

**10.02(a) – Mutual Termination – Loss of Accreditation, License or Medicare/Medicaid Participation**.  Either Party may terminate this Agreement upon thirty (30) days prior notice in the event that the other Party (or in the case of Health System, Health System or any hospital that is Affiliated with a System Member):  (i) becomes insolvent or bankrupt, (ii) loses its hospital, medical school or university accreditation or license (as the case may be) as a result of third-party action, or (iii) has its right to participate in Medicare or Medicaid terminated as the result of third-party action.  For purposes of this Section 10.02(a), a license or accreditation, or Medicare or Medicaid participation, as the case may be, is not "lost" or "terminated" for so long as: (A) the affected Party is appealing or otherwise contesting (or in the case of Health System the affected hospital is appealing or otherwise contesting) such loss or termination, and (B) such accreditation, license or participation remains in effect pending the outcome of any such appeal or contest.  A license, accreditation or participation is "lost" or "terminated" if after all appeals have been taken and determined, or all appeal periods have lapsed, such license, accreditation or participation is no longer in effect.

**10.02(b) – Health System – Not Tax-Exempt**.  Yale/YSM may terminate this Agreement upon thirty (30) days prior notice in the event that Health System, or any hospital

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000271

that is Affiliated with a System Member, is no longer a tax-exempt Entity.

**10.02(c) – Yale University – Not Tax-Exempt.**  Health System may terminate this Agreement upon thirty (30) days prior notice in the event that Yale University is no longer a tax-exempt Entity or in the event that Yale School of Medicine becomes a separate Entity and is not tax-exempt.

**10.02(d) – Yale/YSM Termination – Change of Board Composition.**  Yale/YSM may terminate this Agreement upon one hundred twenty (120) days prior notice if persons nominated by Yale-New Haven Hospital together with persons nominated by Yale University no longer collectively comprise a majority of the Board of Directors of Health System, and such fact will have a material adverse impact on the mission of Yale/YSM (as determined in the sole discretion of Yale/YSM), or on the mission of the Medical Center, or on the purposes for which Yale/YSM and Health System executed this Agreement.

**10.02(e) – Yale/YSM Right to Terminate Upon Sale of Assets, Merger or Consolidation.**  Yale/YSM may terminate this Agreement upon one hundred twenty (120) days prior notice if: (i) Health System or Yale-New Haven Hospital sells or otherwise transfers all or substantially all of its assets to an Entity not Affiliated with Health System or Yale-New Haven Hospital, or (ii) Health System or Yale-New Haven Hospital merges or consolidates with an Entity not Affiliated with Health System or Yale-New Haven Hospital. In the event any transaction of the type described in clause (i) or (ii) above occurs and involves a sale to an Affiliate of Health System or Yale-New Haven Hospital, such Affiliate will automatically be subject to this Agreement.

**10.02(f) – Health System Right to Terminate Upon Sale of Assets, Merger or Consolidation.**  Health System may terminate this Agreement upon one hundred twenty (120) days prior notice if: (i) Yale University sells or otherwise transfers all or substantially all of the assets of the Yale School of Medicine or of YFPP to an Entity not Affiliated with Yale/YSM, or (ii) Yale University establishes either the Yale School of Medicine or YFPP as an Entity and merges or consolidates that Entity with an Entity not Affiliated with Yale/YSM.  In the event any transaction of the type described in clause (i) or (ii) occurs and involves a sale to an Affiliate of Yale University, Yale School of Medicine or YFPP, such Affiliate will automatically be subject to this Agreement.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

83

YNHH 000272

### 10.02(g) – Yale/YSM Right to Terminate Upon Certain Significant Events.

Yale/YSM may terminate this Agreement upon one hundred twenty (120) days prior notice if either Health System or Yale-New Haven Hospital becomes Controlled by an Entity in a manner other than that described in Section 10.02(e), and Health System's or Yale-New Haven Hospital's representatives, as the case may be, do not have either: (i) the right to elect or designate fifty percent (50%) or more of the Board of such other Entity, or (ii) the contractual or other rights that give (A) Health System's representatives to such Board the right to administer this Agreement in all material respects, or (B) Yale-New Haven Hospital's representatives to such Board the right to administer Yale-New Haven Hospital's rights and obligations under this Agreement in all material respects.

### 10.02(h) – Health System Right to Terminate Upon Certain Significant Events.

Health System may terminate this Agreement upon one hundred twenty (120) days prior notice if Yale/YSM becomes Controlled by an Entity in a manner other than that described in Section 10.02(f), and Yale/YSM's representatives do not have either: (i) the right to elect or designate fifty percent (50%) or more of the Board of such other Entity, or (ii) the contractual or other rights that give Yale/YSM's representatives to such Board the right to administer this Agreement in all material respects.

### 10.02(i) – Mutual Termination Upon Specified Events.

(i)   Either Party may terminate this Agreement upon two (2) years prior notice if no agreement has been reached by the Parties concerning: (A) Yale/YSM's responsibility as to Medical Education Affiliations with Secondary Health Care Providers as set forth in Section 4.04; or (B) continuations of then-existing Medical Education Affiliations in accordance with Section 4.05(a); or (C)  Yale/YSM's responsibility as to Hospital Sponsored Clinical Programs with Secondary Health Care Providers as set forth in Section 5.05(b); or (D) continuations of then-existing Hospital Sponsored Clinical Programs in accordance with Section 5.05(e); or (E) the percentage of Yale/YSM Collections that Yale/YSM will pay to Health System as described in Section 9.02(c).

(ii)   Either party may terminate this Agreement upon one (1) year prior notice if no agreement is reached on a replacement provision in accordance with Section 11.17.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

84

**10.02(j) – Termination by Board Action**.  Either Party may terminate this Agreement upon five (5) years prior notice if at least two-thirds (2/3) of the members of the governing body of the terminating Party vote to terminate this Agreement at each of two Board meetings that must be held at least six (6) months, but not more than nine (9) months, apart.

**10.02(k) – Termination for Breach**.

**10.02(k)(i)**.  Either Party may terminate this Agreement if the other Party has breached this Agreement and such breach has not been cured to the notifying Party's reasonable satisfaction within ninety (90) days after the date that the nonbreaching Party gives notice to the other Party specifying the breach.  Termination will be effective immediately upon the notifying Party's notice to the breaching Party at the close of the cure period.  Notwithstanding the foregoing, no termination will occur if:  (A) the breach is of a type that cannot reasonably be cured within such time period; and (B) the breaching Party is making continuous, good faith efforts to cure such breach and such breach is cured to the reasonable satisfaction of the notifying Party within one (1) year following the notice of such breach.

**10.02(k)(ii)**.  During the cure period set forth in Section 10.02(k)(i), the non-breaching Party may: (A) seek appropriate relief consistent with Section 11.10, and (B) withhold payment of any amounts to be paid under the terms of this Agreement or the Fund Agreement until the breach has been cured or otherwise resolved to the reasonable satisfaction of the non-breaching party.  If (1) a breach is subsequently cured, or (2) a breach is claimed but it is later determined that no breach occurred, the Party that withheld amounts to be paid under the terms of this Agreement or the Fund Agreement will promptly pay to the other Party or the Fund, as the case may be, the withheld amounts, provided if clause (2) is applicable, such Party will also pay interest on the withheld amounts at a rate of two percent (2%) per annum over the prime rate (as reported in The Wall Street Journal on the due date of such withheld payments) on the date of payment of the withheld amounts for the period from the date any such amounts were due to the date such amount is paid.

**10.02(k)(iii)**.  A breach of the Fund Agreement will be deemed to be a breach of this Agreement.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

85

YNHH 000274

**10.02(l) – Termination of Fund Agreement**.  In the circumstance of Health System's or Yale/YSM's giving notice of any termination of the Fund Agreement, such Party will also simultaneously give such notice to the other Party to this Agreement.  Regardless of whether such notice is given, or is required to be given, this Agreement will automatically terminate upon the termination of the Fund Agreement.

**10.03   Termination as Remedy**.  Except as provided in Section 10.02(k), in the event either Party terminates this Agreement pursuant to Section 10.02, such termination will be the sole and exclusive remedy of the Parties.

**10.04   Effect of Notice of Termination**.  Except as otherwise specifically provided in this Agreement, during any notice period following a notice of termination, the terms of this Agreement will remain in full force and effect.

**10.05   Effect of Termination**.   Upon the effective date of termination of this Agreement, all rights and obligations of the Parties will terminate except the following, which will survive in accordance with their terms:

**10.05(a)** – The Parties' rights and obligations under any System Member Medical Education Agreement, Hospital Sponsored Clinical Program agreement, Government Sponsored Clinical Program agreement, and Managed Care Contract, for the term of each such agreement.

**10.05(b)** – With respect to each Managed Care Contract then in force, the Parties' obligations pursuant to Article VII, until the last to expire of such Managed Care Contracts expires.

**10.05(c)** – Continuing obligations of the Parties pursuant to Section 7.09 of the Fund Agreement.

**10.05(d)** – Obligations of confidentiality, pursuant to Section 11.01.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

Confidential

YNHH 000275

## ARTICLE XI
## MISCELLANEOUS

**11.01  Confidentiality**.  Neither Party will make this Agreement or any portion hereof available to any person not a Party hereto, other than: (i) to that Party's legal counsel, auditors and other advisors, (ii) to that Party's employees, prospective employees and medical staff leadership, (iii) to the management and the governing body of prospective System Affiliates, (iv) any person or Entity to whom any of the President/CEO, the Yale University President or the Dean at any time in that individual's sole discretion elects to make this Agreement or any portion hereof available, and (v) as required pursuant to a valid order of a court or other governmental body or any political subdivision thereof, provided that to the extent that it may lawfully do so, the Party subject to such order will first have given notice of such order to the other Party and (to the extent possible) given the other Party a reasonable opportunity to interpose an objection or obtain a protective order requiring that this Agreement or any portion hereof be used only for the purpose for which the order was issued.  If this Agreement or any portion hereof is made available pursuant to this Section 11.01, each person to whom it is made available will be advised not to make this Agreement or any portion hereof available to any other person or Entity.  The obligations of this Section 11.01 will survive termination of this Agreement.

**11.02  Use of Yale/YSM Name by Non-System Members**.  Yale/YSM will ensure that the names "Yale" and "Yale School of Medicine", or any variation thereof, will be used in connection with any Medical Education Affiliation or Clinical Program with a Non-System Member only: (i) on a diploma, (ii) in reference materials (the purpose of which is not general advertising) relating to medical education, (iii) for accreditation materials, (iv) as required by law, and (v) to identify a physician as a member of the Yale/YSM faculty.

**11.03  Good Faith; Consensus; Consents**.  The Parties will undertake all obligations in good faith and diligence.  Such undertaking includes best efforts to schedule and to attend meetings; to submit materials and analyses as requested by either Party to assist either Party to evaluate or review a matter in a constructive and thorough manner; to evaluate or review a matter in a constructive and thorough manner; to strive for reaching Consensus or agreement when called for; and not to unreasonably withhold or delay a requested consent.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

87

Confidential

YNHH 000276

**11.04  Affiliation Procedures**.  Health System and Yale/YSM will jointly develop a policy manual and information and procedures to implement this Agreement.

**11.05  Health System Assurance of System Member Compliance**.  Health System will ensure that each System Member will comply with the provisions of this Agreement that are applicable to System Members.

**11.06  Assignment**.  This Agreement will be assignable by a Party only upon the prior written consent of the other Party, provided that the last clause of Section 11.03 will not apply to this Section 11.06.

**11.07  Notices**.  All notices, requests, approvals, demands and other communications required or permitted to be given under this Agreement will be in writing and will be deemed to have been duly given and to be effective when delivered personally (including delivery by express or courier services) or, if mailed, three (3) business days after being deposited in the United States mail as registered or certified mail, postage prepaid, return receipt requested, in each case addressed to the Parties at the following addresses, or to such other address as either Party may designate by notice to the other:

If to Yale/YSM:                              With a copy to:

    Dean                                 General Counsel
    Yale University                      Yale University
    School of Medicine                   Two Whitney Avenue
    333 Cedar Street                     New Haven, CT 06510
    New Haven, CT 06520-8055

    President
    Yale University
    Woodbridge Hall
    New Haven, CT 06520-8229

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

88

YNHH 000277

If to Health System:                          With a copy to:

Office of President/CEO                  D. Terence Jones, Esq.
Yale New Haven Health Services      Wiggin & Dana
789 Howard Avenue                         One Century Tower
New Haven, CT 06519                      New Haven, CT 06508-1832

**11.08  Strict Compliance**.  No failure by either Party to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement will constitute a waiver of any breach of such covenant, agreement, term or condition.  No waiver of any breach of this Agreement will affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement will continue in full force and effect.

**11.09  Successors and Assigns**.  This Agreement will inure to the benefit of and be binding upon the Parties, and their respective permitted successors and assigns.

**11.10  Remedies; Limitation of Damages**.  The Parties are entitled to pursue their remedies at law and equity.  Except as otherwise specifically provided in this Agreement, the Parties will be entitled to restrain by injunction of the violation, or attempted or threatened violation, of any condition or provision of this Agreement, or to a decree specifically compelling performance of any such condition or provision, or to a declaratory judgment concerning any such condition or provision.  In no event will either Party be liable for indirect, incidental, consequential, or any damages other than direct damages, regardless whether a claim therefor is based in contract, tort, strict liability, or any other legal theory.

**11.11  Amendment**.  Except as provided herein, neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated except by the written agreement of the Parties.

**11.12  Captions**.  The captions to this Agreement are for convenience of reference only and in no way define, limit or describe the scope or intent of this Agreement or any part hereof, nor in any way affect this Agreement or any part hereof.

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

89

Confidential
YNHH 000278

**11.13  Cross References**. All references to Exhibits in the text of this Agreement are to the Exhibits to this Agreement.

**11.14  Construction** .

**11.14(a)** – If pursuant to this Agreement an action is required or permitted by a specific date, but such day: (i) is not a business day (*e.g.*, a Saturday, Sunday or major holiday), such date will be extended to the next business day, or (ii) falls on or between December 20 and January 6, such date will be extended to January 7.

**11.14(b)** – Use of any of the following phrases, "for example," "*e.g.*," "such as" or "include" or "including," shall be construed to mean "including but not limited to."

**11.15  Controlling Law**.  This Agreement will be construed, and the rights and liabilities of the Parties determined, in accordance with the laws of the State of Connecticut; provided that the conflicts of law principles of the State of Connecticut will not apply to the extent that they would operate to apply the laws of another state.

**11.16  Entire Agreement**.  This Agreement (including all Exhibits), together with the Fund Agreement, the Managed Care Administrative Services Agreement and any letter agreements executed as of the Effective Date, constitute the entire agreement between the Parties and supersede all prior agreements, oral or written, with respect to the subject matter hereof.

**11.17  Severability**.  If any provision of this Agreement is for any reason held to be invalid or unenforceable, such invalidity or unenforceability will not affect any other provision hereof, and this Agreement will be construed as if such invalid or unenforceable provision were omitted, unless the absence of such provision has a material adverse effect on the substantive rights of either Party.  The Parties will in such instance use best efforts to replace such provision with a valid, enforceable provision that, insofar as practical, implements the purposes of this Agreement.  If the Parties fail to agree upon such replacement provision within ninety (90) days from the date the Parties are notified of any such invalidity or unenforceability, this Agreement may be terminated in accordance with Section 10.02(i)(ii).

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

6/25/99
F:\DATA\CLI\AFFIL14.W51

90

**11.18  No Third-Party Beneficiaries**.  Except as otherwise specifically provided in this Agreement, this Agreement is solely for the benefit of the Parties and no third-party will have any rights with respect to the subject matter of this Agreement and no System Affiliate, physician or other provider will have any right to enforce this Agreement.

**11.19  Execution in Counterparts**.  This Agreement may be executed in two (2) or more counterparts, each of which will be an original, but all of which taken together will constitute one and the same Agreement.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the day and year first written above.

**Yale University**                                    **Yale New Haven Health Services Corporation**


By: _Richard C Levin_                       By: _Joseph A. Zaccagnino_
Richard C. Levin                                      Joseph A. Zaccagnino
President                                             President and Chief Executive Officer

*CONFIDENTIAL*
*PLEASE DO NOT DUPLICATE OR DISTRIBUTE*

*6/25/99*
*F:\DATA\CLI\AFFIL14.W51*

91