1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3
     EQUAL EMPLOYMENT              )
4    OPPORTUNITY COMMISSION,       )
                   Plaintiff,  )        NO: 3:20CV187(VLB)
5                                  )
     vs.                           )
6                                  )        June 28, 2021
     YALE NEW HAVEN HOSPITAL,      )
7    INC.,                         )
                   Defendant.  )        Discovery Dispute
8    _____          Teleconference

9
                         450 Main Street
10                      Hartford, Connecticut

11   B E F O R E :
             THE HONORABLE VANESSA L. BRYANT, U.S.D.J.

12

13   A P P E A R A N C E S :

14   For the Plaintiff :      CAITLIN D. BROWN
                              KIMBERLY ANNE CRUZ
15                            KIRSTEN PETERS
                              Equal Employment Opportunity Comm.
16                            33 Whitehall Street, 5th Floor
                              New York, NY 10004
17
                              MARKUS LANDON PENZEL
18                            Equal Employment Opportunity Comm.
                              JFK Federal Building
19                            Suite 475
                              Boston, MA 02203
20
     For the Defendant:       MARY A. GAMBARDELLA
21                            JOSHUA J. WYATT
                              Wiggin & Dana LLP
22                            Two Stamford Plaza
                              281 Tresser Boulevard
23                            Stamford, CT 06901

24
     Court Reporter:          Martha C. Marshall, RMR, CRR
25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

```
 1

 2    APPEARANCES (Continued):

 3    For the Defendant:          CHRISTOPHER DeGROFF
                                  Seyfarth Shaw LLP
 4                                233 S. Wacker Drive
                                  Suite 8000
 5                                Chicago, IL 60606

 6                                SHANA MADIGAN
                                  Seyfarth Shaw LLP
 7                                975 F Street NW
                                  Washington, DC 20004
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Do we have everyone assembled?

2          THE CLERK:  Yes, Your Honor.  We're ready to

3   proceed.

4          THE COURT:  All right.  I think the first piece of

5   information I need is some understanding as to why there

6   isn't and why I would not need a privilege log in order to

7   resolve this matter.

8          Can Yale respond to that, please.

9          MS. GAMBARDELLA:  Your Honor, on behalf of the

10  defendant, this is Mary Gambardella.

11         What we have said is that the wholesale production

12  of the files would be subject to privilege.  And we have

13  offered to do some kind of targeting in terms of the contents

14  of the file to better be able to develop that privilege log.

15  If we could agree on portions of these files, but that has

16  been a bit of a struggle for us at this point.

17         THE COURT:  I don't understand why you haven't

18  produced a privilege log.  Are you unclear as to what the

19  plaintiffs have requested?

20         MS. GAMBARDELLA:  We are -- the request that we

21  understand is wholesale production of entire files for 115

22  individuals.

23         THE COURT:  Personnel files, is that correct?

24         MS. GAMBARDELLA:  If I may, Your Honor, there are

25  two types of files at issue.  One is a credentialing file

which I would agree with you is akin to a type of personnel

file.  The reason we don't call it that is because

technically, even though we stipulated for ease of discovery

in this case, technically they're not W-2 employees.  So we

don't call them personnel files as you would with a W-2

employee.

So there's a credentialing file that has certain

types of information that we have outlined in the motion.

Then there's what we call peer review files.  And peer review

files contain various types of information that we've also

listed in our brief, and I'm happy to relist them for you

now.

And so what we've understood is they would, without

any compromise, like wholesale production of all of those

files for 115 aggrieved individuals.  The typical format of a

privilege log would be, for example, we will give you this

part of the file, but this part of the file is privileged.

In this case, what we have suggested is that we go through

these things and try to resolve that, and then we would

produce a privilege log that would target elements of these

files.  And that has been part of the obstacle at this point

for us.

THE COURT:  I don't see how the EEOC could possibly

negotiate your assertion of privilege without your complying

with the Federal Rules of Civil Procedures requirement that

1       you produce a privilege log.

2              MS. GAMBARDELLA:  So for purposes of this

3       discussion, what we've said is privileged are the entirety of

4       these files.

5              THE COURT:  And you claim that they are privilege

6       because of the peer review privilege?

7              MS. GAMBARDELLA:  There are two bases that we've

8       outlined in our opposition papers.  One is absolutely, you're

9       absolutely correct, the peer review privilege that we are

10      asking the Court to at least apply the factors and determine

11      that even though it's not under the Federal Rules, it should

12      be applied as it has been analyzed in other cases.

13             The second would be alternatively that the privacy

14      interest of the individuals involved who have been promised

15      in many forms over and over and over the years that these

16      things will remain confidential, that like you would analyze

17      in any other case where there's wholesale production

18      demanded, that those files be protected.

19             And just by way of emphasis, we are having a very

20      difficult time reconciling the EEOC's counter argument.  So

21      there's this issue that -- I'm not going to go into the

22      issue.  I just want to mention it for this purpose.  That we

23      should not be allowed in Phase II to take any individual

24      depositions which we have indicated would be for a different

25      purpose.  I only mention that because while on the one hand

1  arguing we shouldn't be able to do that because

2  individualized assessments, individualized circumstances are

3  not relevant to the case, it's about a blanket policy and,

4  you know, an exam as it applies to everybody in the category.

5  And on the other hand they say they want the production of

6  these entire files for the 115 individuals.

7       So it would be two alternative theories that we are

8  espousing, that these files contain very confidential, very

9  private information, that these individuals have been

10 promised would stay that way.  And we can't seem to get any

11 compromise.  We've also suggested that they indicate to us

12 who in the aggrieved individual group has said they want no

13 part of participating in this and at least narrow it down

14 from the 115.  I understand the 115 may be entitled to

15 relief, depending on the rulings of the Court on the case,

16 but in terms of discovery at this point, given what's in

17 these files, if the EEOC has themselves espoused this is

18 about a policy, a blanket policy, an exam, why do we purvey

19 the privacy interest of 115 physicians at this point in time

20 at least.

21       THE COURT:  The privacy -- whose privacy?  You're

22 talking about the privacy of the plaintiff, the individual

23 plaintiffs or some of them?

24       MS. GAMBARDELLA:  Yes, yes.  Yes, Your Honor,

25 exactly.

1       THE COURT:  They're asking for it.  How can they

2   invade their own privacy?

3       MS. GAMBARDELLA:  No, they're not all asking for it

4   which is what we've said.  We've asked the EEOC to identify

5   who of the 115 aggrieved are active participants in the

6   litigation and willing participants.  Thus far, I think we

7   have seen between 7 to 11 of those.

8       THE COURT:  Participants?

9       MS. GAMBARDELLA:  And we have suggested that -- yes.

10      So while the 115, you know, I will confess the EEOC

11  has maintained that if, for example, Your Honor were to find

12  there's a violation of the law based on the application of

13  this policy, then whether or not I say I want to be an active

14  participant, I may be entitled to relief, just like a class

15  action, right.  I get a notice and I might get money and that

16  kind of thing.  But there's a difference between that and

17  saying I'm an active participant and I'm okay with getting

18  these files.  I want my file.  We have actually suggested

19  that we would go back and say, okay, if these are the active

20  participants and they want them, that's a different story.

21  So we have been struggling with that concept.

22      THE COURT:  Okay.  And the peer review privilege has

23  been applied in this type of situation?

24      MS. GAMBARDELLA:  So the peer review privilege has

25  been applied most often in medical malpractice and other

1    kinds of cases involving regulatory.  In civil rights cases

2    where we're dealing with individual plaintiffs who are saying

3    I, Dr. A, I've been discriminated against in the application

4    of performance management.  That there's younger physicians

5    who are treated better in similarly situated circumstances

6    where their performance has been like mine.  Then it has not

7    been applied.  But the Court after applying the factors.  And

8    so it's important to our argument to note that the Court does

9    not automatically say, sorry, it doesn't apply.  The Court

10   will go through the factors and then at the end of the

11   analysis, as Your Honor did in one of the cases.

12              THE COURT:  Yes.

13              MS. GAMBARDELLA:  Yes, the need for the file based

14   on the claim outweighs this interest.  This is not -- our

15   argument, therefore, is this is not that kind of civil rights

16   case.  This case, as the EEOC itself in multiple pleadings

17   has said, it's about a policy.  It's about application of a

18   policy.  And so it's not about -- go ahead, I'm sorry.

19              THE COURT:  Isn't this more akin to a staff

20   reduction case?

21              MS. GAMBARDELLA:  In a way.  I would say because a

22   staff reduction case, as Your Honor's noting, is a lot about

23   disparate impact in a reduction in force.  It's kind of like

24   that.  And so, however, the distinction here is in a

25   reduction in force case, the analysis would have to delve

1  into why I was selected to be marked for my job to be

2  eliminated.  And where performance -- so if you have all

3  objective criteria, for example, you know, last hired/first

4  fired, if you don't have all objective criteria, let's say,

5  for example, one of the criteria applied to the staff

6  reduction is performance, then I would go back to, you know

7  what, I would see why you have to look at personnel files.

8  Because if there's three people, incumbents in a position,

9  one has to be eliminated, and I say to the Court, well, I

10  think it was because of my age, not my performance.  Then I

11  would understand why you might see the two other files.  But

12  even in cases like that, Your Honor, which, you know, we've

13  all litigated, the wholesale production, for example, of

14  everybody's files has been analyzed as whether or not it's

15  necessary.  So, for example, if I have the scenario I just

16  presented to Your Honor.  I'm one of three.  It picked me.  I

17  think performance was one of the criteria applied and I would

18  say, well, wait a minute, you know, then let's look at the

19  performance of the other two.  If the plaintiff were to say I

20  want the personnel file of all 100 who were retained in every

21  category.  As you know, Your Honor, the defendant would say

22  wait a minute, Your Honor, I don't know why we have to invade

23  the privacy of, you know, 97 other individuals unless the

24  plaintiff is claiming there was something else going on.  The

25  court would narrow that production to the chain of

1    decision-makers for that particular position.  And so it is

2    like that, but the outcome wouldn't necessarily be the same.

3    And what I'm saying it's more like, wait a minute, why do we

4    have to see the very private files of 115 physicians when 115

5    physicians haven't said, yes, yes, we're part of this.  We

6    want this out in the open.

7              The EEOC has also made it clear that their

8    philosophy over all is to make everything public.  And so

9    credentialing files, for example, have not just plain

10   licensing information.  They have information about

11   discipline in other states that have nothing to do with the

12   testing.  They have information about criminal background

13   checks.  They have all kinds of private information that

14   would go with whether or not a physician can have privileges

15   at a hospital.

16             The peer review file would be for discipline within

17   Yale New Haven Hospital for a variety of reasons - conduct,

18   competency.  And so how do we tell these doctors, yeah, we

19   told you that this process will be protected.  We will fight

20   to protect it.  But if 115 of you, despite how many of you

21   are willing participants, well, you know, that's got to go

22   out the door.  That's got to be publicly seen.  That could be

23   subject to public view, including malpractice information and

24   things like that.

25             THE COURT:  There's a confidentiality agreement here

1    so -- not agreement, but order here.  So there's not going to

2    be any public dissemination of this material.  Am I correct?

3          MS. GAMBARDELLA:  Well, it depends on the notion of

4    whether or not this could be attorneys eyes only which it's

5    my understanding that the EEOC has pushed back on.  And it's

6    also whether or not any elements of these files are going to

7    be seen between the seven to eleven individuals who are

8    active participants versus the less than 100 who have not

9    been identified today who are not.  So it's -- you know,

10   there's a concern here about that given the philosophy that's

11   been propounded by the EEOC as we understand it so far.  But

12   again --

13         THE COURT:  -- interested everything being made

14   public.  You're concerned about the peer review files being

15   shared with the seven or eight individuals who are actively

16   involved in the case, that's to your concern?

17         MS. GAMBARDELLA:  That's a secondary -- yes, that's

18   also a concern.

19         THE COURT:  Well, that's resolvable.  That's readily

20   resolvable.

21         As you said, there is a confidentiality agreement in

22   place.  The Court can order that only the attorneys review

23   that material.  So that can be resolved.

24         As far as promised confidentiality is concerned, you

25   couldn't possibly -- Yale could not have possibly guaranteed

1  absolute confidentiality.  There are a whole bevy of laws

2  that could require disclosure of this information.  A peer

3  review privilege is not absolute.  So I can't imagine that

4  these people had been promised that this information will be

5  confidential.

6          MS. GAMBARDELLA:  Could I modify that?

7          THE COURT:  I'm sorry.  I've said it multiple times.

8  But say, for example, you review -- the peer review

9  disclosure revealed that none of the doctors, 70 and older,

10 have been criticized through a peer review process for their

11 performance.  Would that not call into question the propriety

12 of having an across the board mandate or physicians 70 and

13 older?

14         MS. GAMBARDELLA:  So, again, in terms of the merits

15 of the policy, we would be relying on expert testimony about

16 research and data about the deterioration in the physician

17 and being proactive about protecting patients.

18         THE COURT:  I understand that.  But that could be

19 countered with actual as opposed to theoretical or academic

20 opinion.

21         MS. GAMBARDELLA:  Absolutely.

22         THE COURT:  So isn't that probative?

23         MS. GAMBARDELLA:  But let me respond in terms of the

24 discovery -- oh, I'm sorry, Judge.  The phone kind of goes in

25 and out.

1          THE COURT:  Yes.  Go ahead.

2          MS. GAMBARDELLA:  Okay.  So we have already produced

3   the names of the individual practitioners during the relevant

4   time period who have been subjected.  We have produced the

5   data on the results.  We can produce data about whether or

6   not they have demonstrated problems preceding the test.  We

7   have been -- we're ready to produce what we track in terms of

8   that.  So that information is something that we have been

9   providing.

10         So in terms of the generalized statistical

11  information, that we've been providing to the EEOC.  So they

12  know by name who's been subjected to the test, when, what the

13  result was.  And we have been going back with the client

14  tracking any registering of a complaint and errors and things

15  for these individuals who have been subjected to the policy.

16  So that information is not something we are saying they can't

17  have.

18         THE COURT:  But you're not giving them the outcome

19  of the investigation into the complaint.  A party is not

20  entitled to circumscribe the discovery of their opponent.

21  This is discovery.

22         MS. GAMBARDELLA:  But we're not trying to do that,

23  Judge.  Please understand that we're not trying to do that.

24  What we're trying to do is narrow it down.  So we have been

25  happy to have a discussion about the narrowing down, because

1    115 credentialing and peer review files, which are separate

2    files, the wholesale production is what we're pushing back

3    on, not the discovery.  So what we have suggested --

4         THE COURT:  You're giving up the credentialing

5    files, correct?

6         MS. GAMBARDELLA:  Not wholesale credentialing files

7    of the 115 people.  We have objected to that.  What we

8    have --

9         THE COURT:  I thought you agreed to produce the

10   credentialing files.  No?

11        MS. GAMBARDELLA:  No.  I'm sorry, Your Honor, if I

12   misled you.  But what we have suggested, for example, is that

13   we do a sampling and say to the EEOC here's a sample file.

14   And let's take one of the people who you've identified as an

15   active participant.  Can you tell us, do you really need

16   everything in the file or is there a compromise?  And list it

17   by category.  That we have suggested as a compromise because,

18   again, it's volumes of information.

19        THE COURT:  How can they know if they need it if

20   they don't know what's in it?  And aren't these

21   electronically maintained files?

22        MS. GAMBARDELLA:  Not all, no.

23        THE COURT:  How are they maintained?

24        MS. GAMBARDELLA:  Many are in hard copy.  Some is

25   electronic.  Some is printed off and maintained in hard copy

1  in the Risk Management Office.

2  THE COURT:  Okay.  And are they separated from other

3  files?  Are they organized?

4  MS. GAMBARDELLA:  Yes.  Well, they're organized by

5  physician.  Some of the physicians may not have had much in

6  the peer review file.  Some may have much, depending on how

7  long they've been there, anything that's come up.  And so

8  there is no interest on our part in having the EEOC guess

9  what they want.  We have offered to do a file sampling to

10  show them the categories at least to try to narrow this

11  dispute down.

12  And we have not ever guaranteed confidentiality.

13  What we have promised is that if, you know, an occasion like

14  this comes up, we will do our utmost to protect their private

15  information.  That's what we promised.  And I'm hoping that

16  you understand that that's what we're trying to do.

17  And so we've offered the sampling.  We've offered

18  not just one file, we've offered to say, look, let's pick a

19  couple of files from the people who we know are

20  participating.  Let us show you the kind of things that are

21  in there and let's try to target.  And we have not been

22  successful.

23  THE COURT:  All right.  Is there anything else you

24  would like to say?

25  MS. GAMBARDELLA:  The only thing I'd like to say,

Your Honor, is that this is about a policy. It's about the

application of a policy. It is not at this point about the

licensing of doctor number 95 and whether or not he was

licensed in New Hampshire, he had discipline in New

Hampshire, and that had to be resolved before he could have

privileges at Yale New Haven Hospital. It is about a policy.

And so I would ask that Your Honor consider helping

us narrow this down, helping to make this efficient, and

weighing the privacy interest of the doctors who -- I mean,

we know some of these physicians have actually told the EEOC

we are not participants. We are in agreement with the

policy. And I'll tell you the only reason we know is because

they have been contacting Yale New Haven Hospital Chief

Medical Officer's Office and they've been sending copies of

their emails or emailing us to say they don't want any part

of it.

And so we're just struggling, Your Honor. This is

not about trying to obstruct discovery. We're trying to keep

discovery pointed, narrowed as possible, and efficient, while

protecting somebody like that who says I don't want to be

part of this. And now their file could potentially be viewed

by people outside of the circle.

And so we would just ask that you carefully weigh

and consider the balancing of interest in this case. And

thank you for listening.

1          THE COURT:  How many physicians have approached you

2     and said they want no part of this?

3          MS. GAMBARDELLA:  I think -- I have not gotten an

4     update recently, in all candor.  But as of my last

5     conversation, it was approaching a dozen.

6          THE COURT:  Okay.  Thank you.

7          MS. GAMBARDELLA:  Thank you, Your Honor.

8          THE COURT:  You're welcome.

9          And from the defense, please -- I mean the

10    plaintiff, please.

11         MS. BROWN:  Thank you, Your Honor.  This is Caitlin

12    Brown for the EEOC.

13         We think that the point Your Honor raised at the

14    beginning of this argument, the lack of privilege here is

15    extremely poignant.  We don't understand defendant's position

16    that they're somehow unable to produce a privilege log at

17    this point.  If they're wholesale withholding these

18    credentialing files, then it seems like they should be able

19    to identify those credentialing files on a privilege log.

20    And we've asked for such a log repeatedly and they have

21    refused to give us one.  And, in fact, even to date, we don't

22    know the full scope of everything they're withholding under

23    this peer review privilege.  They originally said it was just

24    credentialing files.  That was the only document they told us

25    about.  And they're now, in their opposition to our motion,

1    they're bringing up peer review files and things. They're

2    also withholding those documents. We don't know if there are

3    tens, hundreds, or thousands of other documents they're also

4    withholding based on this asserted privilege because they

5    simply won't tell us.

6         And we think that they have engaged in this practice

7    to act as a black box to delay discovery here. And we think

8    that's inappropriate. And there is a rule to address

9    specifically this kind of behavior, which is that if you

10   don't produce a privilege log identifying the documents that

11   you're withholding then the privilege is waived. And so we

12   think their privilege, if it existed, would be waived here.

13        Now, they offered to produce a few out of these

14   files and they say that was as a compromise, but they have

15   always taken the position that they will not produce all of

16   the credentialing files which we need and which are all

17   relevant to this case. We feel that just selecting the

18   select files that they chose to show us would result in just

19   further delay of the resolution of the dispute.

20        And further, all the descriptions that they've given

21   us as to what are included in these files shows that this

22   information is actually extremely relevant. For example,

23   defense counsel talks about disciplinary records being

24   present in those files. Now, one the issues here and what

25   they'll have to show under the ADEA is that it would have

1　been impossible or highly impractical to deal with these

2　doctors on an individualized basis.  So it would be

3　impossible or highly impractical to figure out on an

4　individualized basis who is no longer competent to practice

5　medicine.

6　　　　　But the fact is, if someone is having significant

7　disciplinary issues, that could be a trigger for someone who

8　needs to be reviewed in a more particular way.  That would be

9　evidence showing they could have used this as an approach to

10　identify who is no longer competent instead of imposing this

11　age based policy.

12　　　　　THE COURT:  Let me just play devil's advocate here.

13　　　　　Doesn't Yale New Haven have an obligation to their

14　patients not to wait until a patient is injured by

15　substandard care before they take action to remove a

16　physician?

17　　　　　MS. BROWN:  Well, we think there's a number of

18　factors that they could use to determine doctors who are no

19　longer competent to practice medicine even before issues

20　arise.  For example, there are systems and certain ethical

21　obligations to engage in reporting if a doctor engages in any

22　behavior that might be questionable.  Now, whether or not

23　that behavior actually leads to any injury or bad outcomes

24　for a patient.  And, you know, these doctors are often

25　working collaboratively.  There are a number of people who

1    could raise these issues.  You know, we think that developing

2    an atmosphere where those ethical obligations are taken

3    seriously and the reporting obligation is followed is, you

4    know, an obligation that's on Yale.  And it's something that,

5    you know, is a strong and positive alternative to imposing

6    instead an age based discriminatory and baseless policy on

7    those aged 70 or above.

8          THE COURT:  There are probably four or five, six

9    ways to achieving the same objective.  That doesn't mean that

10    any one objective is illegal or impermissible.  And

11    reasonable people could differ as to which was preferable.

12    So why is it that reviewing a sample file is not the

13    equivalent of a privilege log?

14          MS. BROWN:  Well, Your Honor, because there could be

15    differences between these individual files as to what they

16    show.  And we know the defendant has been making these

17    arguments as to whether the depositions are necessary and

18    irrelevant as individualized circumstances.  And as we set

19    forth in our briefing papers, the issue is that there is case

20    law that makes clear that if Yale has this age based policy

21    of performing this neuropsychological testing, and they say

22    this is a policy that is vital to the operation of their

23    business, but then they don't apply that policy consistently.

24    And, for example, if they let one doctor who is age 70 or

25    above continuing to practice for three years without having

1   any testing performed, the Fountain case says that that would

2   be fatal to their defense.  But this policy is necessary for

3   their operation of their business.

4          So, for example, if we saw in one credentialing

5   file, a peer review file, indications that instead of

6   imposing the test according to their policy, like they say

7   they will, instead, for one doctor they didn't require that

8   he take the test and instead allowed him to keep practicing.

9   For example, if they decided to speak to the head of that

10  person's department about their performance or other

11  individuals that they work with, and then decide that they're

12  comfortable and that individual keeps practicing, even though

13  they haven't completed the examination, that would mean both

14  that this policy is not actually vital to the operation of

15  their business since they're not actually applying it, and

16  also would show that there's other ways that they could use

17  to identify individuals who are having competency problems.

18  So it would both have the same fail under the ADEA and the

19  ADA.  And that information might be present, you know, only

20  in two or three of the 115 files that we're talking about.

21  And for that reason we can't just accept the files that they

22  select to provide to us.

23         MS. GAMBARDELLA:  Your Honor, may I just clarify

24  something?

25         We asked them to select the files.  We asked them.

1  We didn't say we'd select.  We asked them to select and they

2  identified 115 individual files.  There was no need for us to

3  identify individual files.  They identified them.

4          So I just want to clarify that.  I'm not intending

5  to interrupt the EEOC's argument, but that is not the case.

6  We have said we'll sit down and you identify the files that

7  you want to do a sampling.

8          In terms of what they're saying is data about who

9  didn't get tested, we can provide data without producing 115

10  duplicate -- two times 115 files.  We can tell them if there

11  was a doctor who is age 70 and wasn't tested for three years.

12  We can do that separate.

13          And disciplinary issues do not mean lead to

14  incompetence.  I can, for example, be a doctor who told an

15  inappropriate joke to a colleague and that colleague

16  complained to Human Resources.  That doesn't mean I'm

17  incompetent.

18          And in terms of what you're asking about this

19  policy, Your Honor, you've hit it on the head.  You will

20  find, when the experts testify, that doctors do not tell on

21  each other.  They just don't.  In fact, that's the problem.

22  And I think you will also learn as this case progresses, Your

23  Honor, that the ones who were deficient probably didn't have

24  any reported complaints by their colleagues.

25          MS. BROWN:  Your Honor, if I may.

1          THE COURT:  Yes.

2          MS. GAMBARDELLA:  So this is a situation like pilots

3     when we had a federal regulation that we could make them

4     retire and stop flying.  Why?  Because while the error rate

5     is so low, when there's an error it could be catastrophic.

6     People die.  And that's the reason for the policy.  The

7     experts will have to battle it out about whether the data

8     supports age 70, the data supports an age based policy.

9          But I do want to clarify.  We have said to the EEOC

10    multiple times, you tell us a sampling and you could take a

11    sampling.  We're not saying and therefore the issue's closed,

12    you can't have it.  Just let's try to narrow this down

13    because it's actually 230 files that they're asking for.

14    Because, again, there's two separate categories.

15          And so, you know, I just --

16          MS. BROWN:  Your Honor, if I may?

17          THE COURT:  Yes.

18          MS. BROWN:  So I have to disagree with defense

19    counsel's representation.  While we did request the 115

20    credentialing files and, you know, the request would also

21    cover these peer review files for all these individuals, when

22    defense counsel offered that they would provide us a sampling

23    of those files, they never suggested to us that we could

24    select the files that would be produced.  That just simply

25    didn't occur.  However, you know, just picking a few files

1  would not resolve the dispute here.  And there's already been

2  significant delay in the discovery process.  As Your Honor

3  knows, you've had to extend your deadline for the close of

4  discovery.  And even if we were to look at just, you know,

5  three or four files, that would not resolve the issue because

6  we need all of the files that are at issue.  Like I pointed

7  out, there could be highly relevant evidence that would

8  present in one file but not in another file.

9        THE COURT:  Suppose you had half of them, would that

10  be enough?

11        MS. BROWN:  I don't think it would be sufficient to

12  just have half the files, Your Honor.  Because there could be

13  evidence for 10 other individuals who weren't included in

14  that set, that those individuals actually did not have the

15  policy applied to them and, instead, Yale New Haven Hospital

16  decided that they could continue to practice because of

17  discussions with their co-workers, because of discussions

18  with their supervisors.  And if that's the case, that would

19  evidence inconsistent application of the policy and that

20  would be fatal to their defense.  So I don't think it would

21  be appropriate to only include half of the files.  And I

22  don't think there are also privacy issues here which defense

23  counsel previously asserted.  For example, if there were true

24  privacy issues here, it wouldn't make sense that defense

25  counsel would, you know, produce a handful of these files but

1    not the other.  Surely, if there were true privacy issues

2    then producing one file would be a similar issue as producing

3    multiple files.

4         Additionally, as Your Honor noted, there's a

5    confidentiality order in place here.  That order includes

6    both a simple confidential designation and also an attorney's

7    eyes only designation.  And so we think that's sufficient to

8    address any confidentiality concerns here.

9         In addition, with respect to the peer review

10   privilege concerns defense counsel mentioned, the peer review

11   privilege, when it applies, is meant to protect the identity

12   of an individual who is making the complaint, not the

13   individual who the complaint is about.  So by producing those

14   credentialing files, if you were getting the concerns are,

15   for example, the individuals who are cooperating with the

16   EEOC, that actually wouldn't resolve any possible concerns

17   with the peer review privilege.  But the fact is that

18   privilege doesn't apply here.  And also, there's a

19   confidentiality order which would address any issues.

20        So we think that production of all credentialing

21   files and the peer review files are completely appropriate

22   here.  But, Your Honor, an order just instructing that is not

23   enough here.  Because we still don't know what else defense

24   counsel is withholding.  They're now saying for the first

25   time in their opposition that there are these peer review

1    files which include evidence of patient incidents. And it's

2    vital to the claims here for us to be able to determine

3    whether or not the policy and the testing was actually

4    effective in achieving defendant's stated goal of patient

5    safety.

6        And that's the key here, Your Honor. They say that

7    this policy is about patient safety. And I recognize the

8    concerns about not wanting to let problems happen to patients

9    if they could be prevented sooner. But the fact is they've

10    presented no evidence to us showing that before the policy

11    was implemented, and then after it was implemented, there was

12    actually an improvement in patient safety. They haven't

13    given us any evidence to indicate that this has a positive

14    affect on patient safety and makes a difference. And the

15    fact is if there's no evidence that this is actually doing

16    any good, then it's not right to be subjecting these

17    individuals to an age based invasive neurological exam when

18    there's no evidence that it's actually serving any purpose.

19        MS. GAMBARDELLA: Your Honor, if I may, briefly?

20        THE COURT: Yes.

21        MS. GAMBARDELLA: Every single thing that counsel

22    has said they're looking for in those files can be asked for

23    with data, every single thing. She said are there physicians

24    who were not subjected to the test despite reaching age 70 at

25    their time of reappointment for privileges. We can tell them

1   that.  That would narrow things down.

2           They want to know if there were incidents, patient

3   problems with patient's safety incidents.  That they can

4   connect to people who were or weren't tested.  That's data.

5   Every single thing that I just heard can be produced with

6   data, not wholesale files.  And it's going to be really

7   difficult for us to prove a negative because, again, the

8   reason for the testing is to prevent patient problems,

9   injury.  So if they want specifics before and after the

10  policy, they've never narrowed it down to say, okay, this is

11  what we're really looking for.  How can you produce it in a

12  less invasive way, a less voluminous way, versus what I would

13  characterize essentially as, you know, standard fishing

14  expedition.  Every single category that I just heard can be

15  asked for and responded to with data.

16          MS. BROWN:  Your Honor, if I may?

17          THE COURT:  Yes.

18          MS. BROWN:  Your Honor, first, defense counsel

19  suggests that everything we're asking for can simply be

20  produced as data.

21          First, we're entitled to the best evidence here.

22  And we believe that there was an inconsistent application of

23  the policy.  But, you know, it could be that there are other

24  ways in which the policy was inconsistently applied which we

25  don't know about because we simply haven't seen the

1  documents.  Unless we can see the documents, we don't know

2  what issues might be there.

3          And asking us to speculate as to possible issues

4  when, you know, defense counsel is allowed to review these

5  documents and we're not is really just a very differential

6  way of doing things and puts us at a distinct disadvantage.

7          Second, with respect to data.  We've asked for data.

8  In our request for production of documents we requested data

9  on patient incidents, on outcomes.  They still haven't

10  produced anything to us.  In a meet and confer they

11  represented that they did not understand what data to

12  represent, you know, patient incidents and suggested that

13  they would have to review every single medical file of every

14  single individual to see how the procedure went because there

15  was no such data available.

16          If defense counsel is now taking a different

17  position then, of course, we would want the data showing the

18  change in outcome before and after the policy.  And the fact

19  is while this is a policy that they say is supposed to

20  prevent adverse patient outcomes, the fact is if this policy

21  wasn't in place before 2016, and so wasn't preventing adverse

22  outcomes, then there should be more adverse outcomes pre-2016

23  than after 2016 when, according to defense, this policy was

24  preventing issues.  So there should still be a difference

25  that's visible here.  And there needs to be evidence that

1  this policy is actually effective.  Because if it's not, then

2  it fails under the ADA.  So we don't think that, you know,

3  just having --

4          (No audio 10:55:53 to 10:56:01.)

5          MS. BROWN:  -- issues.

6          MS. GAMBARDELLA:  Your Honor, just again, another

7  clarification.

8          What we said is there's no centralized process for

9  recording patient incidents.  That's what we said.  And a lot

10  of this, a lot of this can be narrowed down by doing a

11  deposition or two of our Chief Medical Officer.  And, you

12  know, we've said if you want to find out more about all this

13  information, let's offer up a deposition or two and then we

14  can work on files.

15          But, again, what the EEOC is arguing to Your Honor

16  is that they need this information and the only way to get

17  it, and I think what I heard is they don't trust us.  But,

18  okay.  They want 230 files irrespective of whether or not

19  they are files belonging to people who are active

20  participants or not.  There has to be a way to narrow this

21  down to balance everyone's interest whereas just producing

22  230 files.

23          Now, we have been producing a lot of information.  I

24  don't think it's a fair characterization to say we've held

25  back on a lot of information.  I don't believe that's

1   accurate and I think it's an unfair characterization of

2   what's been going on in discovery.

3          So while we're talking about the merits of the case,

4   all I can say, Your Honor, is it just takes one patient to

5   die.  And if we can prevent it, that's what the hospital

6   intends to do.

7          In terms of the before and after picture, all we

8   said is there's no centralized mechanism.  And we have

9   encountered a lot of disagreement with how to narrow these

10  issues down and really get them the information that they

11  need.  They have continuously said this is about a policy.

12  Defendant, you don't have the right to take any individual

13  doctor's depositions in Phase II.  Why?  Because

14  individualized information is not relevant.  And yet today

15  it's relevant.

16         So, you know, we're just trying to reconcile that.

17  And, again, there has to be a balanced way of compromise here

18  without producing 230 files.

19         MS. BROWN:  Your Honor, for the EEOC.  First, we

20  shouldn't have to go into depositions blind without having

21  the underlying documents which are key to this case.  We need

22  those documents to know what are the relevant questions that

23  we should be asking.

24         Your Honor, the fact here is simple.  These

25  documents are highly relevant to the claims at issue.

1    They're not protected by any peer review privilege.  There is

2    no privacy issues here because there is a confidentiality

3    order in place.  And further, this is information and

4    documents that Yale has already requested of these

5    individuals, and they're the ones who are putting these

6    individuals through invasive neuropsychological tests.  To

7    suggest that their privacy is now being invaded by having to

8    disclose that information to the EEOC, subject to a

9    confidentiality order, simply doesn't hold water.  This is

10   not a significant burden and this is highly relevant

11   information that is extremely necessary to litigation of this

12   case.

13          And while defense counsel says it only takes one

14   person who has to die, the fact is they haven't shown that

15   this has made a difference for a single person.  The only

16   difference that we've seen is that the policy has made a

17   difference to the doctors who were practicing over the age of

18   70.  That they been subject to these invasive

19   neuropsychological tests and there's no evidence that there's

20   any benefit to the patients.  And that's what's important

21   here.

22          MS. GAMBARDELLA:  Your Honor, those files aren't

23   going to show them that.  Those files are not going to show

24   the EEOC that it made a difference.  They're just not.

25          And you don't have to go into a deposition blind.  I

1	don't understand that statement.  What we've suggested

2	is -- I'm sorry, Judge, are you talking?

3	        THE COURT:  Yes.  Do you routinely do depositions

4	prior to written discovery?

5	        MS. BROWN:  No.  What we've -- no.

6	        THE COURT:  Why not?

7	        MS. BROWN:  We have plenty of written discovery.

8	Plenty.

9	        THE COURT:  That's not my question.  Why do you not

10	conduct depositions before written discovery?

11	        MS. BROWN:  Because it's not -- it's not what

12	we're -- that is not what we're contending is an accurate

13	characterization of what we've offered.  What we have

14	suggested to the EEOC is that if they would like information

15	about how things are tracked, because we don't have a

16	centralized way, that a very short deposition can help them

17	target better documents because we don't have a centralized

18	way.  We have not suggested they take depositions on the

19	merits before we finish written discovery.  We have not done

20	that.  So what you're saying is right, I agree with you, Your

21	Honor, but that's not what we suggested.  What we've

22	suggested is a very short hour with someone 30(b)(6) type

23	thing and then we can do more targeted discovery.  To suggest

24	discovery has been delayed because of us is so unfair because

25	both sides realize the monumental nature of the

1    documentation.  But if what counsel is suggesting they need

2    to know is the before and after picture, they're not going to

3    find that in 230 individual files.  It's just not going to

4    happen.  So I would never suggest you do deps before a

5    written discovery.  But that's not what we're suggesting.

6          MS. BROWN:  Your Honor, for the EEOC.  The fact is

7    that they've objected to 75 percent of our Phase II discovery

8    requests on the basis of the peer review privilege.  They

9    haven't logged the documents that are withheld and there are

10   significant requests where they have not produced any

11   responsive information.

12        Now, whether or not the specific credentialing and

13   peer review files will give us the before and after picture,

14   that's not what needs to be determined here.  We have a

15   separate request for that information.  The issue here is

16   that there's significant discovery that's been withheld and

17   we can't even know the true scope.  We can't even begin to

18   know if there's other objections they have because 75 percent

19   of the requests have been objected to on the basis of an

20   inapplicable privilege.  So we're unable to move forward with

21   discovery because we don't know what's being withheld on the

22   basis of that privilege, on the basis of some other

23   objection.  We just don't know at this point.  And defense

24   has refused to identify the documents actually withheld and

25   that has held up the discovery process significantly.  And

1   that's why we're asking you to issue an order ruling that

2   they produce all the documents that are withheld on the basis

3   of the peer review privilege.

4        MS. GAMBARDELLA:  Your Honor, just respectfully, a

5   final point.  75 percent is because 75 percent of their

6   requests involve these files or elements of these files.

7        In order for us to do the kind of privilege log

8   they're suggesting now, we'd have to go through the 230 files

9   and list all the papers.  And that's the problem.

10       THE COURT:  That's what the rules require.

11       MS. GAMBARDELLA:  If you're going to order us to go

12  through 230 files and list anything withheld on privilege

13  when what we said we're withholding the files based on

14  privilege and privacy interest and over burdensome nature of

15  the demand.

16       THE COURT:  What is burdensome about it?

17       MS. GAMBARDELLA:  Because there's 230 files we're

18  talking about.  Two files for each of the 115 doctors.  And

19  they could have -- the credentialing files will be probably

20  fairly standardized between them, but the peer review file

21  may have a lot of variety.  It's not like a personnel file

22  where I can list application, W-2 form, W-4 form, payroll,

23  direct deposit.  They're not that kind of thing.

24       THE COURT:  That's the whole point.  That's the

25  whole point of a privilege log so that someone other than you

1   can understand what we're talking about.  I don't see why

2   it's overly burdensome.  We're not talking millions of files.

3   Some of them are electronically maintained, some of them are

4   not.  There is a confidentiality agreement here.  The

5   disclosure could be attorneys eyes only.  I see absolutely no

6   reason why this material should not be produced.  I think it

7   can be relevant.  I don't believe it falls within the purpose

8   even of the peer review privilege.  It does not undermine the

9   objective of peer review.

10          I'm going to, you know, I really don't have a

11  sufficiently adequate picture of the basis of your objection

12  to sustain your objection, largely because there is no

13  privilege log.  And the long and the short of it is you've

14  had an opportunity to comply with the rules.  You haven't.

15  You're asserting a privilege that doesn't generally apply in

16  the circumstance.  The objective of that privilege is not

17  achieved in this circumstance.  The confidentiality that you

18  rely upon is unpersuasive because of the confidentiality

19  agreement and in the attorneys eyes only order, and the fact

20  that there could be no way that you could absolutely promise

21  anyone involved in this process that the information wouldn't

22  be disseminated for a bevy of reasons, including the fact

23  that the peer review privilege is not sacrosanct.

24          So we need to move on with this case, as we do with

25  all others.  And at this juncture I think I've heard the

1  parties sufficiently to conclude that Yale needs to produce

2  the information requested.

3          MS. GAMBARDELLA:  Thank you, Your Honor.

4          THE COURT:  How long will it take you to do that?

5          MS. GAMBARDELLA:  May I confer with my client and

6  then get back to Your Honor?

7          THE COURT:  Is there any reason why you can't do it

8  in 30 days?  I assume you have discussed this with your

9  client.  You've already told me that some of it is written,

10  some of it electronic.  Press a button to produce some of it.

11  How long is it going to take?

12          MS. GAMBARDELLA:  If we can do 30 days, I can be

13  comfortable with that.  I didn't know what Your Honor was

14  going to suggest so.

15          THE COURT:  All right.  No more than 30 days.

16          Anything else?

17          MS. BROWN:  Yes, Your Honor.  This is Caitlin Brown

18  for the EEOC.

19          I believe we do have some outstanding issues

20  regarding the tests at issue, the tests that were actually

21  applied, the neuropsychological tests.  So we've been seeking

22  these tests for months at this point.  And if you include the

23  EEOC's administrative investigation, we're seeking it for

24  years.

25          Now, as you know from the papers, defendant first

1   claim the tests weren't relevant.  Then after months of

2   discussion, as we were about to submit the issues to the

3   Court, claims for the first time they did not have the tests

4   at issue, which required even more briefing from the EEOC.

5   However, when the issue was actually presented to the Court,

6   defendant then did identify a number of the tests and

7   produced some related documents.  And we think there's no

8   justifications for defendant's actions in withholding this

9   evidence for months at a time and delaying the discovery

10  process.  And because of that, we will be seeking fees for

11  this under Rule 37.

12          Now, whether a significant portion of this dispute

13  is resolved, there are a few outstanding issues here.

14  Defendants did disclose to us the names of 12

15  neuropsychological tests.  In the past few days has produced

16  a number of documents to us.  We're working on reviewing

17  these documents, but we haven't yet completed them.  We just

18  received them late last week.  However, in disclosing the

19  names of the tests, defendant's statements only discuss the

20  tests that Dr. Hawkins uses.  Well, our response is that we

21  also need to have the documentation of if the test varied

22  over time.  For example, if in 2017, Dr. Hawkins is only

23  using six tests and now he's using twelve, that would

24  represent a significant change which would have an impact,

25  you know, on many factors but one, for example, on whether

1    the tests are no broader or more intrusive than necessary if

2    it's essentially a different test.

3          Our concern about the changes to the tests are

4    supported by a number of documents defendant has produced,

5    including the agreement between Yale New Haven Hospital and

6    Dr. Hawkins, which is Exhibit 5 for our motion, which

7    provided that the process would be subject to refinement and

8    that Dr. Hawkins would meet with Yale New Haven Hospital on

9    at least a quarterly basis to discuss the refinements.

10          We also understand that for many of the tests at

11   issue, defendant did not actually copy the actual test

12   booklet that Dr. Hawkins was using.  Instead, they ordered a

13   new copy of the test and sent those to us.  Now, this

14   violates Rule 34 as defendant did not actually produce the

15   tests as such in the ordinary course of business.  So if a

16   party has an agenda with a witness' notes on it, it has to

17   produce that version.  It can't simply print out a clean

18   version and produce that instead.  But that is what defendant

19   is doing here.

20          Now, it's possible that Dr. Hawkins' test booklets

21   contain notes or on patients changing how he administers the

22   test, or what portions of the test he administered or didn't

23   administer.  But we won't be able to see that on the brand

24   new book that defendant is sending to us.

25          Now, defendant has asserted to us that copying

1    actual test booklets that Dr. Hawkins is using would result

2    in a delay and disruption of Dr. Hawkins' work.  But we think

3    surely there could be at least maybe a two day period when

4    Dr. Hawkins is not conducting examinations on practitioners,

5    age 70 or above, when photocopies could be made.  And also,

6    Yale New Haven Hospital did produce to us other copies of

7    certain test booklets that Dr. Hawkins was using as

8    production that they served to us on only this past Friday.

9    Yale doesn't explain to us why they could photocopy those

10   books, but not the others that Dr. Hawkins is using.

11          And documents in that production actually do support

12   the EEOC's concerns.  At least one Yale New Haven Hospital

13   002776 actually requests notes from an individual who we

14   believe to be Dr. Hawkins.

15          Now, we offered a compromise to resolve this issue.

16   We said that we would make time to do an in person inspection

17   of Dr. Hawkins' test booklets so we could compare what Yale

18   had given to us to the book that Dr. Hawkins is actually

19   using.  So we could see if his materials had, you know, mark

20   ups, changing how the tests were applied, to make sure that

21   they were actually the same edition, things like that.  And

22   also requested an affidavit from Dr. Hawkins just to confirm

23   that the tests that they're giving us are actually all the

24   tests he's used since the program started and not just the

25   ones that he's currently using.

1          So defendant has objected to these offered

2     compromises.  So we would like the Court's assistance in

3     resolving this dispute.

4          MR. DEGROFF:  Your Honor, this is Chris DeGroff.  I

5     can speak to defendant's position on this.

6          THE COURT:  Yes.

7          MR. DEGROFF:  Okay.  I think what this comes down to

8     is a failure to communicate.  While Yale New Haven had valid

9     objections to producing the tests in the first instance, and

10    if the EEOC wants to pursue fees in this even though there

11    hasn't been a ruling on a motion to compel, I guess we can

12    dig into those previous objections and why they were made.

13    But as it stands today, Yale New Haven has agreed to produce

14    the tests.  And I guess one misunderstanding, and it will be

15    resolved once the EEOC actually deposes Dr. Hawkins, is that

16    these are standardized tests.  In other words, I'm going to

17    just give you one example.  Say there's a naming test

18    where there are -- or a memory test where there are 16 words.

19    I'm making up that number.  But let's say they're 16 words

20    that you're asked to remember.  Those particular words must

21    be used.  Dr. Hawkins can't deviate from those if it's under

22    that particular test.

23         So essentially what we've done, because we wanted to

24    get these materials to the EEOC as quickly as possible, it's

25    like asking for a textbook.  We can photocopy every page of

1    the textbook or we can just give the EEOC a copy of the book

2    from the publisher.

3            Now, if there is a difference between the test kits

4    that Dr. Hawkins used and what's in Dr. Hawkins' materials,

5    Yale New Haven will provide that as well.  And that's

6    something that EEOC fails to mention.  In addition to the

7    thousands of pages of materials that we've sent from the

8    publisher, at Yale New Haven's cost of about nine thousand

9    dollars, Yale New Haven has also produced several hundred

10   pages of additional materials last week.  That includes

11   additional tests that Dr. Hawkins originally used over the

12   years.  It includes different versions of the tests going

13   back to at least 2016.

14           Go ahead.  I'm sorry, Your Honor.

15           THE COURT:  What have you not produced that they

16   want?  The dispute isn't over what you produced.  The dispute

17   is over what you haven't produced.

18           MR. DEGROFF:  Right.  The EEOC sounds like wants to

19   trust but verify.  In other words, they don't want to just

20   take, for instance, that we produced a manual.  They want to

21   see the actual manual that's sitting on Dr. Hawkins's desk,

22   and if there is some deviation from one manual to the other

23   that that be produced.  Yale New Haven has agreed to produce

24   that.  In fact, Dr. Hawkins is currently still looking for

25   additional materials that might differ from the clean copy

1    that they've received from the publisher.

2            THE COURT:  Am I to understand that you were going

3    to produce everything they've requested or not?  Is that a

4    yes or no?

5            MR. DEGROFF:  That's a yes.

6            THE COURT:  Okay.  Then there's no dispute, right?

7            MR. DEGROFF:  That's Yale New Haven's position.

8            MS. BROWN:  Your Honor, for the EEOC.

9            We would love it if there were no dispute.  But as

10   you just heard, they're objecting to us inspecting

11   Dr. Hawkins' actual book and they've also objected to giving

12   us photocopies of all of those books.

13           We understand that they are sending us, you know,

14   what they say are the things probably directly from the

15   publisher.  But we have seen notes that we believe to be from

16   Dr. Hawkins on some other test documents.  And so we have

17   reason to believe it's possible he could have varied the test

18   as administered in those other booklets.  You know, we know

19   from documents produced that he set essentially what was the

20   passing score as distinct from, you know, kind of what the

21   baseline for these standardized tests will be as an

22   individualization for doctors, you know, generally.  But the

23   fact is they're not allowing us to see whether or not he made

24   notes on these other tests or the concern that these are

25   actually the same edition.  Because in theory, Dr. Hawkins

1  has been using these test booklets for years.  You know, if

2  they just ordered these new test books two weeks ago, it's

3  very possible to be a different edition which could, you

4  know, have different studies on whether or not the test is

5  valid.

6      So all we're looking for is to be able to see the

7  documents he's actually using.  You know, we've offered to

8  come up to his office, make it as convenient as possible for

9  them.  But the fact is they're refusing to give it to us.

10      MR. DEGROFF:  Your Honor, again, this is Chris

11  DeGroff here.

12      It shows a fundamental misunderstanding of what

13  these tests are, how they operate and, frankly, what Yale New

14  Haven is producing.  Again, if the EEOC has the copies direct

15  from the publisher, to the extent that there are any

16  differences from the materials that the EEOC got directly

17  from the publisher and what Dr. Hawkins uses, that has either

18  already been produced or is in the process of being produced.

19  So, again, we can't produce anything more than -- I guess the

20  only thing that it sounds like there's a dispute is if there

21  is a clean copy of a manual and identical copy on his desk,

22  they want to flip through the copy on his desk to make sure

23  it looks like the copy from the publisher.

24      We've asked Dr. Hawkins, instead, to look through

25  his materials and, if there are any deviations, to provide

1    that to the EEOC.

2            THE COURT:  They are not obligated to accept his

3    analysis.  They are entitled to information.  They're

4    entitled to raw data.  They're not -- you know, you're not

5    entitled to limit or to screen what they receive.  Just have

6    a photocopy made of the manual he used.  How simple is that.

7            MR. DEGROFF:  And, Your Honor, we were simply trying

8    to do this in the least disruptive and the quickest way

9    possible.  If there is a copy of Catcher in the Rye -- let's

10   say they ask for a copy of Catcher in the Rye, and he has a

11   copy of that in his book shelf.  And to get it to them

12   quicker, we could just order a copy of Catcher in the Rye and

13   give that to them.  And to say if there's anything about your

14   copy, Dr. Hawkins, that's in any way different, let us know

15   and we'll go ahead and produce that as well.

16           THE COURT:  I just think it would take more time for

17   him to go through his copy and see and compare to answer that

18   question than it would for someone to just photocopy the one

19   that he used.  So produce it.  30 days.

20           What's next?  Anything else?

21           MR. DEGROFF:  For defendants, that's all that was

22   teed up on the motion to compel today.

23           THE COURT:  All right.  Thank you.  We're

24   adjourned.

25               (Concluded at 11:20, a.m.)

1

2                    C E R T I F I C A T E

3

4          I, Martha C. Marshall, RMR, CRR, hereby certify that

5    the foregoing pages are a complete and accurate transcription

6    to the best of my ability of the electronic recording of the

7    hearing held in the matter of EEOC V. YALE NEW HAVEN

8    HOSPITAL, which was held before the Honorable Vanessa L.

9    Bryant, U.S.D.J, at 450 Main Street, Hartford, Connecticut,

10   on June 28, 2021.

11

12

13

14                              /s/Martha C. Marshall
                             Martha C. Marshall, RMR,CRR
15                           Transcriber

16

17

18

19

20

21

22

23

24

25