IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>YALE NEW HAVEN HOSPITAL, INC.  )<br>)<br>Defendant.  )<br>) | Civil Action No. 3:20-cv-187 (VLB)<br><br><br><br><br>SEPTEMBER 3, 2021 |

**DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

Defendant, Yale New Haven Hospital ("YNHH" or the "Hospital"), by and through its undersigned counsel, respectfully submits its Objection to the Equal Employment Opportunities Commission's ("EEOC") Motion for Protective Order dated August 16, 2021 ("Motion"). In that Motion, the EEOC seeks to prevent YNHH from questioning physician deponents about or relating to diagnoses of "cognitive condition[s] received by any Aggrieved Individual outside of YNHH's testing process, including the details of any such condition, and its impact". (Motion at p. 9 and proposed Order submitted therewith).

I.  **INTRODUCTION**

The EEOC's Motion represents an unconventional and unsupported attempt to prospectively block clearly probative discovery. This Court has emphasized - and the EEOC itself has argued - the standard for discovery is broad. As discussed below, the proposed discovery seeks essential information going to the core issues of this case, is necessary for YNHH's expert to render a complete opinion, and can be conducted without prejudice to the EEOC or the Aggrieved Individuals

1

it represents. The EEOC's authority, on the other hand, is demonstrably inapplicable, and its attempted "catch-all" argument that discovery inquiries by counsel would violate the ADA borders on frivolous.

As the Court is aware, this suit was brought by the EEOC to challenge the Hospital's implementation of a Late Career Practitioner Policy ("Policy"), as well as the underlying cognitive testing conducted, under the ADEA and the ADA. This Policy, as well as the cognitive testing used, are not unique to YNHH; rather, among other things, in view of the increase in the aging physician population, and the goal of more proactively promoting patient safety, several hospitals across the country and abroad have instituted such policies as just one of the tools in their toolbox to further patient safety efforts. In the case of YNHH, the implementation also comes with the input of the Medical Executive Committee, made up of physician peers. While hospitals like YNHH have some mechanisms in place to attempt to track physician error, such mechanisms are generally retrospective, rather than prospective. The subject Policy is designed to be proactive; rather than wait for physician errors to be observed, reported, and/or tracked—which can result in significant damage to patients—YNHH and these other hospitals have reviewed the research and instituted these policies. Like in other occupations (e.g., pilots, FBI agents) errors may be rare, but when they happen in these situations, they can be catastrophic.

The EEOC has nevertheless challenged the Policy under the ADEA and ADA; arguing that testing triggered by age constitutes age discrimination. It further contends that the test itself is not job related nor consistent with business

necessity as required by the ADA.  Yet, in its Motion, the EEOC glosses over this second piece, as if it is not part of the case.  To be sure, the YNHH testing process is directly under attack.  YNHH, in response, contends the absence of cognitive decline is a bona fide occupational qualification, and further, the testing used to diagnose the same is job related, effective and consistent with business necessity.

Thus, in short, in bringing this suit, the EEOC, not YNHH, has placed directly at issue the efficacy of the testing.  Nevertheless, the EEOC attempts to turn the subject on its head, claiming it is YNHH that is attempting to "victimize" the deponents by virtue of posing simple questions designed to discover information that can lend credibility to the assertion the testing process is effective.

In support of this notably <u>pre-emptive</u> Motion, the EEOC not only cites to inapplicable law, but also wholly ignores its own arguments about the discoverability of sensitive information regarding these same physicians, as well as physicians who have not even agreed to participate in this litigation.  Equally noteworthy, the Motion filing was unduly delayed.  Specifically, the parties have engaged in extensive discussions about whether YNHH would even be able to conduct depositions.  YNHH signaled its intention to depose the voluntary claimants over a year ago.  *See* [ECF 36].  YNHH initially noticed depositions on July 12 for August dates, after production was completed per the June 28th Order of this Court.  The EEOC asked YNHH to reschedule the depositions to give it more time to review production and prepare for depositions.  However, the EEOC also mentioned the possibility it would file a Motion for Protective Order for the same reason the Motion is submitted now.

After the meet and confer call referred to by the EEOC in its moving papers, EEOC counsel assured YNHH counsel it would *notify them during the week of July 19 (i.e., by Friday, July 23)* regarding whether it would make the Motion it now has made nearly a month later.  After not hearing from the EEOC by the deadline it set, YNHH relied on the lack of indication this Motion would be filed and noticed the subject depositions for dates in September.  Consequently, this delay has prohibited the parties from attempting adjudication prior to the scheduled depositions, and thus, it is the EEOC which has increased the possibility of keeping depositions open pending adjudication of this Motion.

II.     ARGUMENT

For those reasons set forth above, and as explained more fully below, the EEOC's Motion should be denied.

A. The Motion Constitutes A Pre-Emptive Strike Without Context.

Courts, even in trial situations, are traditionally hesitant to grant prospective prohibitions without seeing context—i.e., typically questions leading up to the subject evidence being sought.  In this case, the EEOC justifies its request by referring to privilege with psychotherapists; yet, does not provide any information to establish whether any of the currently noticed deponents (all of whom at this point have been identified as voluntary participants[1]) have been treated by a psychotherapist, and/or whether the questions posed would even invade the information covered by such a privilege.  See Stark v. Hartt Transp. Sys., Inc., 937

---

[1] Although, notably, scheduling has been fluid as participants have been changing their status as voluntary participants.

4

F. Supp. 2d 88, 92 (D. Me. 2013) (ordering production of information "gleaned and recorded by non-psychotherapists" that implicated plaintiff's mental health). Even in its Motion, the EEOC acknowledges this traditional hesitancy to institute pre-emptive discovery prohibitions, and so it reverts to the argument that the mere posing of the questions is embarrassing and constitutes "further victimization"—certainly a novel standard being proposed. In any event, the EEOC itself has put these matters at issue on behalf of the Aggrieved Individuals it insists it represents so that any applicable privilege would be waived.

      **B.** **The Proposed Inquiries Involve Proper and Discoverable Information**.

To repeat the obvious, it was the EEOC which brought this action knowing the diagnoses in some instances of cognitive decline issued by YNHH's tester, Dr. Hawkins, would be relevant and discoverable. If the EEOC did not apprise the Aggrieved Individuals, and particularly those Aggrieved Individuals identified as voluntary participants whose depositions have been noticed first, that the allegations could lead to further inquiry, it was they who did not manage expectations in this regard.

It is not unusual for plaintiffs, particularly in employment litigation, to be asked delicate questions. If witness discomfort was the proper standard to apply in prohibiting questioning, not only defendants, but also plaintiffs, would be significantly hindered in acquiring probative discovery to which they are entitled. After all, Fed. R. Civ. Proc. 30 presumes that oral discovery is fair game, absent very specific exceptions, none of which are present here. Moreover, to reiterate, discovery in general is intended to be broad and liberal. Luck v. McMahon, No.

3:20-CV-00516, 2021 WL 413638, at *4 (D. Conn. Feb. 5, 2021) (discovery rules are afforded broad and liberal construction).   While crying "victimization", the EEOC hopes this Court will be distracted from the fact that the EEOC did not worry about potential embarrassment when it was demanding private information contained in hundreds of Hospital files belonging not just to voluntary claimants, but also to non-voluntary claimants, and claimants who have affirmatively indicated they do not want to participate.  These files contained personal information regarding licensing, occupational history, and for that matter, the results of the YNHH cognitive testing.

In other words, the EEOC brought this action having to have known the diagnoses of cognitive decline issued by YNHH's tester would be a central issue. In a case where neurocognitive testing is promoted as a reliable, early indicator of a hidden impairment, query how the EEOC should not have known that, in turn, a later or other independent diagnosis for those very impairments would be probative of the reliability of the testing being challenged here.  In simple terms, YNHH should not be prevented from asking, for example, whether the YNHH test results were confirmed by additional testing of that practitioner outside of YNHH. Or, by way of another example, whether YNHH test results prompted any practitioner to seek additional medical review that, in fact, confirmed a latent or unappreciated cognitive disorder.  In a situation like this, YNHH could argue that its testing did precisely what is was designed to do; alert the practitioner of an issue *before* a patient's safety was jeopardized.

**To provide further clarity by way of a potential, real life example, assume YNHH assessed one of the Aggrieved Individuals, and the test showed that they had issues with short term memory and executive functioning. Our hypothetical Aggrieved Individual never recognized s/he had a cognitive disorder, and, surprised by this development, decides to retire given the concerns. Later, the Aggrieved Individual consults a private medical specialist and learns that s/he in fact suffers from early-stage dementia that likely started months before. That condition could have resulted in serious patient safety issues. In that scenario, the YNHH test was precisely the early-indicator of a latent problem that it was designed to identify. Without this discovery, YNHH and its experts would never know about this highly relevant "near miss" situation. To sum up, the fact remains that the conditions of these claimants have been placed directly at issue by the EEOC's challenge, on their behalf, of the need and appropriateness of the testing itself.**

**To further reveal the EEOC's inconsistency in their arguments, the EEOC has recently issued its own Rule 30(b)(6) deposition notice which includes, as a topic, post-testing information; i.e., asking whether, <u>retrospectively</u>, the testing achieved the purpose of preventing medical errors. Such an assertion places YNHH in the impossible position of trying to establish a "negative"; i.e., that in the absence of testing a patient would have been harmed; yet, at the same time, tying YNHH's hands in establishing that, indeed, a practitioner actually engaged in further medical review validating the YNHH test results, which, in turn, contributes to establishing its efficacy.**

**The EEOC further asserts other Hospital practices adequately address safety issues—self-reporting and peer monitoring. The Hospital contends these mechanisms are historically unreliable to prevent issues, a concept which, at least in part, was admitted to by the representative claimant, Dr. Nash, during his September 1 deposition. If, as in our hypothetical above, YNHH learns that a deponent was diagnosed with a cognitive impairment outside of the YNHH testing, but failed to report that to YNHH—either because the practitioner was unaware of the deficiencies or peers either did not observe problems or were reluctant to report them, this information would be relevant to challenge the EEOC's assertion in this regard. To be clear, YNHH contends it should be free to pursue this information and not have its hands tied in discovery with respect to topics the EEOC itself has persisted in labeling relevant and discoverable. Moreover, YNHH is not seeking "post hoc justification" for the test; rather, despite the convenient mischaracterization of relevance, the EEOC recognizes YNHH is seeking discovery on the effectiveness of the very test the EEOC seeks to invalidate.**

C. <u>**The Subject Information is Necessary for YNHH's Expert to Render a Complete Opinion**</u>**.**

**YNHH has retained an Industrial/Organizational Psychologist, Dr. Jone Papinchock, to provide her opinion on the validity of YNHH's assessment program. According to Dr. Papinchock, one of the potential methods of validating a test is "constructive validity." Constructive validity may be one way to show that the tests being used at YNHH are measuring what they are intended to measure (to repeat, the very assertion the EEOC vigorously challenges). Because YNHH uses a battery**

of tests to assess neurocognitive functioning, the results of its battery could be compared to a similar battery later administered by another health care provider.[2] YNHH wishes to ask the Aggrieved Individuals if they have taken neurocognitive tests or received diagnoses that conflict with YNHH's test findings (creating "divergent construct validity") or that support the results of YNHH's tests ("convergent constructive validity"). This sort of test validation has been supported for decades by the scientific community.[3]  By comparing YNHH's tests with the results of similar tests, corresponding diagnoses could, again, be probative of whether YNHH's tests were effective.

The EEOC may disagree with this approach. It may even develop counter-testimony from its own expert that it claims refutes this approach. But that mere fact that the EEOC does not support YNHH's expert theories does not allow it to block discovery necessary for YNHH to develop those theories in the first instance. If that were the case, YNHH could avoid all discovery in this case simply because it does not agree with the EEOC's theories. Yet, of course, that is not how discovery is intended to work.  See also, ECF 91, p. 8 ("EEOC, and its experts, must review the tests to evaluate their effectiveness in achieving YNHH's stated goals.")

---

[2] Gatewood, R.D., Feild, H.S. & Barrick, M.R. (2019). Human resource selection: 9th Edition. Wessex Press, Inc.: New York, NY.

[3] Campbell, D.T. & Fiske, D. (1959). Convergent and discriminant validation by the multitrait-multimethod matrix. Psychological Bulletin, 56(2), pp. 81-105). Cascio, W.F. & Aguinis, H. (2019). Applied psychology in talent management: 8th Edition. Sage Publications: Thousand Oaks, CA.

### D. **YNHH Offered to Provide Heightened Protection Which the EEOC Declined.**

While professing that information about independent diagnoses is "privileged", the EEOC asks this Court to establish a different, more restrictive discovery standard on YNHH. Specifically, the EEOC has already argued any such privilege is the doctors' privilege—and that they represent them—and that in pursing production of highly sensitive Hospital files about the very topic they claim is privileged; i.e., diagnoses which the test they are attacking provided; sufficient protection would be given by marking the materials "Confidential/Attorneys' Eyes Only".

While YNHH maintains privilege cannot be invoked by the EEOC to control discovery by defendant, but be waived for their own argument, YNHH nevertheless offered to mark any of the subject testimony by the deponents with the same, heightened designation. See ECF 91, p. 7 (where the Court observed "any confidentiality concerns on Defendant's part can be addressed through agreement of the Parties and proper maintenance of confidentiality designations, including attorneys' eyes only, if necessary, in accordance with the Court's standing Protective Order issued at the commencement of this case); June 28, 2021 Transcript, pp. 25 (Plaintiff acknowledges "there's a confidentiality order that would address any issues"); p. 31 ("To suggest that their privacy is now being invaded by having to disclose that information to the EEOC, subject to a confidentiality order, simply doesn't hold water.") On August 17, 2021, YNHH counsel made the offer to ensure only counsel would be present during this

testimony, and transcript portions marked with this designation.  The EEOC has declined this offer.

### F. EEOC Has Cited Inapplicable Precedent

EEOC cites In re 3M Combat Arms Earplug Prod. Liab. Litig., No. 3:19-MD-2885, 2020 WL 5578938, at *1 (N.D. Fla. Aug. 19, 2020) for the basic proposition that the psychotherapist-patient privilege has been applied to block production of mental health records where a party claimed garden variety emotional distress. YNHH is not seeking information concerning subsequent testing to challenge the Aggrieved Individuals' damages claim; it seeks this information because EEOC put the efficacy of YNHH's test directly in controversy. See Bagley v. Yale Univ., No. 3:13-CV-1890, 2016 WL 1531341, at *2 (D. Conn. Apr. 15, 2016) (ordering production of mental health records where plaintiff placed mental health in controversy); Selassie v. United Health Servs. Hosps., Inc., No. 305CV0207TJMDEP, 2005 WL 8170806, at *6 (N.D.N.Y. July 27, 2005)(ordering disclosure of psychiatric records placed in issue by non-moving party).

EEOC does, however, cite a case that is applicable here.  In Silvestri v. Smith, No. CV 14-13137, 2016 WL 778358, at *2 (D. Mass. Feb. 26, 2016), the Court held information pertaining to mental health diagnoses and treatment was not within the ambit of the psychotherapist-patient privilege, but rather, the Court gave protection to the contents of confidential *communications* between patient and provider.  The former is precisely what YNHH seeks here.  YNHH has no desire to probe the intimate details of the Aggrieved Individuals' therapy appointments; rather, it seeks information concerning the nature of subsequent testing and diagnoses obtained

**by Aggrieved Individuals that may be confirmative of information obtained by Dr. Hawkins.**

**Conversely, and as already asserted above, discovery is intended to be liberal, Luck, *supra*, 2021 WL 413638, at \*4, and the cry of "victimization" is purposely inflammatory and provocative—attempting to gain this Court's approval of prohibiting YNHH from pursuing what it contends is necessary discovery despite its agreement to provide the information gleaned with the highest level of protection.**

**G. <u>EEOC's Claim the Questions Constitute a Potential ADA Violation Is Wholly Unsupportable</u>.**

**While YNHH contends all of the EEOC's arguments are misplaced, perhaps the most misplaced argument of all is the contention the posing of such questions potentially violates the ADA. In support of this novel and unsupportable position, the EEOC's refers the Court to <u>Fountain v. New York State Dep't of Corr. Servs.</u>, No. 99-CV-389, 2005 WL 1502146, at \*5 (N.D.N.Y. June 23, 2005) for the proposition that counsel's "inquiry" during a deposition constitutes an inquiry violative of the ADA. The citation is completely misleading; <u>Fountain</u> examined whether a general diagnosis inquiry requirement *in the workplace* from the defendant employer New York State Department of Correctional Services met the business necessity requirement under the ADA. The case says nothing about inquiries during a litigation process; here, during a deposition, and particularly one involving testimony covered by a confidentiality agreement by counsel for the employer.**

In general, like the citation to <u>Fountain</u>, the cases cited by the EEOC involve workplace events/inquiries, not litigation contexts. The argument the EEOC is promoting here would establish a standard in every ADA litigation that a defendant posing impairment-related inquiries in discovery would somehow create additional liability for that defendant—even though, astonishingly, such inquiry would, in this situation, necessarily include questions about the YNHH testing and resulting diagnosis the EEOC has placed at issue. In even simpler terms, YNHH contends that this argument is patently absurd, and constitutes another attempt to create a chilling effect on YNHH's otherwise appropriate inquiries.

### III.    CONCLUSION

Given the broad standard for discovery, YNHH asks the Court to permit it the same opportunity, with protections already extended to the EEOC, regarding topics which clearly implicate discoverable information (even if not ultimately admissible). Permitting the prohibition sought by the Motion would create patent inconsistency in what is deemed discoverable in this litigation, and, in any case, defy the language and spirit of the rules of discovery. EEOC counsel will be present at these depositions to ensure the deponents are treated with respect, as is always the case with counsel and their clients. YNHH has no desire to embarrass any of their respected and valued physicians---but again, it was not YNHH which instituted this litigation making these subjects relevant.

WHEREFORE, for the foregoing reasons, Defendant respectfully requests that the EEOC's Motion be denied.

**DEFENDANT,
YALE NEW HAVEN HOSPITAL,**

**By:** */s/ Mary A. Gambardella*
**Mary A. Gambardella (ct05386)
mgambardella@wiggin.com
Joshua J. Wyatt (ct28916)
jwyatt@wiggin.com
WIGGIN AND DANA LLP
One Century Tower
265 Church Street, 18th Floor
New Haven, Connecticut 06508
Tel:  (203) 498-4328
Fax:  (203) 789-2889**

**Christopher J. DeGroff (admitted** *pro hac vice*)
**cdegroff@seyfarth.com
Shana Madigan (admitted** *pro hac vice*)
**smadigan@seyfarth.com
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL  60606**