IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) Civil Action No. 3:20-cv-187 (VLB) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| YALE NEW HAVEN HOSPITAL, INC. | ) ) ) October 1, 2021 |
| Defendant. | ) ) ) |

**MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS**

Defendant, Yale New Haven Hospital, Inc. ("YNHH" or "Defendant") by and through its undersigned counsel, pursuant to Rule 30(a)(2) of the Federal Rules of Civil Procedure, hereby seeks leave of the Court to take more than 10 depositions in this case. The parties met and conferred on this issue on September 21, 2021, but have been unable to reach an agreement. Accordingly, Defendant requests the Court grant it leave to take the deposition of each Affected Individual identified by the EEOC as those who chose to actively participate in this lawsuit (the "Voluntary Claimants"), or in the alternative, preclude Plaintiff from using testimony or Affidavit from any Claimant whose deposition testimony is prevented at summary judgment or trial.

**INTRODUCTION**

The EEOC is, once again, attempting to prevent YNHH from discovery of the discoverable information probative to its defenses. At the end of Phase I of this litigation, designed to identify those for whom the EEOC sought judgment and

relief in this action, the parties stipulated to a claimant pool of 115 total "Affected Individuals," practitioners who were subject to YNHH's Late Career Practitioner Policy and who would (for purposes of this case only) be considered "employees" under the ADA and ADEA. Of those Affected Individuals, the EEOC has named 22[1] "Voluntary Claimants" who have affirmatively chose to actively participate in this litigation, and with whom the EEOC has established an attorney-client relationship. The EEOC has insisted it will only agree to produce nine of the 22 Voluntary Claimants for their depositions. Despite its position that it may elicit Affidavits or testimony from more of these Voluntary Claimants, the EEOC refuses to provide more than the 10 automatically allowed by Rule 30. *See* Fed. R. Civ. P. 30(a)(1).[2] This presents what is becoming a consistent tactic by the EEOC of attempting to block YNHH's ability to conduct all necessary discovery probative of its defenses, while persisting in broad and nearly unrestricted discovery itself. This latest attempt, as well as other similar attempts,[3] should be rejected.

---

[1] While, as of the date of this filing, the EEOC has identified a total of 22 Voluntary Claimants, that number has fluctuated. Accordingly, the number of additional depositions sought is uncertain, but is likely an additional 12 depositions. Further, the EEOC is not only refusing to produce more than 10 Voluntary Claimants for deposition, but also appears to be engaging in tactics to strategically avoid the deposition of at least one individual. More specifically, upon receiving the original 10 deposition notices, the EEOC advised YNHH that several of its Voluntary Claimants had withdrawn from participation in this case, triggering YNHH to substitute those witnesses with others. Yet, now that the first round of depositions has been completed, and the EEOC is refusing to produce others, the EEOC recently notified YNHH that, suddenly, at least one practitioner who had withdrawn in the face of his noticed deposition has since rejoined as a Voluntary Claimant. Query whether, given the EEOC's resistance to permit additional depositions, others who had withdrawn will now come back to voluntary participation.

[2] YNHH has noticed a Rule 30(b)(6) deposition of the EEOC for its tenth deposition.

[3] For example, the EEOC's pending Motion for Protective Order (Doc. 97) seeks to bar YNHH from discovery regarding information related to any diagnosis of a cognitive condition received by any Affected Individual outside the LCP Policy testing process -- information that is directly probative of the efficacy of that testing process.

The EEOC has challenged YNHH's Late Career Practitioner ("LCP Policy"), claiming it is not reasonably necessary to the normal operation of YNHH's business, and not job-related or consistent with the business necessity of patient safety, and thus violates both the ADEA and the ADA.  As emphasized above,  the EEOC, while preventing additional depositions, maintains that it nevertheless "cannot rule out" that it will rely on testimony or Affidavits at summary judgment from all of the Voluntary Claimants to support its case. The result is the astonishing, first-of-its kind argument that YNHH cannot depose the very witnesses the EEOC plans to present. This argument is based solely on the EEOC's subjective perception that the highly relevant testimony to date is enough, and any other testimony would be "cumulative."  No such legal standard should be created here, based on a party's subjective opinion about what discovery is necessary for an opposing party.

Additionally noteworthy, YNHH could have demanded full-day depositions of these Voluntary Claimants thus far, but instead chose to conduct limited, three-hour virtual depositions (many of which have run closer to two hours). The testimony elicited thus far goes to the heart of the EEOC's case and YNHH's defenses; particularly, (1) the high risk and slim margin for error involved in the practice of medicine in a wide variety of positions at YNHH; (2) the importance of and reliance upon cognitive abilities (the very skills tested pursuant to the LCP Policy) in those practices; and (3) the highly autonomous and unsupervised nature of the practitioners' work at YNHH, which limits certain peer-focused safety measures.

Moreover, the EEOC cannot show that it will be prejudiced in any way, other than its contention its counsel are required to attend the depositions. Indeed, YNHH finds it important to repeat the EEOC's assertions, yet again, that individualized circumstances may be probative in this case. *See, e.g.*, Plaintiffs' Mem. Of Law in support of Motion to Compel (Doc No. 71:2) at § (I)(B), pp. 11-12 (arguing individual practitioner credentialing files are "critical information" needed to determine each practitioner's job qualifications, that different practitioners present different levels of risk, and that these facts are relevant to the issue of whether the LCP Policy is necessary). It is curious at best that when this assertion supports a claim for broad discovery by the EEOC, it is used; when it does not support their position, they claim the case is only about "a policy." *See, e.g.,* EEOC Reply in Supp. of Mot. for Protective Order (Doc. 104) at p. 10 ("Because it is the illegality of Defendant's policy that is at issue and *not* any Aggrieved Individual's diagnosis of a cognitive condition…") (emphasis in original).

## LEGAL STANDARD

Under Rule 30, the Court "must grant leave" to permit more than 10 depositions to the extent consistent with Rule 26(b)(1) and (2). Fed. R. Civ. P. 30(a)(2). The Rule provides that additional discovery should be allowed unless the Court determines that: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (2) the moving party has had ample opportunity to obtain the information by discovery in the action; or (3) outside of the scope of discovery as provided by Rule 26(b)(1). *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).

In interpreting these discovery rules, the Supreme Court has long held that they should be entitled to "broad and liberal treatment." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Courts routinely have expanded deposition limits where they have determined that the concerns underlying Rule 26(b)(2)(C) are not implicated. *See, e.g., Alexander v. FBI*, 192 F.R.D. 20 (D.D.C. 2000); *Strode v. City of Venice*, 2007 WL 1595559 (S.D. Ill. 2007); *Mitchell v. Nat'l R.R. Passenger Corp.*, 208 F.R.D. 455 (D.D.C. 2002). In general, "[w]hen an individual voluntarily chooses to participate in [a] lawsuit, he [or she] takes on the obligation to provide discovery about his [or her] claim." *Morangelli v. Chemed Corp.*, 2011 U.S. Dist. LEXIS 151, 2011 WL 7475, at *1 (E.D.N.Y. Jan. 1, 2011).

## LEGAL ARGUMENT

**I.     The EEOC Plans To Use Voluntary Claimant Testimony.**

The EEOC continues to maintain the inconsistent position that further testimony from its Voluntary Claimants is not relevant to its claims, yet at the same time, has repeatedly affirmed that it may well rely on such testimony on both summary judgment and at trial. *See* Exhibit 1 (K. Peters 6.17.2021 Email to C. DeGroff, *et al.*, K. Peters 9.21.2021 Email to C. DeGroff, *et al.*, C. Brown 9.23.2021 Email to C. DeGroff, *et al.*). To compound the unreasonableness of its position, the EEOC refuses to tell YNHH what topics may be covered by these Voluntary Claimants' testimony -- the same testimony Defendant is told is irrelevant. In general, the EEOC has provided little or no information about the Voluntary Claimants, other than to identify them or respond in most cases that there is no probative information (*e.g.*, that none of the Voluntary Claimants ever requested a

5

reasonable accommodation from YNHH). This, even though the EEOC has required YNHH produce tens of thousands of pages of paper and electronic records in each of the 115 Affected Individuals' credentialing files, including records dating back over 50 years, decades before the LCP Policy was conceived. In fact, the EEOC has not yet even included these individuals in its Rule 26(a) disclosures. The EEOC's ongoing attempts to conduct what is effectively unilateral discovery and obstruct YNHH's ability to develop its own record is fundamentally unfair and runs afoul of the spirit of the liberal discovery rules.

Contrary to the EEOC's contentions in this regard, it is well-established that a party is entitled to depose key witnesses upon whose testimony the opposing party relies at trial or on summary judgment. *See, e.g., G-I Holdings, Inc. v. Baron & Budd*, No. 01 CIV. 0216 (RWS), 2002 WL 31251702, at *5 (S.D.N.Y. Oct. 8, 2002) (collecting cases and holding the successor plaintiff was entitled to depose key witnesses, on whose affidavits the defendant intended to rely, prior to summary judgment); *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 175 F.R.D. 34, 43–44 (S.D.N.Y. 1997), *aff'd* (Aug. 15, 1997) (parties are entitled to depose a testifying witness).

Moreover, this would be a one of a kind case anywhere in the country in which the EEOC has identified claimants but refused to produce them for depositions. "Modern federal civil litigation is not designed to be a guessing game…The whole point of the pretrial discovery process is to efficiently permit the parties to glean—with as little expense and complexity as is possible—the basis of the claims or defenses asserted against them and to marshal the record necessary

6

to assert those claims or defenses at trial." *E.E.O.C. v. Ruby Tuesday, Inc.*, No. 2:09-CV-01330, 2012 WL 2116518, at *2-3 (W.D. Pa. June 11, 2012) (extending discovery to allow as many as 150 additional depositions, including those of each and every identified claimant); *see also E.E.O.C. v. SVT, LLC*, 297 F.R.D. 336, 348 (N.D. Ind. 2014) (allowing 30 claimant depositions as a "reasonable starting point," with leave to request additional depositions if needed); *U.S. E.E.O.C. v. Dillard's Inc.*, No. 08CV1780-IEG PCL, 2012 WL 440887, at *11 (S.D. Cal. Feb. 9, 2012) (re-opening discovery to allow defendant opportunity to conduct depositions of 60 newly identified claimants in EEOC representative action challenging a policy under the ADA).

Consistent with this authority, YNHH must at the very least be allowed to depose any claimant on whose testimony the EEOC intends to rely at any procedural stage in this litigation.

II. **Voluntary Claimant Testimony To Date Is Highly Relevant**.

One of the assertions made by the EEOC in defending this untenable position has been its subjective opinion that the deponents have been asked "irrelevant questions;" something that, even if true, would not prohibit discovery. Defendant is now forced to reveal strategies that no party should be forced to disclose to be able to merely conduct discovery (and, perhaps, this is the EEOC's agenda in compelling YNHH to make this Motion in the first instance). However, to provide the Court with a glimpse of why this argument, even if at all relevant to the adjudication of this Motion, should be rejected, YNHH below sets forth examples of the testimony of the Voluntary Claimants to date which underscore the relevance

7

of the questions being posed to the analysis of the EEOC's claims and YNHH's defenses.

      A.    <u>**Testimony Is Probative To The Determination Of Whether LCP Testing Was Necessary To YNHH's Business**</u>.

The deponents' descriptions of the day-to-day functions of each of their clinical practices at YNHH supports the argument that the neuropsychological testing performed pursuant to the Policy was necessary to an essential component of YNHH's business -- patient safety -- in direct conflict with the EEOC's allegations. *See* Compl. at pp. 1-2 ("By subjecting its employees to the Policy, YNHH violates the ADA's prohibition against subjecting employees to medical examinations that are not job-related and consistent with business necessity.").

The issue of whether the Policy is consistent with business necessity is relevant to YNHH's defenses as to both the ADEA and ADA claims. *See* 29 U.S.C. § 623(f)(1) (ADEA) (age classification is lawful "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business."); 42 U.S.C. § 12112(d)(4)(A) (ADA) (prohibiting employers from requiring medical examinations and making medical inquiries "unless such examination or inquiry is shown to be job-related and consistent with business necessity."). The claimants' testimony is also important evidence upon which YNHH's expert opinion will rely.

Each witness deposed thus far has been asked to describe the cognitive processes necessary to perform their work functions (which have varied significantly witness to witness) safely and effectively. Those cognitive processes are precisely the type assessed by the LCP Policy testing. For example, of the nine

8

deponents, each have described situations where sustained concentration is necessary for each of their individual job duties:

- **Atkins Dep. at 31:24-32:6, 32:23-33:1 (explaining importance of staying focused as a Physician Assistant) (***see*** Exhibit 2 (Atkins Dep. excerpts));**

- **Binder Dep. at 45:17-46:11 (describing the need for extended concentration as "self-evident") (***see*** Exhibit 3 (Binder Dep. excerpts));**

- **Boras Dep. at 65:23-66:3 (all of his cases required extended periods of concentration) (***see*** Exhibit 4 (Boras Dep. excerpts));**

- **Davey Dep. at 64:8-11 (acknowledging her practice requires periods of concentration) (***see*** Exhibit 5 (Davey Dep. excerpts));**

- **Finkelstein Dep. at 69:20-70:21 (describing process of diagnosing rare disease and developing treatment plan as example of need for extended period of concentration) (***see*** Exhibit 6 (Finkelstein Dep. excerpts);**

- **Hirokawa Dep. at 52:2-16, 59:6-16 (affirming practice at YNHH required extended periods of concentration and describing prolonged surgical procedure as example) (***see*** Exhibit 7 (Hirokawa Dep. excerpts));**

- **Kashgarian Dep. at 56:13-57:6 (describing maintenance of sole focus required by multi-step process of analyzing biopsies) (***see*** Exhibit 8 (Kashgarian Dep. excerpts));**

- **Mitchell Dep. at 53:10-15 (every patient visit as requires extended concentration) (***see*** Exhibit 9 (Mitchell Dep. excerpts));**

- **Nash Dep. at 105:1-14 (describing reviewing hematology slides as an example of task requiring extended period of concentration) (***see*** Exhibit 10 (Nash Dep. excerpts)).**

Concentration is one of the attributes screened as part of the battery of neuropsychological tests conducted pursuant to the LCP Policy.

Another element assessed by the LCP screening test is visio-spatial memory. Again, many if not all of the Voluntary Claimants have described how

9

they must absorb visual data and make decisions based upon what they have seen. *See, e.g.,* Atkins Dep. at 28:19-29:11 (Exhibit 2) (describing need to make quick decisions based on visual information received, such as labs, radiology films, MRI results); Davey Dep. at 48:11-14 (Exhibit 5) (treating patient with insulin pump required her to "interpret the blood sugar patterns to help the patient determine the volume of insulin to go through the pump"); Hirokawa Dep. at 54:20-55:2 (Exhibit 7) (practice required him to analyze x-rays and lab reports and act on them); Nash Dep. at 100:8-23 (Exhibit 10) (describing need to analyze visual images and retain them in long-term memory).

Fine motor skills and hand-eye coordination are yet another element of the LCP Policy testing that the deponents have described as required by their respective practices. *See, e.g.,* Atkins Dep. at 35:1-7 (Exhibit 2) (removing a "speck" from someone's cornea); Boras Dep. at 55:1-57:9 (Exhibit 4) (suturing, intubation, putting in a chest tube); Binder Dep. at 54:19-56:5 (Exhibit 3) (passing instrument through patient's throat, down esophagus, and into stomach; passing biopsy instrument through less than one centimeter opening of endoscope to retrieve "snippet" of tissue). The list goes on and on. All of this testimony is critical to any analysis of the job-relatedness and necessity of the testing required by the LCP Policy.

### B. Deposition Testimony Undermines The EEOC's Claim That Alternative Methods Of Assuring Competency Are Sufficient.

The EEOC has repeatedly argued in their moving papers that the LCP Policy is not necessary because existing peer review policies and practices are sufficient to identify cognitive deficiencies prior to the commission of patient harm. *See, e.g.,*

Plaintiff's Supplemental Memorandum in Support of its Case Management Plan (Doc. 31) at p. 20 ("there are already many methods in place that YNHH has used and continues to use to assess either performance or cognitive competence. Therefore, YNHH already assesses actual cognitive competence and actual performance in numerous objective ways without reference to age.") (emphasis omitted).

Yet, the deposition testimony thus far provides evidence suggesting these methods may not be as proactive or preventative as the EEOC seems to claim. Indeed, the depositions have garnered testimony probative to the argument by YNHH that: (1) there is a culture of non-reporting among practitioners in the medical field in general; (2) practitioners use individual decision-making as to what is important enough to report; and (3) practitioners may have a high level of autonomy with little to no oversight or observation of their work. *See, e.g.*, Atkins Dep. at 40:24-41:10 (Exhibit 2) ("Q: Do you think there is a culture of other doctors not reporting the mistakes of other doctors? A: Yes.  Q: What do you think about that? Do you think that is a problem? A: Definitely" [internal objections omitted]); Finkelstein Dep. at 83:21-84:7 (Exhibit 6) ("the culture is one where you're not encouraged to [report colleagues] because I've never been asked to do it, and if I wanted to do it, I wouldn't know how to do it, actually."); Hirokawa Dep. at 48:9-50:11 (Exhibit 7) (describing use of personal judgment in determining whether to report errors); Binder Dep. at 30:8-31:1 (Exhibit 3) (sole decision maker on patient care with no oversight).   These excerpts alone should sufficiently support YNHH's entitlement to discovery as to the necessity of the LCP Policy.

11

C.   **The Nature Of The Voluntary Claimants' Practices Are Unique And A Sample Of Their Testimony Is Not Representative.**

The EEOC has also asserted that further testimony from Voluntary Claimants would be "cumulative." However, here again, YNHH can show otherwise. The testimony elicited from each Voluntary Claimant deposed thus far has been unique and establishes that many of the Voluntary Claimants are not similarly situated to the anchor claimant in this case, Dr. Irwin Nash, because the nature and essential functions of their practices at YNHH varied widely.[4] Accordingly, the analysis of the EEOC's ADEA and ADA claims, and YNHH's defenses -- particularly, whether the LCP testing was job-related and/or necessary to patient safety -- may differ practice to practice, claimant to claimant.

During the relevant time period, Dr. Nash was a pathologist and hematologist who analyzed and diagnosed tissue samples and did not typically treat patients directly. *See* Nash Dep. at 55:16-22, 81:9-13; 83:18-24. This was very different work from many of the other deponents, whose practices also differed widely from each other. *See, e.g.*, Atkins Dep. at 10:3-5, 14:22-24, 15:1 (Exhibit 2) (Physician Assistant, Occupational Medicine); Boras Dep. at 7:15-22 (Exhibit 4) (Attending

---

[4] The EEOC brings this case under Title I of the ADA, which incorporates by reference § 706(f)(1) and (3) of Title VII, and Title I of the Civil Rights Act of 1991. Section §706 allows the EEOC to bring what are called "representative actions" as an agency on behalf of specifically identified Claimants and a group of similarly-situated aggrieved individuals for unlawful discrimination. *See Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 333 (1980). This lawsuit arises out of an administrative charge filed by Dr. Nash, one of the Voluntary Claimants. Dr. Nash is the only Affected Individual in this case who filed a charge. Accordingly, the claimants to this representative action must be similarly situated to Dr. Nash. *See Harris v. Amoco Production Co.*, 768 F.2d 669, 682 (5th Cir. 1985) (in representative action pursuant to § 706, EEOC acts on behalf of charging part(ies) and similarly situated individuals); see also Compl. (Doc. 1) at ¶ 31 (alleging unlawful employment practices under the ADA against Dr. Nash and similarly situated individuals).

Physician, Emergency Department); Mitchell Dep. at 20:3-16 (Exhibit 9) (Nurse Practitioner, Gynecological Oncology).

Indeed, it bears repeating in defense of requesting discovery that should not have to be compelled by Court intervention, that the EEOC itself has argued, when seeking extensive individual Affected Individual discovery, <u>that each practitioner is unique and that each of their individual circumstances are relevant</u>.  For example, in seeking all of the Affected Individuals' credentialing files (files for all 115 claimants in this case, not only those of the Voluntary Claimants), the EEOC rejected all offers of a representative sampling.  *See* Plaintiffs' Mem. Of Law in support of Motion to Compel (Doc No. 71:2) at § (I)(B), pp. 11-12 (arguing individual practitioner credentialing files are "critical information" needed to determine each practitioner's job qualifications, that different practitioners present different levels of risk, and that these facts are relevant to the issue of whether the LCP Policy is necessary).  In an email dated April 23, 2021, summarizing the parties' meet and confer on the EEOC's request for production of all 115 Affected Individuals' credentialing files, the EEOC stated:

> As each doctor's circumstances are unique, we are not inclined to make such unsupported assumptions, and the law does not require that we do so.

*See* Exhibit 11 (M. Penzel 4/23/2021 Email to C. DeGroff, *et al.*).  Likewise, YNHH should not be required to make unsupported assumptions about the nature of the Voluntary Claimants' practices.

13

### D. Interrogatories Are Not a Sufficient Substitute.

An additional, self-serving argument made by the EEOC has been that documentary evidence and interrogatory answers are the "better" way to elicit this information. To the contrary, neither corporate records nor interrogatory answers are adequate substitutes for depositions.

The testimony to date actually establishes that YNHH's documents do not tell the whole story. *See, e.g.,* Hirokawa Dep. at 32:1-8 (Exhibit 7) (YNHH record of medical privilege delineation not complete picture of practice); Mitchell Dep. at 24:13-23, 25:3-19 (Exhibit 9) (YNHH record of medical privilege delineation not accurate depiction of practice). YNHH administrative credentialing files do not and cannot provide a complete picture of the nature of the claimants' practices and what it was they were actually doing -- and the essential functions and risks involved -- on a day-to-day basis. *See E.E.O.C. v. DHL Exp. (USA), Inc.,* No. 10 C 6139, 2012 WL 5381219, at *4 (N.D. Ill. Oct. 31, 2012) (granting defendant's motion for additional depositions and rejecting EEOC's arguments that corporate records were adequate substitute and that additional depositions would be duplicative where certain deposition testimony already elicited was inconsistent).

Likewise, YNHH should not be required to rely on interrogatories as a substitute for oral discovery. *See Cedars-Sinai Med. Ctr. v. Ray*, 2019 U.S. Dist. LEXIS 96855, at *11-12 (S.D.N.Y. June 10, 2019) ("neither written interrogatory responses, which are edited by attorneys and do not permit fluid follow-up, nor the testimony of a corporate representative, are substitutes for the personal testimony" of a key witness); *Mill-Run Tours, Inc. v. Khashoggi*, 124 F.R.D. 547, 549

14

(S.D.N.Y. Feb. 17, 1989) ("the interrogatory format does not permit the probing follow-up questions necessary in all but the simplest litigation[, and] without oral deposition, counsel are unable to observe the demeanor of the witness and evaluate his credibility in anticipation of trial … [and] written questions provide an opportunity for counsel to assist the witness in providing answers so carefully tailored that they are likely to generate additional discovery disputes.") (citations omitted).  If this was the rule, YNHH should also be allowed to substitute interrogatory responses for upcoming depositions.

Finally, the depositions to date have actually suggested that the EEOC may not have collected and produced all of the documents requested by YNHH in discovery, which will be a subject of future meet and confer between the parties. *See, e.g.,* Atkins Dep. at 66:18-20 (Exhibit 2) (describing categories of documents related to practice at YNHH and stating "I don't know" as to whether she provided those to the EEOC); Binder Dep. at 13:17-20 (Exhibit 3) ("Q: Did you provide any documents to the EEOC related to your practice at Yale New Haven Hospital? A: No."); Boras Dep. at 72:7-73:20 (Exhibit 4) ("Q:…And how did you determine what was relevant to this case? A: I didn't.  Whatever showed up that had, you know, names on it relevant to Hawkins or communications related to him I sent them."). The EEOC cannot point to documents produced in discovery as a substitute for depositions, when it appears the EEOC may not have been fully forthcoming with those documents thus far in discovery.

**III.   The EEOC Has Not Offered Any Way That It Will Be Prejudiced By Additional Depositions, While YNHH Can Demonstrate Profound Prejudice If Not Allowed.**

During the parties' meet and confer on September 21, 2021, the EEOC could only articulate one way that it would be "prejudiced" by the depositions: requiring the EEOC and its claimants to attend what the EEOC believes to be "pointless" depositions. That is simply not prejudice, it is litigation. This, particularly where it was the EEOC itself who advanced these very individuals as their Voluntary Claimants.

The Claimant depositions have been narrowly tailored, short depositions lasting two to three hours each. The parties successfully completed all nine depositions over the course of just six days out of a two-week period. Additional depositions will not impact the discovery schedule in this case. The Claimant depositions have been conducted in a professional and efficient way, and the Claimants consistently testified that their depositions required minimal preparation. *See, e.g.,* Binder Dep. at 12:5-8 ("Q: Dr. Binder, what did you do to prepare for your deposition today? A: I don't think very much..."); Finkelstein Dep. at 9:8-12 ("Q: Did you do anything to prepare for giving testimony this morning?... A: I just looked through some emails that were sent."); Mitchell Dep. at 14:1-20 ("Q: What did you do to prepare for your deposition today?  A: I replied to the information that was given to me regarding the case from the [EEOC.]"). One deponent even complimented counsel about the deposition. *See* Hirokawa Dep. at 99:15-17 (Exhibit 7) ("Well, thank you very much. You've been very respectful, all of you. I appreciate that.").

On the other hand, the prejudice to YNHH if unable to depose the Voluntary Claimants would be profound. Requiring YNHH to move into the dispositive motion stage having little to no idea what these claimants will provide as testimony is litigation by ambush, which has been flatly rejected in this Circuit. *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 236 (2nd Cir. 1985) ("Discovery serves important purposes, such as avoiding surprise, fully disclosing the nature and scope of the controversy, narrowing, simplifying, and framing the issues involved, and enabling parties to obtain the factual information needed to prepare for trial.") (internal citation omitted); *Trueman v. New York State Canal Corp.*, 2010 WL 681341, at *2 (N.D.N.Y. Feb. 24, 2010) (citing JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 3303 (3rd ed. 2009)) (the whole purpose behind the liberal discovery afforded by the Federal Rules of Civil Procedure is to avoid surprise and trial by ambush); *Costa v. AFGO Mech. Servs., Inc.*, 237 F.R.D. 21, 26 (E.D.N.Y. 2006) ("Open discovery is the norm. Gamesmanship with information is discouraged and surprises are abhorred. Adherence to these principles assists the trier of fact and serves efficiency in the adjudication of disputes.") (internal quotation omitted).

The Voluntary Claimants have provided, and are expected to continue to provide, evidence highly relevant to YNHH's defenses to the EEOC's claims. The EEOC cannot simply freeze discovery as an attempt at damage control.

## CONCLUSION

In sum, for the reasons stated above, YNHH asks the Court to allow the depositions of these active, voluntary participants in the case, and reject the

17

EEOC's novel and prejudicial attempt to hamstring YNHH's defense.  In the alternative, YNHH asks the Court to enter an order precluding the EEOC from using testimony of non-deposed Voluntary Claimants on summary judgment or at trial. *See Equal Emp. Opportunity Comm'n v. Performance Food Grp., Inc.*, No. CV 13-1712, 2020 WL 1287974, at *2 (D. Md. Mar. 18, 2020) (striking the declarations of non-deposed claimants and reaffirming previous order precluding the use of such testimony at trial).

        DEFENDANT,
        YALE NEW HAVEN HOSPITAL,


        By: */s/ Christopher J. DeGroff*
            Christopher J. DeGroff

            Christopher J. DeGroff (admitted *pro hac vice*)
            cdegroff@seyfarth.com
            Shana Madigan (admitted *pro hac vice*)
            smadigan@seyfarth.com
            **SEYFARTH SHAW LLP**
            233 S. Wacker Drive, Suite 8000
            Chicago, IL  60606

            Mary A. Gambardella (ct05386)
            mgambardella@wiggin.com
            Joshua J. Wyatt (ct28916)
            jwyatt@wiggin.com
            **WIGGIN AND DANA LLP**
            One Century Tower
            265 Church Street, 18th Floor
            New Haven, Connecticut 06508
            Tel:  (203) 498-4328
            Fax:  (203) 789-2889

**CERTIFICATE OF SERVICE**

This is to certify that on the 1st day of October 2021, a copy of the foregoing **MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS** was filed electronically. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's CM/ECF system.

                                           _____*/s/ Shana Madigan*_____
                                           **Shana Madigan (admitted *pro hac vice*)**