# EXHIBIT 3

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
Civil Action No. 3:20-cv-187(VLB)
----------------------------------------------------x

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                        Plaintiff,

          - against -

YALE NEW HAVEN HOSPITAL,

                        Defendant.

----------------------------------------------------x
                        September 15, 2021
                        11:00 a.m.


VIRTUAL DEPOSITION of HENRY J. BINDER, a witness

on behalf of the Plaintiff herein, taken pursuant

to Notice, and held remotely before April Pearl, a

Court Reporter and Notary Public of the State of

Connecticut.

800.DAL.8779
dalcoreporting.com



2

```
 1   A P P E A R A N C E S :

 2           EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                     John F. Kennedy Federal Building
 3                   Room 475
                     Boston, Massachusetts 02203-0506
 4           BY:  KIRSTEN PETERS, ESQ.
                  CAITLIN BROWN, ESQ.
 5                (Present for portions)

 6


 7           SEYFARTH SHAW, LLP
                     Co-Attorneys for the Defendant
 8                   233 S. Wacker Driver
                     Suite 8000
 9                   Chicago, Illinois 60606
             By:  SHANA MADIGAN, ESQ.
10                CHRISTOPHER J. DeGROFF, ESQ.

11


12           WIGGIN AND DANA, LLP
                     Co-Attorneys for the Defendant
13                   One Century Tower
                     265 Church Street
14                   18th Floor
                     New Haven, Connecticut 06508
15           BY:  MARY A. GAMBARDELLA, ESQ.
                  (Present for portions)
16


17


18   ALSO PRESENT:
             NINA JAFFE-GEFFER
19

20

21

22

23

24
```



**HENRY J. BINDER**                                              **12**

1          answer, that would be great.

2                    THE WITNESS:  Okay.  Certainly.

3

4    BY MS. MADIGAN:

5          Q.    Dr. Binder, what did you do to prepare

6    for your deposition today?

7          A.    I don't think very much, I don't

8    think.

9          Q.    Did you speak -- I don't want to know

10   the substance of any conversation you had with

11   your EEOC counsel, but did you speak with them?

12         A.    Yes, I did speak with them.

13         Q.    And do you remember, did you speak

14   with them more than once?

15         A.    I think I spoke with them twice.

16         Q.    And do you recall reviewing any

17   documents?

18         A.    No.

19         Q.    Okay.  Do you have in your possession

20   any materials related to your practice at Yale New

21   Haven Hospital?

22         A.    Not -- certainly not where I am

23   presently located, and I don't believe I have.  I

24   had an office at Yale Medical School continuously



1    until this past June.  I do not believe that there

2    were any records in that office.  I have

3    effectively dispersed my material that related to

4    my practice.  And if there were anything related

5    to my practice, they were destroyed.

6              Q.    Okay.  When was that?

7              A.    In June of 2021.

8              Q.    Okay.

9              A.    But I also said, I don't believe there

10   were any records, but if there were any records,

11   they did not -- they were not brought to my home.

12             Q.    Okay.  They were in your office at

13   Yale?

14             A.    Yes.

15             Q.    If there were any?

16             A.    Yes.

17             Q.    Did you provide any documents to the

18   EEOC related to your practice at Yale New Haven

19   Hospital?

20             A.    No.

21             Q.    Okay.  And did you have any email,

22   electronic files or any type of electronic

23   material?

24             (Telephone interruption.)



**HENRY J. BINDER**                                      30

1    to -- I'll say, how important is patient safety to

2    you?

3            A.    It's very much important.

4            Q.    And how important do you think it is

5    to the hospital administration?

6                  MS. PETERS:  Objection.

7            A.    I hope that it would be important.

8            Q.    Okay.  Can you tell me about how

9    much -- did you have autonomy in your practice?

10           A.    Would you define "autonomy".

11           Q.    Did you have the ability to make

12   decisions on your own about patient care?

13           A.    Yes.

14           Q.    Did anyone oversee your caring for

15   patients?

16                 MS. PETERS:  Objection.

17           A.    Not to my knowledge.

18           Q.    And again, that is in the 2016 to 2019

19   time frame.

20           A.    I wasn't practicing in 2019.

21           Q.    2016 to December 31, 2018, time frame,

22   no one was overseeing or supervising your

23   practice?

24                 MS. PETERS:  Objection.

800.DAL.8779
dalcoreporting.com

CONFIDENTIAL



1         A.    No.

2         Q.    Okay.

3               MS. MADIGAN:   This may be a good time

4         for a break.   Is that okay with everyone?

5               MS. PETERS:   Sure.   That works with

6         us.

7               MS. MADIGAN:   Ten minutes?

8               MS. PETERS:   Okay.

9               MS. MADIGAN:   Okay.   Great.   See you

10        in ten minutes.

11

12               (Recess taken.)

13

14   MS. MADIGAN:

15        Q.    Dr. Binder, again, talking about the

16   time period 2016 to December 31, 2018, did your

17   practice require you to keep up to date on

18   developments in your field?

19        A.    Yes.

20        Q.    Did you have to stay up to date on

21   advances in techniques?

22        A.    I'm not certain that I would delineate

23   it into techniques.   I would ask you to define

24   what you mean by "techniques."   But it's just

800.DAL.8779
dalcoreporting.com



CONFIDENTIAL

1              When I was doing inpatient

2    consultations, I was working very closely with one

3    of our postdoctoral fellows, with or without an

4    additional medical resident and/or medical

5    student.  And inpatient consultations was done in

6    which the medical fellow would be the lead person

7    for effectively receiving the consultations that I

8    was to see, organizing them, and we would then see

9    patients together.

10          Q.   And you would need to manage your time

11   effectively in order to do all of those different

12   aspects of your practice?

13          A.   If you don't manage your time

14   effectively, you just spend more time.  I

15   didn't -- never in my life did I have an 8 to 4

16   job.

17          Q.   Did you have elements of your practice

18   that required you to have an extended period of

19   concentration?

20               MS. PETERS:  Objection.

21          A.   I don't know what you mean.

22          Q.   Well, did you need to -- did you have

23   extended periods of time where you needed to focus

24   on something?

**HENRY J. BINDER**                                    **46**

1              MS. PETERS:  Objection.

2         A.   I think I always focused on what I was

3    doing.

4         Q.   When you were performing procedures,

5    you needed to focus during those procedures;

6    right?

7         A.   I think that would be self-evident.  I

8    think everything you are doing, when you are

9    seeing patients, you are focused on that patient.

10   And I'm not thinking about whatever you are trying

11   to get me to say.

12        Q.   I'm just asking questions, Doctor.

13        A.   I'm just answering questions.

14        Q.   Thank you.

15             Did you have distractions?  Were there

16   ever distractions while you were performing

17   procedures?

18             MS. PETERS:  Objection.

19        A.   Probably not, because you were in a

20   room where the door was shut.  There was a sign on

21   the door saying procedure in progress, and one was

22   not interrupted.

23        Q.   Were there any other elements of your

24   practice where there might be distractions?

**HENRY J. BINDER**                    54

1          MS. PETERS:  Objection.

2      A.   Manipulation of the endoscope was done

3  by moving your hand as well as your fingers.

4      Q.   Okay.  And did those tasks require

5  fine motor skills?

6      A.   I would say gross motor skills.

7      Q.   Gross motor.  Did you have any

8  elements of your practice that were fine motor?

9      A.   Depends on your definition of fine

10  motor.  I don't know the difference between gross

11  and fine motor.  If you do, please let me know.

12      Q.   What do you think fine motor skills

13  are?

14      A.   Fine motor skills of an

15  ophthalmologist doing eye cataract surgery is

16  going to be quite different than the, quote, fine

17  motor skills of a gastroenterologist holding an

18  endoscope.

19      Q.   Okay.  What are the fine motor skills

20  of a gastroenterologist?

21      A.   Moving the tip of a -- passing the

22  instrument through the back of the patient's

23  throat, passing it into -- directing it so that it

24  goes into the esophagus, passing it forward under

800.DAL.8779
dalcoreporting.com

CONFIDENTIAL

1   direct vision into the stomach and visualizing

2   specific areas until you are satisfied areas have

3   been seen appropriately.

4              And if necessary and if appropriate,

5   then passing a small instrument through, in

6   essence, a tube, an opening in the endoscope that

7   permitted you to pass a biopsy instrument through

8   the instrument into the stomach where you then had

9   the ability, again, using your hands to take a

10  snippet of tissue that could then be retrieved

11  through the endoscopic biopsy instrument out of

12  the endoscope, placed in a bottle containing

13  formalin to be processed by the pathologist for a

14  histologic examination.

15         Q.   And so what was the size of the

16  opening that you were working through?

17         A.   My comment to you is I'd say it was

18  small.  I don't know the millimeter size.

19         Q.   But millimeters; right?

20         A.   Okay.

21         Q.   Okay.  Not an inch, less than an inch?

22         A.   Considerably less than an inch.

23         Q.   Less than a centimeter?

24         A.   You are jumping from metric to

**HENRY J. BINDER**                                    56

1    nonmetric.

2             Q.    Bear with me.

3                   So would you say less than a

4    centimeter wide opening?

5             A.    Yes.

6             Q.    Did your practice ever require you to

7    solve or address problems that you hadn't seen

8    before?

9                   MS. PETERS:   Objection.

10            A.    I'm uncertain.

11            Q.    Was there any -- did you ever --

12            A.    Excuse me.   Excuse me.   The answer to

13   that is of course.   Because when I published --

14   you will see that I reported seconds for the

15   initial observations, and there are articles that

16   I have had published in the New England Journal of

17   Medicine.   And the New England Journal of Medicine

18   does not repeat what -- let's just say repetition.

19                  And I can describe, thinking about it,

20   at least and indeed, I would only focus on the new

21   England Journal of Medicine, that there were

22   probably five or six different articles published

23   of initial observations that I had made regarding

24   patients.