# EXHIBIT 4

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
Civil Action No. 3:20-cv-187(VLB)
-------------------------------------------------x

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                     Plaintiff,

       - against -

YALE NEW HAVEN HOSPITAL,

                     Defendant.

-------------------------------------------------x
                              September 14, 2021
                              2:17 p.m.
```

**VIRTUAL DEPOSITION** of **JOHN BORAS**, a witness on behalf of the Plaintiff herein, taken pursuant to Notice, and held remotely before April Pearl, a Court Reporter and Notary Public of the State of Connecticut.



800.DAL.8779
dalcoreporting.com
DALCO

2

```
 1   A P P E A R A N C E S :

 2         EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                John F. Kennedy Federal Building
 3              Room 475
                Boston, Massachusetts 02203-0506
 4         BY:  SONYA SHAO, ESQ.
                KIRSTEN PETERS, ESQ.
 5              (Present for portions)

 6


 7         SEYFARTH SHAW, LLP
                Co-Attorneys for the Defendant
 8              233 S. Wacker Driver
                Suite 8000
 9              Chicago, Illinois 60606
           By:  CHRISTOPHER J. DeGROFF, ESQ.
10


11
           WIGGIN AND DANA, LLP
12              Co-Attorneys for the Defendant
                One Century Tower
13              265 Church Street
                18th Floor
14              New Haven, Connecticut 06508
           BY:  MARY A. GAMBARDELLA, ESQ.
15              JOSHUA WYATT, ESQ.

16

17

18

19

20

21

22

23

24
```



```
 1   hospital?
 2        A.    I'm retired.
 3        Q.    And when was your retirement
 4   effective?
 5        A.    Probably December 31, 2018.
 6        Q.    Okay.  So have you performed any
 7   services as a medical professional since December
 8   31, 2018?
 9        A.    No.
10        Q.    All right.  So you were totally
11   retired as of that point?
12        A.    Yeah.  Well, I am, yes.
13        Q.    Yeah, as of 12/31/18?
14        A.    Correct.
15        Q.    Okay.  Thank you.  Just before your
16   retirement, what was your status?  What was the
17   last status you had with respect to the hospital,
18   Yale New Haven Hospital?
19        A.    I was an attending physician in the
20   emergency department.
21        Q.    And what were your primary
22   responsibilities in that role?
23        A.    See and evaluate patients, admit or
24   discharge them, depending on the severity of their
```



1  A. I'm sure there is.
2  Q. What about fine motor skills, do you
3  believe that fine motor skills were important to
4  your role?
5  A. To an extent. It depends on how fine
6  you mean. You need to be able to suture. You
7  need to be able to intubate. You know, you don't
8  need to be able to do a micrograft. I mean, you
9  need to do things that emergency physicians do.
10 Q. And sometimes fairly quickly; correct?
11 A. Yeah.
12 Q. What about hand-eye coordination, is
13 that an important skill to all of those procedures
14 that you named?
15 A. To an extent. It doesn't require a
16 lot of great hand-eye coordination. You know,
17 it's not like hitting a 95-mile-an-hour fast ball.
18 Q. You don't think hand-eye coordination
19 is important to be able to suture somebody?
20        MS. SHAO: Object to form.
21 A. I mean, there is some hand-eye
22 coordination there, but it's not at the level of a
23 micro-surgeon. Let's put it that way.
24 Q. Well, I didn't ask you to quantify

1  levels.
2        A.   Yes, you are.
3        Q.   No, I'm not.  Let me clarify.  I'm not
4  asking you to quantify levels or to compare you to
5  anybody else.
6             I'm asking whether or not hand-eye
7  coordination is an important skill in your role,
8  not anybody else's role, your role.  And I'm not
9  comparing levels or quantifying.
10       A.   A minimal level of hand-eye
11 coordination is needed.
12       Q.   Thank you.
13            What about when you intubate somebody,
14 is that a minimal level of hand-eye coordination?
15       A.   It requires some hand-eye
16 coordination, yes.  They are all different.
17 Everybody is different.
18       Q.   They are all different.
19       A.   Yep.
20       Q.   Give me an example of something you
21 did in the ED that required the highest level of
22 hand-eye coordination.
23            MS. SHAO:  In the 2016 to 2019 time
24       period?



1          MS. Gambardella:  Any time.  I'm not
2     limiting.
3          Q.   Give me an example.
4          A.   Perhaps putting a chest tube in.  I
5     don't know.  It's hard to grade them.
6          Q.   Well, okay.  Putting in a chest tube,
7     does that require minimal hand-eye coordination or
8     more than minimal?
9          A.   More than minimal.
10         Q.   Give me an example of the most complex
11    case you took care of in the ED, let's say in the
12    last, you know, three years of your tenure.  No
13    names, obviously, just the most complex.
14         A.   In terms of, you are talking about
15    hand-eye coordination?
16         Q.   I'm not talking about that anymore.
17    I'm talking about complexity.
18         A.   You are talking about complexity of
19    patients?
20         Q.   Yeah.
21         A.   Well, I had a patient basically
22    present in cardiogenic shock.  I believe, that was
23    what the terminal event was.  The question was
24    whether it was that or septic shock, but with

1  question, that is exactly what I'm asking you.
2  The ED is dynamic.  So you have to have the
3  ability to change direction or your course of
4  action, depending on what is happening with any
5  particular patient; isn't that correct?
6         A.    Yeah.
7         Q.    Okay.
8         A.    Yes.
9         Q.    And then you have to be able to
10 communicate with a patient or the patient's family
11 in a way they understand; correct?
12        A.    Yes.
13        Q.    Okay.  So how would you be able to
14 generally organize the order of priorities during
15 your shift?
16              MS. SHAO:  Object to form.
17        Q.    Does that depend on -- okay.  I'm
18 sorry.  Objection to form.
19              Would that depend on the patient, what
20 they are presenting with at any particular shift?
21        A.    Yeah, it depends on the severity of
22 illness on presentation.
23        Q.    Okay.  And give me an example of a
24 case that requires you to have extended periods of

 1    concentration.
 2         A.   I'm not certain what you are asking.
 3    They all require extended concentration.
 4         Q.   Okay.  That's good enough.
 5              And you have to not only be able to
 6    communicate with patients or their family but with
 7    other medical professionals within the hospital;
 8    correct?
 9         A.   Correct.
10         Q.   Sometimes you would also have to call
11    a patient's primary care physician, correct, and
12    communicate what is going on in the ED?
13         A.   Usually after, at the end of the
14    treatment, yes.
15         Q.   Well, --
16         A.   It's not too frequently that we'd end
17    up calling them before.
18         Q.   I see.
19         A.   It's usually more of a courtesy call
20    to let them know that they were there.
21         Q.   What about specialists who treat a
22    patient, you would have to know who they are, and
23    under appropriate circumstances, be able to call
24    in the information to them, too; correct?

72                          JOHN BORAS

```
 1  didn't do that?
 2          A.   I don't discuss my personal business
 3  with other people.
 4          Q.   Were you ever asked -- and this is yes
 5  no or you don't recall.  Please don't discuss the
 6  content of the conversation.
 7               Were you ever asked to search for
 8  emails or other documents relating to being tested
 9  at Yale New Haven Hospital?
10          A.   Yes.
11          Q.   When was that?
12          A.   In the last several months.
13          Q.   And was that from somebody at the
14  EEOC?
15          A.   Yes, from Attorney Peters.
16          Q.   Thank you.
17               And what did you do to search for
18  relevant documents?
19          A.   I looked through any papers that I
20  might have had here, and I also searched on my
21  personal computer and found precious little.
22          Q.   Okay.  So I take it you turned
23  anything over --
24          A.   Yes.
```



```
 1         Q.   -- that was pertinent?
 2              And how did you determine what was
 3   relevant to this case?
 4         A.   I didn't.  Whatever showed up that
 5   had, you know, names on it relevant to Hawkins or
 6   communications related to him I sent to them.  But
 7   that is all I had, which is nothing, basically.
 8         Q.   Okay.  So you didn't withhold
 9   anything?
10         A.   No.  I have nothing to withhold.
11         Q.   Yeah.  So you don't know of anything
12   that you recall that got deleted or is missing?
13         A.   I don't know of anything that is
14   missing, and probably nothing is deleted from my
15   home mail.
16         Q.   Okay.
17         A.   I mean, if I had any other
18   communications, they would have been at the --
19   through the Yale email, and I don't have access to
20   that, so.
21         Q.   Does your wife work?
22         A.   Yes.
23         Q.   Where does she work?
24         A.   Presently, she is working for a
```