# EXHIBIT 7

```
IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - - - -X
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
                              Plaintiff,

        -against-                       Civil Action No.
                                        3:20-CV-187(VLB)
YALE NEW HAVEN HOSPITAL, INC.,
                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - -X
                                  September 13, 2021
                                  2:00 p.m.
```

**VIRTUAL DEPOSITION** of RONALD HIROKAWA, a witness herein, taken pursuant to Notice, and held remotely via videoteleconference, before Tara Ferguson Mirra, a Court Reporter and Notary Public of the State of Connecticut.



```
 1   A P P E A R A N C E S :

 2

 3       EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
             Attorneys for Plaintiff
 4           255 East Temple Street, 4th Floor
             Los Angeles, CA 90012
 5       BY: SONYA SHAO, ESQ.

 6

 7       SEYFARTH SHAW, LLP
             Attorneys for Defendant
 8           233 S. Wacker Drive, Suite 8000
             Chicago, Illinois 60606
 9       BY: CHRISTOPHER J. DEGROFF, ESQ.
             SHANA MADIGAN, ESQ.
10

11
         WIGGIN AND DANA LLP
12           Attorneys for Defendant
             One Century Tower
13           265 Church Street, 18th Floor
             New Haven, Connecticut 06508
14       BY: MARY A. GAMBARDELLA, ESQ.

15

16

17

18

19

20

21

22

23

24
```



1  but does it accurately capture the types of
2  procedures that you did at Yale New Haven in the
3  time period that's on there, the 2017 to 2019?
4       A.   It's a -- it's limited number of
5  procedures relative to what we are privileged to do.
6  They used the term minor procedures and so forth,
7  which list a little more in detail what we do, but
8  this is a broad summary of the cases that we do.
9       Q.   Is there anything -- again, I'm going to
10 invite you to use the pronoun "I" versus "we,"
11 because I'm interested only in you today unless I
12 say otherwise.  I know it's artificial.
13           So these are the types -- at least some of
14 the types of procedures that you did during this
15 time period; right?
16      A.   That's correct.
17      Q.   Okay.  And it is correct to say that you
18 did these same sorts of procedures in the year 2016?
19      A.   Yes.
20      Q.   And at some point you went to refer and
21 follow; correct?
22      A.   Correct.
23      Q.   Am I correct that that was in April of
24 2019?

1  discussing the case.
2         These cases are brought up not necessarily
3  by the individual who was involved in doing them,
4  but they're brought up statistically.  If you have,
5  you know, certain things that are out of the
6  bell-shaped curve, they might be, you know, brought
7  up to discussion because they don't fall in to the
8  usual.
9     Q.   Got it, but there would be some instances
10 with mistakes that do fall within that ordinary
11 curve that may not go addressed between colleagues,
12 at least; right?
13    A.   That's possible.  I -- I -- yes.
14    Q.   Have you ever reported a mistake by one of
15 your colleagues to someone at the Yale New Haven
16 Hospital between 2016 and 2019?
17         MS. SHAO:  Objection to form.  Lacks
18     foundation.
19    A.   I don't believe I have.
20    Q.   Have you ever discussed -- and I'm
21 expanding now to the entire time you've been at Yale
22 New Haven, okay, worked within its network -- have
23 you had occasion where you saw a mistake by a doctor
24 and raised it just directly with them?

```
 1              MS. SHAO:  Object to form.
 2       A.     No.
 3       Q.     You've reported that -- each of those
 4   incidents to someone else?
 5              MS. SHAO:  Object to form.
 6       A.     We -- we reported it to the committee that
 7   discussed the case.  I don't know if I'm -- if you
 8   want to hear the case or, number one, if I'm allowed
 9   to discuss the case, but --
10       Q.     Yeah.  I don't want you to name names, but
11   you did -- it sounds to me like you're thinking
12   about a particular instance; right?
13       A.     I am, yes.
14       Q.     But in -- you oversee residents; correct?
15       A.     Yes.
16       Q.     Do you report each of their mistakes to a
17   committee?
18       A.     Yes.
19       Q.     Has there ever been a time where you just
20   looked over the shoulder of a resident and realized,
21   oh, they're using X-procedure when they should be
22   using Y-procedure and redirected them in the moment?
23       A.     Yes.
24       Q.     And --
```



1     A.    You mean as a one-on-one-type of direction
2  that I would -- yes.
3     Q.    And were each of those reported?
4     A.    No.  No, I wouldn't consider those errors.
5  I wouldn't consider those, you know, even bad
6  judgment.  Those are situations where someone is
7  learning, and I would consider that more teaching
8  than, you know, redirecting them because they were
9  doing something wrong and also realizing that there
10 are alternative ways to do the same thing.  One has
11 to take that into consideration, I think.
12           MS. SHAO:  I'm sorry.
13           MR. DeGROFF:  I got you.  We've been going
14      for about an hour.  Why don't we take a short,
15      ten-minute break, if that works.  We're going
16      off the record.  I've got it exactly at one
17      hour that we've been on the record so far.  So
18      why don't we meet back here in ten minutes at
19      3:15 eastern time.
20
21           (A brief recess was taken.)
22
23 BY MR. DeGROFF:
24    Q.    Doctor, we're back on the record.  Is

1          Yes.  The answer is yes.
2     Q.   Would it be important for you to remember
3  certain facts about your patients and previous
4  interaction with them?
5     A.   Yes.
6     Q.   Can your job sometimes be hectic?
7     A.   Yes.
8     Q.   When you were in mid-procedure, let's say
9  you're in surgery, were there ever occasions where
10 what you were seeing at the operating table required
11 you to change direction on a particular procedure
12 you were conducting?
13    A.   Yes.
14    Q.   So would it be accurate to stay you needed
15 to be flexible in your job at times?
16    A.   Yes.
17    Q.   Did you actually communicate medical
18 information with the patients?
19    A.   Yes.
20    Q.   You would meet with them, I would imagine,
21 before a procedure and sometimes after a procedure?
22    A.   Yes.
23    Q.   And was part of your job to communicate
24 medical information to your patients?

1   to determining and treating what the actual problem
2   is.  That's one type of problem.
3           Another type of problem would be bleeding.
4   If someone were to have significant bleeding from
5   either a neck injury or nose or sinus problem, like
6   nosebleeds can be significant, these are problems
7   that are considered emergencies that we have to take
8   care of and treat urgently.
9       Q.   Would you agree that you would have to
10  make quick decisions in those moments?
11      A.   Yes.
12      Q.   More specifically, would you have to make
13  quick decisions based on something that you were
14  reviewing or reading, for example, x-rays or other
15  radiology reports?
16          MS. SHAO:  Object to form.
17      A.   Are you -- can you rephrase that question.
18      Q.   Of course.  It was a clunky question.  Let
19  me try it again.
20          Let me give you an example:  Were there
21  ever times where you would receive x-rays and need
22  to act on them quickly?
23      A.   Relatively quickly.
24      Q.   Were there times where you would receive

 1   lab reports and would need to act on those quickly?
 2        A.   Yes, relatively quickly.
 3        Q.   If, for example, a patient were having
 4   trouble breathing and their pulse ox was dipping and
 5   you were seeing that on a monitor, you might need to
 6   react to what you're viewing on the monitor quickly;
 7   correct?
 8        A.   Correct.
 9        Q.   In the course of treatment, would you ever
10   have to remember certain information that you may
11   have learned just recently?  For example -- well,
12   let me back up.
13             Did you see multiple patients at roughly
14   the same time?  Obviously you can't see people
15   simultaneously, but would you be treating multiple
16   patients at once?
17        A.   Yes.
18        Q.   In those situations, would you have to
19   remember where you are with each of those patients?
20        A.   Yes.
21        Q.   Was there any element of triaging in your
22   practice as an ENT between 2016 and 2019?
23             MS. SHAO:  Object to form.
24        A.   Generally, when you're referring to



```
 1   the -- what I was trying to get at.  So thank you.
 2             Were there parts of your job that required
 3   extended periods of concentration?
 4        A.   Yes.
 5        Q.   Give me an example of one of those.
 6        A.   Well, when we're in a situation where we
 7   would operate for a long period of time, six hours,
 8   you have to be pretty much concentrating for the
 9   majority of that time.  There may be times during
10   that six hours that don't require your full
11   attention, if you will, because things are going
12   along at a certain level, but your full attention
13   and concentration, for the most part, of a long
14   operation.  So if we're talking about duration of
15   time, then I would say that's the most likely
16   situation is a prolonged surgical procedure.
17             MS. SHAO:  Can we pause for one second.
18
19             (A discussion was held off the record.)
20
21   BY MR. DeGROFF:
22        Q.   Were there distractions in your job as an
23   ENT?
24        A.   Are there distractions --
```



```
 1    artificial and sometimes uncomfortable
 2    situation.
 3            MS. GAMBARDELLA:  Chris, did we leave the
 4    deposition open pending adjudication of that
 5    motion?
 6            MR. DeGROFF:  Oh, yes.  Yes.  I guess we
 7    should specify that, that this deposition,
 8    Doctor, is not closed at this point.  There is
 9    still an open issue with the court as to
10    certain questions that we get to ask.  So
11    depending on how the judge rules on that,
12    either we will never meet one another again or
13    we might have some additional questions for
14    you.
15            THE WITNESS:  Okay.  Well, thank you very
16    much.  You've been very respectful, all of you.
17    I appreciate that.
18            MR. DeGROFF:  Thank you.
19
20            (Hirokawa Exhibit A, YNHH106166, was
21            marked for identification.)
22
23            (Hirokawa Exhibit B, YNHH106178, was
24            marked for identification.)
```

