# EXHIBIT 11

| | |
|---|---|
| From: | MARKUS PENZEL <MARKUS.PENZEL@EEOC.GOV> |
| Sent: | Friday, April 23, 2021 3:41 PM |
| To: | DeGroff, Christopher; Gambardella, Mary |
| Cc: | Madigan, Shana; LATEESHA VINES; KIMBERLY CRUZ; KIRSTEN PETERS; CAITLIN BROWN; Wyatt, Joshua |
| Subject: | EEOC v. YNHH: Meet and Confer |

**[EXT. Sender]**

**Chris and Mary:**

Because we covered a lot of ground during our meet and confer on the 21st and many representations/commitments were made, we thought it would be helpful to send this summary of our discussion. If we've got anything wrong, please let us know. We also respond to certain proposals you made during our discussion.

1. **With the exceptions discussed below, you represented that you are not withholding documents that have been specifically identified as responsive based on your objections; instead, you say you are withholding documents in response to requests where you read the RPD as being vague, ambiguous, or could be read in a way that extends beyond the matters in this case. Nonetheless, as you put it, there isn't some Redwell folder on your desk filled with documents you are withholding.  You have logged in your privilege log all you have come across that is attorney-client/work product privileged, everything – a total of four documents. You aren't withholding anything else on the basis of privilege, aside from peer review materials, which have not been logged in a privilege log.**

   **Regarding peer review materials, you still maintain that a peer review privilege applies, and that this privilege applies to the credentialing files of all Aggrieved Individuals. As a compromise, you asked whether we could obtain waivers from the doctors who are cooperating with us, saying that they have no objection to YNHH producing their credentialing file, in which case you might be willing to produce those individuals' credentialing files. You indicated that these waivers would protect the hospital from possible liability it believes exists related to disclosure.  You stated that, unless we can get waivers, you would not consider producing these files and that motion practice would be necessary.**

   **We have considered your proposal and decline it.**

   **The peer review privilege does not exist in federal court.  *Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182 (1990) (declining to create a federal peer review privilege); *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir.1987) (holding that in a federal question case, "the federal law of privilege controls"); *Wisconsin Province of Soc'y of Jesus v. Cassem*, 468 F. Supp. 3d 482, 489 (D. Conn. 2020) ("[M]edical peer review privilege is not recognized by federal common law and discoverability in federal cases other than medical malpractice and related actions is common and long-**

standing."); *Johnson v. Nyack Hosp.,* 169 F.R.D. 550, 561 (S.D.N.Y. 1996) (holding in a race discrimination case brought under Title VII of the Civil Rights Act that a federal privilege for medical peer review materials would not be recognized). Therefore, Defendant has no valid objection to the production of these materials, and the EEOC is not required to obtain any waivers to obtain them. If you are in possession of contrary authority that supports your position, please provide it immediately.

However, even if we were to obtain the waivers you propose, they would only address a fraction of the credentialing files to which the EEOC is entitled, which includes those for involuntary claimants. You have also asserted peer review privilege as an objection to numerous other requests (*see* Request Nos. 1 - 8, 10 - 26, 30 - 32, 38 – 40) to which the waiver would not resolve any dispute. Therefore, we would still need to bring this issue to the court, even after engaging in the time-consuming process of obtaining these waivers. You suggested that we should make assumptions about the contents of those other files based on the much smaller number you may be willing to produce after receiving waivers, making the production of the remainder unnecessary. However, as each doctor's circumstances are unique, we are not inclined to make such unsupported assumptions, and the law does not require that we do so.

In short, Defendant has a legal obligation to produce the credentialing files for all of the claimants and other relevant materials you claim are protected, while the EEOC has no obligation to obtain waivers in order to receive them. We simply do not see how obtaining waivers will help move the case along, particularly when there will have to be motion practice in any event. This is probably the kind of discrete issue that lends itself to the Court's summary telephone conference procedure. If not, we will move to compel the production of these documents.

2. You addressed the failure by YNHH to turn over any ESI. You told us that, in approximately March 2016, before the Late Career Practitioner Policy (the Policy) was adopted in final form, and well before Dr. Nash filed his charge in late 2018, YNHH adopted an aggressive email auto-purge policy which deletes all emails every six months. Therefore, you claim that any emails relating to the adoption and early implementation and administration of the Policy have been purged and no longer exist.

    The EEOC requests the following information regarding YNHH's discovery responses, which EEOC trusts you will provide promptly:

    a. When, if ever, did YNHH place a litigation hold on emails and other documents relating to the adoption, administration, and implementation of the Policy? While the auto-purge policy may explain the absence of emails prior to the date the Charge was filed, it does not explain their absence thereafter, when they were required to be maintained. *See* 29 C.F.R. § 1602.14.

    b. Which custodians were subject to a litigation hold, if any, and on what date was each hold issued? Have emails and/or documents from relevant custodians created post-Charge filing been purged?

    c. **What is YNHH's document retention/document destruction policy? While we trust your representation about the auto-purge policy for e-mail, we would like to independently review and understand YNHH's overall policy.  If not included in the documentation of the policy, please describe whether there are exceptions to the email purge (for example, emails saved in specific folders), and whether any backup archives exist.  It seems difficult to believe that every 6 months, a business as large as YNHH deletes *all* email from *all* sources/locations.**

    d. **Did you conduct any ESI search of relevant custodians for information stored in electronic form other than email, and if so, what was done? Chris represented in his email of March 1, responding to our emails of January 29 and February 24: "In terms of the ESI issues, those necessarily are connected to the discovery responses as the custodians you suggest would (in part) be those we identify in response to certain Interrogatories in a couple of weeks.  We are currently tracking down those names, and as some are not YNHH employees, we are assessing what ESI YNHH can access." When you finished tracking down those names, who were they, and were searches of them conducted?  Please explain your process and methodology in searching for ESI and the ESI searches you have conducted to date.**

    e. **We would like our IT professional to talk to YNHH's IT professional after you provide your document retention policy. Please let us know when this can be scheduled in the next week or so.**

3. **Regarding your responses to our Interrogatories:**

    a. **You stated that you are looking for additional information with respect to Interrogatories 1, 2, and 11, and that if you obtain more information, you will provide it. Please provide a timeframe for this.**

    b. **Regarding Interrogatory No. 6, you stated that Dr. Hawkins was the author of the document, that it was created in April 2019, that you are trying to get supplemental information, and that you will get us an updated response to this interrogatory.**

    c. **Regarding Interrogatory 12, you represented that your answer is complete.**

    d. **Regarding Interrogatory 17, we understand that your response includes only Dr. Hawkins and those individuals that you have listed as members of the Late Career Practitioner Committee, and you represented that you have not identified any other individuals with relevant knowledge.**

4. **Regarding your responses to our Document Requests:**

    a. **You asserted that you have produced all responsive documents for Request Nos. 2, 3, 5, 7, 10, 11, 12, 13, 17, 18, and 19.  Considering the ESI**

3

discussion above, it is the Commission's understanding that this production does not include ESI.

b. Regarding Request No. 19, you have asked and have not been able to identify information or documents regarding the "untoward events" mentioned in this statement from a letter/email from Peter Herbert, Chief of Staff: "It is noteworthy that our Institutional Practice Quality and Peer Review Committee (IPQPRC) has had to address at least two (2) significant untoward events in patients that occurred under the care of practitioners with age related limitations."

c. Regarding Request No. 6, you will not produce the test batteries. We explained why we believe this position is absolutely unsupportable.

d. Regarding Requests Nos. 14 and 15, EEOC clarified that it is not seeking patient files which reflect medical errors. You indicated that you would investigate whether YNHH tracks medical errors, adverse outcomes, etc., *i.e.*, any of the errors, events, and outcomes that YNHH claims it is seeking to prevent with the Policy. If this data is not tracked, and if it could only be created by reviewing every patient file to determine whether an error/adverse outcome occurred, then you will respond that YNHH does not track this type of data. We have also asked for the policies relating to tracking medical errors/adverse outcomes, and you will look to see whether they exist.

e. You indicated that Requests Nos. 14 and 15 presumed that YNHH looked at possible malpractice and errors related to patient safety within the hospital itself and decided to implement the Policy as a result of those issues, but that this was not actually the case. When we understandably asked you to stipulate that YNHH did not review any internal safety data prior to adopting the Policy, you, however, refused to do so. You stated that the physicians that did not pass the cognitive tests under the Policy may not have committed medical errors, but they were found deficient as a result of the test.

f. Regarding Request No. 16, you agreed to give us unredacted versions, with the exception that you will keep the names of those not on Exhibit A redacted. We agreed to this.

g. Regarding Request No. 20, you will investigate what data exists as you are doing for Requests 14 and 15.

h. Regarding Request No. 21, you understand what we want – anything related to neurological testing for cause not covered by the Policy -- but insist that we serve a separate document request seeking this information.

i. Regarding Request No. 22, our position was that to compromise, EEOC will accept the documents within this request relating to three Affected Individuals who were rated as pass, three rated as qualified pass, three rated as borderline deficient, and three as deficient and/or fail. This will

4

       **allow EEOC to assess the efficacy of YNHH's physician safety assessments as they relate to the implementation of the Policy. We clarified that we are looking not only for the Credentialing files, but any other documents that fall within the reappointment process, such as OPPE and FPPE reviews. You indicated that our request remains subject to your position on peer review privilege.**

    j. **Regarding Request No. 23, you stated that for now you believe you have provided everything, but if additional responsive documents are located, you will produce them.**

    k. **Regarding Request No. 25, you are seeing if there is anyone who fits the bill as having received a Focused Professional Practice Evaluation. You've produced what you have, and you are looking for more.**

    l. **Regarding Request No. 29, this request encompasses credentialing files, which remains subject to your position on peer review privilege.**

5. **Depositions of Voluntary Claimants**

**You stated that you wanted to take the depositions of voluntary claimants to defend yourself against the ADA Interference Claim. We stated that we saw no need for this, as there are no disputed facts and the issue is one of law.**

**Afterward, EEOC reviewed our respective positions in our Joint Rule 26(f) filing (Dkt. 36), which remain consistent:**

   "**Defendant's Position: Defendant seeks to depose each Aggrieved Individual identified in Phase I (to the extent their claims are not resolved through Phase I dispositive motions). Defendant's position is that the EEOC's claims and YNHH's defenses necessitate individualized discovery on several issues, including but not limited to, each Aggrieved Individual's qualifications, ability to practice, and the actual impact of the Policy on each Aggrieved Individual's employment.**

   "**EEOC's Position: EEOC believes that deposing each Aggrieved Individual when there are no damages issues as part of this Phase, Phase I has resolved employment status, and there is no dispute that Defendant's Policy was applied to these individuals without consideration of their individual circumstances other than their age, is not proportional to the needs of the case and therefore opposes this request, absent good cause shown. Plaintiff reserves the right to oppose any such depositions."**

**We are considering our position. Can you explain why you need to conduct more depositions than the maximum number of 10?**

**Best,**

**Mark and Caitlin**

5