**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) Civil Action No. 3:20-cv-00187-SALM |
| v. | ) ) January 12, 2022 |
| YALE NEW HAVEN HOSPITAL, INC., | ) ) |
| Defendant. | ) |

<u>**MEMORANDUM OF LAW IN SUPPORT OF THE EEOC'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS REGARDING PEER REVIEW COMMITTEES, COMPLAINTS AND PATIENT SAFETY DATA**</u>

## <u>TABLE OF CONTENTS</u>

NATURE OF THE CASE AND BACKGROUND ........................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.   YNHH Must Produce its Full Spreadsheets Tracking Matters Considered by Its Peer
     Review Committees as Kept in the Ordinary Course of Business, and Minutes of its PPEC
     (f/k/a IPQPRC) from January 2010 to Present. ................................................................ 3

     A.   YNHH Denies the Existence of the Summary Spreadsheets, then Produces Only
          Partial Documents. ................................................................................................. 4

     B.   The Summary Spreadsheets and Minutes are Highly Relevant to the Claims and
          Affirmative Defenses Here. ..................................................................................... 6

II.  YNHH Must Produce a Sample of 100 RL Solutions Complaints, Which Bear on the
     Viability of Using Complaints to Identify Unsafe Practitioners. ....................................... 13

III. Data Regarding Safety Events Must be Produced, as it will Confirm YNHH's Inability to
     Demonstrate that the Policy Reduces Patient Harm. ........................................................ 15

CONCLUSION .................................................................................................................... 18

The United States Equal Employment Opportunity Commission, through undersigned counsel and pursuant to Rules 34 and 37 of the Federal Rules of Civil Procedure, hereby submits this Memorandum of Law in support of its  Motion to Compel Defendant Yale New Haven Hospital, Inc. to produce: 1) spreadsheets described by the Executive Director for Yale New-Haven Health System, who maintains them, summarizing the matters considered by YNHH's peer review committees, including that which "handles questions of individual physicians or practitioners competence based on errors that have occurred;" 2) minutes of that same Committee from January 2010 to present; 3) a sample of 100 complaints and associated data from YNHH's RL Solutions system, which tracks staff and patient complaints regarding medical practitioners; and 4) data regarding the number of "Serious Safety Events," "Precursor Safety Events," and "Near Miss Safety Events"—metrics which YNHH uses to track patient safety—occurring at YNHH per month from January 2010 to present, or documents sufficient to show the same.

## NATURE OF THE CASE AND BACKGROUND

Yale New Haven Hospital, Inc. ("YNHH") is a hospital in New Haven, Connecticut.  In 2014, YNHH adopted a "Late Career Practitioner Policy" (the "Policy" or "LCPP") which currently requires that all of its medical practitioners age seventy or older undergo annual or bi-annual neuropsychological and ophthalmological examinations, based solely on their age.  *See* Ex. 5.[1]  This neuropsychological testing includes the administration of a battery of 16 tests,

---

[1] All exhibit references herein refer to the exhibits attached to the Declaration of Caitlin D. Brown in Support of Plaintiff's Motion to Compel ("Brown Decl.") filed in support of the EEOC's Motion.  With the exception of those they did not produce, Defendant has marked every Exhibit to the Declaration as confidential pursuant to the Standing Protective Order (Dkt. 4).  On January 10, 2022, the EEOC provided these exhibits to Defendant, to allow Defendant to review and determine the need for a motion to file these exhibits under seal.  In the interim, the EEOC publicly files a redacted version of this Memorandum of Law and Exhibits to the Declaration. On

selected by psychiatrist Dr. Keith Hawkins, taking between one and five hours to complete.  *See* Ex. 6 at 1; Ex. 3 (excerpts from the deposition transcript of YNHH's corporate representative under F.R.C.P. 30(b)(6) on 11/2/2021 (hereinafter "30(b)(6) Dep.")), 291:2-291:15.  Under the Policy, practitioners who refuse to undergo these medical examinations cannot remain on the YNHH Medical Staff, and their privileges with the hospital are automatically relinquished.  *See* Ex. 5 at YNHH 119730.  After implementing the written Policy in 2014, YNHH began testing practitioners in October 2016.  *See* Ex. 6 at 2.

The EEOC has alleged that YNHH's Policy of age-based testing violates the Age Discrimination in Employment Act ("ADEA") and the Americans with Disabilities Act ("ADA"), as it discriminates based on age and subjects employees to unlawful medical examinations.  *See* Dkt. 119.  YNHH admits that its Policy discriminates based on age and imposes medical examinations within the purview of the ADA, but asserts affirmative defenses, claiming that its Policy falls under the Bona Fide Occupational Qualification exception to the ADEA, and is a business necessity under the ADA.  *See* Dkt. 125 at 6, 9.

Specifically, YNHH claims that the Policy was necessary due to studies concluding that individuals aged seventy and above were at a higher risk of cognitive decline,[2] even though YNHH never assessed whether its *own* practitioners aged seventy and above were providing substandard care,[3] had engaged in more errors than younger practitioners,[4] were the subject of

---

the date this motion was filed, the EEOC served unredacted copies on Defendant, and with the Court's permission, will submit unredacted copies to the Court for *in camera* review while Defendant's motion to seal is pending.

[2] 30(b)(6) Dep., 229:21-231:18.

[3] *Id.*, 228:21-229:19.

[4] *Id.*, 238:8-239:1.

more complaints,[5] or had worse performance or patient outcomes.[6]  Still, YNHH asserts that the Late Career Practitioner Policy was necessary to "prevent patient harm."[7]  At the same time, it concedes there is "no[] evidence" that the Policy has actually done so.[8]

Through this Motion, the EEOC seeks production of the specific documents discussed in detail below which are directly relevant to the claims and YNHH's affirmative defenses.  These documents are highly relevant to the claims here, their production presents minimal burden, and any confidentiality concerns are addressed by the standing protective order in place in this matter (Dkt. 4).  As demonstrated below, an Order compelling production of these documents is appropriate.[9]

## **ARGUMENT**

### I.  **YNHH Must Produce its Full Spreadsheets Tracking Matters Considered by Its Peer Review Committees as Kept in the Ordinary Course of Business, and Minutes of its PPEC (f/k/a IPQPRC) from January 2010 to Present.**

Through the discovery conducted so far, YNHH has explained the processes through which it reviews medical practitioner performance, including when mistakes are made or adverse outcomes occur.  Documents and testimony produced to date show that many of these reviews are performed by several peer review committees, including the Professional Practice Evaluation Committee ("PPEC"), and the Medical Staff Professionalism Committee ("MSPC"), each of which meets on a monthly basis.  *See* Ex. 7 at YNHH 113597; Ex. 4 (excerpts from the

---

[5] *Id.*, 243:9-15.

[6]  *Id.*, 244:16-244:24.  YNHH believes this information is "irrelevant." *Id.*

[7] *Id.*, 250:22-251:1.

[8] *Id.*, 249:16-21.

[9] The parties conferred by telephone regarding the documents the EEOC seeks to compel, and later continued to confer via email.  Though the parties resolved certain discovery disputes, they were unable to resolve those the EEOC now brings before the Court.  Brown Decl. ¶ 7.

deposition transcript of Ms. Theresa Zinck-Lederer on 12/7/2021 (hereinafter "Zinck-Lederer Dep.")), 72:2-72:18.  After each of these meetings, minutes are created and maintained by Ms. Zinck-Lederer's department. *See* Ex. 7 at YNHH 113600; Zinck-Lederer Dep., 301:14-301:21, 199:24-200:10, 129:10-130:10.  The PPEC, formerly known as the Institutional Practice Quality and Peer Review Committee ("IPQPRC"), "handles questions of individual physicians or practitioners competence based on errors that have occurred or near misses that have occurred," (30(b)(6) Dep., 40:10-40:16; 38:11-38:14).  This Committee also initiates Focused Professional Practice Evaluations ("FPPE"), which is the review of a detailed practice of a physician.  Ex. 7 at YNHH 113597, YNHH 113599.  The MSPC, which includes within its scope the Operating Room Professionalism Committee ("OR Professionalism Committee") (Zinck-Lederer Dep., 117:16-117:24), handles professionalism complaints related to the medical staff, which are "concerning to" the Hospital because "when there [are] not collegiate interactions, there is good literature to show that patient harm occurs."  30(b)(6) Dep., 38:18-39:1; 40:2-40:9.  These committees therefore all address medical practitioner performance issues which are key to patient safety.

A.   <u>**YNHH Denies the Existence of the Summary Spreadsheets, then Produces Only Partial Documents**</u>.

The EEOC requested that Defendant produce the minutes of these Committee meetings from January 2010 to present, and any document summarizing the matters considered and findings made by these Committees, as these documents would be highly relevant to its claims under the ADA and ADEA, and were responsive to several of its Requests for the Production of Documents.[10]  Defendant objected to the EEOC's request for meeting minutes, asserting that

---

[10] Ex. 1, **RFP No. 14** ("Data sufficient to show the number of medical errors made on a monthly basis and the age of the medical practitioner(s) responsible for the error at the time the error was

production of these minutes was overly burdensome and not proportionate to the needs of the case. Further, Defendant's counsel, and later Defendant in its 30(b)(6) deposition, asserted that no documents summarizing the matters considered by these Committees existed. *See* Brown Decl., ¶¶ 4-5 (Defendant's counsel stated, "[t]here is no central database for tracking all 'medical errors,' let alone one that identifies a single practitioner responsible for each 'error.'"); 30(b)(6) Dep., 148:20-149:17 (no chart created summarizing matters reviewed by IPQPRC/PPEC); *id,* 155:19-156:2 (no chart summarizing the outcomes of the MSPC processes); *id,* 165:15-165:19 (no chart summarizing all FPPE processes and their outcomes).

However, in December 2021, the Executive Director of Yale New-Haven Health System, Ms. Theresa Zinck-Lederer, testified that, in fact, YNHH *did* maintain excel spreadsheets that tracked the matters considered by the PPEC, MSPC, and OR Professionalism Committees. Zinck-Lederer Dep., 44:15-44:23; *id.,* 128:7-19; *id.,* 119:20-120:18 (describing Excel files she maintains which track matters considered by PPEC, MSPC, and OR Professionalism Committee); *id.,* 88:15-88:23 (describing information tracked in spreadsheets). Ms. Zinck-

---

made from 2010 through the present."); **RFP No. 20** ("For the period beginning with the date of the first "untoward event" referenced above, all documents generated by the IPQPRC relating to incidents of patient harm attributed to medical staff practitioners under age 70, including, but not limited to, documents concerning any discipline or diminishment of hospital privileges as a result."); **RFP No. 31** ("All documents concerning the manner and means of reviewing the performance of each Affected Individual during the relevant time period, including, but not limited to, the assignment of supervisors or any oversight, review, correction, and/or management of work performed by each Affected Individual at YNHH."); **RFP No. 32** ("All documents concerning YNHH programs that any Affected Individual is required to participate in, including, but not limited to, those pertaining to quality assurance, . . . risk management, . . .safety, . . . peer review, and other compliance programs."); **RFP No. 25** ("Documents concerning the application of YNHH's "Focused Professional Practice Evaluation" policy, including, but not limited to, documents triggering the application of the policy and the outcome of the application of the policy in each instance."); **RFP No. 15** ("Documents sufficient to identify the number of legal proceedings involving medical practitioners with privileges at YNHH arising from alleged medical error from 2010 through the present."); **RFP No. 21** ("Documents concerning the application of the Late Career Practitioner Policy to anyone "for cause," the reason for its application, and the result of the application.").

Lederer testified that these summary spreadsheets, as she maintains them, include information going back to 2007 or 2008.  *Id.*, 162:21-164:5.  Ms. Zinck-Lederer also testified that, contrary to Defendant's prior assertions of burden, she maintains all of the PPEC minutes in her office, both in electronic and hard copy form, going back at least to 2007 or 2008.  *Id.*, 129:22-130:15.

Though the EEOC believed that the minutes of *all* of these Committees could provide probative information, in the interest of compromise, the EEOC agreed not to pursue minutes of every committee if YNHH would produce the spreadsheets Ms. Zinck-Lederer described as they are maintained in the ordinary course of business, and the minutes of the PPEC.  Subsequently, YNHH produced a partial version of Ms. Zinck-Lederer's spreadsheets, showing only events from 2014 to present, but has refused to produce the full versions of the spreadsheets.  Excerpts from these spreadsheets are attached hereto as Exhibits 8-11.  YNHH also refused to produce the PPEC minutes.  However, the EEOC has located isolated samples of these minutes contained within previously produced peer review files.  *See, e.g.,* Exs. 12-13.

Although piecemeal and incomplete, the minutes and partial spreadsheets the EEOC has had the opportunity to review demonstrate the vital nature of these *full* documents to the EEOC's ability to undermine and rebut YNHH's defenses.  Therefore, the full spreadsheets as maintained in the ordinary course of business and the PPEC minutes going back to at least January 2010 must be produced.

    **B.**    <u>The Summary Spreadsheets and Minutes are Highly Relevant to the Claims and Affirmative Defenses Here.</u>

The partial spreadsheets Defendant has produced already evidence age discrimination in its simplest form.

YNHH asserts that its Policy of age-based testing is necessary to identify practitioners aged seventy and above who have a "potential capacity to cause harm," because YNHH doesn't

believe it should "wait until some harm event happens" before taking action against older practitioners. 30(b)(6) Dep., 285:10-286:4 (the Policy's testing "assess[es] someone's potential capacity to cause harm."); *id.,* 291:16-292:6 (noting the significant distinction that they are seeking individuals with the "potential . . . to not be able to practice safely); *id.,* 269:13-270:12. Once this *potential* to cause harm is allegedly confirmed by LCPP test results, practitioners aged seventy and above have been asked to relinquish some or all of their medical privileges—even though no harm had actually occurred.  *See* Zinck-Lederer Dep., 278:24-280:8; 30(b)(6) Dep., 241:25-242:13.

In stark contrast, documentation from YNHH's peer review committees shows that it applies an *entirely different* standard to medical practitioners *under* the age of seventy.  Far from revoking privileges based on a *potential* to cause harm, when younger doctors commit errors that *actually* harm patients—even when they cause multiple deaths—YNHH allows them to keep practicing.

For example, the partial version of one of Ms. Zinck-Lederer's spreadsheets shows that in REDACTED the PPEC found that REDACTED had REDACTED REDACTED Ex. 8, 2/25/2014 entry.[11] REDACTED REDACTED . *Id* REDACTED REDACTED REDACTED *Id.,* 10/25/2016 and 6/25/2019 entries.  However, as Defendant has not produced the more detailed PPEC minutes from this meeting, REDACTED is still unknown. REDACTED REDACTED

---

[11] Exs. 8-11 show excerpts printed from the *partial* version of Ms. Zinck-Lederer's spreadsheet which summarizes matters considered by the PPEC (f/k/a IPQPRC), which YNHH has produced. Brown Decl. ¶ 12.

REDACTED

. *Id.* 6/25/2019 entry.  REDACTED

REDACTED

*Id.,* 2/25/2020 entry.  REDACTED

*Id.*, 2/23/2021 entry.

REDACTED is not the only example of YNHH's age-based double standard.  In REDACTED the PPEC found that REDACTED had REDACTED REDACTED Ex. 9.  REDACTED REDACTED *Id.* REDACTED . *Id.*

In another instance, REDACTED the PPEC reviewed a concern relating to a REDACTED where REDACTED Ex. 10, 5/27/2014 entry.  REDACTED .[12]  The PPEC found REDACTED had REDACTED REDACTED *Id.* REDACTED REDACTED . *Id.,* 7/22/2014 entry.  REDACTED the PPEC again reviewed REDACTED, after REDACTED . *Id.,* 11/26/2019 entry.  The PPEC found a REDACTED REDACTED *Id.*, 12/18/2019 entry.

REDACTED . *Id.*, 1/28/2020 entry.  REDACTED

_____

[12] https://medicine.yale.edu/profileREDACTED



REDACTED. *Id.,* 2/25 and 5/19/2020 entries. REDACTED. The Committee found that REDACTED REDACTED." *Id.* 7/14/2020 entry. YNHH has not removed REDACTED from practice, even though his mistakes injured and killed *multiple* patients. Instead, YNHH appointed REDACTED the REDACTED [13]

The fact that YNHH implemented its Policy to remove practitioners aged seventy and older due to an alleged "*potential*" to harm patients, but allows younger practitioners to continue practicing after *actually* harming—even killing—multiple patients, is age-based discrimination in its purest form. This evidence, extracted from the partial spreadsheet, is critical to undermining YNHH's patient safety rationale for the LCCP and tends to show, instead, that the real reason behind the Policy is discriminatory bias against older doctors. The EEOC is entitled to the *full* spreadsheets, which will provide additional such evidence.

Moreover, under the ADEA, an employer implementing an age-based policy "must first establish that the job qualifications which the employer invokes to justify his discrimination are 'reasonably necessary to the essence of his business.'" *E.E.O.C. v. Com. of Mass.*, 987 F.2d 64, 73 (1st Cir. 1993) (quoting *E.E.O.C. v. City of E. Providence*, 798 F.2d 524, 528 (1st Cir. 1986)). "If the employer succeeds in making this showing, it must then establish that it 'is compelled to rely on age as a proxy for the safety-related job qualifications validated in the first inquiry.'" *Id.*

---

[13] https://medicine.yale.edu/REDACTED

To do so, YNHH would have to prove that it is "'impossible or highly impractical' to deal with the older employees on an individualized basis,"  (*Providence*, 798 F.2d at 528), for example, by evaluating older practitioners' competence in the same way as younger practitioners, including through the PPEC and MSPC.

The peer review committee documentation sought is highly relevant to and probative of this assessment.  First, unless these documents show that practitioners aged seventy and above were causing a disproportionate amount of patient harm, there is no basis to conclude that age is a proper proxy for practitioner competence.  Second, YNHH asserts that it cannot do individual assessments of older practitioner competence based on actual performance, as it does for younger practitioners, because it should not have to wait for a patient to be harmed to take action.  *See* 30(b)(6) Dep., 269:13-270:12; Dkt. 92, 30:3-6.  However, these documents will show that for younger practitioners, YNHH has no issue waiting for patient harm to occur before taking action—and often, fails to act even after patients have died.  This directly undermines YNHH's argument that the Policy is justified by business necessity based on a patient safety rationale.

YNHH has also asserted that it cannot assess older practitioners on an individualized basis by relying on complaints from patients and other medical staff because physicians are reluctant to report their colleagues.  *See* 30(b)(6) Dep., 271:22-272:8.  But YNHH has stated this reluctance applies to *all* physicians, so it is unclear why this could legitimately serve as the basis for testing only older physicians.  *Id.*  Regardless, the PPEC minutes, which include more details of the Committee's discussions than the summary chart, will demonstrate that practitioners *do,* in fact, report their colleagues.  *See, e.g.,* Ex. 12 (referencing REDACTED

); Ex. 13 (REDACTED

REDACTED                                                  ).  Discovery of such documents is

critical to the EEOC's ability to directly undermine YNHH's argument that neuropsychological

testing is necessary to identify older practitioners with performance problems, because relying on

complaints and other performance measures is not practical.

These documents also bear directly on the analysis of the EEOC's claims under the

Americans with Disabilities Act.  Under the ADA, where an employer subjects a class of

employees to medical examinations—here, practitioners age seventy and above—the employer

must show that the examinations are "job-related and consistent with business necessity."[14]  42

U.S.C. § 12112(d)(4)(A).  To do so, Defendant must show that "'it had some reason for

suspecting that the . . . **class of employees**[] would be unable to perform essential job functions

or would pose a danger to the health and safety of the workplace,'" necessitating the

implementation of the Policy. *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97

(2d Cir. 2003) (emphasis added) (quoting *Fountain v. New York State Dep't of Corr. Servs.*, 190

F. Supp. 2d 335, 339 (N.D.N.Y. 2002).  As discussed above, unless these documents show that

practitioners age seventy and above were disproportionately harming patients, there is no support

for YNHH's position that they posed a danger in the workplace.

As to the scope of the information sought, to properly perform this assessment, the EEOC

must review documentation for several years *prior* to the implementation of the Policy, which

occurred in 2014.  Documents from this period are vital to assess whether, at the time YNHH

made its decision to implement the LCPP, the decision was supported by facts lining up with the

job-relatedness and business necessity arguments now offered in litigation.  YNHH's production

---

[14] YNHH asserts patient safety as a business justification for the Policy.  *See* Dkt. 24, p. 8
(Fourth Affirmative Defense); *see also* Ex. 5.

of Ms. Zinck-Lederer's spreadsheets only from 2014 on, therefore, withholds essential information.

It is also key that the EEOC receive the PPEC Minutes, in addition to the summary spreadsheets. While the summary spreadsheets provide high level information, the minutes contain additional detail which is at times essential to understand the severity of the errors at issue, and to show the source of concerns raised. For example, compare the entry for the portion of the PPEC meeting on REDACTED discussing REDACTED, (Ex. 11), to the partial minutes the EEOC possesses from that meeting, discussing the same doctor. Ex. 13 at YNHH 009971. The minutes reflect that REDACTED a statement not reflected in the summary chart, which undermines YNHH's argument that it cannot rely on staff complaints. *Id.*, *cf.* Ex. 11. Further, while the summary chart reflects that REDACTED the minutes reflect that REDACTED Ex. 13 (emphasis added). This additional language makes clear the severity of the error and the concerns raised.

The production of these spreadsheets and the IPQPRC/PPEC minutes from January 2010 to present impose virtually *no burden* on YNHH. Dr. Zinck-Lederer testified that all of these documents are readily accessible, as they are stored in her office. *See* Zinck-Lederer Dep. 128:7-16; 130:2-5. As the IPQPRC/PPEC met monthly, there would be 132 sets of minutes from January 2010 to present, and a review of the minutes the EEOC obtained as parts of other files indicates that they are generally 2-4 pages long, resulting in a high estimate of just over 500 pages of production. Confidentiality concerns are unfounded here, because YNHH has already

produced partial versions of these documents, and because of the standing protective order in place in this matter. *See* Dkt. 4.

As described in detail above, the excel spreadsheets[15] described by Ms. Zinck-Lederer and the IPQPRC/PPEC minutes from January 2010 to present are highly relevant to the claims at issue here and critical to undermining and/or rebutting the defenses of YNHH.  Further, their production presents minimal burden and no confidentiality concerns exist.  Accordingly, the EEOC asks the Court to order the immediate production of these documents responsive to the EEOC's Requests.

## II.     YNHH Must Produce a Sample of 100 RL Solutions Complaints, Which Bear on the Viability of Using Complaints to Identify Unsafe Practitioners.

The EEOC is also seeking a sample of 100 complaints from YNHH's RL Solutions system, which is the repository YNHH uses to track patient and staff complaints and concerns. Zinck-Lederer Dep., 64:2-64:20.  Specifically, the EEOC has requested the first 100 complaints in RL Solutions starting from January 15, 2019,[16] and all RL Solutions data associated with such complaints, in excel format.[17]  YNHH refuses to produce more than five sample complaints from this system.

---

[15] These documents, produced in Excel format, allow the EEOC to filter and sort the information therein to identify entries related to specific practitioners and complaints.  If these files are instead produced as images, this functionality will be lost.  The EEOC therefore asks that the Court order the production of these files in Excel format, which is the format in which YNHH maintains them in the ordinary course of business.

[16] The EEOC requested the complaints starting from this date to ensure that it was receiving a representative sample, and not simply complaints specifically selected for production by YNHH because Defendant believed them to be most beneficial to its case.

[17] Such documents are responsive to multiple Requests for the Production of Documents previously served by the EEOC including **RFP 32**, seeking "All documents concerning YNHH programs that any Affected Individual is required to participate in, including, but not limited to, those pertaining to quality assurance, medical audit, risk management, . . . safety, . . . peer review, and other compliance programs," as the RL Solutions system pertains to safety and

13

These documents are relevant for many of the same reasons as the PPEC documents discussed above. In order to prove its affirmative defense under the ADEA, YNHH must prove that it is "'impossible or highly impractical' to deal with the older employees on an individualized basis," (*Providence*, 798 F.2d at 528), to determine whether those individuals are safely practicing medicine. While YNHH says it is not possible to rely, at least in part, on patient and staff complaints to identify unsafe practitioners, these documents are critical to rebut that position. This sample will aid the EEOC in determining the frequency of complaints made about practitioners, to see the nature of information stored and tracked regarding each complaint in RL Solutions, and how YNHH responds to these complaints in a true snapshot, not limited to 5 cherry-picked examples. For example, the sample from this database may show that a patient or staff member had submitted a complaint that a doctor was unable to recall information about the patient's condition, called them by the wrong name several times, or prescribed a medication unrelated to the patient's condition. If this were the case, the fact that such complaints are made is highly probative. This sample will allow the EEOC to see the nature of complaints received and the information stored, and determine whether production of a larger number of complaints may ultimately be warranted.

The EEOC therefore asks the Court to order the production of a sample of complaints in the RL Solutions system to include the first 100 complaints starting from January 15, 2019, and all RL Solutions data associated with such complaints, in Excel format.

---

quality assurance, and tracks complaints regarding affected individuals. Ex. 1. These documents are also responsive to **RFP No. 8**, seeking "Documents supporting Defendant's claim in paragraph 29 of its Answer (ECF 24) that the ophthalmologic and neuropsychological exams administered in connection with the Late Career Practitioner Policy are job-related and consistent with business necessity." Ex. 1. As discussed below, these documents are directly relevant to that affirmative defense, because they bear on whether it is practical to rely, at least in part, on staff and patient complaints to identify unsafe practitioners.

III.     **Data Regarding Safety Events Must be Produced, as it will Confirm YNHH's Inability to Demonstrate that the Policy Reduces Patient Harm.**

In its Request for the Production of Documents, the EEOC sought "[d]ocuments and communications concerning the efficacy, or lack thereof, of the Late Career Practitioner Policy . . . ." Ex. 1.  This request is appropriate because, in order for YNHH to prove its affirmative defense under the ADA that the Policy is a business necessity, YNHH "must actually show that the [Policy] contributes to the achievement of [its stated] business necessities." *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 101 (2d Cir. 2003).  Thus, YNHH "has the burden to demonstrate that its policy actually effects its purpose." *Fountain v. New York State Dep't of Corr. Servs.*, No. 99-CV-389, 2005 WL 1502146, at *8 (N.D.N.Y. June 23, 2005).

For example, in *Fountain*, the plaintiff challenged a policy of the New York State Department of Correctional Services ("DOCS") which required that employees returning to work after an absence provide a doctor's statement with a diagnosis of the employee's illness.  *Id.* at *1.  The plaintiff challenged the diagnosis requirement as an illegal medical inquiry under the same provision of the ADA at issue here.  DOCS asserted that this policy was a business necessity, in part to help prevent the spread of infectious diseases in the prison system.  *Id.*  The court noted that, in order to prove business necessity under the ADA, "DOCS has the burden to demonstrate that its policy actually effects its purpose."  *Id.* at *8.  During an earlier appeal in the case, the Second Circuit had ruled that, as the "parties [had] made only conclusory assertions regarding the benefits . . . of the diagnosis requirement," "[f]actual development on the efficacy of general diagnoses (as opposed to certification without diagnoses) in improving workplace health and security . . . [was] particularly necessary."  *Conroy*, 333 F.3d at 99.  On remand following this ruling, Defendant could only identify one instance where its diagnosis policy had prevented the spread of disease, but asserted this number did not adequately reflect the policy's

effect, which defendants claimed was "impossible to measure." *Fountain*, 2005 WL 1502146, at *8. The court found that "the record d[id] not contain any information, one way or the other, as to the nature and effect of the [policy]," and so "[d]efendants ha[d] not demonstrated that the [policy] serves a business necessity through . . . its stated justifications" including "prevent[ing] the spread of infectious disease." *Id.,* at *8, *10. The court therefore found that "plaintiff's cross-motion for summary judgment must be granted." *Id.*

In November 2021, YNHH's former Chief Medical Officer and current Chief Executive Vice President and Chief Clinical Officer of the Yale New Haven Health System, Dr. Balcezak, testified as YNHH's 30(b)(6) representative.[18] Dr. Balcezak testified that the goal of the Late Career Practitioner Policy is to "prevent patient harm." 30(b)(6) Dep., 250:22-251:1. However, when asked, "testifying today on behalf of the hospital, is there any evidence the adoption of late career practitioner policy has prevented patient harm," Dr. Balcezak responded, "I would say that is not evidence that we would be able to create."[19] 30(b)(6) Dep., 249:16-21; *see also id.*, 247:18-248:7 (only evidence that the Policy has prevented patient harm is Dr. Balcezak's "belief.").[20]

---

[18] The topics noticed for this deposition included, but were not limited to, "Does YNHH consider its Late Career Practitioner Policy a success and, if so, why, and what metrics has it used to assess that success?"

[19] Confirming this position, when asked whether there was evidence that patient harm increased when YNHH suspended its testing under the Policy during the pandemic, Ms. Zinck-Lederer testified that the "[i]nformation is not available . . . . It doesn't exist." Zinck-Lederer Dep., 300:5-300:19. Of course, just because YNHH is unable to identify any data *supporting* its position that the Policy reduces patient harm, does not mean that data measuring patient harm doesn't *exist*.

[20] Defendant's admission that there is no evidence that the Late Career Practitioner Policy prevents patient harm is determinative, as YNHH "has the burden to demonstrate that its policy actually effects its purpose." (*Fountain*, 2005 WL 1502146, at *8 (N.D.N.Y. June 23, 2005). If Defendant would stipulate to its concession that there is no evidence that the Policy prevents patient harm, and agree not to seek to admit contrary evidence on this point at summary judgment or trial, the EEOC could withdraw this request. To date, Defendant has not done so.

The EEOC is entitled to documents confirming YNHH's admission that there is no evidence that its Policy prevented patient harm, to the extent Defendant may later seek to contradict the admission at summary judgment or trial via documentary or any other evidence. YNHH must therefore produce its documents and data tracking patient harm at YNHH.

As YNHH's designated corporate representative, Dr. Balcezak testified that the specific patient harm the Policy seeks to prevent is "serious events where patients were harmed and it could be preventable."  30(b)(6) Dep., 250:22-251:1; 239:3-23.  Dr. Balcezak testified that such harm was measured by the metrics identified in Exhibit 14, which describes events categorized as REDACTED

30(b)(6) Dep., 239:3-23, 200:1-201:23; Ex. 14.  As YNHH itself identified these safety metrics as relevant, the EEOC asked YNHH to produce data showing the number of SSEs, PSEs and NMEs at YNHH per month from January 2010 to present, or documents sufficient to show the same.  These documents are responsive to the EEOC's Request for Production No. 4, seeking documents regarding the Policy's effectiveness.  *See* Ex. 1, RFP No. 4.  YNHH has refused to produce this data, with the exception of a partial data set starting in October 2017.

The full data requested is relevant to the EEOC's claim under the ADA, because it will demonstrate a lack of correlation between YNHH's application of the Policy and patient safety, as measured by YNHH.[21]  YNHH began testing practitioners under the Policy in October 2016. It then suspended its testing for approximately one year during the pandemic, from March 2020 to March 2021.  Presumably, if the Policy is an effective way to prevent patient harm, a review

---

[21] Dr. Balcezak did assert that if you compare the number of Serious Safety Events when the testing started in 2016 to today's rates, that there are fewer Serious Safety Events today, but asserted it would be "impossible to prove" that the change resulted from the Policy.  30(b)(6) Dep., 250:22-251:24.

of this data should show a marked reduction in safety events starting in October 2016, and an increase in safety events when the testing was paused from March 2020 to March 2021, followed by another decline when testing was resumed.  However, if there is no correlation between this data and the periods of testing, it will further evidence that the Policy does nothing to reduce patient harm.  Further, the data must be produced starting in January 2010, so that the EEOC can observe any variation or trends in the data that already existed *prior* to the initiation of the testing.  This is essential, because if the number of safety events had been declining at a certain rate for several years *before* testing was started, and then continued declining at that same rate *after* testing began, there would be no reason to believe that such continued decline resulted from the Policy.

The EEOC therefore asks the Court to order YNHH to produce data showing the number of Serious Safety Events, Precursor Safety Events, and Near Miss Safety Events at YNHH per month from January 2010 to present, or documents sufficient to show the same.

## **CONCLUSION**

For the reasons stated above, the Commission respectfully requests that the Court order Defendant to produce the documents requested herein.

Dated: January 12, 2022

Respectfully submitted,

s/ Caitlin D. Brown

*Attorney for Plaintiff*
Trial Attorney
Bar No. phv11110
Tel: (929) 506-5277
caitlin.brown@eeoc.gov

Kirsten Peters
Trial Attorney
Bar No. phv10940

Tel: (929) 506-5325
kirsten.peters@eeoc.gov

Kimberly A. Cruz
Supervisory Trial Attorney
Bar No. phv10827
Tel: (929) 506-5345
kimberly.cruz@eeoc.gov

U.S. Equal Employment
Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004
Fax: (212) 336-3623

Sonya Shao
Trial Attorney
Bar No. phv20208
Email: sonya.shao@eeoc.gov
Tel: (213) 218-5252
U.S. Equal Employment Opportunity
Commission
Los Angeles District Office
255 East Temple St., 4th Floor
Los Angeles, CA 90012