# EXHIBIT 3

1          IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF CONNECTICUT

3    _____
     EQUAL EMPLOYMENT OPPORTUNITY   )
4    COMMISSION,                    )CIVIL ACTION NO.:
                                    )3:20-cv-187-VLB
5                     Plaintiff,    )
                                    )
6    v.                             )
                                    )
7    YALE NEW HAVEN HOSPITAL,       )
                                    )
8                     Defendant.    )
     _____)
9

10

11        DEPOSITION OF THOMAS J. BALCEZAK, M.D.

12

13   DATE:           November 2, 2021

14   TIME:           9:38 a.m.

15   HELD AT:        Wiggin & Dana
                     265 Church Street
16                   New Haven, Connecticut

17      By:          Sarah J. Miner, RPR, LSR #238

18

19

20

21

22

23

24

25

EEOC V.                                                  Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

2

 1  A P P E A R A N C E S:

 2  For the Plaintiff:

 3  Caitlin D. Brown, Esq.
    Kimberly A. Cruz, Esq.
 4  Kirsten Peters, Esq. (Via Zoom)
    U.S. Equal Employment
 5  Opportunity Commission
    New York District Office
 6  33 Whitehall Street, 5th Floor
    New York, New York  10004
 7

 8  For the Defendant:

 9  Mary A. Gambardella, Esq.
    Wiggin and Dana LLP
10  One Century Tower
    265 Church Street
11  New Haven, Connecticut

12  and

13  Christopher J. DeGroff, Esq.
    Seyfarth Shaw LLP
14  233 South Wacker Drive
    Suite 8000
15  Chicago, Illinois  60606-6448

16

17

18

19

20

21

22

23

24

25

EEOC V.                                                    Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

3

1                            STIPULATIONS

2

3          It is stipulated by counsel for the parties

4     that all objections are reserved until the time of

5     trial, except those objections as are directed to

6     the form of the question.

7          It is stipulated and agreed between counsel

8     for the parties that the proof of the authority of

9     the Commissioner before whom this deposition is

10    taken is waived.

11         It is further stipulated that any defects in

12    the notice are waived.

13         It is further stipulated that the reading and

14    signing of the deposition transcript were not

15    waived.

16

17

18

19

20

21

22

23

24

25

38

1  care delivered is consistent.

2      Q   Okay.  So we talked about chart review,

3  interviews, and data review.  Is there any other

4  steps that happen as part of the PPEC review?

5      A   Again, there are lots of different steps,

6  and it depends on the kind of case.  For example,

7  underneath the PPEC on this sheet, you will see the

8  MSPC.  The PPEC is now -- it used to be called the

9  Institutional Practice Quality and Peer Review

10 Committee or the IPQPRC.

11     Q   So the MSPC is now what the IPQPRC used to

12 be?

13     A   No, the PPEC is what -- the PPEC now is

14 what the IPQPRC used to be.  When the IPQPRC was

15 first launched more than a decade ago we recognized

16 that about a third of the cases that came before

17 the IPQPRC that were coming to us for review

18 involved issues of professionalism, issues of

19 professionalism are quite concerning to us.  It is

20 not just about being nice.  In health care where

21 there is a power gradient between individual

22 members of the care team, when practitioners,

23 whether they be physicians, APRNs, nurses,

24 pharmacists, what have you, when there is not

25 collegiate interactions, there is good literature

EEOC V.                                                    Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

39

1  to show that patient harm occurs.

2          When we started the IPQPRC more than a

3  decade ago, it was noted that there was a subset of

4  adverse events that were occurring that had, at

5  least as part of their root cause, professionalism

6  issue.  So that was the origin of the MSPC.  We

7  took all the professionalism issues whether or not

8  they had a bad outcome associated with them.

9  Again, putting in a layer of this, again, Swiss

10  cheese professionalism is one of those which is if

11  there is an unprofessional interaction between two

12  members of a care team, we want to nip that in the

13  bud and prevent that latent error, that error from

14  reaching the patient.  So that is an additional --

15  that is an additional outgrowth from the IPQPRC.

16      Q   So the IPQPRC had about a third of the

17  issues dealing with professionalism?

18      A   Correct.

19      Q   Because of that, what did you do?  Did you

20  split it off?

21      A   We did.  We did two things.  One is we

22  created a code of conduct for our medical staff and

23  then brought that through the approval process

24  through our Medical Executive Committee, the

25  approval body for our organized medical staff.  We

40

```
 1   sent it out to all of our medical staff as part of
 2   the process.  As there are complaints of
 3   professionalism, we bring them now to the Medical
 4   Staff Professionalism Committee.
 5            Again, because we know, and there is good
 6   literature to support this, that when there are
 7   concerns about people's professional behavior, it
 8   can create an environment where patient harm can
 9   happen.
10       Q    So the Medical Staff Professionalism
11   Committee handles professionalism issues.  What
12   does the PPEC handle?
13       A    PPEC handles questions of individual
14   physicians or practitioners competence based on
15   errors that have occurred or near misses that have
16   occurred.
17       Q    So when you say errors that have occurred,
18   is there a way that the hospital defines that?
19       A    We have a general definition around error.
20   We use the definition that if upon review and
21   retrospect all of the appropriate steps were taken
22   and still there was a bad patient outcome, that is
23   not considered an error.  But if there was a
24   deviation from generally accepted standards, then
25   that is an error.
```

1  listing are all the ways a PPEC review is triggered

2  or are there more?

3           MS. GAMBARDELLA:  Object to form.

4        The document speaks for itself.

5           You can answer.

6           THE WITNESS:  It says these are some

7        of the ways.  Some of the ways I just

8        listed.  We would have a broad definition.

9        It is -- you know, we didn't want to limit

10       ourselves in terms of what would trigger a

11       PPEC review.

12  BY MS. BROWN:

13    Q   If you look at the top of page 4, it says

14  all cases referred to the PPEC are logged and

15  tracked in a central repository.  What is that

16  referring to are central repository?

17    A   Our medical office files.

18    Q   Is that one document?

19    A   No.

20    Q   So is there a summary document which

21  summarizes the cases reviewed by the PPEC and the

22  outcomes?

23    A   Yes.

24    Q   And who maintains that document?

25    A   Our medical staff executive, office

149

1  administrator Theresa Zinck-Lederer, L-E-D-E-R-E-R.

2      Q    What arrangements are tracked in that

3  file?

4      A    Minutes from the PPEC inclusive from our

5  discussions, the cases that are referred, how they

6  are adjudicated and what are the outcomes and what

7  we do with the decisions we made.

8      Q    How far back in time does that document

9  go?

10     A    Well, we have the minutes that go back

11 more than a decade.

12     Q    Okay.  Is there a document, you know, for

13 example a chart, that lists, you know, the name of

14 each person reviewed, the nature of the review and

15 the outcomes, anything like that?

16     A    A summary document?  No, we have not

17 created a summary.

18     Q    So would the minutes be the documents that

19 you would look at to, you know, as a summary of the

20 -- sorry.  Strike that.

21          So when it is saying -- you see here, the

22 second paragraph, logged and tracked in a central

23 repository, which is itself considered a

24 confidential --

25     A    Second paragraph says all cases.

155

1  call low level events that didn't rise to the level
2  of meeting an MSPC level intervention, we created
3  an agent area for that area.  99 percent of the
4  issues someone has a harsh word, they have a tough
5  glance, they are unprofessional in one way or
6  another through action or inaction, we try to
7  resolve them at the lowest level through that agent
8  committee.
9          If there is a pattern of behavior or they
10 believe they are unable to address the issue, we
11 would elevate that to the MSPC.  So I can't give
12 you a total number because there is agent
13 committees like that one I just described, but
14 through the MSPC I would say we probably have
15 three, maybe four a month.
16     Q    So average three or four a month?
17     A    I think that is probably in the realm,
18 yes.
19     Q    Is there a document maintained that
20 summarizes the MSPC processes that occurred and the
21 outcomes?
22     A    Yes, the minutes.
23     Q    The minutes.  And similarly, there is not
24 a summary chart that summarizes all the procedures?
25     A    No.  And there would be no reason to

156

1  because we would never look at it as an aggregate
2  of the medical staff.  What we do, however, is as
3  an individual practitioner has issues, they get
4  filed in that individual's person -- in their
5  chart.  So I would be able to go and pull REDACTED
6  we were talking about and look at his chart and say
7  over the last 10 years he has three events of that
8  type and three events of that type.  So really the
9  -- I guess the access of how we want to analyze
10  that is not over-arching the medical staff, but
11  really by individual hospital staff members.
12      Q   The hospital has never done an assessment
13  that younger doctors go before the MSPC as opposed
14  to older doctor?
15      A   No.
16      Q   How about men go before the MSPC more than
17  women?
18      A   No.
19      Q   Is there ever any kind of underlying cause
20  found for the issues by the MSPC, drug abuse
21  problem, cognitive decline?
22              MS. GAMBARDELLA:  Objection to form.
23              THE WITNESS:  You asked that earlier.
24          No, we never found a substance review
25          problem.

165

1          after an event has already occurred.
2    BY MS. BROWN:
3         Q    We are focused on one practitioner, it
4    doesn't cover their process, it only covers one
5    small element?
6         A    Most of the time, yes.
7         Q    So if they pass an FPPE with respect to
8    the element of their practice, would you say they
9    are safe to practice with respect to that element?
10              MS. GAMBARDELLA:  Objection to form.
11         You can answer.
12              THE WITNESS:  That is what it is
13         intended to do I would say, yes.
14    BY MS. BROWN:
15         Q    Is there any document that summarizes all
16    of the FPPE processes that have occurred and their
17    outcomes?
18         A    I don't think that exists in a single
19    location.
20         Q    Which committee oversees FPPE?
21         A    Which committee oversees FPPE.
22              MS. GAMBARDELLA:  Objection, lacks
23         foundation.
24              You can answer.
25              THE WITNESS:  That is a good

200

1    Q    The witness has now been handed what has
2 been marked as Exhibit 9, Bates stamp Yale-New
3 Haven Hospital 119876.
4         Do you recognize this document?
5    A    Yes.
6    Q    What is this document?
7    A    REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

12   Q    REDACTED

REDACTED

REDACTED

REDACTED

16   A    Sure.  I will do it with an illustration.
17 So you are a patient.  I am a patient in the
18 hospital.  A near miss event is my physician writes
19 for me that I need to be put on ibuprofen.  That
20 gets transcribed, gets sent down to the pharmacy.
21 The pharmacy, for whatever reason, mistakenly fills
22 that prescription not with ibuprofen but with
23 acetaminophen.  That comes up to the floor.  The
24 nurse walked it to my room.  The nurse looks at the
25 jar, looks at the order recognizes that does not

201

1  match.  The nurse stops the line and says these do
2  not match, there is a problem here or there's an
3  error.  He or she caught that before it reaches the
4  patient.  That is a near miss event.  It was just
5  because of one final good barrier that the event
6  was captured.
7         Taking that same issue.  That nurse
8  doesn't catch there is a difference between
9  acetaminophen and ibuprofen and he or she
10  administers it to me, but I don't have any serious
11  changes in my condition.  In fact, my pain gets
12  better.  That is a precursor event.  The error
13  reached the patient but did not cause any
14  appreciative harm.
15         A serious safety event would be that he or
16  she administers that event to me and I have an
17  anaphylactic reaction and I need to be moved to the
18  ICU.  That's a serious safety event, meaning the
19  error reached the patient and it caused pervation
20  in my expected clinical safety course.
21     Q   Are those metrics that the hospital uses
22  to measure patient safety?
23     A   Yes.
24     Q   Are there other metrics that the hospital
25  uses to measure patient safety?

228

1   sort of neuropsychological testing?
2        A    At that point, the errors were so grave
3   and the history was so concerning that upon
4   presentation of the data, Dr. Herbert and the chair
5   of surgery at the time said we had two processes
6   that we could pursue.  One is you could retire.
7   And the other is we would have a formal review done
8   by our Credentials Committee because in order to
9   remove someone's privileges against their wishes,
10  you need to go through the formal process.  Faced
11  with that, both individuals retired.
12       Q    And there are minutes of the IPQPRC
13  reflecting the matter with REDACTED
14       A    Yes.
15       Q    Did you review those before?
16       A    No, I reviewed a portion of them.
17       Q    Before the hospital adopted the late
18  career practitioner policy, did it provide -- did
19  it conduct any studies on whether its practitioners
20  -- sorry.  Strike that.
21            Before the hospital adopted the late
22  career practitioner policy, did the hospital
23  perform any studies as to whether members of the
24  medical staff age 70 or above were causing
25  disproportionate harm to patients?

229

1           MS. GAMBARDELLA:  Object to form.
2        Did the hospital perform?
3  BY MS. BROWN:
4        Q    Yes.
5        A    No, we did not do any statistical review.
6        Q    Before adopting the late career
7  practitioner policy, did the hospital perform any
8  studies as to whether its members of the medical
9  staff age 70 or above were providing substandard
10  care to hospital patients?
11               MS. GAMBARDELLA:  Object to the form.
12          You can answer.
13               THE WITNESS:  No, our hospital -- our
14          medical staff did not perform any of the
15          studies.  What we did is we did a
16          literature search of which we have given
17          to you and is in that document with Dr.
18          Cooney's slide presentation because the
19          studies had already been done.
20  BY MS. BROWN:
21        Q    If there was no evidence that members of
22  the medical staff at Yale-New Haven Hospital age 70
23  or over were providing substandard care, why was it
24  necessary to change anything?
25               MS. GAMBARDELLA:  Object to form.

EEOC V.                                                    Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

230

1              You can answer.
2              THE WITNESS:  We never have done any
3         studies at Yale-New Haven Hospital to show
4         that penicillin treats syphilis, yet that
5         is what we use.  Because we don't need to
6         replicate studies that have already been
7         done at other institutions and have been
8         published in the peer review literature.
9         We went to the peer review literature.  We
10        found what information we needed.  There
11        was no reason to replicate the study.
12   BY MS. BROWN:
13        Q   If the study is published in peer review
14   literature, do you accept it as true?
15              MS. GAMBARDELLA:  Object to form.
16              THE WITNESS:  In many cases, yes.
17        There are cases where there are fraud.  We
18        look at the predominance of evidence.  In
19        this case, it's not one study, it's not 20
20        studies, it's hundreds.
21   BY MS. BROWN:
22        Q   Those are all studies of medical doctors
23   in the United States?
24              MS. GAMBARDELLA:  Object as to form.
25        You can answer.

EEOC V.                                              Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

231

1               THE WITNESS:  There is a lot of, --
2          there is a lot of thought that went into
3          this.  And many of the studies are
4          general studies about cognitive decline in
5          the aging, for example.  Some of the
6          studies have to do with adverse events or
7          malpractice or errors or death or length
8          of stay or efficiency as related to age.
9          The predominance of the studies led the
10         majority of our medical staff, as I
11         mentioned, to believe there was an
12         association particularly where there is an
13         inflection point at age 70 that we should
14         have something in place to protect patient
15         safety and that needs to be something that
16         has to do to evaluate the ongoing
17         competence of individuals over the age of
18         70 to continue to practice safely.
19   BY MS. BROWN:
20       Q   What was the hospital's goal in adopting
21   the late career practitioner policy?
22       A   You keep saying hospital, which is
23   incorrect.  The hospital did not adopt it.  The
24   organized medical staff which is self-governing and
25   decides its own rules about who can join and what

238

1          cognitive decline that happens with age
2          that has been proven to be associated
3          nationally with bad patient outcome and we
4          should do the best we can to make sure
5          that that is not happening to our medical
6          staff.
7    BY MS. BROWN:
8        Q    Did the hospital explore that concern by
9    conducting a study as to whether or not its medical
10   staff age 70 or above engaged in more errors than
11   those under the age of 70?
12             MS. GAMBARDELLA:  Objection to form.
13          You can answer?
14             THE WITNESS:  No, we accepted the
15          national literature just like we would
16          that when we saw the national literature
17          that suggests that individuals that
18          maintain active board certification have
19          fewer errors.  We didn't do the study to
20          see if we should study our practitioners
21          to see if board certification.  We
22          accepted that and built it into our bylaws
23          so you have to be board certified.
24          Someone else had done that study and it
25          was published in the peer review

EEOC V.                                         Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

239

1          literature.
2    BY MS. BROWN:
3         Q    What is the harm that the late career
4    practitioner policy is trying to prevent?
5         A    Patient harm.
6         Q    When you say that, how does the hospital
7    measure patient harm?
8         A    We just showed you on the triangle diagram
9    you handed me.
10        Q    So Exhibit 9?
11        A    That is one of the ways, yes.
12        Q    Are there other ways?
13        A    Sure.  I mean, again, as I mentioned some
14   of the individual errors, so may not make it to --
15   I will leave it at that.  Yes, serious events where
16   patients were harmed and it could be preventable.
17   The difference here, though, and the reason I am
18   pausing is because the vast majority of harm in
19   hospitals is systems based.  Individual
20   practitioner harm is a very -- it is a very narrow
21   and specific kind of harm that happens when a
22   physician either acts in a way to cause harm or
23   fails to act in a way that prevents harm.
24              And as I mentioned earlier, much of what
25   physicians do happens privately between the patient

EEOC V.                                            Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

240

1  and the physician that we don't have insight into.
2  The two cases that I mentioned, the reason why we
3  know about them was not just because they are
4  catastrophic harm, it is because other individuals
5  were part of that care team and they saw realtime
6  that the two physicians got into trouble and didn't
7  know how to get out of it.  And as I mentioned, it
8  is easiest in procedural areas where you have a
9  tech and a nurse and a fellow and a resident, but
10 particularly in cognitive specialties you do not
11 have that.  It is you and a patient alone in a
12 room.  Those are harder to find.  The medical staff
13 was very concerned about those kinds of harm.
14      Q   Isn't it true that in the cognitive
15 specialties medical staff of all ages are alone
16 with a patient in the room?
17      A   Yes.
18      Q   When adopting the late career practitioner
19 policy, did the hospital consider how Yale New
20 Haven hospitals practitioners age 70 and above
21 performed on the OPPE metrics we discussed earlier?
22      A   Yes, as I mentioned before, we consider
23 the OPPE a necessary but insufficient way of
24 measuring people's quality.
25      Q   Did the hospital assess whether or not

241

1   members of the medical staff age 70 or above did
2   worse on those metrics than younger members of the
3   medical staff?
4        A    No, but we did go back and look at
5   individuals who had uncovered cognitive deficits as
6   the two I mentioned, and the OPPE metrics failed to
7   shine a light on where the performance haps were.
8        Q    The two that you just mentioned, do you
9   know that they had cognitive deficits?
10       A    I don't.  Because we didn't have the
11   policy and we never tested them.
12       Q    You said those two other practitioners,
13   REDACTED                    --
14       A    REDACTED
15       Q    REDACTED        you did a postop review of
16   their OPPE data.  And what were the results?
17       A    I don't remember that there was any
18   correlation between the two.  I can tell you
19   subsequent to that there have been -- I can think
20   of at least two additional folks.  There was a
21   physician -- the physician that performed almost
22   the worst on this cognitive exam is a physician
23   named REDACTED .  REDACTED is his first name.  Last
24   name is REDACTED .
25            Performed abominably on the exam.  One of

242

1  the lowest performers, well below any of the peers.
2  If you go back and look at that individuals OPPE
3  they had limited information on his practical
4  ability even though he admitted 30 to 40 patients.
5  He was an REDACTED .  REDACTED .  Takes
6  care of patients on a one-on-one basis.  Had no
7  contact with a resident or fellow.  He -- we looked
8  carefully at his OPPE and there was nothing in
9  there to indicate the challenges he had.  He also
10 had no adverse events that we were aware of.  But
11 that is just -- I state that we were aware of
12 importantly because hopefully -- I really hope this
13 is we caught him before he had an adverse event.
14     Q    When adopting the late career practitioner
15 policy, did the hospital assess whether medical
16 staff members age 70 or above were
17 disproportionately aware of serious events when
18 compared to medical staff members under age of 70?
19              MS. GAMBARDELLA:  Asked and answered.
20        You can answer again.
21              THE WITNESS:  No, we looked at
22        literature.
23 BY MS. BROWN:
24     Q    What about precursor events?
25     A    No, we looked at literature.

EEOC V.                                                    Thomas J. Balczak, M.D.
Yale New Haven Hospital, Inc.

243

```
 1        Q    Over the last ten years, have Yale New
 2   Haven hospital's medical staff members age 70 and
 3   above been disproportionately for serious safety
 4   events?
 5        A    Not studied.
 6        Q    How about the same question for precursor
 7   events?
 8        A    Not studied.
 9        Q    At the time of the consideration of
10   whether to adopt the late career practitioner
11   policy, did the hospital review any data that it
12   received more complaints about medical staff
13   members age 70 and above at Yale New Haven Hospital
14   as compared to those under 70?
15        A    Not studied.
16        Q    Are there any other performance metrics
17   that the hospital reviewed when adopting the late
18   career practitioner policy that showed its
19   practitioners over the age of 70 presented greater
20   risk to patients?
21             MS. GAMBARDELLA:  Objection to form.
22        You can answer.
23             THE WITNESS:  Yes, we looked at the
24        national literature.  Remember there are
25        only 159 members at the time that were
```

EEOC V.                                                Thomas J. Balczak, M.D.
Yale New Haven Hospital, Inc.

244

```
 1            over the age of 70.  That is not a large
 2            enough group to discern a statistically
 3            different number based on the number of
 4            events that we have per year.  So it would
 5            been impossible to do any of the studies
 6            with any firm statistically valid
 7            conclusion you are suggesting.  However
 8            again, we don't independently verify what
 9            has been established in the literature.
10                 And the literature has firmly
11            established the connections between age
12            particularly above age 70 and adverse
13            events, malpractice claims and cognitive
14            decline.
15  BY MS. BROWN:
16       Q    When you were adopting the late career
17  practitioner policy, the hospital didn't review any
18  data regarding performance or patient outcomes for
19  medical staff members age 70 or above at Yale-New
20  Haven Hospital?
21                 MS. GAMBARDELLA:  Objection.  Asked
22            and answered.
23                 THE WITNESS:  No, because it is
24            irrelevant.
25  BY MS. BROWN:
```

247

1  our cases.

2       Q   Does the hospital consider the late career

3  practitioner policy to be a success?

4       A   Yes.

5       Q   Why?

6       A   Because of the reasons I just described is

7  that if you look at the individual physicians that

8  we have identified, the dozen or so that we have

9  identified that were clear fails or in the middle,

10 we have prevented patient harm we are absolutely

11 certain because we have taken those physicians,

12 counseled them asked them to stop practicing either

13 a specific privilege or altogether and we have been

14 successful.  They haven't objected.  They accepted

15 our recommendations.  And in all of the situations,

16 we talked to them about what it is that they would

17 like to do with the rest of their careers and found

18 accommodation for them.

19      Q   How do you know you prevented patient

20 harm?

21      A   I know as a physician that has been

22 practicing medicine for 35 years that has been a

23 patient safety executive for the last 15.

24      Q   You said when we were discussing other

25 matters, physicians are evidence based, they want

EEOC V.                                                    Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

248

```
 1  to see evidence?
 2       A    Yes.
 3       Q    What is the evidence that you have
 4  prevented patient harm?
 5               MS. GAMBARDELLA:  Same objection.
 6          The term evidence and --
 7               THE WITNESS:  It is my belief.
 8               MS. GAMBARDELLA:  -- asked and
 9          answered.
10  BY MS. BROWN:
11       Q    There is no evidence you prevented patient
12  harm?
13               MS. GAMBARDELLA:   Objection.
14               THE WITNESS:  It is my firmly held
15          belief that there has definitely been
16          patient harm by this.
17  BY MS. BROWN:
18       Q    You are testifying on the behalf of the
19  hospital today.  Right?
20       A    Yes.
21       Q    Not from your personal belief, but does
22  the hospital have any evidence that this policy has
23  prevented patient harm?
24               MS. GAMBARDELLA:  How do you prove a
25          negative?  Objection.  I am sorry.
```

EEOC V.                                          Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

249

1          Objection to form.

2               MS. BROWN:  Mary, please, I

3          appreciate you --

4               MS. GAMBARDELLA:  I got it.

5          Objection to form.  Asked and answered.

6          Asked and answered.

7               You can answer again.

8               My apologies.

9               You can answer.

10              MS. BROWN:  I would like to place on

11         the record objection to counsel's speaking

12         objection.

13              MS. GAMBARDELLA:  I didn't get it all

14         out.  I said I apologized.

15   BY MS. BROWN:

16     Q   Dr. Balcezak testifying today on behalf of

17   the hospital, is there any evidence the adoption of

18   late career practitioner policy has prevented

19   patient harm?

20     A   I would say that is not evidence that we

21   would be able to create.  I would say that I am not

22   just stating my personal belief, but I will go on

23   the record firmly, as evidenced by the fact we are

24   defending this vigorously to great expense because

25   we believe it is the right thing to do.  We would

EEOC V.                                          Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

250

1  not engage in this defense as vigorously as we are

2  if we did not believe that it worked.  And that is

3  myself and it is our CEO, it is the president's,

4  all the president's over the last 10 years of

5  Medical Executive Committee.  The patient safety

6  executives.  It is our Board of Trustees.  It is

7  not my personal belief.  I am here on behalf of our

8  entire management team on behalf of our entire

9  leadership and our board and say unequivocally, we

10 believe this works.

11         I have received calls from numerous

12 colleagues across the country including individuals

13 that in the face of being asked to cease and desist

14 have collapsed, have ceased, said we want you to

15 defend this, it is the right thing to do, it is

16 patient safety oriented.  This is the practice of

17 medicine.  We know the practice of medicine.

18     Q   Dr. Herbert was the chief medical officer.

19 Does he still support the late career practitioner

20 policy?

21     A   Yes.

22     Q   The late career practitioner policy is

23 trying to prevent serious safety events.  Is that

24 right?

25     A   I would broaden that definition.  It is

EEOC V.                                                          Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

251

1    trying to prevent patient harm.

2        Q    Patient harm.  Is there any evidence that

3    after the late career practitioner policy was

4    adopted, patient harm went down because of that

5    adoption?

6                   MS. GAMBARDELLA:  Objection to form.

7              You can answer again.

8                   THE WITNESS:  Understand for a

9              minute, unfortunately, that the cause and

10             effect is almost impossible to prove.  You

11             can prove association through statistical

12             methods.  There is an association between

13             patient harm reduction and the institution

14             of our late career practitioner policy.  I

15             cannot tell you that there is cause and

16             effect there.  It would be impossible to

17             prove.

18   BY MS. BROWN:

19       Q    How do you show the association?

20       A    Because if you look at the time when it

21   began and we currently are and you look at the

22   number of harm events in our organization, the

23   number is statistically lower than it was even five

24   years ago.

25       Q    If the late career practitioner policy was

```
 1              Doesn't what exist?  I am sorry.
 2    BY MS. BROWN:
 3        Q    If the OPPE process is flawed and you say
 4    this additional late practitioner policy is
 5    necessary because of those flaws, isn't the OPPE
 6    flawed as to practitioners of all ages?
 7                    MS. GAMBARDELLA:  Object to form.
 8              Asked and answered.
 9                    You can answer.
10                    THE WITNESS:  I am confused by your
11              question.  Let me see if I can give it a
12              try to answer.
13                    This statement here says that
14              statistical variance because you need
15              large numbers to show small difference,
16              you can't just do peer review.  So it is
17              not perfect.  Is it better than nothing?
18              Yes.  It is not perfect.  Again, there is
19              a special cause variation.  There is a
20              special cause problem in physicians over
21              the age of 70 that just looking in the
22              rearview mirror at events that already
23              happened, it is possible that that may not
24              be caught through that peer review.  For a
25              variety of reasons.  One is the Ns may be
```

EEOC V.                                                    Thomas J. Balczak, M.D.
Yale New Haven Hospital, Inc.

270

1               small.  Two, again, coming back to the
2               fireproofing versus firefighting should we
3               really wait until some harm event happens
4               because of a group of physicians that we
5               know are at risk of cognitive decline, not
6               all of them, but some  of them.  When
7               there is a low risk, low cost, minimally
8               invasive intervention that we can do that
9               can find those physicians and then we can
10              work with them to accommodate them how
11              they can practice medicine safely.  That
12              is what this is outlining.
13    BY MS. BROWN:
14       Q   You said there is -- the OPPE process is
15    imperfect and won't find -- strike that.
16          The OPPE process is imperfect and because
17    of that you needed to adopt the late career
18    practitioner policy?
19              MS. GAMBARDELLA:  Mischaracterizes
20              his testimony.
21              THE WITNESS:  I would restate that
22              and say as evidenced by the documents you
23              have handed me, we have been evolving our
24              ability to assess competency, quality and
25              safety among our medical staff.  We will

EEOC V.                                                    Thomas J. Balczak, M.D.
Yale New Haven Hospital, Inc.

271

1          continue to do so and we will continue to
2          do so when we find areas where we can
3          continue to improve our ability to assess
4          individual's ability to practice medicine.
5          This was one of those areas.
6   BY MS. BROWN:
7       Q    So the hospital's OPPE process is not
8   sufficient to determine whether a medical staff
9   member is competent to exercise their privileges?
10              MS. GAMBARDELLA:  Objection to form.
11              THE WITNESS:  No, I wouldn't agree
12          with that.  It is the best we do now.  And
13          we will continue to evolve it.  Is it
14          perfect?  No, it is not perfect.  And it
15          will never be perfect.
16   BY MS. BROWN:
17       Q    The slide here refers to a sentinel event.
18   What is that?
19       A    That's another term -- it's an older term
20   for serious safety event.  It is an old term,
21   commissioned term they have since retired.
22       Q    And the slide also says enormous innate
23   reluctance to threaten career of colleagues of any
24   age.  Do you agree that reluctance exists for all
25   members of the medical staff for all ages?

EEOC V.                                          Thomas J. Balczak, M.D.
Yale New Haven Hospital, Inc.

272

1      A   What that refers to is what I have been
2 saying before, which is if Mary and I are close
3 colleagues, we have worked together on a regular
4 basis, I am very reluctant to say, you know, she is
5 just not good at colonic anastomosis.  There is a
6 reluctance among physicians for a variety of
7 reasons that are cultural and that they will not
8 call out their colleagues.
9      Q   Are there steps the hospital could take to
10 make its medical staff members more likely to
11 report concerns about their colleagues?
12              MS. GAMBARDELLA: Objection to form
13          and asked and answered.
14              You can answer again.
15              THE WITNESS:  Again it is cultural.
16          Cultural changes is very hard.  We have
17          done things.  We are at the cutting edge
18          of things to improve that culture.  The
19          high reliability work that I mentioned is
20          probably one of the best internationally
21          recognized mechanisms to do that.
22 BY MS. BROWN:
23      Q   The reluctance you are citing for medical
24 staff members to report on other medical staff
25 members, what do you base that on?  Is there any

285

1       Q    Can you think of any other possible
2   examples?
3       A    Sure.  Physicians that are in their
4   private office, we talk to their partners.  We
5   looked at patient complaints.  We read -- in some
6   cases we read the actual notes that the physician
7   wrote.  We reviewed -- that is about it.
8       Q    Okay.  Anything else you can think of?
9       A    No.
10      Q    Why couldn't you have performed those
11  assessments before doing the neuropsychological
12  assessment?
13                MS. GAMBARDELLA:  Objection.
14                You can answer.
15                THE WITNESS:  We could have, but
16           again what I would say to you is that this
17           process has pointed out to us that those
18           measures that we have done, those
19           inquiries that we have made in most of the
20           situations where we had made them in
21           patients -- sorry, in physicians that had
22           real challenges with the performance of
23           this test yielded no additional
24           information.  So there was no signal, if
25           you will, under those other data that we

EEOC V.                                           Thomas J. Balcezak, M.D.
Yale New Haven Hospital, Inc.

286

1              collected that pointed to them having
2              problems.  This was a unique and not
3              replicable way of assessing someone's
4              potential capacity to cause harm.
5  BY MS. BROWN:
6      Q   So you were able to find no connection
7  between their score on the late career practitioner
8  policy, neuropsychological testing and any
9  performance metric the hospital has --
10      A   In no consistent way, correct.
11              MS. BROWN:  Do you need a break?
12              THE COURT REPORTER:  Could we take a
13          five-minute break.
14              (Recess taken from 5:09 p.m. to 5:12
15          p.m.)
16              (Off-the-record discussion.)
17              MR. DEGROFF:  The parties have agreed
18          that we will -- EEOC will reserve one hour
19          of 30(b)(6) deposition time and add that
20          hour to Dr. Balcezak's fact witness
21          deposition when that deposition takes
22          place.
23              MS. GAMBARDELLA:  Subject to meet and
24          confer about the total time.
25              MR. DEGROFF:  We already have the

291

1  memory, working memory, language skills?

2          What does confusion mean?  That is a very

3  general term.  In that situation we would do

4  specific testing.  We could see we have done -- in

5  that spreadsheet you have handed me, there are

6  people that have done detailed evaluations.

7  Instead of one-hour screening exam, we do a four or

8  five-hour battery that is tailored to what the

9  one-hour screening showed.  Then if we think there

10 is concern there, we follow it up with a one-year

11 test.

12      Q   Some people are subject to testing for up

13 to five hours under the policy?

14      A   Yes, and some people, based on those

15 results, may require testing in one year.

16      Q   Has the hospital conducted any studies to

17 determine whether the late career practitioner

18 policy actually identifies practitioners who cannot

19 practice safely?

20              MS. GAMBARDELLA:  Object to form.

21         Multiple undefined terms.

22              You can answer.

23              THE WITNESS:  That is at its core.

24         Our goal here is to find people who have a

25         potential, that is important, to not be

292

1            able to practice safely because of some

2            impairment in their cognitive ability.

3            Again, we are trying to catch this problem

4            before it leads to patient harm so there

5            is a potential there, and that's what

6            we're trying to find.

7    BY MS. BROWN:

8        Q   Having the potential to not being able to

9    practice safely is sufficient to curtail someone's

10   privileges?

11       A   Again, we have never curtailed anyone's

12   privileges because of this.

13       Q   Has the hospital ever assessed whether the

14   scores of medical staff members on the late career

15   practitioner examinations, the neuropsychological

16   examinations, whether they correlate with medical

17   staff members, OPPE metrics?

18       A   I did mention earlier that we have looked

19   at folks that have performed very poorly on the

20   cognitive testing and we see no correlation between

21   the OPPE metrics and this testing.

22       Q   Has the hospital ever assessed whether the

23   scores of medical practitioners on the late career

24   practitioner policy neuropsychological exams

25   correlate with a higher responsibility for serious