## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| U.S. Equal Employment Opportunity Commission, | |
| Plaintiff, | Civil No. 3:20-cv-00187 (SALM) |
| v. | |
| Yale New Haven Hospital, Inc., | |
| Defendant. | June 24, 2022 |

## RULING AND ORDER ON
## EEOC'S THIRD MOTION TO COMPEL (ECF No. 154)

### I.   INTRODUCTION

In 2016, Yale New Haven Hospital ("YNHH") adopted a "Late Career Practitioner Policy" ("LCPP" or "Policy"), under which medical practitioners aged seventy or older are required to undergo neuropsychological and ophthalmological testing upon appointment or re-appointment. The United States Equal Opportunity Commission ("EEOC") believes that the Policy violates the Age Discrimination in Employment Act, 29 U.S.C. §§ *et seq.* ("ADEA"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and it filed this lawsuit in 2020. The Court ordered that discovery be conducted in phases, with "Phase I" determining the employment status of any practitioners affected by the Policy, and "Phase II" addressing whether the Policy violates the ADEA or the ADA. Phase I discovery closed on January 29, 2021, and the parties have been conducting Phase II discovery ever since.

The EEOC claims to have learned in Phase II that YNHH failed to disclose several practitioners that it had been ordered to disclose in Phase I. It has now moved the Court for an order directing YNHH to disclose those practitioners, and to produce related documents. (EEOC's

Third Mot. to Compel, ECF No. 154) (hereinafter "Motion" or "Mot."). It also seeks an order directing YNHH to answer a related interrogatory. (*Id.*) For its part, YNHH disputes that the Court previously ordered it to make this disclosure, and it says that the EEOC delayed unreasonably in bringing the motion. (Def.'s Memo. of L. in Opp'n to Pl. EEOC's Third Mot. to Compel, ECF No. 158) (hereinafter "Opposition" or "Opp'n").

For the reasons that follow, the EEOC's Motion is **GRANTED IN PART AND DENIED IN PART**. The Court will order YNHH to disclose some but not all of the practitioners at issue; to produce certain documents related to them; and to answer the disputed interrogatory. The Court's order is set forth more fully in Section IV below.

## II.   BACKGROUND

According to YNHH, "[i]n the last two decades, a number of studies have been undertaken and a robust body of literature developed regarding the effect of aging on the competence of physicians." (Ltr. from S. Wright to E. Ostolski, Jan. 6, 2019, ECF No. 32-1.) "[I]n response to the scientific evidence identified regarding late career practitioners and with a primary focus on ensuring that patient care is provided at the safest and highest level of quality," YNHH's Medical Staff Executive Committee "established a Sub-Committee to thoroughly review the matter." (*Id.* at 3.) After "extensive research and review of published studies," "[t]he Late Career Practitioner Policy was developed . . . and implemented in March 2016." (*Id.* at 4.)

The Policy requires medical practitioners aged seventy or older to submit to testing if they wish to be appointed or reappointed. Specifically, the Policy states that "at the time of initial appointment or beginning with the first re-appointment, and for every reappointment thereafter that occurs after reaching the age of (70), prospective Members or Members of the Medical staff,

as applicable, are required to undergo neuropsychologic and ophthalmologic examinations and a Peer Review Evaluation." (Ex. A to Opp'n, ECF No. 158-1, at 1.) It remains in force today.

The EEOC believes that the Policy is illegal. In particular, it contends that "[b]y subjecting only age 70+ applicants to, and age 70+ employees of, YNHH to the Policy," YNHH has violated the ADEA. (Am. Compl., ECF No. 119, at 1.) It also alleges that the Policy "violates the ADA's prohibition against subjecting employees to medical examinations that are not job-related and consistent with business necessity." (*Id.* at 2.) After an administrative proceeding, the EEOC filed this civil action on February 11, 2020, seeking (among other things) a permanent injunction prohibiting use of the Policy. (Compl., ECF No. 1.)

At the beginning of the case, the parties agreed that discovery should be phased, but they disagreed on the order of the phases. (*See* Def.'s Mot. for Discovery Conf., ECF No. 25, at 1.) The EEOC proposed that Phase I focus on the legality or illegality of the Policy, and that discovery into the numbers and identities of persons who had been subjected to the Policy be deferred to a second phase. (*See* EEOC's L.R. 26(f) Rpt. of Parties' Planning Mtg., ECF No. 28, at 9-10.) In the EEOC's view, only "minimal" discovery would be required to get to the bottom of the legality issue – and since that issue might be dispositive, it would be more efficient to put it first. (*Id.*; *see also* Memo. of L., ECF No. 28-1, at 5.) YNHH, by contrast, proposed that Phase I be "designed to identify the Aggrieved Individuals whose claims will be litigated in this action, and to determine if they are 'employees' under the ADEA and ADA," with the question of "whether the Policy violates the ADEA or ADA" left to Phase II. (Def.'s Proposed L.R. 26(f) Rpt., ECF No. 29, at 7-8.) Citing the discovery plan in a Western District of Pennsylvania case as a precedent, YNHH argued that early identification of affected individuals would "frame[] the case, and provide[] the necessary certainty and clarity to move forward with the litigation." (Def.'s Suppl. Memo. in

Supp. of Proposed Discovery Plan, ECF No. 32, at 3) (citing *EEOC v. Norfolk S. Corp.*, No. 2:17-cv-01251 (W.D. Pa.)).

Consistent with its view that the identification of relevant individuals should come first, YNHH proposed to "provide the EEOC with the names and contact information of any individual subject to the Policy" "[w]ithin 30 days of the entry of the discovery schedule." (*Id.* at 7.) The EEOC would then "provide [YNHH] with a final list of the names of its Aggrieved Individuals," along with "a verified explanation of the Aggrieved Individuals' relationship to the Defendant," within sixty days. (*Id.*) Phase I discovery would then close, and the parties would submit "motions for summary judgment concerning the status of the Aggrieved Individuals as 'employees' under the ADEA and/or the ADA" forty-five days later. (*Id.* at 8.)

After briefing and oral argument, the Court substantially adopted YNHH's proposal. (Order on Case Mgmt. Plan, ECF No. 34, at 7.) The Court divided discovery into two phases, with Phase I directed to "determin[ing] the employment status of any individuals affected by the Policy, after which summary judgment motions on this issue will then be filed." (*Id.*) Phase II would then "address whether the Policy violates either the ADEA or the ADA, to the extent necessary." (*Id.*) The Court directed the parties "to meet, confer, and submit a revised Rule 26(f) report" filling in the details. (*Id.*)

The parties submitted their Rule 26(f) report on August 21, 2020, and in it, they explained their joint understanding of Phase I. (Joint Rev. R. 26(f) Rpt. of Parties' Planning Mtg., ECF No. 36, at 7-8) (hereinafter "26(f) Rpt."). They both agreed that, in light of the Court's order, Phase I would be "designed to identify the Aggrieved Individuals regarding whom EEOC will seek judgment and relief in this action, and to determine if they are 'employees' under the ADEA and/or the ADA." (*Id.* at 7.) YNHH then committed to provide the EEOC with an Excel spreadsheet

listing the names of, and last known contact information for, all individuals who had "been subject to the Policy." (*Id.* at 7-8.) YNHH added that it would "supplement its initial production with the names and contact information of additional individuals who become subject to the Policy during Phase I of discovery, up to 90 days before the close of the Phase I discovery period." (*Id.* at 8.) Within 90 days of receiving this information from YNHH, the EEOC would "make its first identification of Aggrieved Individuals." (*Id.*)

While the Court was reviewing the Rule 26(f) report, the EEOC served sixty-one requests for production on YNHH. (Ex. 1 to Mot., ECF No. 154-3.) Relevant here, Request No. 25 sought production of "[d]ocuments sufficient to show" the contact information for each "Affected Individual," with "Affected Individual" defined as "any individual who has been asked to take a neuropsychological examination pursuant to" the Policy. (*Id.* at 6, 10.) After asserting a number of "general objections," YNHH's only specific objection was that the request was "overly broad and not proportional to the needs of this case as it seeks unnecessary duplicative materials." (Ex. 2 to Mot., ECF No. 154-3, at 22.) It then stated that, "[s]ubject to and without waiving its objections," it would produce "the last known contact information, including home and business addresses and telephone numbers, and personal and non-YNHH business email addresses for all individuals subject to" the Policy. (*Id.*)

After reviewing the 26(f) Report, the Court entered a preliminary scheduling order (Prelim. Sched. Order, ECF No. 45), the meaning of which the parties now dispute. In the order, the Court directed YNHH to "produce to the EEOC a spreadsheet listing the potentially affected individuals, those over the age of 70 *who were directed to submit to testing* under Yale's Policy, by" November 6, 2020. (*Id.*) (emphasis added). It then ordered the EEOC to "identify each 'Aggrieved Individual' on the spreadsheet produced by Yale by" November 30, 2020. (*Id.*) In a later order it

extended the EEOC's compliance date to January 19, 2021, but it again used the "directed to submit to testing" formulation.  (Order, ECF No. 48.)  As will be shown below, the parties now dispute the meaning of "directed to submit."

On December 7, 2020, YNHH represented that it had timely "produced a spreadsheet identifying all of the potential Aggrieved Individuals, per the Court's Order."  (YNHH's Resp. to EEOC's Mot. for Discovery Conf., ECF No. 53, at 3-4.)  The EEOC says that "[a]fter receiving the spreadsheet of 170 identified practitioners," it "then interviewed and/or attempted to interview those practitioners" with a view to determining whether each individual "was 'employed' by YNHH under applicable law."  (Decl. of K. Peters, ECF No. 154-2, ¶ 5.)  The parties then negotiated in an effort to resolve the Phase I "employment" issue by stipulation.  (*See* Jt. Mot. to Extend Phase I Discovery, ECF No. 58, at 1.)  Those negotiations succeeded, and on January 1, 2021, the parties stipulated to a list of 115 practitioners who would – and a list of 54 practitioners who would not – be "considered YNHH employees" for purposes of this case.  (Jt. Mot. to Approve Stip., ECF No. 60.)  They also agreed that neither party would file a summary judgment motion with respect to the Phase I issue.  (*Id.*)  With these stipulations in place, Phase I discovery closed on January 29, 2021, and the parties embarked on Phase II.  (*See* Order, ECF No. 59.)

In March 2021, YNHH began producing the minutes of meetings of its Late Career Practitioner Committee.  (Opp'n at 12.)  Sometime in the summer or fall of 2021, the EEOC spotted references in those minutes to fifteen practitioners who "were subjected to the Policy, but not disclosed by YNHH."  (Ex. 3 to Mot., ECF No. 154-3.)  In January 2022 its counsel e-mailed YNHH's counsel, demanding a "full explanation as to why these individuals were not listed in the" November 2020 Phase I disclosure, and an "amended version" of that disclosure "that identifies **all individuals** who were subjected to YNHH's Policy to date (which includes, per the

Court's order, all who 'were directed to submit to testing.')"  (*Id.*) (emphasis in original).  YNHH provided some additional information on February 7, 2022, but stated that it did not share "EEOC's interpretation of individuals 'directed to submit to testing'" as encompassing practitioners who had been "merely notified of the requirements of the LCP Policy."  (*Id.*)

The EEOC filed this Motion eleven weeks later, on April 18, 2022.  It seeks three specific orders.  (Mot. at 1.)  First, it seeks an order directing YNHH to produce "[a] list of *all* individuals potentially affected by" the Policy, "'those over the age of 70 who were directed to submit to testing under Yale's Policy,' as this Court directed YNHH to do in its order dated November 3, 2020."  (*Id.*) (emphasis in original).  In other words, it seeks the names and contact information of all practitioners who are within the scope of the November 2020 order, including any that have not yet been uncovered through its review of the meeting minutes.  Second, it asks the Court to order YNHH to produce "the summary datasheets and complete credentialing files" for the previously undisclosed doctors whom it learned about from that review.  (*Id.*)  Third, it seeks an order requiring production of "a list of each member of YNHH's organized medical staff who maintained credentials with YNHH at the age of seventy or older, but who did <u>not</u> complete a neuropsychological examination under the LCPP."  (*Id.*) (emphasis in original).

YNHH filed its opposition on May 9, 2022, and the EEOC filed its reply brief on May 23, 2022.  (EEOC's Reply in Supp. of Third Mot. to Compel, ECF No. 159) (hereinafter "Reply").  The Court scheduled oral argument for June 2, 2022, but rescheduled it to June 9, 2022 at the parties' request.  (Mot. to Adjourn, ECF No. 163; Order, ECF No. 165.)  On that date, the Court heard more than an hour of argument.  (Minute Entry, ECF No. 171.)  The motion is now ripe for decision.

### III.   DISCUSSION

### A.   Issue One:  The EEOC's Request for a List of "All Individuals Potentially Affected by YNHH's Late Career Practitioner Policy"

The EEOC first seeks an order directing YNHH to produce a "list of *all* individuals potentially affected by [the Policy], 'those over the age of 70 who were directed to submit to testing.'"  (Mot. at 1) (emphasis in original).  It notes that its Request for Production No. 25 requested "documents sufficient to show" the contact information for "each Affected Individual," with "Affected Individual" defined as "any individual who has been asked to take a neuropsychological examination pursuant to" the Policy.  (Memo. of L. in Supp. of EEOC's Third Mot. to Compel, ECF No. 154-1, at 3) (hereinafter "Memo.").  It adds that YNHH agreed, in its response to that request, to "produce the last known contact information" for "all individuals subject to" the Policy.  (*Id.*) (citing Ex. 2 to Mot., ECF No. 154-3, at 22).  It suggests that, in producing the contact information for fewer than "all individuals subject to the Policy," YNHH did not comply with the Request for Production.  (*See id.*)

Yet the principal basis for the EEOC's argument is not the Request, but rather the Court's order of November 3, 2020.  (*Id.* at 5-7) (citing Order, ECF No. 48).  In that order, the Court directed YNHH to produce a spreadsheet listing "the potentially affected individuals."  (Order, ECF No. 48.)  The order elaborated that "potentially affected individuals" meant "those over the age of 70 who were directed to submit to testing under Yale's Policy."  (*Id.*)  The EEOC says that nothing in the order permitted YNHH to hold back information on any relevant practitioner.  To the contrary, "the Court ordered YNHH to produce a spreadsheet identifying *all* of the potentially affected individuals."  (Memo. at 6) (emphasis in original).

YNHH argues that even though it failed to disclose some practitioners who appeared in the meeting minutes, its disclosure nevertheless complied with the Court's order.  (Opp'n at 6-9.)

YNHH notes that the order required disclosure of only those practitioners who had been "**directed** to *submit to testing*," and it contends that there is a difference between being "directed to submit to testing" and merely being "alerted to the steps needed for credentialing or re-credentialing." (*Id.* at 6-7) (emphases in original).  It then argues that if, say, a practitioner had already decided to retire by the time she was "apprised of [the] credentialing requirements," that practitioner would not have been "'directed' to submit to testing."  (*Id.* at 7.)  Putting it differently, YNHH adds that "[p]ractitioners over age 70 applying for privileges at YNHH or seeking to renew those privileges were not required or directed to yield to YNHH's authority – they had a choice." (*Id.* at 8.)  Those practitioners could voluntarily step down their privileges to a lower level, but if they insisted on being appointed or re-appointed to the highest level of privileges, only then would they have been "directed" to submit.  (*See id.*)

The Court is not persuaded by YNHH's interpretation, for several reasons.  First, the order clearly required YNHH to produce contact information on all practitioners who were even "potentially affected" by the Policy – not to claim for itself the right to decide which practitioners were and were not, in fact, actually affected.  (Order, ECF No. 48) (directing YNHH to produce "a spreadsheet listing the potentially affected individuals").  Second, the history of the scheduling dispute that led to the order provides no support for YNHH's interpretation.  YNHH twice committed to produce contact information on all practitioners who were "subject to" the Policy, not merely those who actually submitted to it (*see* 26(f) Rpt. at 7-8; *see also* Def.'s Suppl. Memo. in Supp. of Proposed Discovery Plan, ECF No. 32, at 3), and in arguing for its preferred form of phasing it touted the *Norfolk Southern* case, in which the employer "produced the names and contact information of all of the potential class members." (*Id.*)  Third and perhaps more importantly, the Policy clearly "directs" practitioners to submit to testing.  Each practitioner over

the age of 70 received a letter informing her that she "will be subject to the requirements of the" Policy, and that "[i]n order to comply, [she] will need to have both an ophthalmologic examination and undergo neuropsychological testing." (Reply at 2-3 and Ex. 1 to Reply at 1.) The letter asks the practitioner to set up an appointment with a particular doctor, and it closes with a bold-type admonition that if she does not complete the testing by a particular date, her "**[f]ailure to do so my result in termination from the Medical Staff.**" (Ex. 1 to Reply at 2) (emphasis in original).[1] In summary, YNHH's interpretation of the Court's prior order is unpersuasive.

Ordinarily this observation would dispose of the EEOC's motion. "[D]iscovery orders are meant to be followed," *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 853 (2d Cir. 1995), and "[a] party who flouts such orders does so at [its] peril." *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988). Here, however, there are two additional considerations to address, the first of which is the EEOC's delay in bringing the Motion. YNHH produced the Late Career Practitioner Committee meeting minutes in mid-2021 (*see* Opp'n at 12), and had the EEOC reviewed those minutes promptly and diligently, it would have noticed the deficiencies in YNHH's production no later than the fall. Instead, it failed to raise those deficiencies with YNHH until January 2022 (*see* Ex. 3 to Mot., ECF No. 154-3), and did not file its Motion until almost three months later. Second, if the EEOC has not waived its claims through delay, the Court still must consider the proper temporal scope of the relief to be ordered. In other words, the Court must consider whether YNHH should be ordered to produce contact information on all practitioners

---

[1]    Moreover, YNHH evidently has not complied with the order even under its own interpretation. Under YNHH's view of the order, it would have been obliged to disclose both (a) those practitioners who actually submitted to testing, and (b) those practitioners who constrained it to "direct" compliance by, for example, insisting on being fully re-credentialed without submitting to testing. But YNHH says that it only disclosed the former, because "those identities were more easily provided." (Opp'n at 8-9.)

who were "potentially affected" by the Policy from its inception until today, or instead from inception only through Phase I discovery.  (*See* Opp'n at 10-11) (asserting that the customary duty to supplement discovery responses under Rule 26(e) did not apply to Phase I discovery in this case).

With respect to the first issue, the law is clear that motions arising out of non-compliance with court orders should be made within a reasonable time.  "A motion for Rule 37 sanctions should be promptly made, thereby allowing the judge to rule on the matter when it is still fresh in his mind."  *Mercy v. Suffolk Cnty.*, 748 F.2d 52, 55 (2d Cir. 1984).  "While Rule 37 does not establish any time limits within which a motion for sanctions must be filed, unreasonable delay may render such motions untimely."  *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 886 (S.D.N.Y. 1999).  Applying these principles, courts have rejected Rule 37 motions when they were made after discovery had closed entirely, *e.g., In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-1570 (GBD) (SN), 2018 WL 4096106, at *2 (S.D.N.Y. Aug. 27, 2018), and where the requested sanction was the preclusion of evidence, an adverse inference, or an award of attorneys' fees.  *E.g., Citgo Petro. Corp. v. Odfjell Seachem*, No. H-07-2950, 2013 WL 2289951, at *9 (S.D. Tex. May 23, 2021) (listing sanctions sought by plaintiff).

Yet this case is different from those cases.  In this case, discovery has not closed entirely, and the EEOC is not seeking the same sort of sanctions.  Rather, it seeks only another order directing YNHH to do what it has already been ordered to do.  *See Lateral Link Grp. v. Habeas Corp.*, No. CV 14-05695-JAK (JEMx), 2016 WL 3457144, at *1 (C.D. Cal. June 23, 2016) (explaining that under Rule 37(b), "relief for violating a discovery order is discretionary and not limited to the options listed in 37(b)(2)(A)(i)-(vii)," and may include the sort of relief ordinarily given under Rule 37(a)).  YNHH has cited no authority for the proposition that the EEOC's delay

effectively voids the Court's order and excuses YNHH from complying with it.  Under the unique facts of this case, the Court declines to hold that the EEOC forfeited its right to compliance with the order through delay.

The second issue implicates the duty to supplement discovery responses.  Under Rule 26(e), a party "who has responded to an interrogatory, request for production, or request for admission . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  Moreover, "[t]he duty to supplement and correct disclosures and responses is a continuing duty and no motion to compel further supplementation is required."  *Lima LS PLC v. PHL Variable Ins. Co.*, No. 3:12-cv-01122 (WWE) (HBF), 2014 WL 2002485, at *2 (D. Conn. May 15, 2014).  The duty ordinarily continues after discovery has closed, *see McKinney v. Conn.*, No. 3:06-cv-2055 (WWE) (HBF), 2011 WL 166199, at *2 (D. Conn. Jan. 19, 2011) ("The fact that discovery has closed has no bearing on Defendants' duty to supplement under Rule 26(e)."), and indeed it should be discharged "with special promptness as the trial date approaches."  Fed. R. Civ. P. 26(e) advisory committee's note to 1993 amendments.  Applying these principles, the EEOC contends that YNHH should supplement its Phase I list as new practitioners are subjected to the Policy.  (Memo. at 7; Reply at 5-6.)  It seeks an order directing YNHH to supplement the list to include not only those practitioners who should have been (but were not) disclosed by the close of Phase I discovery, but also all others who were "directed to submit to testing" between that date and today.  (Mot. at 1) (seeking list "updated to the present").

YNHH counters that neither the parties nor the Court intended for the list of practitioners to be subject to the continuing duty to supplement.  (Opp'n at 10-11.)  It contends that the whole "purpose of Phase I was to determine with finality the pool of Affected Individuals in this case

upon which the EEOC's liability claims can be determined in Phase II." (*Id.* at 10.) It then argues that subjecting the list to the duty of supplementation would "have the absurd result of resetting the litigation back to Phase I with every supplemental disclosure, even as the Parties rapidly approach the end of Phase II discovery, and potentially after summary judgment motions have ben filed and/or on the eve of trial." (*Id.* at 11.)

Having reviewed all of the filings that led to the November 3, 2020 order, the Court agrees with YNHH that the list was not subject to supplementation beyond the close of Phase I discovery. In their Rule 26(f) report, the parties expressly agreed that YNHH's duty to supplement would encompass "additional individuals who become subject to the Policy during Phase I of discovery, up to 90 days before the close of the Phase I discovery period." (26(f) Rpt. at 8.) The clear (if negative) implication of this agreement is that YNHH would not be under an obligation to supplement the list beyond 90 days before the close of Phase I. "Parties are free to 'agree upon . . . limitations on discovery.'" *Kalra v. Adler, Pollock & Sheehan, P.C.*, No. 3:18-cv-00260 (KAD) (TOF), 2020 WL 7828790, at *4 (D. Conn. Dec. 31, 2020) (quoting Fed. R. Civ. P. 29 advisory committee's note to 1993 amendment). "And provided that such agreements are properly memorialized in writing, courts ordinarily enforce them." *Id.*

Taking all of the foregoing observations together, the Court will order YNHH to produce a list of all persons who were directed to submit to testing, including but not necessarily limited to all persons to whom YNHH sent the form letter attached as Exhibit 1 to the EEOC's Reply, on or before November 6, 2020. For each person so listed, YNHH must provide his or her last known contact information, to include home and business addresses, home and business telephone numbers, and personal and non-YNHH business e-mail addresses.

**B.      Issue Two:  The EEOC's Request for "Summary Datasheets and Complete Credentialing Files"**

After learning from the Late Career Practitioner Committee meeting minutes that YNHH had omitted practitioners from its November 6, 2020 spreadsheet, the EEOC served additional requests for production on December 21, 2021.  (Ex. 6 to Mot., ECF No. 154-3.)  In Request for Production 43, it asked for "[t]he summary datasheet and complete credentialing files" for the fifteen practitioners whose identities it had learned from the minutes.  (*Id.*)  As it explains in its brief, a "summary datasheet" "is the document showing a practitioner's LCPP examination results."  (Memo. at 7.)  And a "credentialing file" is "similar to a personnel file," in that it "contains information regarding a practitioner's credentials to practice medicine at YNHH and includes, for example, their application for privileges, their disciplinary and malpractice claim history, specific patient incidents and reports by colleagues, descriptions of their privileges, the dates on which a practitioner's credentialing privileges are granted by YNHH and when they are set to expire."  (*Id.* at 8.)  YNHH objected to producing these documents, in part because the fifteen individuals had not yet "been identified as YNHH employees for the purposes of this litigation." (Ex. 7 to Mot., ECF No. 154-3.)  The EEOC now seeks an order compelling their production.[2] (Mot. at 1.)

The Court has previously ordered YNHH to produce credentialing files and neuropsychological examinations.  When the EEOC moved to compel production of those materials with respect to the 115 practitioners whose employee status was stipulated to, the Court held that "[t]he EEOC is entitled to review these records to see if the Policy enacted by the

---

[2]      The EEOC asks for an order compelling production of files for "sixteen" individuals (Mot. at 1), but this appears to be a counting error.  The interrogatory and the response make plain that only fifteen practitioners are at issue.  (Exs. 6 & 7 to Mot., ECF No. 154-3) (listing fifteen individuals).

Defendant in 2016 is necessary."  (Memo. of Dec. Granting Pl.'s Mot. to Compel, ECF No. 91, at 5.)  "[G]iven the extreme public interest in ensuring that age discrimination, if it exists at all, is appropriately limited to cases where no other way of ensuring public safety is available, or other equally compelling circumstances, and given the minimal private interest in Defendant's medical practitioner's having their personnel files reviewed in litigation, where sensitive personal information will be protected from public disclosure, the high probative value of the requested files, and the fact that these files are being requested to redress the rights of the doctors themselves," the Court directed YNHH to produce the 115 credentialing files within 30 days.  (*Id.*)

Presumably because of this history, YNHH does not object to the EEOC's current motion on grounds of irrelevance or burden.  (*See* Opp'n at 13-14.)  Rather, it objects on the ground that production of these materials would be "premature," since the fifteen practitioners' "employment status with YNHH has not been established or stipulated."  (*Id.* at 13.)  YNHH notes that the requested materials are "highly sensitive and confidential," and it suggests that if they are to be produced at all, they should be produced only "*after* there is a determination concerning the 15 practitioners' employment status."  (*Id.* at 14.)

The Court disagrees with YNHH.  Because neuropsychological examination information and credentialing files have already been held to be relevant in this case, "it is up to the responding party to justify curtailing discovery."  *Huseby, LLC v. Bailey*, No. 3:20-cv-00167 (JBA) (TOF), 2021 WL 3206776, at *6 (D. Conn. July 29, 2021) (quoting *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018)).  And YNHH's sensitivity and confidentiality concerns are insufficient to curtail discovery where, as here, there is a protective order in place.  (ECF No. 4.)  As the Court previously explained, "any confidentiality concerns on Defendant's part can be addressed through agreement of the Parties and proper maintenance of

confidentiality designations, including attorneys' eyes only, if necessary, in accordance with the Court's standing Protective Order issued at the commencement of the case." (Memo. of Dec. Granting Pl.'s Mot. to Compel, ECF No. 91, at 5.) Accordingly, the Court will order YNHH to produce the credentialing files and summary datasheets on the fifteen individuals listed in the EEOC's Request for Production No. 43.

### C.   Issue Three:  Practitioners Who Maintained Credentials With YNHH After Age 70 But Who Did Not Submit to Testing

In response to the EEOC's claims, YNHH pled as an affirmative defense that it adopted the Policy "for legitimate, non-discriminatory and non-retaliatory business reasons." (Answer & Aff. Defs. to Am. Compl., ECF No. 125, at 8.) The EEOC says that this "business necessity" defense would be "fatally undermine[d]" by evidence that the Policy "was not enforced in a way that is consistent with YNHH's stated business necessity of preventing patient harm," at least in the case of its ADA claim. (Memo. at 11) (citing *Fountain v. N.Y. State Dep't of Corr. Servs.*, No. 99-CV-389, 2005 WL 1502146, at *8 (N.D.N.Y. June 23, 2005). It therefore propounded an interrogatory in Phase II, asking YNHH to provide several items of information "for each member of YNHH's organized medical staff who maintained credentials with YNHH at the age of seventy or older, but who did not complete a neuropsychological examination under the" Policy. (Ex. 9 to Mot., ECF No. 154-3.) The evident purpose of the interrogatory was to find out "why the medical staff member was permitted to maintain credentials with Defendant without satisfying the requirements of" the Policy. (*Id.*)

YNHH objected to the interrogatory as overly broad, irrelevant, disproportionate, and unduly burdensome. (Ex. 10 to Mot., ECF No. 154-3.) It provided a partial answer "[s]ubject to and without waiving" those objections; it explained in a general way that some practitioners were excused from the testing requirement because they were about to retire, and others were excused

because of the COVID-19 pandemic.  (*Id.*)  But it declined to provide the practitioner-by-practitioner answers that the EEOC had requested.  (*Id.*)  In its Opposition, it explained that supplying such an answer would "require a manual review of each practitioner's credentialing and [Late Career Practitioner] files," which would in turn "need to be undertaken by a Director-level staff person" who would have to be "exclusive[ly] dedicate[ed]" to the task for "several days." (*Id.*; *see also* Decl. of T. Zinck-Lederer, Ex. B to Opp'n, ECF No. 154-2, ¶¶ 8-9.)  It also explained that the EEOC already has much of the requested information.  (Opp'n at 16) (stating that the EEOC already has, for the 115 practitioners whose employment status has been stipulated to, "their dates of birth, their credentialing files, and the Late Career Practitioner Committee Minutes that detail the ongoing status of each practitioner subject to the LCPP and describe extensions granted and the reasons therefor").

This dispute implicates well-settled principles.  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Information is 'relevant' if it '(a) has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.'" *Huseby*, 2021 WL 3206776, at *6 (quoting Fed. R. Evid. 401).  "When a party files a motion to compel, it bears the initial burden to show the relevance of the information it seeks," but once it meets this burden, "it is up to the responding party to justify curtailing discovery."  *Id.*  "To resist discovery on grounds of undue burden, a party must ordinarily demonstrate that burden with an affidavit or other proof."  *Doe v. Wesleyan Univ.*, No. 3:19-cv-01519 (JBA) (TOF), 2021 WL 4704852, at *4 (D. Conn. Oct. 8, 2021).

Applying these principles to this case, the Court concludes that YNHH must answer the EEOC's Interrogatory No. 20.  The information sought by the interrogatory is plainly relevant to

the business necessity defense, and indeed YNHH does not seriously contend otherwise.[3]   And while YNHH has submitted a declaration from a knowledgeable person in support of its claims of burden (Decl. of T. Zinck-Lederer, Ex. B to Opp'n, ECF No. 154-2, ¶¶ 8-9), the burdens she describes – "several days" of "dedicate[ed]" work – are not the sort of burdens that have been held sufficient to deprive an interrogating party of highly relevant discovery in a complex case.  *See, e.g., Staveley NDT Techs., Inc. v. Namicon, S.R.L.*, No. 3:98-cv-1136 (RNC) (DFM), 2000 WL 852436, at *2 (D. Conn. Apr. 10, 2000) (overruling burdensomeness objection when plaintiff claimed that it would take "several . . . employees tens of hours to find the documents").  In this very case, the Court has previously held that requiring YNHH to produce 115 credentialing files was "not overly burdensome" in light of the needs of the case.  YNHH has not shown that the burdens of answering Interrogatory No. 20 are undue or disproportionate to those needs.

## IV.   CONCLUSION

For the foregoing reasons, the EEOC's Motion is granted in part and denied in part.  YNHH is ordered to:

A.   Produce a list of all persons who were directed to submit to testing, including but not necessarily limited to all persons to whom YNHH sent the form letter attached as Exhibit 1 to the EEOC's Reply, on or before November 6, 2020.  For each person so listed, YNHH must provide his or her last known contact information, to include

---

[3]   YNHH initially objected to Interrogatory No. 20 on the ground that it "seeks information that is neither relevant nor proportional to the needs of the case" (Ex. 10 to Mot., ECF No. 154-3), but it did not brief that objection.  "Courts around the country have held that failure to brief an objection constitutes an abandonment of that objection."  *Huseby, LLC v. Bailey*, No. 3:20-cv-00167 (JBA) (TOF), 2021 WL 723319, at *4 n. (D. Conn. Feb. 24, 2021) (citing, *inter alia*, the leading case of *Cardenas v. Dorel Juvenile Grp., Inc.*, 230 F.R.D. 611, 620 (D. Kan. 2005)).

home and business addresses, home and business telephone numbers, and personal and non-YNHH business e-mail addresses.

B.    Produce summary datasheets and credentialing files for the fifteen individuals listed in the EEOC's Request for Production No. 43 dated December 21, 2021.  YNHH may designate any documents so produced as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEY'S EYES ONLY," as appropriate, under the Standing Protective Order.

C.    Answer the EEOC's Interrogatory No. 20 dated December 1, 2021.

Although compliance with this order would ordinarily be due by July 8, 2022, *see* D. Conn. L. Civ. R. 37(d) ("Unless a different time is set by the Court, compliance with discovery ordered by the Court shall be made within fourteen (14) days of the filing of the Court's order."), the Court will extend YNHH's compliance deadline to July 15, 2022 in light of the forthcoming holiday. All other claims for relief requested in the EEOC's Motion are denied.

This ruling and order is a "determination of [a] nondispositive motion[] . . . relating to discovery."  D. Conn. L. Civ. R. 72(C)(2).  As such, it is reviewable pursuant to the "clearly erroneous" statutory standard of review.  *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Conn. L. Civ. R. 72.2.  It is an order of the Court unless reversed or modified by the District Judge in response to a timely objection under Local Rule 72.2(a).

Dated at Hartford, Connecticut this 24th day of June, 2022.


*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge