**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**YALE NEW HAVEN HOSPITAL, INC.,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)  **Civil Action No. 3:20-cv-00187-**<br>)  **VLB**<br>)<br>)  **March 24, 2023**<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF
THE EEOC'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

Factual Background ................................................................................................ 3

Claims and Legal Standard ................................................................................. 8

I.  The Elements of the EEOC's *Prima Facie* Case Under the ADEA and ADA Have Been Met. .................................................................................................. 9

II.  The Required Elements of YNHH's Affirmative Defenses ........................... 10

  A.  To Prevail Under the ADEA, YNHH Must Prove that Its LCPP was Reasonably Necessary to the Normal Operation of Its Business, and Either that Substantially All YNHH Practitioners Aged 70 or Older Could Not Safely Perform their Jobs, or that it is Highly Impractical to Individually Determine Their Competence. ............................................... 11

  B.  To Prevail Under the ADA, YNHH Must Prove that the LCPP's Examinations are Job-Related and Consistent with Business Necessity. ................................................................................................................. 13

Argument ................................................................................................................ 16

I.  The LCPP is Not Reasonably Necessary for the Normal Operation of YNHH's Business, Nor Consistent with Business Necessity. .................................... 16

  A.  The Successful Operation of YNHH and Other Hospitals Under the Same Management, YNHH's Own Data and History, and the American Medical Association's Policy All Show that the LCPP is Not Reasonably Necessary for the Normal Operation of YNHH's Business or Consistent with Business Necessity .......................................................................... 17

  B.  YNHH Did Not Define the Group of Practitioners Subject to the LCPP Consistent with Business Necessity, as It Had No Basis to Conclude the Group Posed a Genuine Safety Risk, Failed to Consider the Duties of the Affected Practitioners, and Did Not Apply the Policy to Those with Risk Factors for Cognitive Impairment Other than Age. ....................... 31

  C.  Extensions, Exceptions, and Inconsistent Application of the LCPP Are Inconsistent with Business Necessity, or with a Claim that the LCPP Is Necessary for the Normal Operation of YNHH's Business. .................. 38

II.  YNHH Cannot Establish that The LCPP is Job-Related; Instead It is Broader and More Intrusive than Necessary. ............................................................. 45

  A.  The LCPP Neuropsychological Exams Are Not Job-Related Because They Do Not Predict On-the-Job Performance, Safety, or Impairment. ................................................................................................................. 46

  B.  Because the LCPP Exams Are Not Tailored to Measure the Practitioner for the Job at Issue, They Are Not Job-Related, But Instead Broader and More Intrusive than Necessary. ............................................................. 50

**III. YNHH Cannot prove that The LCPP Actually Contributes to Patient Safety or Effectuates The Goal of Public Safety. ........................................................... 57**

**IV. YNHH Cannot Prove that it is Highly Impractical to Identify Impaired Practitioners on an Individualized Basis, and that No Policy Other than the LCPP would Equally Advance Its Goals with less Discriminatory Impact. . 61**

    **A.   YNHH's Pre-LCPP Policies Sufficiently Identified Practitioners with Job-Related Impairments on an Individualized Basis. .................................. 63**

    **B.   YNHH Cannot Prove that Less-Discriminatory Alternatives are Inferior to the LCPP. ............................................................................................ 68**

**Conclusion..................................................................................................................... 70**

In 2016, Yale New Haven Hospital implemented a policy to evaluate the competence of its medical practitioners aged 70 and older, saying it was necessary to prevent patient harm.  However, none of the hospital's hundreds of performance and safety measures had shown that these practitioners were practicing less competently than younger practitioners, or harming more patients.  Still, YNHH imposed this "Late Career Practitioner Policy" only on those aged 70 and older.

To measure the competency of these senior practitioners, YNHH did not test their medical knowledge.  It did not observe the surgeons performing surgery.  It did not ask the radiologists to read x-rays.  Or have the pediatricians diagnose a patient.   Instead, YNHH's new policy subjected these practitioners to neuropsychological and ophthalmological exams at least every two years.  These exams required all practitioners, regardless of specialty, to perform tasks such as naming as many animals as possible in one minute, drawing a complex geometric figure from memory after seeing it ten minutes prior, and when looking at text such as "red blue," naming either the color written or color of the text.  Refuse to comply and lose your privileges to work at the hospital, the policy said.  Perform too poorly, and you may be asked to resign.

Practitioners' results on these exams did not correlate with any other measure of practitioner performance or safety at YNHH.  YNHH admits that these exams are not designed to determine if a practitioner is fit to practice medicine.  They cannot predict the likelihood of a practitioner making an error or harming a patient on the job.  And though the policy has been enforced for over five years now, YNHH admits it has no evidence that it prevents patient harm.

The United States Equal Employment Opportunity Commission sued YNHH based on its age-based imposition of medical exams, as they violate the Age Discrimination in Employment Act and the Americans with Disabilities Act.[1]  In response, YNHH raises affirmative defenses, under which it must show that its Late Career Practitioner Policy is reasonably necessary to the normal operation of its business, job-related and consistent with business necessity.[2]  As part of these defenses, YNHH "has the burden to demonstrate that its policy actually effects its purpose,"[3] and "that it is 'impossible or highly impractical' to deal with the older employees on an individualized basis" to determine where competence concerns exist.[4]

On the undisputed facts, YNHH cannot meet these burdens.  The hospital operated safely for years without the policy, with no indication that practitioners aged 70 and older were less competent than their younger peers.  The exams imposed have no relation to the jobs at issue—which vary significantly—and do not predict on-the-job performance.  YNHH has no evidence that the policy has effected its purpose of preventing patient harm, and cannot explain why a practitioner's 70th birthday renders insufficient the multitude of measures YNHH uses to ensure practitioner competence before that date.

---

[1] 29 U.S.C. § 623(a)(1)-(2); 42 U.S.C. § 12112(d)(4)(A).

[2] *See* 29 C.F.R. § 1625.6(b); 42 U.S.C. § 12112(d)(4)(A).

[3] *Fountain v. N.Y.S. Dep't of Corr. Servs.*, No. 99-CV-389, 2005 WL 1502146, at *8 (N.D.N.Y. June 23, 2005); *see Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 95 (2d Cir.2003).

[4] *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 414 (1985).

YNHH has argued that its policy is necessary because of risks of deterioration associated with the aging process.  *See* ECF No. 125 (Am. Answer), ¶ 21.  However, "[t]hroughout the legislative history of the ADEA, one empirical fact is repeatedly emphasized: the process of psychological and physiological degeneration caused by aging varies with each individual." *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 409 (1985).  The "use of age as a criteria for decline and unfitness for employment strikes at the heart of the ADEA." *EEOC v. Com. of Mass.*, 987 F.2d 64, 71 (1st Cir. 1993).  Instead, "the ADEA commands that 'employers are to evaluate [older] employees . . . on their merits and not their age.'" *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610-11 (1993) (quoting *Criswell,* 472 U.S. 400, 422 (1985)).

The undisputed material facts in this matter establish that YNHH is incapable of proving its affirmative defenses under the ADA and ADEA.  The EEOC therefore asks the Court to grant summary judgment to the EEOC, finding that YNHH's Late Career Practitioner Policy violates the ADA and ADEA.

## FACTUAL BACKGROUND

Prior to implementing the LCPP, YNHH operated safely.  SMF ¶ 5.   It won numerous awards for patient safety, and was a top-rated hospital in the country in terms of patient safety.  SMF ¶ 5. It was accredited by The Joint Commission, which issues safety-related standards for hospitals.  SMF ¶ 7.  YNHH had already implemented numerous non-discriminatory policies to ensure practitioner competence.  SMF ¶¶ 11-19, 200-16; *infra* Section IV.A.  Prior to the LCPP, YNHH utilized its Medical Staff Health Policy to identify practitioners unable to practice

with reasonable skill and safety due to an impairment, including due to substance abuse, physical illness, mental illness, impaired vision, or age-related deterioration or cognitive decline, and it still relies on this policy to identify impairment in practitioners under age 70.  SMF ¶ 19.  The MSHP was particularly effective to address cognitive impairment—though physicians are at an extremely high risk of substance abuse and mental health issues, prior to the LCPP, more practitioners were assessed under the MSHP for age-related cognitive impairment than for substance abuse or mental health issues.  SMF ¶ 18, 186-87.

The idea for YNHH's LCPP came not from its medical staff, but from its Board of Trustees, based on "things that had been in the news."  SMF ¶ 20.  Members of the Board of Trustees questioned Dr. Peter Herbert, YNHH's then-Chief Medical Officer, about whether the hospital should evaluate older practitioners for cognitive impairment.  SMF ¶¶ 20-21.  Dr. Herbert believed that YNHH's then-existing systems were robust enough to detect cognitive impairment, and did not share the Committee's concern that cognitive impairment in the medical staff was being missed.  SMF ¶ 22.

YNHH had hundreds of metrics for measuring practitioner performance and patient safety, including patient complaints, medical staff complaints, patient outcomes, mortality rates, infection rates, and surgical complication rates, patient length of stay in the hospital, readmission rates, and malpractice claims, and methods to compare the performance of YNHH practitioners to others across the country to identify outliers.  SMF ¶ 11-16, 134; *See* Ex. 25 (OPPE Policy), Ex. 26 (Vizient Report).   However, none of the hundreds of metrics showed that YNHH

4

practitioners aged 70 and older were less competent or presented a greater risk to patients than younger practitioners at YNHH. SMF ¶¶ 24-26. Further, a statistical analysis of YNHH's peer review data has shown that YNHH practitioners aged 70 and older are not subject to peer review at higher rates than younger practitioners. *See infra,* Section I.A.1*;* SMF ¶¶ 169-177; Ex. 69 (Expert Report of Dr. George). Therefore, YNHH lacked any factual basis to believe that its practitioners aged 70 and older presented a genuine risk to patient safety when it adopted the LCPP. SMF ¶¶ 29-30.

Still, in 2016 YNHH ultimately implemented its LCPP, requiring that each practitioner aged 70 or older seeking to obtain or retain clinical privileges at YNHH undergo a neuropsychological screening exam and ophthalmological exam at least once every two years. SMF ¶¶ 2, 63, 65. If a practitioner refused to comply with the LCPP, they relinquished their clinical privileges. SMF ¶¶ 2, 68; Ex. 19, 20. Clinical privileges are required for practitioners treating patients at YNHH. SMF ¶ 9. However, certain Yale School of Medicine professors who acted only in a teaching capacity were also required to have YNHH clinical privileges. SMF ¶¶ 9-10. Losing privileges meant losing their positions with Yale. SMF ¶¶ 9-10. For practitioners treating patients or performing clinical work at YNHH, losing clinical privileges would end their work at YNHH. SMF ¶¶ 9, 127; *see* SMF ¶ 55.

YNHH contracted with a neuropsychologist, Dr. Hawkins, to design and implement the LCPP neuropsychological exams. SMF ¶ 69. The core neuropsychological screening battery takes between 50-90 minutes to complete, and is not modified based on a practitioner's specialty. SMF ¶¶ 71, 73. The core

battery includes tests asking a practitioner to draw the figure on the right after seeing it ten minutes prior, to name as many animals as possible in one minute, to identify within twenty seconds a missing element of a picture such as that on the left,[5] and when looking at text such as "red blue," to either name the written color or the color of the text. SMF ¶¶ 75-80, Ex. 29 at YU013272-73; Ex. 64, Exhibit 9 to Appendix C.   In a later part of the test, the practitioner must identify either the color or read the text based on whether or not the word is in a box.   SMF ¶ 79.   A full description of all tests included in the core screening battery, and the materials and images they use, is reflected in the expert report of Dr. Kramer, Ex. 64, Appendix C.

In the initial session, Dr. Hawkins administers an "extended" screening battery to some practitioners based on their performance on the core battery. SMF ¶ 87.   In advance of the neuropsychological screening exam, Dr. Hawkins asks whether the practitioner has medical conditions including hypertension, diabetes, stroke, epilepsy, ADHD, a learning disability, cancer, or a psychiatric condition. SMF ¶ 72; *see* Ex. 27.

Based on this screening exam, Dr. Hawkins categorizes some practitioners as "pass."  SMF ¶ 96.  These individuals can continue their recredentialing process, and do not have to undergo additional neuropsychological examination for two

---

[5] SMF ¶ 80, Ex. 64, Exhibit 9 to Appendix C (YNHH 005777).  This image is part of the WAIS-IV Picture Completion test.  *Id.*  This is the ninth out of twenty-five images shown; as the missing parts become harder to identify in later pictures, the majority of pictures are more challenging than this one.  *Id.*

years.  SMF ¶ 98.  Others performing worse on the screening exam, receiving a "Qualified Pass," must re-submit to the neuropsychological exam again within one year.  SMF ¶ 99.  Still others are not permitted to continue their recredentialing process unless they complete a comprehensive neuropsychological exam that takes several hours to complete, and usually lasts multiple sessions.  SMF ¶¶ 101, 108, 111.  In advance of the comprehensive exam, Dr. Hawkins seeks an even more detailed medical history, which has included questions such as whether a practitioner's mother used alcohol, non-prescription drugs, or suffered morning sickness when pregnant with the practitioner, whether the practitioner wet the bed after five years of age, had been diagnosed with an eating disorder, had been hospitalized for emotional or psychiatric problems, or had been diagnosed with HIV/AIDS.  SMF ¶ 109; *see* Ex. 28.

As of mid-2022, YNHH had subjected over 280 practitioners to the neuropsychological screening exam, and between 19 and 25 practitioners to the comprehensive exam.  SMF ¶ 111-12.

The LCPP neuropsychological exam is not designed to determine if a practitioner is fit to practice medicine. SMF ¶ 140.  It cannot predict the likelihood that a practitioner will make errors on the job or harm a patient.  SMF ¶¶ 140-42.  It cannot predict a practitioner's competence to perform their privileges safely and effectively, and does not measure impairment in the ability to perform those privileges.  SMF ¶¶ 143-46.  YNHH has found no correlation between a practitioner's performance on the LCPP neuropsychological exams and any of its hundreds of measures of practitioner performance and patient safety.  SMF ¶ 135.  In fact, for

the majority of practitioners who had "real challenges" on the LCPP neuropsychological testing, an investigation of their on-the-job performance found no evidence of the impairment suggested by the LCPP exams.  SMF ¶¶ 147-48.

Though YNHH asserts that the purpose of the LCPP is to prevent patient harm, it can present no evidence that the policy has done so.  SMF ¶¶ 117-19.  The LCPP has had no measurable impact on patient safety at YNHH.  SMF ¶ *Id.*

## CLAIMS AND LEGAL STANDARD

In February 2020, the EEOC brought suit against YNHH based on its Late Career Practitioner Policy, which imposes medical examinations based on a practitioner's age as a condition of their continued employment.  The EEOC alleged that YNHH violated the Age Discrimination in Employment Act, as its LCPP discriminates against practitioners with respect to the terms and conditions of their employment with YNHH, and adversely affects a practitioner's status as an employee, because of the practitioner's age.  *See* 29 U.S.C. § 623(a)(1)-(2) ("ADEA"); ECF No. 01 at 6-7, ECF No. 119 at 7.  The EEOC also alleged that YNHH violated the Americans with Disabilities Act, as its LCPP requires medical examinations which are not job-related and consistent with business necessity.  42 U.S.C. §12112(d)(4)(A) ("ADA").[6]

---

[6] All pre-suit administrative obligations were met. Under the ADEA, the only such obligations are: (1) notice of a charge of discrimination; and (2) conciliation. *See* 29 U.S.C. § 626(d)(2).  The ADA imposes those same obligations as well as: (3) receipt of a charge; (4) investigation of the charge; and (5) notice of a determination of reasonable cause to believe that a violation of the ADA occurred. *See EEOC v. Sterling Jewelers*, 801 F.3d 96, 100 (2d Cir. 2015) (setting forth preconditions to EEOC Title VII action); *EEOC v. Waffle House,* 534 U.S. 279, 285 (2002) (Title VII

The EEOC now moves for summary judgment on its claims under the ADA and ADEA, asking the Court to find YNHH liable for violating those statutes. Summary judgment is appropriate where "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *O'Hara v. Nat'l Union Fire Ins. Co.*, 642 F.3d 110, 116 (2d Cir. 2011); Fed. R. Civ. P. 56(a).

## I.   THE ELEMENTS OF THE EEOC'S *PRIMA FACIE* CASE UNDER THE ADEA AND ADA HAVE BEEN MET.

The EEOC's *prima facie* cases under both the ADEA and ADA have already been established here.  For both claims, the EEOC must demonstrate that YNHH was an employer within the meaning of the statutes.  29 U.S.C. § 623(a); 42 U.S.C. §12112(d)(4); *Penn. State Troopers Ass'n v. Miller*, 621 F. Supp. 2d 246, 251-52 (M.D. Pa. 2008); *Williams v. FedEx Corp.*, 849 F.3d 889, 901 (10th Cir. 2017).  For its ADEA claim, the EEOC may make out its *prima facie* case by demonstrating that the LCPP was applied based on age. *See Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985) (prima facie case of age discrimination made out where application of policy "depends upon . . . age"); *Hahn v. City of Buffalo,* 596 F. Supp. 939, 945 (W.D.N.Y. 1984) (same), *aff'd*, 770 F.2d 12 (2d Cir. 1985).  For its ADA claim, the EEOC may make out its prima facie case by demonstrating that the LCPP exams constitute

---

"enforcement powers, remedies, and procedures" apply to EEOC enforcement of ADA) (citing 42 U.S.C. § 12117(a)).

Here, YNHH admits that a charge was filed, YNHH received notice of that charge, the EEOC investigated that charge, YNHH received notice of EEOC's reasonable cause determination, and that the EEOC engaged in conciliation communications. *See* SMF ¶¶ ---.  These facts satisfy the EEOC's pre-suit administrative obligations. The EEOC investigated that charge. *See Sterling Jewelers*, 801 F.3d at 101 ("The sole question for judicial review is whether the EEOC conducted an investigation."); *Mach Mining v. EEOC*, 575 U.S. 480, 494-95 (2015).

required medical examinations or disability-related inquiries under the ADA.  *Penn. State Troopers*, 621 F. Supp. 2d at 251-52 (citing *Conroy v. N.Y. State Dep't of Corr. Servs.,* 333 F.3d 88, 95 (2d Cir.2003)); *Williams*, 849 F.3d at 901 ("A plaintiff asserting a claim under § 12112(d)(4)(A) must show . . . that the defendant-employer required him to undergo a medical examination or made a disability-related inquiry of him.").

YNHH admits that: (1) YNHH accepted the LCPP, which was enforced by YNHH employees (SMF ¶¶ 31, 67); (2) YNHH was an employer of 115 enumerated practitioners and others subject to the LCPP (SMF ¶ 4); (3) the LCPP applies only to practitioners aged 70 or older (SMF ¶¶ 2, 63); (4) the LCPP's neuropsychological and ophthalmologic exams "are medical exams under the ADA (SMF ¶ 64);" and (5) practitioners aged 70 and older were required to undergo those exams in order to keep their clinical privileges, necessary to work at the Hospital or Yale School of Medicine.  SMF ¶¶ 2, 9-10, 63.  The EEOC has therefore established its prima facie cases under both statutes.

## II.     THE REQUIRED ELEMENTS OF YNHH'S AFFIRMATIVE DEFENSES

Because the EEOC has established its *prima facie* cases, liability here turns on YNHH's ability to establish its affirmative defenses under the ADEA and ADA. The undisputed facts establish that YNHH cannot satisfy these defenses and, as a result, the EEOC is entitled to judgment as a matter of law.

A.   **To Prevail Under the ADEA, YNHH Must Prove that Its LCPP was Reasonably Necessary to the Normal Operation of Its Business, and Either that Substantially All YNHH Practitioners Aged 70 or Older Could Not Safely Perform their Jobs, or that it is Highly Impractical to Individually Determine Their Competence.**

YNHH first raises an affirmative defense to the EEOC's claim that its LCPP violates the Age Discrimination in Employment Act.  "[T]he ADEA commands that 'employers are to evaluate [older] employees . . . on their merits and not their age,'" because "[i]t is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610-11 (1993) (quoting *Criswell,* 472 U.S. at 422).  In a similar case where an employer conditioned the continued employment of those aged 70 and older on medical examinations of their mental condition,[7] the First Circuit noted the Supreme Court's observation that "'[t]hroughout the legislative history of the ADEA, one empirical fact is repeatedly emphasized: the process of psychological and physiological degeneration caused by aging varies with each individual."  *Com. of Mass.*, 987 F.2d at 71 (quoting *Criswell,* 472 U.S. at 409).  The First Circuit found that where defendant "allow[ed] age to be the determinant as to when an employee' deterioration will be so

---

[7] **The First Circuit found that as the law at issue, § 90F, conditioned continued employment of employees aged 70 and older on the completion of medical exams, it constituted a "conditional involuntary retirement program, which some employees may escape through satisfaction of a burden imposed on them by the statute."**  ***Com. of Mass.***, **987 F.2d at 74.  The Court made this finding based on the text of the statute, even though "[n]o employees ha[d] been forced to retire since § 90F ha[d] been in effect."**  *Id.* **at 66.  Citing the Supreme Court, the First Circuit noted that "the ADEA is of particular force when mandatory retirement is at issue, as it is here."**  *Id.* **at 71 (citing** *Western Air Lines*, **472 U.S. at 410 ("[T]he policies and substantive provisions of the [ADEA] apply with especial force in the case of mandatory retirement provisions.")).**

significant that it requires [the] special treatment" of an exam, such "conception of and use of age as a criteria for decline and unfitness for employment strikes at the heart of the ADEA." *Id.*

YNHH seeks to justify its age-based LCPP as a bona fide occupational qualification ("BFOQ") reasonably necessary to the normal operation of its business. *See* ECF No. 125 (Answer to Am. Compl.) at 9; 29 U.S.C. § 623(f)(1). "[T]he BFOQ defense, which shifts the focus from the merits of the individual employee to the necessity for the age classification as a whole, is 'meant to be an extremely narrow exception to the general prohibition' of age discrimination contained in the ADEA." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 87 (2000) (quoting *Criswell*, 472 U.S. at 412); *see Correa-Ruiz v. Fortuno*, 573 F.3d 1, 4 (1st Cir. 2009) (the "'BFOQ exception' is 'extremely narrow'"). "Simply put, where an employer believes a medical examination is required for a particular position, the test cannot be age-based unless there is a powerful case supporting such disparate treatment." *Epter v. N.Y.C. Transit Auth.*, 127 F. Supp. 2d 384, 392 (E.D.N.Y. 2001).

To establish the BFOQ defense, Defendant must first prove that the age-based policy is "reasonably necessary to the normal operation of the particular business." *Criswell*, 472 U.S. at 422 (employer must "validate any discrimination as 'reasonably necessary to the normal operation of the particular business.'"); *see* 29 C.F.R. § 1625.6(b) (employer must prove that "the age limit is reasonably necessary to the essence of the business"); *Epter*, 127 F. Supp. 2d at 391 (a policy's "age classification has to be justified as being reasonably necessary to the operations of the [defendant]'s business in order to withstand scrutiny."). This

standard "is one of 'reasonable necessity,' not reasonableness"—the "age qualifications [must] be something more than 'convenient' or 'reasonable.'" *Gately v. Com. of Mass.*, 2 F.3d 1221, 1228 (1st Cir. 1993) (quoting *Criswell*, 472 U.S. at 419, 414).

If Defendant can satisfy the first prong of the affirmative defense, it must then satisfy the second prong by showing that it had "a factual basis for believing . . . that all or substantially all [practitioners aged 70 or older] would be unable to perform safely and efficiently the duties of the job involved;" or, (2) "that it is 'impossible or highly impractical' to deal with the older employees on an individualized basis." *Criswell,* 472 U.S. at 414 (internal quotations omitted); *see also Kimel*, 528 U.S. at 87 (quoting *Criswell*, 472 U.S. at 422-23); 29 C.F.R. § 1625.6(b).  Further, if YNHH asserts that the goal of the BFOQ is public safety, it "must prove that the [policy] does indeed effectuate that goal and that there is no acceptable alternative which would better advance it or equally advance it with less discriminatory impact."  29 C.F.R. § 1625.6(b).

YNHH must set forth a "particularized, factual showing" as to each element set forth above to succeed on the BFOQ defense.  *Johnson v. Mayor & City Council of Baltimore*, 472 U.S. 353, 362 (1985).

**B.**     **To Prevail Under the ADA, YNHH Must Prove that the LCPP's Examinations are Job-Related and Consistent with Business Necessity.**

YNHH also asserts that the LCPP's medical examinations do not violate the Americans with Disabilities Act because they are "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *See* ECF No. 125 at 8.

To satisfy this affirmative defense, YNHH must first establish that the exams are job-related, meaning that they are "narrowly tailored inquir[ies] into the employee's ability to carry out [their] job-related functions." *Conroy*, 333 F.3d at 94. The defendant must show that the exams "fairly and accurately measure[] the individual's actual ability to perform the essential functions of the job." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007). "An employer urging a business necessity defense [under the ADA] must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position." *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999) (citing *Smith v. City of Des Moines, Iowa,* 99 F.3d 1466, 1475 (8th Cir.1996)).

Defendant must then show that the examinations are consistent with business necessity. In doing so, YNHH must "first show that the asserted 'business necessity' is vital to the business." *Conroy*, 333 F.3d *at* 97-98. "[T]he business necessity standard is quite high, and is not [to be] confused with mere expediency." *Id.* at 97 (quoting *Cripe v. City of San Jose,* 261 F.3d 877, 890 (9th Cir. 2001)). Where the asserted business necessity is safety-related, the evidence must demonstrate "that the risks are real and not the product of stereotypical assumptions." *EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000); *see also EEOC v. Rath Packing Co.*, 787 F.2d 318, 332 (8th Cir. 1986) (In Title VII context, for policy to be justified by business necessity, "the problem to be addressed by the [policy] must be concrete and demonstrable, not just 'perceived'").

Where a policy subjects a class of employees to medical exams, the employer must then demonstrate that "it has reasons consistent with business

necessity for defining the class in the way that it has," including "a reasonable basis for concluding that such employees as a group pose a genuine . . . risk." *Conroy*, 333 F.3d at 101; *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 283 F. Supp. 3d 72, 82 (S.D.N.Y. 2017) (same).

Next, a defendant "must actually show that the [Policy] contributes to the achievement of [its stated] business necessities." *Conroy,* 333 F.3d at 101. Defendant thus "has the burden to demonstrate that its policy actually effects its purpose." *Fountain v. N.Y.S. Dep't of Corr. Servs.*, No. 99-CV-389, 2005 WL 1502146, at *8 (N.D.N.Y. June 23, 2005).   The Second Circuit "emphasize[s] that the examination of whether a policy actually contributes to the business necessity is vital," and making "only conclusory assertions regarding the benefits . . . of the [medical exams]" is insufficient.  *Conroy*, 333 F.3d at 99-100).

Finally, the defendant must prove that the examination or inquiry "is no broader or more intrusive than necessary." *Conroy*, 333 F.3d at 98.  Therefore, the examination or inquiry should "be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue."  *Id.* at 97 (quoting *Tice v. Centre Area Transp. Auth.,* 247 F.3d 506, 515 (3d Cir. 2001)).

YNHH cannot establish that its LCPP is reasonably necessary to the essence of its business, or that its exams are job-related and consistent with business necessity.

<u>**ARGUMENT**</u>

**I.**   <u>**THE LCPP IS NOT REASONABLY NECESSARY FOR THE NORMAL OPERATION OF YNHH'S BUSINESS, NOR CONSISTENT WITH BUSINESS NECESSITY.**</u>

Under the ADEA and ADA, YNHH must make a particularized, factual showing that the LCPP is reasonably necessary for the normal operation of its business, and consistent with business necessity.

The record evidence does not support YNHH's business necessity defense. YNHH asserts that the LCPP is necessary to the operation of its business, and that the LCPP is justified by YNHH's business necessity of preventing patient harm. SMF ¶ 117.  YNHH claims that practitioners aged 70 and older have a potential to have an increased risk of cognitive impairment, making them more likely to make an error that could harm a patient.  SMF ¶ 167.  As a result of this claimed higher risk of impairment, YNHH says it must subject older practitioners to neuropsychological exams under the LCPP.[8]  SMF ¶ 167.

YNHH's claimed business necessity crumbles in the face of even a cursory examination of the undisputed evidence.   Before implementing the LCPP, YNHH was an award-winning hospital meeting numerous safety standards, with no evidence that its practitioners aged 70 and older were causing more harm to patients than those under 70.  SMF ¶¶ 5, 7, 23-28. YNHH then decided to apply its LCPP to all practitioners aged 70 and older, without regard to whether their duties actually impacted patient safety.  SMF ¶¶ 2, 9-10, 63, 164.  At the same time, YNHH

---

[8] **YNHH has provided no justification for why it is necessary to subject practitioners aged 70 and older, but not younger practitioners, to ophthalmological exams.  SMF ¶ 218.**

declined to impose such exams on practitioners under age 70 with risk factors for cognitive impairment *other* than age.  SMF ¶¶ 185-89.  After implementing the LCPP, YNHH failed to apply it consistently—allowing some practitioners to practice for years without completing the exams, completely pausing the exams for a year, and excusing practitioners from the exams if they agreed to retire within six months. SMF ¶¶ 190-99.  These undisputed facts, combined with the successful operation of other hospitals in the Yale New Haven Health System without similar policies, and the American Medical Association's opposition to such age-based exams, establish that the LCPP is not a business necessity for YNHH.

    **A.**    <u>The Successful Operation of YNHH and Other Hospitals Under the Same Management, YNHH's Own Data and History, and the American Medical Association's Policy All Show that the LCPP is Not Reasonably Necessary for the Normal Operation of YNHH's Business or Consistent with Business Necessity.</u>

In order to prevail on its affirmative defenses, YNHH must show not that the LCPP is "reasonable," but that it is "reasonably *necessary* to the normal operation of [its] business."  *Criswell*, 472 U.S. at 422 (emphasis added); *see* 29 C.F.R. § 1625.6(b).  YNHH must also show that the LCPP is justified by a "business necessity" that is "vital to the business."  *Conroy*, 333 F.3d *at* 97-98.  As YNHH claims the LCPP is necessary because of the potential increased risk posed by older practitioners, it must prove that those "risks are real and not the product of stereotypical assumptions."  *Exxon Corp.*, 203 F.3d at 875; *see also EEOC v. State of Ill.*, No. 86 C 7214, 1991 WL 259027, at *3 (N.D. Ill. Nov. 29, 1991) (where defendant asserted age limitation in hiring was necessary because of a higher incidence of heart disease with age, "general statements of physical exertion and stress are not enough to establish that physical fitness is reasonably necessary [for the job at

17

issue]. [Defendant] must present some evidence that the absence of [heart disease] was a genuine concern for all applicants."); *EEOC v. Stan Koch & Sons Trucking, Inc.*, 557 F. Supp. 3d 884, 897 (D. Minn 2021) (to show policy was consistent with business necessity under Title VII, policy had to be "addressed to a problem that is 'concrete and demonstrable, not just perceived,' and 'essential to eliminating the problem, not simply reasonable or designed to improve conditions.'" (quoting *EEOC v. Rath Packing Co.*, 787 F.2d 318, 332 (8th Cir. 1986)).

An examination of the material undisputed facts shows that YNHH cannot meet this burden.

### 1. YNHH's Data Does Not Show that Its Practitioners Aged 70 and Older Posed a Risk to Patients.

First, YNHH cannot satisfy its burden because, prior to implementing the LCPP, it had no data showing that practitioners aged 70 and older were less competent or more of a risk to patient safety than its younger practitioners.  SMF ¶¶ 23-26, 28-29.  In fact, YNHH cannot identify a single practitioner aged 70 or older who harmed a patient due to the practitioner's cognitive impairment.  SMF ¶ 28.  As discussed above, YNHH has hundreds of measures of practitioner competence and patient safety, including patient complaints, medical staff complaints, patient outcomes, mortality rates, infection rates, surgical complication rates, length of stay in the hospital, readmission rates, malpractice claims, and the incidence of peer review. SMF ¶ 11-16, 134.  YNHH considered this data irrelevant to its adoption the age-based LCPP.  SMF ¶ 27.

However, this Court disagreed, and noted that data regarding the rate at which YNHH practitioners aged 70 and older were subjected to peer review is

relevant to whether YNHH's adoption of the LCPP was justified.  *See* ECF No. 92, 12:7-22.  An analysis of such data shows that YNHH practitioners aged 70 and older did not present a greater risk to patients than their younger colleagues.

During this litigation, YNHH produced a spreadsheet tracking issues that were discussed by its peer review committees, including its Professional Practice Evaluation Committee ("PPEC"), and the Medical Staff Professionalism Committee ("MSPC").[9]  SMF ¶ 174.  These committees address concerns regarding practitioner competence based on errors that have occurred, and issues of professionalism, which are significant because research shows that professionalism issues can lead to worse patient outcomes.  SMF ¶ 169.  The PPEC evaluates any concern about a practitioner's competence raised by a peer review process.  SMF ¶¶ 171-73.

The peer review spreadsheet produced by YNHH is a contemporaneously maintained document intended to track every issue of individual practitioner performance discussed by the PPEC, MSPC or the IPQPRC, reflecting data from 2010 through the end of 2021.  SMF ¶ 174; Ex. 9.  Each row in the spreadsheet reflects the name of the practitioner discussed, their department, the date of the discussion, a summary of the issue, and if available, the medical record number associated with the issue that arose.  SMF ¶ 174; Ex. 9.  YNHH uses this spreadsheet to see a practitioner's history of issues before the peer review

---

[9] The matters addressed by the PPEC and MSPC were originally considered by a single combined committee, the Institutional Practice Quality and Peer Review Committee ("IPQPRC").  SMF ¶ 170.

committees, identify trends for a practitioner, and to compare rates of issues between YNHH departments. SMF 174.[10]

The EEOC retained an expert to analyze this spreadsheet and evaluate whether practitioners aged 70 and older were appearing before these peer review committees at a higher rate than younger practitioners.  The EEOC's Labor Economist, Dr. George, first determined the age distribution of YNHH practitioners with clinical privileges[11] each year from 2010 through 2021 using data produced by YNHH, then looked at what proportion of practitioners in those age groups appeared in the peer review spreadsheet.  SMF ¶ 175-76.  Dr. George found no statistically significant difference between the percentage of YNHH practitioners aged 70 and older who had an appearance on the spreadsheet, as compared to those under age 70.  SMF ¶ 176.[12]  Dr. George also found that, over the eleven-year period she analyzed, 5% of the YNHH medical staff were aged 70 and older, and similarly, 5% of the peer review spreadsheet entries related to practitioners aged

---

[10] A more fulsome description of the nature of information considered by these YNHH peer review committees, the manner in which the peer review spreadsheet is maintained, the data recorded in it, and the way in which it is utilized by YNHH is available in the EEOC's Motion to Exclude the Testimony of Michaelyn Corbett, Ph.D., filed concurrently with this motion.

[11] As the LCPP applies only to practitioners with clinical privileges, Dr. George's analysis examined the population of YNHH medical staff with clinical privileges. SMF ¶ 176.  All references to YNHH medical staff in connection with Dr. George's analysis refer to the YNHH medical staff with clinical privileges.

[12] Dr. George ran multiple variations of her analysis, including only looking at peer review entries that included a unique patient medical record number.  SMF ¶ 177; Ex. 69.  Such an analysis would avoid double-counting issues that were discussed twice, and would only include issues with a direct connection to patient care.  Every variation of her analysis confirmed her result, that there was no statistically significant difference between practitioners aged 70 and older and those under 70. SMF ¶ 177; see Ex. 69 for a detail explanation of Dr. George's analyses.

70 and older.  SMF ¶ 176; Ex. 69 at 8.  YNHH practitioners aged 70 and older appeared before the YNHH peer review committees exactly as much as one would expect based on their representation on the YNHH medical staff.

YNHH has identified no data suggesting that its practitioners aged 70 and older present a genuine risk to its patients.  An analysis of the spreadsheet YNHH itself relies on to track practitioner performance issues shows that no such risk exists.  Courts regularly find that a policy is not vital to an employer's business where there is no evidence of a problem necessitating the policy in the first place.  For example, in *Port Authority Police Benevolent Ass'n, Inc.*, the Port Authority asserted that its policy of sick leave examinations was justified by the business necessity of curbing excessive absences and determining if "sick" employees could return to work in some capacity, such as light duty.  283 F. Supp. 3d at 88.  To support this claimed necessity, the Port Authority submitted data regarding the annual cost of sick leave and absences.  *Id.*  However, the Port Authority failed to submit evidence of the cost of *excessive* absences—the asserted problem the policy sought to address—or "evidence quantifying the costs that would be saved by using officers in light-duty positions"—*i.e.*, the extent to which the policy would fix that problem.  *Id.*  The Court found that without such evidence, the business necessity had not been established.  Instead, the Port Authority possessed only a "general desire to reduce sick leave and overtime costs" which did not "rise[] to the level of being vital to its business."  *Id.* (desire to reduce sick leave and overtime costs was "a 'mere expediency' doubtlessly shared by <u>any</u> employer").

Without proof of an issue or risk it needed to address, YNHH cannot show that implementing the LCPP was reasonably necessary to the normal operation of its business, or justified by a vital business necessity.  These facts also render YNHH incapable of proving a substantial factual basis to believe that nearly all of its practitioners aged 70 and older could not safely and efficiently execute their clinical privileges—another possible element of YNHH's BFOQ defense.[13]

The LCPP was a 'solution' in search of a problem that never existed.  The undisputed evidence shows that it is not necessary for the operation of YNHH's business or consistent with business necessity.

> 2. **YNHH and Other Hospitals Operated Safely Without the LCPP, and YNHH's Then-Current CMO, its Medical Staff, The Joint Commission, and the American Medical Association All Believe the LCPP Is Unnecessary.**

An examination of YNHH's history, the operation of other hospitals in its network, and the policies of national organizations, such as the American Medical Association and The Joint Commission, further demonstrate that the LCPP is not necessary for the operation of YNHH's business.

Prior to the adoption of the LCPP, YNHH operated safely and was a top-rated hospital in terms of medical care.  SMF ¶ 5.   YNHH was accredited by The Joint Commission, a private organization that issues safety standards and is the leading

---

[13] *See Kimel*, 528 U.S. at 87 (defendant may satisfy the second prong of the BFOQ defense by proving "'a substantial basis for believing that all or nearly all employees above an age lack the qualifications required for the position'" (quoting *Criswell¸* 472 U.S. at 422-23)). This avenue of proof is further closed to YNHH because the vast majority of practitioners passed the LCPP exams and were allowed to continue practicing.  SMF ¶ 98.

organization for accrediting hospitals.  SMF ¶ 7.  Prior to the adoption of the LCPP, YNHH continuously met The Joint Commission Standards.  SMF ¶ 7.

The American Medical Association ("AMA") also opposes age-based competency exams for physicians.  SMF ¶ 32.  The AMA Policy on "Assessing the Competency of Physicians" notes that "[r]esearch suggests that the effect of age on an individual physician's competency can be highly variable."  SMF ¶ 33; Ex. 18.  The AMA directs that "[s]ince wide variations are seen in cognitive performance with aging, age alone should not be a precipitating factor" for assessing a physician's competence.  SMF ¶ 33; Ex. ¶ 18.  Further, "[i]t is the policy of the AMA to oppose the use of cognitive exams as the major means of evaluating a physician's clinical competence."  SMF ¶ 34; Ex. 18.

The idea of the LCPP originated not from YNHH's Chief Medical Officer or staff, but from the Hospital's Board of Trustees.  SMF ¶ 20.  When the YNHH Board of Trustees proposed implementing age-based cognitive testing in 2014, then YNHH Chief Medical Officer, Dr. Herbert, did not think it was necessary to ensure patient safety.  SMF ¶¶ 20-22.  Instead, he believed that the Hospital's then-effective policies were sufficient.  SMF ¶ 22.  The YNHH medical staff also opposed the idea—more than twice as many staff members voted *against* the LCPP than for it, with multiple staff members remarking that the proposal was discriminatory.  SMF ¶ 31; *see* Ex. 8.

The LCPP further cannot be a business necessity because Yale New Haven Health System (YNHHS"), the network YNHH falls within, has elected not to apply such a policy to its remaining hospitals.  Dr. Thomas Balcezak succeeded Dr.

Herbert as YNHH Chief Medical Officer in October 2014. SMF ¶ 6.  Dr. Balcezak vehemently supports the LCPP, and testified as a Rule 30(b)(6) witness for YNHH in this action.  Dr. Balcezak held the YNHH CMO role until June 2021, when he became Chief Executive Vice President and Chief Clinical Officer of the Yale New Haven Health System ("YNHHS"), a network which includes four hospitals in addition to YNHH.  SMF¶ 6.  The CMOs of each of those hospitals now report to Dr. Balcezak, and his duties include supervising some of their operations.  SMF ¶ 6.  No other YNHHS hospital has an LCPP.  SMF ¶ 8.  Still, all five YNHHS hospitals are certified by The Joint Commission, have award-winning patient care, and Dr. Balcezak testified that he would have surgery at any one of them.  SMF ¶ 8.  The fact that the remaining hospitals in the YNHHS have operated safely and successfully for years without a LCPP shows that it is not a business necessity.

YNHH's successful operation for years without the LCPP undercuts its affirmative defense, as "[t]he operation of the [employer] without the new age restrictions does not suggest their necessity." *EEOC v. State of Miss.*, 654 F. Supp. 1168, 1181 (S.D. Miss. 1987) (finding "[m]ost persuasive" the fact that prior to the implementation of the policy, defendant "had extensive and successful experience with" employees over the age limits, who "functioned effectively").

Still, YNHH claims that it will prove the necessity of the LCPP with expert testimony regarding physician deterioration.  *See* ECF No. 92 at 12:14-17.  However, the Supreme Court, when considering an airline's mandatory retirement age, observed that "[w]hen an employee covered by the [ADEA] is able to point to reputable businesses in the same industry that choose to eschew reliance on [such

a policy], when the employer itself relies on individualized testing[14] in similar circumstances, and when the administrative agency with primary responsibility for maintaining airline safety has determined that individualized testing is not impractical for the relevant position, the employer's attempt to justify its decision on the basis of the contrary opinion of experts—solicited for the purposes of litigation—is hardly convincing on any objective standard short of complete deference." *Criswell*, 472 U.S. at 423.  All other YNHHS hospitals operate without an LCPP, neither The Joint Commission nor the American Medical Association believe that age-based medical exams are necessary to ensure practitioner competence, and, as explained in Section IV.A below, YNHH utilizes individualized factors to require such exams of practitioners *under* age 70.  In the face of such evidence, the opinion of YNHH's experts "is hardly convincing." *Id.*

> ### 3. YNHH Identifies Errors Made by Two Older Practitioners as an Impetus for the LCPP, but Their Histories Reveal the LCPP Exams as Unnecessary and Unable to Predict Practitioner Performance.

Lacking any data to support the necessity of the LCPP, YNHH has identified errors made by two older practitioners— ███████████████████ —as the impetus for the adoption of the LCPP.  SMF ¶ 35.  In fact, the impairments of ███ ████████████ were known *before* they committed these errors, and so they

---

[14] *Criswell,* 472 U.S. 400 (1985), was decided prior to the ADA's adoption in 1990, barring medical exams of employees unless shown to be "job related and consistent with business necessity."  Therefore, *Criswell*'s references to medical exams and "individualized testing" must be read in the context of post-ADA cases addressing age-based medical exams, finding that medical exams must be imposed based on "individualized factors," not simply age.  *Com. of Mass.*, 987 F.2d at 71; *Epter v. N.Y.C. Transit Auth.*, 127 F. Supp. 2d 384, 391 (E.D.N.Y. 2001) ("[I]t would make a mockery of the notion of individualized testing to take it to mean testing all those over a certain age and only some of those under it . . . .").

could have been addressed by YNHH's existing policies. And despite overwhelming evidence of ███████████s incompetence on the job, he *passed* neuropsychological testing. The history of these two practitioners, as admitted by YNHH, shows why the LCPP is unnecessary, and demonstrates the dangers of substituting neuropsychological exams for true measures of physician competence.

In February 2010, YNHH reviewed ██████████, a Pediatric Surgeon in his 70s, after he accidentally severed the spermatic cord of a child during an inguinal hernia repair surgery. SMF ¶ 36. Concerns had already been raised about ██ ████████ competence prior to this error. SMF ¶ 37. During the review, YNHH found that ██████████ complication rate was 18% (compared to 2-5% for his colleagues), which was basis to believe that he was not practicing to the same standard as his colleagues. SMF ¶¶ 38-39. Nurses and others anonymously raised concerns that ██████████ practice was deteriorating. SMF ¶ 40. In May 2010, the YNHH Credentials Committee failed to consider these anonymous concerns, in violation of YNHH policy, and decided not to remove ██████████ from practice. SMF ¶¶ 40-41.

Several weeks later, ██████████ operated on an infant over the objections of other practitioners. SMF ¶ 43. ██████████ accidentally cut the baby's bowel, leading to its death two days later. SMF ¶ 43-44. Over the next several months, a surgical fellow, a nurse, and ██████████ Chief each raised concerns to YNHH leadership regarding ██████████s mental acuity and short-term memory, citing specific examples of his forgetfulness on the job. SMF ¶¶ 46-47; Exs. 11-12

(reporting that █████████ would "often tell [her] the same piece of information several times, not remembering that he had already brought it to my attention," "ask the same question repeatedly even though the answer was given after the first time the question was posed," and "tell different people on our service different orders to put in on a patient that are often contradictory in nature").  The Chief suggested that ██████████ may be cognitively impaired.  SMF ¶ 47; Exs. 11-12. In October 2010, another three doctors were interviewed regarding ███████ and all three expressed concerns about his ability to continue practicing medicine. SMF ¶ 48; *see* Ex. 13 at YNHH 122331-32 (pediatric fellow "would not refer her own child or other children to him . . . he should no longer practice"; another believed his "judgment may be impaired").  Still, YNHH did not remove █████████ from practice.  SMF ¶ 51.  Several months later, ██████████ made another error, harming a third patient.  SMF ¶ 52.

As of December 2010, the YNHH IPQPRC had serious concerns about the adequacy of ██████████ patient care.  SMF ¶ 49.  Then-CMO Dr. Herbert testified that there was "so much evidence of bad judgment" by █████████ describing his care as "a disaster."  SMF ¶ 45.  YNHH's Medical Staff Health Policy ("MSHP"), in place long before the LCPP, set forth the procedure for evaluating concerns of practitioner impairment, including those due to age.  SMF ¶¶ 18-19; *see* Ex. 6.  As permitted by that policy, Dr. Herbert ordered ██████████ to complete neuropsychological and ophthalmologic examinations—the same type of exams later required by the LCPP.  SMF ¶ 50.

███████████ passed the neuropsychological and ophthalmological exams. SMF ¶ 53. His results on both tests were normal. SMF ¶ 53.

On this basis, YNHH renewed ███████████ clinical privileges, including to perform the inguinal hernia repair surgery during which he previously severed the spermatic cord of a child. SMF ¶¶ 54-55. He treated hundreds more patients at YNHH. SMF ¶ 56.

The second practitioner Dr. Balcezak cited was a Radiation Oncologist in his 80s, ████. SMF ¶ 35, 57. In the Spring of 2013, ████ made an error during a procedure which led to a patient experiencing a non-fatal stroke. SMF ¶ 57. Though ████ Department Chief knew his practice had been deteriorating for years prior to this error, the Chief failed to follow the MSHP's procedure to evaluate those concerns. SMF ¶ 58. And though a purpose of the MSHP was the development of educational programs to assist medical staff in recognizing the signs of potential impairment, YNHH did not train its medical staff on how to recognize and respond to concerns of age-related impairment. SMF ¶ 17, 217.

The history of ███████████ shows that the LCPP is not necessary to identify impaired practitioners, as their deterioration was known to YNHH *before* they made the errors at issue, so they could have been avoided had YNHH enforced their existing policies. Further, YNHH fails to explain how errors made by two older practitioners who *harmed* patients justifies the imposition of an age-based examination policy, when far *more* YNHH practitioners *under* the age of 70 have made errors resulting in patient deaths. *See* SMF 181-84; *see* Ex. 9.

Instead, YNHH's response to ▮▮▮▮▮▮ demonstrates the *dangers* of relying on neuropsychological exams in lieu of direct, on-the-job measures of practitioner competence. ▮▮▮▮▮▮ errors had injured two patients and killed another, he had a complication rate three to nine times higher than others in his department, and at least six of his colleagues had raised concerns about his mental acuity and competence. Several of these concerns specifically related to ▮▮▮▮▮▮ short-term memory, including that he would "often tell [one colleague] the same piece of information several times, not remembering that he had already brought it to [her] attention," "ask the same question repeatedly even though the answer was given after the first time the question was posed," and "tell different people on [their] service different orders to put in on a patient that are often contradictory in nature." SMF 46; Exs. 11-12. And yet, ▮▮▮▮▮▮ neuropsychological testing showed "normal short and long term recall." SMF ¶¶ 53-54; Ex. 14 at YNHH 122126-29. This disconnect demonstrates that neuropsychological exams cannot reliably predict on-the-job performance, even with respect to abilities they are purportedly designed to measure, such as short-term memory.[15]

This unreliability is particularly concerning based on the evidence that YNHH puts more stock in the results of neuropsychological exams than in demonstrated on-the-job performance. As of December 2010, the YNHH IPQPRC had serious concerns regarding the adequacy of ▮▮▮▮▮▮ patient care, and Dr. Herbert

---

[15] As explained further in Section II.B below, the fact that ▮▮▮▮▮▮ neuropsychological exam results did not match his on-the-job performance demonstrates that the LCPP neuropsychological exams are not job-related, which YNHH must establish in order to succeed on its affirmative defense under the ADA.

lamented the extensive evidence of ████████ bad judgment, saying he should have instructed ████████ to stop practicing at that point.  SMF ¶¶ 49, 51.  However, once ████████ passed his neuropsychological and ophthalmological exams, he was recredentialed and allowed to continue operating on patients at YNHH.  SMF ¶¶ 53-54, 56.  When deciding whether ████████ was safe to practice medicine, YNHH gave more weight to neuropsychological exams than to ████████ 18% complication rate, the harm he caused multiple patients, or the specific, particularized concerns raised by at least six of his colleagues.

YNHH also credits the neuropsychological exams over direct measures of job performance when the exams *do* show impairment, but direct job-related measures *do not*.  Dr. Balcezak testified that, for those practitioners who had "real challenges" on the LCPP neuropsychological exams, YNHH looked at other sources of information about their performance, including interviewing the Chair of the practitioner's department, the Director of the clinic they worked in, and their coworkers on the medical staff or in their private office about their performance, looking at the practitioner's quality metrics and patient complaints, and looking at notes the practitioner wrote.  SMF ¶ 147, Balcezak Dep., 11/2/21, 283:22-286:10.  For the majority of practitioners, these other sources of information did *not* indicate that the practitioner was impaired on-the-job.  SMF ¶ 148.  Faced with such conflicting evidence, Dr. Balcezak again trusted the neuropsychological exams to measure competence over job-related observations, calling the exams a "unique

and not replicable way of assessing someone's potential capacity to cause harm."
**Balcezak Dep., 11/2/21, 283:22-286:10;** *see* **SMF ¶ 148.**

Far from a justification for the adoption of the LCPP, ▇▇▇▇▇▇▇▇ is a cautionary tale of the inability of neuropsychological exams to predict practitioner competence and safety.  Still, the hospital relied on those exams in abdication of its duty to assess practitioners using job-related evidence, and to act to protect its patients when that evidence showed that a practitioner was not practicing safely.

> **B.**  **YNHH Did Not Define the Group of Practitioners Subject to the LCPP Consistent with Business Necessity, as It Had No Basis to Conclude the Group Posed a Genuine Safety Risk, Failed to Consider the Duties of the Affected Practitioners, and Did Not Apply the Policy to Those with Risk Factors for Cognitive Impairment Other than Age.**

YNHH also cannot establish its business necessity defense as it failed to define the group of practitioners subject to the LCPP in a manner consistent with its asserted business necessity of patient safety.  Summary judgment is appropriate because the undisputed material facts show that YNHH had no basis to conclude that all its clinical practitioners aged 70 and older posed a genuine risk to patient safety, applied the policy to all such practitioners regardless of their actual duties, and did not apply the policy to practitioners with risk factors for cognitive impairment *other* than age.

> **1.**  **YNHH Had No Basis to Believe Those Subjected to the LCPP Posed a Genuine Safety Risk, and Its Asserted Justification Is Belied by Its Failure to Require Exams Based on Risk Factors for Cognitive Impairment Other than Age.**

Where an employer implements a policy subjecting a class of employees to medical exams under the ADA, it must demonstrate that "it has reasons consistent with business necessity for defining the class in the way that it has." *Conroy*, 333

F.3d at 101; *Port Auth.,* 283 F. Supp. 3d at 82 (same).  As YNHH's stated business necessity is patient safety, YNHH must show that "it has a reasonable basis for concluding that [the practitioners subject to the LCPP] as a group pose a genuine . . . risk" to patient safety.  *Conroy*, 333 F.3d at 101; *see also Port Auth.*, 283 F. Supp. 3d at 88 (policy applicable to officers using more than five days of sick leave was not defined consistent with business necessity where employer "d[id] not offer any evidence showing that [those officers] . . . would pose a safety risk or be unable to discharge their responsibilities when they return to work[.]").  Therefore, "there must be some justification for concluding that the policy is necessary for the class of employees affected, even though the employer need not justify the policy as to each individual employee." *Port Auth.*, 283 F. Supp. 3d at 83.

YNHH subjected all of its practitioners with clinical privileges aged 70 and above to the LCPP.  SMF ¶¶ 2, 63.  However, for the reasons set forth in Section I.A.1 above, the record is clear that YNHH has no evidence that those practitioners, as a group, pose a genuine risk to patient safety.  There is no record evidence that YNHH practitioners aged 70 and older were causing more harm, making more mistakes, or practicing less competently than younger practitioners.  SMF ¶¶ 23-30.  Further, YNHH admits it has no basis, other than consistency with the LCPP's neuropsychological exam requirement, for imposing ophthalmological exams at age 70.  SM¶ 218.  Therefore, summary judgment for the EEOC is appropriate because YNHH lacks any "justification for concluding that the policy is necessary for [these practitioners]." *Port Auth.*, 283 F. Supp. 3d at 83.

YNHH claims it is justified in applying the LCPP to these practitioners because of general population studies finding that individuals aged 70 and older, as a group, are at a higher risk of cognitive impairment than those under age 70. However, YNHH's stated rationale is belied by the fact that YNHH does not mandate these examinations for practitioners at higher risk of cognitive impairment for reasons *other* than age.  For example, those who have suffered a stroke, have had multiple concussions or COVID-19, or have high blood pressure are all at higher risk for cognitive impairment.  SMF ¶ 188.  However, YNHH has no policy requiring that practitioners who experience a stroke, concussions, or COVID-19 undergo neuropsychological exams before returning to work, nor does YNHH subject those with high blood pressure to the LCPP.  SMF ¶ 189.  Instead, impairment from any of these factors is identified through the self-report mechanisms of YNHH's MSHP. SMF ¶¶ 18, 189.   If it were truly consistent with YNHH's "business necessity" to subject practitioners at higher risk of cognitive impairment to neuropsychological exams, YNHH would not allow practitioners who just suffered a stroke or concussion to return to work without these tests.  *See EEOC v. State of Miss.*, 654 F. Supp. at 1168, 1177 (finding that defendant's total lack of "effort to monitor an employee's heart attack risk factors" aside from age undermined its affirmative defense).

YNHH's policy of subjecting practitioners to neuropsychological testing based only on age, but not these other risk factors, fails to define the group consistent with business necessity, and suggests that YNHH's true motivation for the LCPP is not risk of impairment, but something else entirely.

2.     **Subjecting All Aged 70+ Practitioners to the LCPP Regardless of Duties Does Not Define a Class Consistent with Business Necessity, and Results in a Policy that is Broader than Necessary.**

YNHH also fails to define the group subject to the LCPP consistent with business necessity because it applies the LCPP to all practitioners regardless of their duties or the potential risk they could present to patients.

A medical "inquiry is only justified by [defendant]'s need for employee fitness as required according to the particular duties that an employee must perform." *Fountain v. N.Y.S. Dep't of Corr. Servs.*, No. 99-CV-389, 2005 WL 1502146, at *10 (N.D.N.Y. June 23, 2005).  Therefore, where individuals in the positions at issue are "engaged in a multitude of tasks which involve a broad range of physical and mental requirements in the context of different types of safety and security risks, . . . .[l]umping all [those positions] together without regard to whether their assignments implicate public safety does not forge a class consistent with that business necessity." *Port Auth.*, 283 F. Supp. 3d at 89  (group not defined consistent with business necessity where medical exams applied to police officers of all ranks, "regardless of the officer's job assignment") (quoting *Fountain*, 2005 WL 1502146, at *10); *EEOC v. Boeing Co.*, 843 F.2d 1213, 1221 (9th Cir. 1988) (general descriptions of the flying tasks of pilots in different categories was "too general to satisfy the purposes of ADEA," where the "tasks performed by Boeing pilots encompass a wide range of physical and psychological demands, and a wide range of risks of harm to the pilots and to others if an accident occurs").

Where employees in positions perform distinct duties, applying the same policy to all members based on an "assum[ption] that the same fitness for duty

concerns apply mechanically to all members regardless of their job description" results in an overbroad policy inconsistent with the business necessity of ensuring fitness for duty. *Penn. State Troopers Ass'n v. Miller*, 621 F. Supp. 2d at 264 ("For example, a member who has consumed cold medicine may be unfit for duty on PSP's pilot squad, whereas the same medication would likely not impair a member assigned to perform ministerial tasks or investigative research.").

YNHH applied the LCPP to all practitioners with clinical privileges, without assessing whether their actual duties carried a risk of possible patient harm. YNHH's LCPP applies to all practitioners aged 70 and older with clinical privileges at YNHH. SMF ¶ 2. In general, clinical privileges permit a practitioner to practice medicine and treat patients at YNHH. SMF ¶ 9. However, certain professors at the Yale School of Medicine were required to have YNHH clinical privileges, even though they were not providing any patient care, and were only acting in a teaching capacity. SMF ¶ 10. Despite providing no patient care, these professors were still subject to the LCPP's neuropsychological and ophthalmological exams. SMF ¶¶ 2, 10, 63. Requiring these exams of practitioners who provide no patient care is inconsistent with the stated business necessity of patient safety. *See EEOC v. Boeing Co.*, 843 F.2d at 1221 (9th Cir. 1988) (finding relevant to BFOQ analysis the fact that "a significant portion of the time of pilots" in a certain class "was devoted to training other pilots—a task that on its face does not appear to present as much stress or as grave a safety risk as that associated with carrying the primary responsibility for operating the aircraft").

Further, with respect to the YNHH practitioners who *did* practice medicine, the LCPP applies to all such practitioners aged 70 and older, regardless of their specialty or duties performed.  SMF ¶ 2, 63.  This group spans dozens of positions, including neurosurgeons, nurse practitioners, dermatologists and psychiatrists.  SMF ¶ 157.  Even within a single specialty such as Pathology, the actual duties of a practitioner still vary significantly by sub-specialty.  SMF ¶ 159, Balcezak Dep. 7/25/22, 273:15-274:9; (sub-specialties of Pathology at YNHH include anatomic, clinical, molecular, and genetic pathology, and a practitioner in each of those sub-specialties performs different tasks).  Further, even practitioners with the same job title may exercise different privileges.  SMF ¶ 158.

These practitioners therefore perform a multitude of tasks involving a broad range of physical and mental requirements in the context of different safety and security risks. SMF ¶¶ 157-59, 165-66.  For example, some of these practitioners operate on patients, and some do not; some practitioners interact directly with patients, and some do not; some positions require fast reaction times, while others do not; some practitioners work largely alone, while others are regularly surrounded by medical staff colleagues.  SMF ¶¶ 157-59, 165-66

In defining the class subject to the LCPP, YNHH conducted no analysis to determine, for example, whether a short-term memory impairment of a Dermatologist in an outpatient clinic would actually present a genuine risk to patient safety, as compared to a Nurse Practitioner working in its Emergency Room.  SMF ¶ 156.  YNHH also failed to consider whether unimpaired vision, examined by the LCPP's ophthalmological exam, was necessary for a particular

practitioner's duties. *See* SMF ¶ 218.  Having unimpaired vision is not a requirement for all medical practitioners at YNHH to perform their jobs.  SMF ¶ 220.  Indeed, several YNHH practitioners have been legally blind while successfully performing their duties.  SMF ¶ 219.   Still, in applying the LCPP, YNHH "lumped" all of its practitioners together, without considering whether or to what extent each person's duties implicated patient safety or required unimpaired vision.  This approach "does not forge a class consistent with th[e] business necessity" of patient safety.  *Port Auth.*, 283 F. Supp. 3d at 89.

Finally, YNHH's asserted link between the LCPP and business necessity is undermined by its attempts to expand the scope of the LCPP to practitioners with no clinical privileges at all.  As noted above, the LCPP currently applies to YNHH practitioners aged 70 and older with clinical privileges. SMF ¶¶ 2, 63.  However, for several years, YNHH has considered expanding the scope of the LCPP to include practitioners in a medical staff category previously referred to as "Refer & Follow," and submitted a proposal to this effect to the Medical Executive Committee.  SMF ¶ 127.  Individuals in the "Refer & Follow" category have no clinical privileges and cannot treat patients at YNHH.  SMF ¶¶ 10, 127.  When asked what risk individuals in the "Refer & Follow" group posed to patients at YNHH, Ms. Zinck-Lederer answered simply: "None."[16]  SMF ¶ 128; Zinck-Lederer Dep., 430:10-430:14.  In 2018, the YNHH Medical Executive Committee considered a proposal to expand the

---

[16]   Q. What risk did refer and follow practitioners present to patients at YNHH?
     MS. GAMBARDELLA:  Objection to form.  Go ahead.
     THE WITNESS:  None.

LCPP to these individuals, and as of at least 2019, this expansion was still under consideration.  SMF ¶ 127.

YNHH has asserted that the purpose of the LCPP is the safety of its patients. SMF ¶ 117.  This therefore begs the question—why expand the LCPP to practitioners who pose *zero risk* to those patients?  An email sent by Ms. Zinck-Lederer in connection with this proposal suggests an answer: she estimated, "based on experience to date," that if the expansion passed, "15-25%" of the individuals in the "Refer & Follow" group would "just drop off and go to Honorary,"—*i.e.,* retire—"w[ith]out] undergoing testing."  Ex. 23; SMF ¶ 129.  Dr. Hawkins, who designed and administered the LCPP neuropsychological battery, also observed that "if the [LCPP] has done little else than prompt some to consider retiring, it has performed a real service."  Ex. 45; SMF ¶ 123.  According to Dr. Herbert, practitioners retiring to avoid the LCPP exams was "widespread," and he believed this impact of the LCPP should have been included in the JAMA article published by Drs. Balczak and Cooney. SMF ¶ 124.

C. <u>Extensions, Exceptions, and Inconsistent Application of the LCPP Are Inconsistent with Business Necessity, or with a Claim that the LCPP Is Necessary for the Normal Operation of YNHH's Business.</u>

Once implemented, YNHH also failed to apply the LCPP in a manner that was consistent with business necessity, or that indicated it was necessary for the normal operation of its business.

In *Conroy*, the Second Circuit observed that if a "policy is applied inconsistently," it will be "more difficult to prove business necessity," even if "[defendant] le[ft] a great deal of discretion within the hands of its administrators in implementing the . . . policy."  333 F.3d at 101-02.  A defendant's "inconsistent

application of its evaluation procedures provide[s] objective evidence that the evaluation order was not consistent with business necessity[.]" *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 524 (7th Cir. 2015).   In addition, where an employer asserts that a fitness for duty examination is required due to safety concerns, permitting the employee to continue working before completing such an examination is evidence that the "fitness-for-duty examination was not, in fact, consistent with business necessity." *Id.* at 526.

Under the LCPP, practitioners are required to complete the LCPP neuropsychological and ophthalmologic exams prior to their recredentialing deadline, which falls every two years.  SMF ¶ 65.   If the practitioner receives a "pass," they have satisfied the LCPP requirements for that cycle and are not required to test again for another two years.  SMF ¶ 98.  Under the written LCPP standards, if a practitioner receives a "qualified pass," they are required to undergo the neuropsychological examination again within one year.   SMF ¶ 99.   If a practitioner receives a "borderline deficient," the LCPP standards state that there will be a recommendation that they complete the LCPP comprehensive exam, and the LCP Committee did, in fact, direct many practitioners who scored in the "borderline deficient" category or below to undergo the comprehensive exam. SMF ¶¶ 101, 105-107; *see* Exs. 37-41.

However, YNHH failed to enforce the LCPP in a manner consistent with its stated requirements, or consistent with business necessity.  YNHH provided numerous extensions under the LCPP, allowing practitioners to keep their clinical privileges to continue practicing and treating patients without undergoing the

39

LCPP exams.  SMF ¶ 197; Ex. 41.  A summary of these extensions is attached as Exhibit 41,[17] showing the original deadline for a practitioner to complete the LCPP neuropsychological exams for that cycle, and the date they ultimately either completed the screening exam or relinquished their clinical privileges.

From the LCPP's implementation to date, YNHH granted at least 70 individual extensions of the LCPP neuropsychological exam deadlines.  Ex. 41; SMF ¶ 197. YNHH gave extensions to over 65 practitioners, compared to 280 who had taken the LCPP neuropsychological exams.[18]   Ex. 41; SMF ¶ 197.  The average length of these extensions exceeded seven months, and more than 35 were six months or longer.  *See* Ex. 41; SMF ¶ 197.

Many extensions were even lengthier.  For example, ████████—who filed the charge that led toi this suit—was directed to retake the LCPP exams in March 2019, but refused to do so.  SMF ¶¶ 1, 199; *see* Ex. 21.   Still, YNHH allowed ████████ to practice through January 2021 without retaking the LCPP exams, a period of nearly two years.   SMF ¶ 199; Ex. 72.  YNHH also granted many extensions to those who agreed to imminent retirement.  So many extensions were granted on this basis that in 2020, YNHH amended the LCPP to *exempt* practitioners who agreed to retire within six months after their next reappointment deadline.  SMF ¶ 125; Ex. 20 at YNHH 118804.  When asked how a practitioner's agreement to retire in six months

---

[17] Pursuant to Federal Rule of Evidence 1006, this exhibit summarizes information contained in more voluminous records produced by YNHH, which are also filed with this motion for the Court's review. This exhibit represents the best efforts of EEOC staff to identify these extensions, but it does not necessarily capture every LCPP extension YNHH granted.

[18] Calculated as of mid-2022.

made them safer to practice today, Dr. Balcezak answered: "It doesn't."  SMF ¶ 126; Balcezak Dep., 7/12/22, 41:10-41:17.  By prioritizing retirement of older practitioners over safety, YNHH reveals the LCPP's true purpose.

Some of the extensions YNHH granted related to COVID-19.  SMF¶¶ 190, 192. YNHH paused all LCPP neuropsychological examinations for approximately one year, from March 17, 2020, through March 19, 2021 (the "covid pause").[19]  However, during this time, YNHH renewed the credentials of over 40 late-career practitioners for full two-year terms, without examining them. SMF ¶ 192.  YNHH continued to successfully operate while the LCPP was paused.  SMF  191.  This continued operation without the policy purportedly necessary for the operation of its business makes clear the LCPP is not supported by a business necessity as a matter of law.  *See U.S. EEOC v. Dillard's Inc.*, No. 08CV1780-IEG(PCL), 2012 WL 440887, at *6 (S.D. Cal. Feb. 9, 2012) ("Dillard's rescinded its policy of requiring doctor's notes in July of 2007.  If the Policy was indeed job-related and a matter of business necessity, Dillard's has failed to explain how it is now able to operate as a business without such policy.").  Even when excluding this one-year covid pause when calculating the length of extensions, they remain significant.  YNHH had given both ███████████████ extensions of approximately one year before COVID-19 even began.  Ex. 41; SMF ¶ 197.  Excluding the one-year covid pause, the extensions on average still exceeded 4.5 months, with more than 20 extensions of over six months.  *See* Ex. 41; SMF ¶ 197.

---

[19] Subject to one exception related to Dr. Cooney, explained below.

YNHH resumed LCPP exams around mid-March 2021.  SMF ¶ 193.  The covid pause had created a backlog of practitioners who needed to be examined.  SMF ¶ 193.  However, YNHH had contracted with only one neuropsychologist—Dr. Hawkins—to perform the LCPP exams, creating a bottleneck to completing testing.  SMF 194.  Still, YNHH did not retain more neuropsychologists to quickly administer the delinquent exams—as one might expect for exams essential for patient safety.  SMF ¶ 196.  Instead, it granted practitioners an extension of *another* year to be examined by Dr. Hawkins, resulting in almost two years without LCPP enforcement.  SMF ¶ 195-96.  Voluntarily electing to double the time the LCPP was paused instead of simply hiring more neuropsychologists is not consistent with those exams being a business necessity.

Further, Exhibit 41 reflects only extensions from a practitioner's original deadline to the date they either completed the neuropsychological screen or retired—not *additional* extensions granted for the committee to review test results or for a comprehensive exam to be completed.  *See* Ex. 41; Declaration of Andres Puerta.  These multi-hour LCPP comprehensive exams were ordered when a practitioner had performed poorly on the neuropsychological screening exam.  SMF ¶¶ 101, 105-108.  If passing the LCPP neuropsychological exams were actually necessary for the safe practice of medicine, one would expect YNHH to suspend from practice those who performed poorly on the screening exams, pending their completion of the comprehensive exam.  However, YNHH did not suspend these practitioners.  Instead, YNHH allowed them to continue exercising their clinical

privileges, practicing medicine and treating patients, often for extended periods. SMF ¶¶ 102-103.

For example, ████████ received the seventeenth lowest global score on the screening exam out of over 350 administrations.   SMF ¶ 106.   Dr. Guida was directed to take the comprehensive exam, but practiced for another *two years and five months* without taking it.  SMF ¶ 106.  ████████ received the twelfth-lowest global score on the screening exam.  SMF ¶ 105.  ████████ was directed to take the comprehensive exam, but practiced for another ten months without doing so. SMF ¶ 105.  ████████ received the seventh lowest global score on the screening exam, and Dr. Balcezak initially expressed concern about him practicing because of confusion and visualization problems.  SMF  198. However, YNHH allowed ████████ to practice for another nine months without undergoing additional testing. SMF ¶ 198.  ████████ was also told to take the comprehensive exam, but practiced for about six months without completing it.  SMF ¶ 107.

The LCPP exams cannot be necessary for the operation of YNHH's business of maintaining safety for its patients if it allows multiple practitioners to go years without completing them.  Courts agree.

For example, in *Fountain v. N.Y.S. Dep't of Correctional Servs.*, No. 99-CV-389, 2005 WL 1502146 (N.D.N.Y. June 23, 2005), the court considered a Department of Corrections policy requiring officers on sick leave for more than three days to provide a doctor's certification with a medical diagnosis.  *Id.* at *1. Defendant claimed this policy was necessary because "it ensured that its corrections officers were physically able to perform their jobs and it helped prevent the spread of

infectious diseases" in the prison.  *Id.*  However, the Court found that defendant's asserted business necessity was "fatally undermined by [defendant's] admission that it allows employees to return to work who have forgotten to bring their doctor's certification."  *Id.* at *8.

Similarly, in *Wright v. Ill. Dep't  of Child. & Fam. Servs.*, 798 F.3d 513 (7th Cir. 2015), the employer ordered plaintiff, a caseworker with the Department, to undergo a "fitness for duty" mental health examination after she displayed certain concerning behavior on the job.  However, while awaiting this examination, plaintiff was not placed on leave, but "for almost two months, she continued to oversee her normal case load, which included approximately twenty-two cases."  *Id.* at 518.  The court found this evidence "supports a finding that the Department did not believe that [plaintiff] posed a safety risk to the children with whom she worked and, instead, that it considered her competent to continue working with approximately two-dozen children," supporting a finding that the "fitness-for-duty examination was not, in fact, consistent with business necessity."  *Id.* at 526.

Here, too, YNHH's actions belie a belief that these late career practitioners imperil their patients.  YNHH's response to required reporting further eviscerates the veracity of such views.  Under Connecticut state law, YNHH must report to the Department of Public Health when it has "any information that appears to show that a health care professional is, or may be, unable to practice his or her profession with reasonable skill or safety for any of the following reasons: (A) Physical illness or loss of motor skill, including, but not limited to, deterioration through the aging process . . . ."  Conn. Gen. Stat. Ann. § 19a-12e(b)(1).  YNHH

claims that at least eighteen practitioners' LCPP performance demonstrated impairments they thought likely to "impair their ability to practice medicine independently." SMF ¶ 131; Ex. 52. However, to date, YNHH has reported only *one* practitioner to the Connecticut Department of Health based on their LCPP performance. SMF ¶ 132. Assuming that YNHH would not knowingly violate state law, the only conclusion to be drawn is that YNHH does not genuinely believe that practitioners who performed poorly on the LCPP exam might be unable to practice with reasonable skill and safety.

## II.   YNHH CANNOT ESTABLISH THAT THE LCPP IS JOB-RELATED; INSTEAD IT IS BROADER AND MORE INTRUSIVE THAN NECESSARY.

To establish its affirmative defense under the ADA, YNHH must establish that the LCPP's medical exams are "job-related" and no broader or more intrusive than necessary. Job-related exams are "narrowly tailored inquir[ies] into the employee's ability to carry out [their] job-related functions." *Conroy v. New York State Dep't of Corrective Servs.*, 333 F.3d 88, 94 (2d Cir. 2003). YNHH must therefore show that the LCPP's exams "fairly and accurately measure[] the individual's actual ability to perform the essential functions of the job." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007) (citations omitted). "An employer urging a business necessity defense [under the ADA] must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position." *Belk*, 194 F.3d at 951 (8th Cir. 1999) (citing *Smith v. City of Des Moines, Iowa,* 99 F.3d 1466, 1475 (8th Cir.1996)); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 426 (1975) (a job-related test must be "demonstrably a reasonable measure of job performance[.]").

YNHH admits that the LCPP exams do not meet these standards.

A.   **The LCPP Neuropsychological Exams Are Not Job-Related Because They Do Not Predict On-the-Job Performance, Safety, or Impairment.**

The purposes of the LCPP include "fairly and adequately evaluat[ing]" "the performance and competence of late career practitioners," and "confirm[ing] current competence to perform requested privileges . . . with acceptable skill and safety," and "protect[ing patients] from harm." SMF ¶ 62; Ex. 19.

However, Dr. Hawkins, who designed and administers the LCPP neuropsychological exam, admits that it was not designed to determine if a practitioner is fit to practice medicine, or if a practitioner is making errors on the job. SMF ¶ 140. The LCPP neuropsychological exams can't predict the likelihood that a practitioner will harm a patient. SMF ¶¶ 141-42. As YNHH's expert Dr. Papinchock admitted, the LCPP neuropsychological exams do not measure impairment of a practitioner's ability to perform their privileges safely and effectively, or predict their competence to exercise those privileges. SMF ¶¶ 143-146.

Finally, though courts repeatedly recognize the importance of "validating" employment exams to ensure they actually measure job performance,[20] YNHH admitted that the LCPP neuropsychological test battery has never been validated

---

[20] *See infra, Albemarle Paper Co. v. Moody*, 422 U.S. 405, 428 (1975) (recognizing importance of "validating" a test to ensure it measures job performance); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (employment tests adopted "without meaningful study of their relationship to job-performance ability" were not job-related).

as a screening instrument for the function of older physicians.[21]  SMF¶ 138.  According to Dr. Balcezak, such validation is important because "[i]t's one thing to fail on a test for visuospatial deficits.  It's another thing altogether to not be able to look at a chest x-ray and see a mass.  The two are logically very related, but unless you show a direct correlation, you can't say that there is a validated correspondence or correlation between your failure to be able to put two pieces of an airplane together and your ability to read a chest x-ray." SMF ¶ 161; Balcezak Dep., 9/27/22, 186:13-187:2.

Based on these admissions, it is impossible for YNHH to prove that these exams were "narrowly tailored inquir[ies] into" a practitioner's "ability to carry out [their] job-related functions."  *Conroy*, 333 F.3d at 94.  As a result, YNHH's affirmative defense must fail.

These admissions, and the LCPP's inability to predict job performance, are well-supported by the evidence on the ground.

YNHH has found no correlation between a practitioner's performance on the LCPP neuropsychological exams and any of its hundreds of measures of practitioner performance and patient safety.[22]  SMF ¶ 133.  Further, as explained in Section I.A.3 above, the majority of practitioners who had "real challenges" on

---

[21] YNHH's failure to properly validate the LCPP exams is fatal to its ability to demonstrate job relatedness.  *See Guardians Ass'n of N.Y.C. Police Dep't, Inc. v. Civ. Serv. Comm'n of N.Y.C.*, 630 F.2d 79, 106 (2d Cir. 1980); *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 113 F. Supp. 3d 663, 682–83 (S.D.N.Y. 2015) (test that  "was not properly validated . . . is not job related.").

[22] Dr. Hawkins also believed that "it was important with regard to possible legal challenges," to "evaluat[e]" the LCPP neuropsychological "battery against other measures of physician competence," to determine if the battery was serving its purposes.  SMF ¶ 136 ; Ex. 33 at YU011211-1.

the LCPP neuropsychological test did *not* evidence impairment in more direct measures of job performance, such as co-worker observations, quality metrics or patient complaints.  SMF ¶¶ 147-48, Section I.A.3.

The lack of correlation between performance on the neuropsychological battery and job performance is unsurprising, because such tests often fail to predict real-world behavior.  SMF ¶ 84; *see* Ex. 64 (Kramer Rept.) at 1-4.  Dr. Kramer is a neuropsychologist who leads the University of California San Francisco Memory and Aging Center, has published hundreds of peer reviewed articles on cognitive health and aging, and who authored many neuropsychological exams, including two that are used in the LCPP screening battery.  *See* Ex. 64, at 1-2, B-5-49.  Dr. Kramer explained that neuropsychological tests often do not predict real-world behavior, even with respect to the abilities they are designed to measure, let alone predicting competence to practice medicine.  SMF ¶ 84; Ex. 64 at 2-4.  Making errors on a neuropsychological exam does not mean a practitioner will make errors on the job.  SMF ¶ 141.

Dr. Hawkins agreed: a disclaimer appeared at the bottom of his contract with YNHH, and on *every* LCPP results form, stating that "with any findings or determinations made by [Dr. Hawkins], there is no guarantee that the Examinee does or does not suffer from . . . a decline in cognitive, sensory, motor or self-regulatory abilities . . . that could impair the practice of medicine.  Thus, neuropsychological findings should not be used as the sole factor in YNHH's determination of the Examinee's capacity to exercise clinical responsibilities."  SMF ¶ 149; Ex. 32 at YNHH 000915; *see, e.g.,* Ex. 31 at YU021644, n.1.  Yet, even

when these "other factors" showed no impairment, YNHH credited the neuropsychological test results alone.

Recognizing the disconnect between neuropsychological test performance and job performance, Dr. Hawkins often told the LCP committee that if they wanted to know whether the practitioner would make errors on the job, they should observe the practitioner's on-the-job performance. SMF ¶¶ 150-151; Exs. 36, 38-40. For example, even after evaluating ████████ over three sessions with the comprehensive exam, Dr. Hawkins advised that her "[s]uitability for specific clinical responsibilities would be best determined by a direct assessment of on-the-job competence and consideration of the reports of coworkers and supervisors." Ex. 37 at YU012610; *see, e.g.,* Ex. 40 at YU004684 (recommending "[a] careful review of his clinical performance" for ████████; Ex. 38 at YNHH122829 (recommending "[o]ngoing monitoring of job performance for error" for ████████ to determine if weakness "exists in work environments"); Ex. 39 at YNHH 122851 (recommending "[m]onitoring of job performance" for ████████ to determine whether "error-proneness evident in the testing situation exists in work environments").[23]

---

[23] "Weaknesses" on neuropsychological tests could be based on long-standing traits that never before barred a practitioner from medical practice. Even after completing comprehensive testing over multiple sessions, Dr. Hawkins often could not tell whether perceived weaknesses were due to age-related cognitive decline, or such longstanding traits, such as personality, generally lower intellectual abilities, or a poor response to testing. SMF ¶ 150. For example, Dr. Hawkins tested a Nurse Practitioner, ████████ over three sessions. SMF ¶ 150; Ex. 36. At the end of this testing Dr. Hawkins was unable to say whether ████████' performance on the comprehensive exam was due to "brain compromise-related decline" or "personality," which Dr. Herbert described as "ditzy," and "[un]changed in 30 years." SMF ¶ 150; Ex. 37 at YU012609; Ex. 36 at YNHH 009438.

YNHH's reliance on neuropsychological exams to judge competence—often to the exclusion of other evidence—ignores warnings from neuropsychologists about their inability to predict job performance, including YNHH's own Dr. Hawkins. As these exams can't predict whether a practitioner can safely and competently perform their duties, they cannot meet the definition of "job-related."

**B.**   **Because the LCPP Exams Are Not Tailored to Measure the Practitioner for the Job at Issue, They Are Not Job-Related, But Instead Broader and More Intrusive than Necessary.**

Because YNHH failed to tailor the LCPP exams to each practitioner's job, they cannot be job-related, but are instead broader and more intrusive than necessary.

The Supreme Court has directed that by requiring that tests be job-related, "Congress has commanded . . . that any tests used must measure the person for the job and not the person in the abstract." *Griggs v. Duke Power Co.*, 401 U.S. 424, 436 (1971). Therefore, "[a]n employer urging a business necessity defense must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position." *Belk*, 194 F.3d at 951 (8th Cir. 1999). "Furthermore, 'an examiner must consider meaningful work-related information, including the type of activity to be performed [and] the level and duration of effort required.'" *Id.* (quoting *Smith v. City of Des Moines, Iowa,* 99 F.3d 1466, 1475 (8th Cir.1996)). The exam must be "narrowly tailored" to the position, *Conroy*, 333 F.3d at 94, and a medical examination that "can also identify

---

Under similar circumstances, Dr. Hawkins could not tell if ██ ████ performance was due to age-related cognitive decline or whether his "intellectual abilities have always been below those of his physician peers." SMF ¶ 151; Ex. 39 at YNHH 122851.

50

conditions having no impact on a[n employee]'s ability to perform the job," is broader and more intrusive than necessary. *Port Auth. Police Benevolent Ass'n, Inc.*, 283 F. Supp. 3d at 84 .

The American Medical Association also directs that competency exams relate specifically to the tasks a physician is to perform.  SMF ¶ 33; Ex. 18.  The AMA Policy on "Assessing the Competency of Physicians" directs that "methods of assessment should be relevant to physician practices to inform judgments and provide feedback regarding physicians' ability to perform the tasks specifically required in their practice environment."  SMF ¶ 33; Ex. 18.

Dr. Hawkins's neuropsychological exam is preceded by questioning about a practitioner's medical history, including whether the practitioner has ever had hypertension, diabetes, stroke, epilepsy, ADHD, a learning disability, cancer, or a psychiatric condition.  SMF ¶ 72; Ex. 27. In advance of the comprehensive exam, Dr. Hawkins asks even *more* invasive questions, which have included whether a practitioner's mother used alcohol, non-prescription drugs, or suffered morning sickness when pregnant with the practitioner, whether the practitioner wet the bed after five years of age, had been diagnosed with an eating disorder, or had been hospitalized for emotional or psychiatric problems (and when), or had been diagnosed with HIV/AIDS.  SMF ¶ 109; Ex. 28.  At no point has YNHH explained why such information is necessary.

After these medical inquiries, Dr. Hawkins administers the neuropsychological exam.  Dr. Hawkins did not study or consider practitioner jobs at YNHH when designing the LCPP screening battery.  SMF ¶ 73.  He does not

change the tests in the screening battery based on a practitioner's specialty—it is the same for everyone.  SMF ¶ 73.  Further, Dr. Hawkins uses the same thresholds to determine if a practitioner has "passed" that core battery, regardless of specialty.  SMF ¶ 73.  This is so despite it being impossible to establish a performance threshold above which a practitioner will generally be safe to practice medicine, and below which they are generally not, particularly across multiple specialties.[24]  SMF ¶¶ 92-93; Hawkins Dep., 5/12/22, 271:5-273:6.  Instead, the neuropsychological battery is broad, designed to cover "all aspects of cognitive ability," "kind of like an IQ test."  SMF ¶ 81.

In his contract and on each LCPP results form, Dr. Hawkins affirmed that "[t]he relevance of particular neuropsychological strengths, or weaknesses, to competence in the practice of medicine will vary across medical specialties, settings, and specific tasks and responsibilities."  SMF ¶ 155; Ex. 31 at YU021644; Ex. 32 at YNHH 000915.  And yet, the LCPP neuropsychological battery is not tailored to a practitioner's actual job.

As discussed in Section I.B.2 above, the duties of YNHH practitioners vary significantly.  SMF ¶¶ 158-59, 165-66.  The LCPP neuropsychological battery therefore seeks to measure abilities that are not required by all YNHH practitioners,

---

[24] Dr. Hawkins established the "pass" thresholds using his professional judgment. SMF ¶ 90. However, there is no scientific literature establishing at what level a practitioner needs to perform on a neuropsychological test battery in order to be considered safe to practice medicine.  SMF ¶ 91.  It is therefore not surprising that Dr. Hawkins' proposed "pass" thresholds have changed several times over the years.  SMF ¶ 91.

making it broader and more intrusive than necessary.[25]  SMF ¶ 160.  For example, some tests in the LCPP core battery seek to measure visuospatial abilities and short-term memory, and YNHH's expert Dr. Papinchock asserts that others seek to measure language production, attention, concentration, visual perception, visual memory, processing speed and eye-hand coordination.  SMF ¶ 163.  However, as several YNHH practitioners have been legally blind, it cannot be that all YNHH practitioners require visuospatial abilities, visual perception and visual memory. SMF¶ 219.  YNHH also determined that another practitioner with "severe" short-term memory impairment could still safely perform his duties, and so short-term memory cannot be a necessity for every position.  SMF ¶ 164.  Some practitioners work in areas with numerous distractions, where the abilities of concentration and attention would seem more essential, while others work in areas without distractions, like a lab.  SMF ¶ 165-66.  Some practitioners communicate directly with patients, suggesting a need for stronger verbal skills, while others do not. SMF ¶ 165-66.  Some practitioners have to make quick decisions, while others do not.  SMF ¶ 165-66.

Despite these many differences, YNHH imposed the same broad exam upon practitioners, and determined only *afterwards* whether any indicated weaknesses were actually pertinent to the job the practitioner performed. SMF ¶ 152.  In multiple instances after examining a practitioner, Dr. Hawkins told the LCP Committee to determine whether weaknesses he perceived would impact that practitioner's job

---

[25] As noted in Section I.B.2 above, YNHH also imposed the LCPP's ophthalmologic exams on practitioners regardless of whether visual acuity was required of their position, making its application broader and more intrusive than necessary as well.

performance.  SMF ¶¶ 149-152; *see e.g.,* Ex. 36 YNHH 018960 (directing committee to "[p]erform[] . . . a job analysis, to determine if weaknesses in mental arithmetic, spatial analysis, and manual dexterity pose threats to patient well-being"); Ex. 38 at YNHH 122829 ("Consider whether the limitations reported above have job performance implications (i.e., decline in reasoning skills, limited capacity to solve novel problems, especially if they involve spatial analysis, and procedures requiring manual dexterity.").

A broad medical examination, untethered to the specific job at issue, is not "a narrowly tailored inquiry into the employee's ability to carry out her job-related functions" as the ADA requires.  *Conroy*, 333 F.3d at 94.

For example, in *Port Authority Police Benevolent Ass'n, Inc.*, the Port Authority mandated that officers complete a full physical examination, preceded by a "health questionnaire" that "pose[d] an array of questions that probe an officer's physical and mental health history."  283 F. Supp. 3d at 79.  The physical examination "consist[ed] of a battery of tests," which were "the same for all Port Authority police officers, regardless of the officer's rank or job assignment."  *Id.* Defendant asserted that the exam "could identify any health condition or issue that, if left untreated, might eventually impact the police officer's ability to perform the job safely."  *Id.* at 84.  The Court found that this exam was impermissible under the ADA, finding it "important[]" that "the annual medical examination can also identify conditions having no impact on a police officer's ability to perform the job." *Id.*  As the exam was "intended to be comprehensive and to reveal a panoply of

54

conditions, including those having no relevance to an officer's ability to perform the job," it could not be job-related under the ADA.  *Id.* at 85.

In *Conroy*, the Second Circuit considered the Department of Corrections' policy requiring that employees returning from sick leave submit a medical certification containing a general diagnosis, which the Court found was a medical inquiry under the ADA.  333 F.3d at 92.  The Department of Corrections asserted that the general diagnosis was necessary "to determine 'the ability of an employee to perform job-related functions,'" because its purpose was "to provide information necessary to ensure that a corrections officer can safely return to work."  *Id.* at 94.  However, the Second Circuit found that "a general diagnosis is not a narrowly tailored inquiry into the employee's ability to carry out her job-related functions."  *Id. ; see also Penn. State Troopers*, 621 F. Supp. 2d at 261 (when considering a similar policy, finding that policy was not "neither vital to the business of PSP nor narrowly tailored to serve the avowed business necessity" when it was used to identify "conditions that might, but that are not certain to, affect a member's fitness for duty[.]").

The LCPP neuropsychological exams and questionnaires do not determine whether a practitioner has an ability required for the specific duties they perform,but rather aim to issue a "general diagnosis" of cognitive impairment.  The fact that the exams measure abilities having "no impact" on a practitioner's ability to do their job defeats any claim of job-relatedness.

YNHH's own expert concedes that the LCPP exams do not measure a practitioner's ability to perform their specific privileges at YNHH, but instead

claimed that "the neuropsychological testing under the LCPP [was] job-related for [nearly] every job in America."  SMF ¶ 154; Papinchock Dep., 5/5/22, 250:11-250:17. However, an exam purportedly related to the performance of "every job in America," by definition cannot be a "narrowly tailored inquiry" into specific job-related functions.  Instead, when determining whether an exam is job-related, the Supreme Court observed that "Congress has commanded . . . that any tests used must measure the person for the job and not the person in the abstract."  *Griggs* 401 U.S. at 436.

In *Griggs,* the Supreme Court considered an employer's decision to implement two tests for promotion purposes: "the Wonderlic Personnel Test, which purports to measure general intelligence, and the Bennett Mechanical Comprehension Test."  *Id.* at 428. The Court analyzed whether these tests were "job related," but observed that "[n]either [test] was directed or intended to measure the ability to learn to perform a particular job or category of jobs."  *Id.* at 428-29. The Court noted that the Wonderlic was adopted "without meaningful study of [its] relationship to job-performance ability," rather because of "the Company's judgment that [it] generally would improve the overall quality of the work force." *Id.* at 431.  Despite the testing requirement, employees who had not "taken the tests have continued to perform satisfactorily and make progress in departments" where the test was used.  *Id.* at 431-32.  The Court found that the intelligence test was not job-related, because it was not "shown to bear a demonstrable relationship to successful performance of the jobs for which it was used," *id.* at 431, and that the case "demonstrate[d] the inadequacy of broad and general testing devices."  *Id.* at

433; *see also Albemarle Paper Co.*, 422 U.S. at 427 (1975) (employer who sought to impose "two general ability tests, the Beta Examination, to test nonverbal intelligence, and the Wonderlic Test (Forms A and B), [a] purported measure of general verbal facility" failed to establish that those tests were sufficiently job-related).

Like the intelligence and verbal facility tests in *Griggs* and *Albemarle,* the LCPP neuropsychological test battery does not measure a person for their job, but rather assesses their general, abstract abilities.[26]  Indeed, Dr. Cooney, who sat on the LCP committee, described the battery as "kind of like an I.Q. test," and in fact, four of the tests from the core battery are sourced from the "Wechsler Adult Intelligence Scale."  SMF ¶ 81, Ex. 75.  Such "broad, general testing devices" cannot be used to make employment decisions without significant, direct evidence of their ability to predict successful performance of the jobs.  YNHH has no such evidence.

### III.  YNHH CANNOT PROVE THAT THE LCPP ACTUALLY CONTRIBUTES TO PATIENT SAFETY OR EFFECTUATES THE GOAL OF PUBLIC SAFETY.

YNHH says the goal of the LCPP is preventing patient harm.  SMF ¶ 117. YNHH admits it has no evidence that the LCPP prevents patient harm.  SMF ¶¶ 118-19.  As a result, it cannot establish its affirmative defense under the ADA.  To the extent YNHH's objective in its BFOQ defense is public safety, that defense will fail for the same reason.

---

[26] Further, like in *Griggs*, YNHH practitioners who have not taken the exams—due to the covid pause or YNHH's significant extensions—still successfully performed their duties.  *See supra* at __.

If YNHH asserts that the goal of its BFOQ defense is public safety, YNHH must "prove that the challenged practice does indeed effectuate that goal[.]" 29 C.F.R. § 1625.6(b)(3). Similarly, under the ADA, when imposing a policy requiring medical exams or inquiries, the employer "has the burden to demonstrate that its policy actually effects its purpose." *Fountain*, 2005 WL 1502146, at *8. The Second Circuit caselaw in *Conroy* and its remand in *Fountain* set forth how this standard is to be applied.

In *Fountain* and *Conroy,* the plaintiff challenged a policy of the New York State Department of Correctional Services ("DOCS") requiring that employees returning to work after a three-day absence provide a doctor's certification with a diagnosis of the employee's illness. *Conroy*, 333 F.3d at 92; *Fountain*, 2005 WL 1502146, at *1. The plaintiff challenged the diagnosis requirement as an illegal medical inquiry under the same provision of the ADA at issue here. *Conroy*, 333 F.3d at 93. DOCS asserted that its diagnosis policy was a business necessity, including to determine officers' fitness for duty, prevent the spread of infectious diseases in the prison system, and curb sick leave abuse. *Fountain,* 2005 WL 1502146, at *1.

The Second Circuit ruled that to prove the policy was consistent with business necessity under the ADA, DOCSHH "must actually show that the general diagnosis requirement contributes to the achievement of [DOCS'] business necessities," and that this examination is "vital." *Conroy,* 333 F.3d at 100-01. The court ruled that "conclusory assertions regarding the benefits or lack thereof of the diagnosis requirement" were insufficient to meet this burden. *Id.* at 99. Instead,

"[f]actual development on the efficacy of general diagnoses (as opposed to certification without diagnoses) in improving workplace health and security and in curbing sick leave abuse [was] particularly necessary." *Id.*

On remand, DOCS asserted that its prior policy of requiring a doctor's certification *without* a diagnosis was insufficient because doctors made errors in judging fitness for duty. *Fountain*, 2005 WL 1502146, at *7. Applying the law of *Conroy,* the court found that DOCS did not justify the diagnosis requirement, where it did not present "statistics" sufficient to show that this "error rate" was enough to justify an additional, ADA-violative policy. *Id.* With respect to the purpose of preventing the spread of disease, DOCS asserted that the impact of its policy was "impossible to measure." *Id.* However, the court found that as "the record d[id] not contain any information, one way or the other, as to the nature and effect of the [policy]," DOCS "ha[d] not demonstrated that the [policy] serves a business necessity." *Id.,* at *8, *10. The court granted plaintiff's summary judgment motion. *Id.; see also Penn. State Troopers*, 621 F. Supp. 2d at 253 ("[A] medical examination or inquiry that furthers a business necessity without playing a vital role in consummating it will transgress the ADA." (citing *Conroy,* 333 F.3d at 97)).

YNHH asserts that the purpose of the LCPP is preventing patient harm.[27] SMF ¶ 117. The LCPP has been in place since late 2016, with the exception of the

---

[27] YNHH has previously asserted that the impact of the LCPP is impossible to measure, because seeking such evidence asks it to "prove a negative." ECF No. 92 (transcript of 6/28/21 oral argument), 27:6-9; ECF No. 135 at 3. However, *Fountain* establishes that such a claim does not excuse the evidentiary burden of the ADA's affirmative defense. *Fountain*, 2005 WL 1502146, at *8. Further, if YNHH again takes this position, the EEOC will show how YNHH measures the impact of a multitude of its other policies designed to prevent patient harm with data and

one-year covid pause, and so YNHH has had over five years to gather data on the LCPP's efficacy.  SMF ¶ 70.  However, YNHH admits it has no evidence that the LCPP has prevented patient harm.  SMF ¶¶ 118-19, 224-25.  Dr. Balcezak, as YNHH's corporate representative, testified:

> Q   Dr. Balcezak testifying today on behalf of the hospital, is there any evidence the adoption of late career practitioner policy has prevented patient harm?
> A   I would say that is not evidence that we would be able to create.

30(b)(6) Dep., 11/2/21, 249:16-249:21;[28] SMF ¶¶ 118-19.

Under the Second Circuit's directive in *Conroy*, therefore, YNHH cannot make out its affirmative defense under the ADA.  Under *Conroy's* standards, to establish that the LCPP contributed to the necessity of preventing patient harm, YNHH would have to provide "facts" on the "efficacy" of the LCPP in preventing patient harm, as compared to its policies and procedures *other* than the LCPP, such as the MSHP, OPPE, and peer review processes.  *Conroy*, 333 F.3d at 99.  YNHH has not done so.  SMF ¶¶ 118-19.  For the same reasons, YNHH cannot

---

metrics, such as a reduction in Serious Safety Events.  *See* SMF ¶¶ 120-122 (attributing an 80% reduction in Serious Safety Events to its High Reliability Organization initiative, also designed to reduce patient harm).

[28] *See also*, *id.*, 247:19-248:7:

Q   How do you know you prevented patient harm?
A   I know as a physician that has been practicing medicine for 35 years that has been a patient safety executive for the last 15.
Q    You said when we were discussing other matters, physicians are evidence based, they want to see evidence?
A   Yes.
Q   What is the evidence that you have prevented patient harm?
     [objection]
THE WITNESS:  It is my belief.

establish that the LCPP "effectuates th[e] goal" of public safety under the ADEA.[29]

The undisputed material facts show that YNHH cannot prove that the LCPP prevented patient harm or effectuated the goal of public safety, and so both of its affirmative defenses must fail.

## IV.   YNHH CANNOT PROVE THAT IT IS HIGHLY IMPRACTICAL TO IDENTIFY IMPAIRED PRACTITIONERS ON AN INDIVIDUALIZED BASIS, AND THAT NO POLICY OTHER THAN THE LCPP WOULD EQUALLY ADVANCE ITS GOALS WITH LESS DISCRIMINATORY IMPACT.

Even if YNHH could meet every other element of its affirmative defenses (it cannot), YNHH would still fail because it cannot meet its burden of proving that it is highly impractical to identify practitioners who are unable to safely and efficiently practice medicine due to cognitive impairment without an age-based policy.  YNHH also cannot show that there is no acceptable alternative to the LCPP that would equally advance YNHH's asserted safety-related business necessity with less discriminatory impact.  YNHH's policies in place *before* the LCPP—properly enforced—were sufficient to identify practitioners who could not safely practice because of cognitive impairment.  If YNHH would like to *further* improve its safety mechanisms, there are several non-discriminatory steps it could take to do so, other than the LCPP.  As a result, YNHH cannot establish its affirmative defense under the ADEA.

The second prong of the BFOQ defense requires that the employer show its age-based qualification is a legitimate proxy for the relevant safety-related

---

[29] With respect to the LCPP's ophthalmological exam, there is even more evidence that it has no impact on patient safety—not a single practitioner's ophthalmological exam results have ever been found to preclude them from safely exercising their privileges.  SMF ¶¶ 223-25.  Therefore, the ophthalmologic exams cannot possibly have an effect.

qualification.  *See Criswell,* 472 U.S. at 414.  YNHH "may not arbitrarily set up seventy years of age as the point at which to determine the fitness of its employees." *Com. of Mass.*, 987 F.2d at 70-71.  Rather, it must make a "'particularized, factual showing' that age is an effective proxy for determining" which practitioners should be subject to the requirements of the LCPP. *Gately v. Com. of Mass.*, Civ. A. No. 92-13018-MA, 1998 WL 518179, at *4 (D. Mass. Nov. 24, 1993) (quoting *Johnson*, 472 U.S. at 362).  YNHH may make this showing in two ways: (1) by showing that it had "a factual basis for believing . . . that all or substantially all [practitioners aged 70 or older] would be unable to perform safely and efficiently the duties of the job involved;" or, (2) "that it is 'impossible or highly impractical' to deal with the older employees on an individualized basis." *Criswell,* 472 U.S. at 414 (internal quotations omitted).

As explained in Section I.A.1, *supra,* the first route is unavailable to YNHH, as there exists no factual basis in the record upon which to assert that all or substantially all of its practitioners aged 70 and older are unable to safely and efficiently perform their duties.[30]

---

[30] As detailed in Section I.A.1 *supra,* YNHH has no data to show that nearly all its practitioners aged 70 and older are unable to safely and efficiently perform their clinical privileges. See also SMF ¶¶ 29-30.  The implementation of the LCPP has only confirmed that there is no basis upon which to assert that all or substantially all YNHH practitioners over age 70 are incapable of safely performing their clinical privileges: the record shows that the "vast majority" of practitioners aged 70 or older who undergo the LCP examination are placed in the "pass" category and proceed as normal with their reappointment processes. SMF ¶ 98, 30.

In order to make out the BFOQ defense,[31] therefore, YNHH must take the second route: showing it is "highly impracticable" for the hospital to "deal with its older employees on an individualized basis," by identifying practitioners with impairments as it does for those under the age of 70.

However, even if YNHH makes out the first and this second prong of the BFOQ affirmative defense, its burden is not met.  If YNHH asserts that the goal of its BFOQ defense is public safety, it must further prove "that there is no acceptable alternative [to the LCPP] which would better advance [the goal of patient safety] or equally advance it with less discriminatory impact." 29 C.F.R. § 1625.6(b); *see also Criswell,* 472 U.S. at 416 n.24; *EEOC v. Com. Penn. Liquor Control Bd.*, 565 F. Supp. 520 (E.D. Pa. 1983) (granting summary judgment to the EEOC based on defendant's inability to establish its safety-related BFOQ defense).  Under the ADEA, it is YNHH who bears the burden of proving that no acceptable alternatives exist, not the EEOC.  29 C.F.R. § 1625.6(b).

A.     YNHH's Pre-LCPP Policies Sufficiently Identified Practitioners with Job-Related Impairments on an Individualized Basis.

First, the undisputed facts establish that YNHH cannot meet this affirmative defense because it is not highly impractical to identify impaired providers—of any age—on an individualized basis.   Indeed, YNHH did that for years before

---

[31] The existence of acceptable alternatives also bears on YNHH's business necessity defense under the ADA claim, as the existence of less discriminatory alternatives undermines the purported business necessity of the LCPP, and renders it more intrusive than necessary. *See, e.g., Penn. State Troopers Ass'n*, 621 F. Supp. 2d at 261 (M.D. Pa. 2008) (finding that Pennsylvania State Troopers' ability to "adequately assess its members' fitness for duty through many [non-discriminatory] regulations" undercut its business necessity defense asserted in response to ADA claim).

implementing the LCPP, using its Medical Staff Health Policy, OPPE, peer review, patient complaints, staff complaints, malpractice information, and other performance and safety measures.

YNHH has in place multiple policies that require ongoing monitoring of physician competence. First, at the time of a practitioner's initial appointment and every two years thereafter, the Executive Committee of the Medical Staff and Medical Peer Review Credentialing Committee assesses the practitioner's ability to exercise their privileges safely and with reasonable skills. SMF ¶ 11. Then, on an ongoing basis, YNHH conducts Ongoing Professional Practice Evaluations ("OPPE") of all practitioners. SMF ¶ 14; *see* Ex. 25. When conducting such reviews, YNHH has hundreds of measures it can look at when trying to assess a practitioner's ability to think through a patient's case, execute or technically complete the case, or identify physicians whose performance requires further review, of which patient complaints, adverse outcomes, and malpractice claims are only a few. SMF ¶ 11-16, 134; *See* Ex. 25 (OPPE Policy), Ex. 26 (Vizient Report). As part of its OPPE process, YNHH submits performance and safety metrics to the Vizient database, which collects data from 116 leading academic medical centers, and compares practitioner performance across hospitals on these metrics to identify outliers. SMF ¶¶ 14-15; *See* Ex. 25, Ex. 26.

YNHH can also rely on patient and co-worker complaints to identify impaired practitioners. In 2021 alone, YNHH received 16,000 patient complaints, and it receives approximately 15,000 staff complaints *per month.* SMF ¶ 201. These

complaints and concerns can be analyzed and investigated to uncover practitioner performance issues. SMF ¶ 208.

If concerns are raised based on any of these sources, YNHH can require that a practitioner undergo a medical, neuropsychological, or ophthalmological exam under the YNHH Medical Staff Health Policy, which has been in place since at least 2001. SMF ¶¶ 17-19; *see* Ex. 6. In fact, with respect to the ophthalmological exam, YNHH didn't know why it was appropriate to rely on self-report to identify vision impairments in those under age 70, but not over 70. SMF ¶¶ 221-22; Balczek Dep., 7/25/22, 294:12-18.[32] To date, YNHH relies on the Medical Staff Health Policy to address concerns of practitioner impairment—including cognitive impairment—for practitioners under age 70. SMF ¶ 18. In this way, YNHH uses individualized factors such as OPPE measures, patient complaints, staff complaints, and the "hundreds" of measures of performance it has to determine if a medical exam is necessary, and to require it only in those circumstances. SMF ¶ 11-16, 134.

This process was sufficient to identify practitioners who were impaired, including due to cognitive impairment, prior to the adoption of the LCPP. Even though physicians are at an extremely high risk of substance abuse and mental health issues, prior to the LCPP, more practitioners were assessed under the MSHP for age-related cognitive impairment than for substance abuse or mental health issues. SMF ¶ 18, 186-87. These other metrics have been effective in identifying

---

[32] **Q. With respect to vision impairment, why is it appropriate to rely on self-report for practitioners under the age of 70, but not for practitioners age 70 or above?** [objection]

THE WITNESS: I don't know.

cognitive impairments in practitioners under age 70: Using OPPE metrics, YNHH identified a doctor under age 70 who was having performance concerns, and required that she undergo a neuropsychological exam.  SMF ¶ 216.  Two other practitioners under age 70 were referred for neuropsychological exams after concerns were raised by their colleagues.  SMF ¶ 204.

YNHH relies on the MSHP, OPPE, peer review processes and other factors to monitor the physician competence, including as it related to cognitive impairment, for those practitioners under age 70.  There is no reason it cannot do the same for practitioners aged 70 and older.  *See Penn. State Troopers Ass'n,* 621 F. Supp. 2d 246 (instead of medical inquiry, employer's policies allowing it to impose medical exams based on on-the-job performance issues was sufficient); *Com. Penn. Liquor Control Bd.*, 565 F. Supp. at 523 (finding that defendant's practice of annually monitoring ability of each Enforcement Officer to use firearms suggested that defendant could similarly "monitor Enforcement officers with respect to strength, agility, hearing, and visual acuity" on an annual basis rather than enforce a mandatory retirement age).  The sufficiency of these other policies is further affirmed because before implementing the LCPP, YNHH operated safely.  SMF ¶ 5.  As YNHH admits that the LCPP has had no measurable impact on patient safety or preventing patient harm, SMF ¶¶ 117-18, there is no basis to believe that the LCPP is *more* effective than YNHH's other policies in identifying impairments which will affect a practitioner on the job.

Courts have held that it is appropriate to rely on similar factors to determine that physicians are competent, instead of engaging in a medical inquiry.  For

example, when considering a request for a preliminary injunction in *Med. Soc'y of N.J. v. Jacobs*, No. CIV. A. 93-3670 (WGB), 1993 WL 413016 (D.N.J. Oct. 5, 1993), the court considered the necessity of disability-related inquiries made by the New Jersey Board of Medical Examiners to physicians seeking a medical license.  The inquiries included those asking whether the physician had ever suffered from mental or psychiatric illnesses, whether they had been dependent on alcohol or controlled substances, or whether the physician had an uncorrected physical handicap that limited their ability to practice medicine.  *Id.* at *1. The Board asserted that these questions were necessary to determine if a practitioner met eligibility requirements for a medical license, and that affirmative answers would subject a physician to additional review.  *Id.* at *6.

The court found that such questions were unnecessary, and so plaintiff was highly likely to succeed on their ADA claim.  The court found that there, like here, "[t]he essential problem with the present questions is that they substitute an impermissible inquiry into the status of disabled applicants for the proper, indeed necessary, inquiry into the applicants' behavior," because it is "fundamental that an individual's status cannot be used to make generalizations about that individual's behavior." *Id.* at *7.  The court explained that to determine fitness, the Board could formulate alternative questions, and base its determination on other information including "information about malpractice payments," "sanctions taken by boards of medical examiners and health care entities," and reports from fellow doctors who were required to report "information which reasonably indicates that another practitioner has demonstrated an impairment."  *Id.* at *7.  The court also

found that the Board could rely on "that most important source of information of all, patient complaints." *Id.*

Here, YNHH can rely on similar measures to gauge competence and determine on an individualized basis which practitioners have performance concerns that justify a medical exam. As such, it is not highly impractical for YNHH to deal with the practitioners aged 70 or above on an individualized basis, and there are less discriminatory alternatives which achieve the same result. Under the undisputed facts, YNHH's BFOQ defense therefore fails.

### B.  YNHH Cannot Prove that Less-Discriminatory Alternatives are Inferior to the LCPP.

Finally, to the extent YNHH asserts that its pre-LCPP policies are insufficient and it must take *further* steps to prevent patient harm, the LCPP remains unjustified because there are multiple non-discriminatory steps YNHH could take to improve its processes.   YNHH is therefore unable to meet its burden to prove that "that there is no acceptable alternative [to the LCPP] which would better advance [the goal of patient safety] or equally advance it with less discriminatory impact."  29 C.F.R. § 1625.6(b).  On the undisputed material facts, YNHH's ADEA affirmative defense must fail again.

In her expert report, Dr. Ilene Moore,[33] opined that YNHH could implement several policies and mechanisms to more effectively identify physicians' poor performance and impairment, without resorting to age-based qualifications. SMF

---

[33]     Dr. Ilene Moore is a board-certified physician with over fourteen years' experience as an Assistant Professor at Vanderbilt University School of Medicine's Center for Patient and Professional Advocacy (CPPA). *See* Ex. 73, at 2,. Her area of expertise includes patient and staff complaints; addressing unprofessional conduct; disclosure of medical errors; peer review; and medical malpractice. *Id.*

¶¶ 203, 208, 210, 212; Ex. 73 at 47-55.  However, for the purposes of this motion, a few examples suffice:

First, there is an association between the number of patients' complaints about a practitioner, and both adverse outcomes and malpractice complaints.  SMF ¶ 207.  Automatically analyzing the frequency of patient complaints about a practitioner, in a systematic way that allows detection of small rates of change, which YNHH does not do, can allow a hospital to identify underlying practice issues with a practitioner.  SMF ¶¶ 208-209.

It is also possible to differentiate practitioners with neurocognitive disorders from those without by conducting a language analysis of the patient complaints regarding the practitioner, as certain words in those complaints were much more often used when a complaint referred to a practitioner with cognitive impairment.  SMF ¶ 210; *see* Ex. 73 at 35.  However, YNHH does not run language analyses on its patient complaints.  SMF ¶ 211.

Further, although YNHH has configured its RL Solutions complaint system for *patient* complaints in such a way that one can select from a drop-down of practitioner names to identify the practitioner who is the subject of the complaint, it has not taken this approach with respect to *staff* complaints.  SMF ¶ 215.  As a result, there is no way for YNHH to run a report of all staff complaints relating to a particular practitioner, for analysis or identifying trends.  SMF ¶ 214.

Finally, YNHH could engage with a reporting system that analyses and codes patient complaints, and creates reports based on complaints comparing a practitioner's complaints against their peers, to identify outliers, much like how

YNHH uses the Vizient system. SMF ¶ 212 However, YNHH does not use such a system. SMF ¶ 213.

Each of these examples represents a non-discriminatory approach YNHH could take to improve its monitoring of practitioners and seek to prevent patient harm. Yet, it has not implemented them, and so does not know their impact. As the LCPP has no discernable impact on patient safety (SMF ¶¶ 118-19), any of these strategies defeat YNHH's BFOQ defense, if they have even a small benefit, or even if they have *no* benefit, because they would "equally advance [public safety] with less discriminatory impact." 29 C.F.R. § 1625.6(b). It is YNHH's burden to show that these changes, and any other policy YNHH could implement, would be less effective than the LCPP. Under the undisputed facts here, it cannot do so.

<u>CONCLUSION</u>

For the reasons stated above, the Commission respectfully requests that the Court grant the EEOC's motion for summary judgment, and find YNHH liable for violations of both the ADEA and ADEA.

Dated:       March 24, 2023

Respectfully submitted,

<u>s/ Caitlin D. Brown</u>

*Attorneys for Plaintiff*
Caitlin D. Brown
Trial Attorney
Bar No. phv11110
Tel: (929) 506-5277
caitlin.brown@eeoc.gov

Kimberly A. Cruz
Supervisory Trial Attorney
Bar No. phv10827

**Tel: (929) 506-5345**
**kimberly.cruz@eeoc.gov**

**Daniel Seltzer**
**Trial Attorney**
**Bar No. phv20678233**
**Tel: (929) 506-5308**
**Daniel.Seltzer@eeoc.gov**

**U.S. Equal Employment**
**Opportunity Commission**
**New York District Office**
**33 Whitehall Street, 5th Floor**
**New York, NY 10004**
**Fax: (212) 336-3623**

**Anastasia Doherty**
**Trial Attorney**
**Bar No. phv206963**
**Tel: (617) 865-3685**
**anastasia.doherty@eeoc.gov**

**U.S. Equal Employment**
**Opportunity Commission**
**Boston Area Office**
**John F. Kennedy Federal Building**
**15 New Sudbury St., Rm. 457**
**Boston, MA 02203**

**Andres F. Puerta**
**Trial Attorney**
**Bar No. phv207157**
**Newark Area Office**
**Two Gateway Center, 17th Floor**
**Newark, NJ 07023**
**andres.puerta@eeoc.gov**