**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**YALE NEW HAVEN HOSPITAL, INC.,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)  **Civil Action No. 3:20-cv-00187-VLB**<br>)<br>)  **March 24, 2023**<br>)<br>) |

**THE EEOC'S LOCAL RULE 56(a)1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. Dr. Irwin Nash filed a timely charge with the Commission alleging violations of the ADEA and ADA by Defendant Yale New Haven Hospital, Inc. ("YNHH"), in connection with a YNHH Department of Physician Services Policy regarding Late Career Practitioners. ECF No. 119, ¶ 8; ECF No. 125, ¶ 8; *see also* Ex. 1; Ex. 19.

2. This Late Career Practitioner Policy ("LCPP") requires physicians and other practitioners aged 70 and over who are obtaining or renewing clinical privileges with YNHH to undergo survpsychological and ophthalmologic exams prior to appointment or reappointment. *See* ECF No. 119, ¶ 19; ECF No. 125, ¶ 19; Ex. 77 (hereinafter "Zinck-Lederer Dep."), 436:10-21; Ex. 19 at YNHH 000925 (providing that, if a practitioner refused to comply with exam requirements of the LCPP, "their application is considered incomplete and their appointment and privileges are considered to have been automatically relinquished").

3. The EEOC's procedural prerequisites for filing suit have been met: EEOC issued a Notice of Charge of Discrimination to YNHH on November 14, 2018, and conducted an investigation. *See* Ex. 3 (notice of charge); ECF Nos. 31-1, 31-2, 31-3, 31-4 (investigation conducted); Ex. 4 (determination finding reasonable cause); *See* ECF. No. 119, ¶ 10-12; ECF. No. 125, ¶ 10-12 (conciliation unsuccessful).

4. YNHH is a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2); has continuously been an employer engaged in an industry affecting commerce and within the meaning of the ADA and the ADEA, and has had at least 20 employees including, for the purposes of this litigation, the applnamed individuals at Exhibit A to Docket Entry No. 60-00, any direct employees of YNHH, and any employees of Yale University or Northeast Medical Group subject to

YNHH's LCPP. ECF. Nos. 119 ¶¶ 5-7, 125 ¶¶ 5-7, 60 ¶¶ 2, 4 & 60-001.

## I.   YNHH OPERATED SAFELY BEFORE IMPLENTING THE LCPP

5.   According to Dr. Peter Herbert, YNHH's Chief Medical Officer from 2010 to 2014, YNHH operated safely and was a top-rated hospital in the country for medical care prior to the adoption of the LCPP.  Ex. 75 (hereinafter "Herbert Dep."), 21:3-8, 26:2-5, 24:14-25:6.

6.   Dr. Thomas J. Balcezak served as YNHH's Chief Medical Officer from October 2014 to July 2021, and is currently Chief Executive Vice President and Chief Clinical Officer of Yale New Haven Health System ("YNHHS"). Ex. 96 (hereinafter "30(b)(6) Dep., 11/2/21"), 13:24-14:7, 14:25-15:8. Balcezak oversees operations at all five YNHHS hospitals and their Chief Medical Officers report to him. 30(b)(6) Dep., 11/2/21, 13:24-14:19; 14:25-15:8;  Ex. 94 (hereinafter cited according to date and 30(b)(6) designation as "30(b)(6) 7/12/22", "Balcezak Dep. 7/12/22" or "Balcezak Dep. 7/25/22"), Balcezak Dep. 7/25/22, 304:8-21.

7.   YNHH has been surveyed at least three times since 2008 by the Joint Commission ("TJC"), a private organization that accredits hospitals, and each time has been found to have met the standards promulgated for accreditation. 30(b)(6) Dep., 11/2/21, 139:12-140:6; Ex. 73 at 43-44.

8.   The other YNHHS hospitals are accredited by TJC and have received awards for their patient care.  The other hospitals within YNHHS have not adopted an LCPP because of this lawsuit. Balcezak Dep., 7/25/22, 305:06-306:08; 306:9-306:22.

9.   Yale School of Medicine faculty with appointments in clinical departments must obtain clinical medical staff privileges at YNHH, which allow a physician to

come into the hospital and take care of patients, and are specific to the physician. ECF No. 119, ¶15; ECF No. 125, ¶ 15; Brown Dep., 19:13-21:10.

10. Some Yale School of Medicine or Nursing professors are required to have YNHH clinical privileges even though they are not providing clinical care to YNHH patients, and are only acting in a teaching capacity. Ex. 95 (hereinafter "Balcezak Dep., 9/27/22") 136:6-22; Ex. 92 (hereinafter "Cooney Dep."), 33:10-34:4, 159:6-160:3; Ex. 88 (hereinafter "Hawkins Dep., 7/29/22"), 19:19-21:9.

11. At the time of a practitioner's initial appointment and every two years thereafter, the Executive Committee of the Medical Staff and Medical Peer Review Credentialing Committee assesses the practitioner's ability to exercise their privileges safely and with reasonable skills.  *See* ECF Nos. 119 ¶ 16; 125 ¶ 16.

12. YNHH has hundreds of measures it can look at when trying to assess a practitioner's ability to think through a patient's case, execute or technically complete the case, or identify physicians whose performance requires further review. 30(b)(6) Dep., 11/2/21, 107:16-108:25; Balcezak Dep., 9/27/22, 72:8-72:21.

13. YNHH looks at sources including patient complaints, adverse outcomes, and malpractice claims when determining practitioner competency.  30(b)(6) Dep., 11/2/21, 78:15-79:18.

14.  YNHH's Ongoing Professional Practice Evaluation ("OPPE") policy states that YNHH medical staff leaders will review physician evaluation metrics on a rolling basis to identify outliers. Ex. 25 at YNHH 113601-2, 113604-05; Zinck-Lederer Dep., 47:17-49:1; 136:16-138:6; 30(b)(6) Dep., 11/2/2021, 32:23-33:19.

15. Vizient Clinical Database collects data from 116 leading academic medical

centers, and calculates expected values for a patient's length of stay, mortality, readmission rate, complication rate, and other patient safety metrics. This allows YNHH to compare a practitioner's performance on certain metrics against other physicians at YNHH and comparable hospitals to identify outliers.  Ex. 25 at YNHH 113604; Ex. 26 at YNHH 112596-112602; 30(b)(6) Dep., 11/2/21, 81:3-81:22.

16. If a physician is identified as an "outlier," YNHH will subject the physician to further review, which could include case reviews, referral to Focused Professional Practice Evaluation (FPPE), or "collecting more data." Zinck-Lederer Dep., 138:24-139:24; 30(b)(6) Dep., 11/2/21, 94:21-97:8, 82:25-83:2.

17. Since 2001, YNHH has maintained a Medical Staff Policy on "Medical Staff Health & Committee on Medical Staff Health."  One of its objectives is to identify practitioners who are unable to practice with reasonable skill and safety due to impairment. The policy requires development of measures to assist staff in identifying impairment.  Ex. 6 ("MSHP"); 30(b)(6) Dep., 11/2/21, 304:3-304:19; Herbert Dep., 56:15-56:23; 30(b)(6) Dep. 11/2/21, 305:18-306:4.

18. Under the MSHP, YNHH relies on reports from colleagues, patients, and self-reporting, to identify practitioners impaired due to substance abuse, mental or physical illness, or vision impairment.  From the beginning of 2010 to 2015, more practitioners were reviewed under the MSHP for suspected age-related cognitive decline than for suspected substance abuse or mental illness. Ex. 6 at YNHH 000055; Herbert Dep., 56:15-56:23; 30(b)(6) Dep., 11/2/21, 305:18-306:4, 307:12-308:24, 310:11-311:3; Balcezak Dep. 7/25/22, 293:7-293:22.

19. Prior to the adoption of the LCPP, if a concern were raised about a

practitioner, the Hospital could and did require the practitioner to undergo a neuropsychological and ophthalmological examination under the MSHP. Herbert Dep., 55:7-56:13; 30(b)(6) Dep., 7/12/2022, 91:12-91:23; Ex. 6 at YNHH 000059; 30(b)(6) Dep. 11/2/21, 307:12-308:24, 310:11-311:3; Ex. 14.

## II. ADOPTION OF THE LCPP

20. The idea of evaluating older practitioners for cognitive impairment at YNHH was originally raised by the Hospital's Trustees, "in the context of things that had been in the news." Herbert Dep., 57:17-58:23, 59:22-60:16, 58:24-59:20;  Ex. 51.

21. Dr. Peter Herbert was YNHH's Chief Medical Officer ("CMO") in 2014, when the concept of the LCPP was first proposed to the Medical Executive Committee. Herbert Dep., 21:3-21:8, 57:17-58:23, 59:22-60:16; Cooney Dep., 35:2-35:10.

22. When asked whether YNHH's pre-LCPP systems were robust enough to ensure patient safety, Dr. Herbert stated that he did not share any concern that the hospital was missing cognitive impairment in medical staff. Herbert Dep., 61:4-62:3.

### A.   YNHH Lacked a Factual Basis to Implement the LCPP

23. Prior to implementing the LCPP, YNHH did not review its OPPE metrics, Vizient Reports, malpractice claims, patient or staff complaints, errors, safety and quality metrics, or any other data regarding practitioner performance or patient outcomes to determine whether its practitioners aged 70 and older were performing worse or presented more of a risk to patients than younger practitioners.   30(b)(6) Dep., 11/2/21, 178:21-179:7, 210:10-15, 228:21-229:19, 234:17-235:14, 238:8-239:1, 240:18-241:7, 243:1-24, 244:16-244:24; 298:13-298:21.

24. **Prior to implementing the LCPP, YNHH did not study any data relating to the performance or safety of its own practitioners to determine whether its practitioner aged 70 and older performed less competently or were more of a risk to patients than younger practitioners.  Balcezak Dep., 7/25/22, 298:13-298:21; 30(b)(6) Dep., 11/2/2021, 238:8-14; 229:6-229:19, 242:14-25.**

25. **Prior to implementing the LCPP, there was no evidence that YNHH practitioners aged 70 and older were harming patients more than younger practitioners.  30(b)(6) Dep., 11/2/21, 228:21-229:19; 178:21-179:7, 228:21-229:19, 234:17-235:14, 238:8-239:1, 243:1-244:24; Balcezak Dep., 7/25/22, 298:13-21.**

26. **Prior to implementing the LCPP, there was no evidence that YNHH practitioners aged 70 and older were making more errors than younger practitioners, or practicing less competently. 30(b)(6) Dep., 11/2/21, 238:8-239:1, 178:21-179:7, 210:10-210:15, 228:21-229:19, 234:17-235:14, 243:1-243:24, 244:16-244:24; Balcezak Dep., 7/25/22, 298:13-298:21.**

27. **YNHH considered data regarding performance and patient outcomes for its practitioners aged 70 and older to be irrelevant to its adoption of the LCPP.  30(b)(6) Dep., 11/2/21, 244:16-244:24.**

28. **Dr. Balcezak could not identify any practitioner aged 70 or older who caused patient harm because of cognitive impairment. 30(b)(6) Dep. 7/12/22, 115:6-117:8.**

29. **Prior to implementing the LCPP, YNHH did not have a factual basis for believing that all or substantially all YNHH medical practitioners aged 70 and older were unable to safely and efficiently perform their YNHH clinical privileges.  30(b)(6) Dep. 7/12/22, 115:6-117:8; 30(b)(6) Dep., 11/2/21, 228:21-229:19; *see also id.,* 178:21-**

179:7,   210:10-210:15,   228:21-229:19,   234:17-235:14,   238:8-239:1,   243:1-243:24, 244:16-244:24; Balcezak Dep., 7/25/22, 298:13-298:21.

30. YNHH does not have a factual basis for believing that all or substantially all YNHH medical practitioners aged 70 and older are unable to safely and efficiently perform their YNHH clinical privileges. 30(b)(6) Dep. 7/12/22, 115:6-117:8; Ex. 90 (hereinafter "Papinchock Dep., 1/6/23"), 91:9-92:2; Ex. 60; Ex. 59 at YNHH 123608; 30(b)(6) Dep., 11/2/21, 228:21-229:19; see also id., 178:21-179:7, 210:10-210:15, 228:21-229:19, 234:17-235:14, 238:8-239:1, 243:1-24, 244:16-24; Balcezak Dep., 7/25/22, 298:13-21.

31. In August 2014, the YNHH medical staff voted on the adoption of the LCPP. 40 members of the medical staff voted against the adoption of the LCPP and 17 members voted in favor. Medical staff members said that the proposal was discriminatory, unfairly assumed that late career physicians were incompetent, and that younger practitioners may also have conditions that could affect their practice. Ex. 7 at YNHH 121099; Herbert Dep., 77:15-78:24, 218:16-219:20; 30(b)(6) Dep., 7/12/22, 30:16-31:6; Ex. 8; Ex. 51 at YNHH 125436.

32. The American Medical Association ("AMA") opposes the use of age-based cognitive exams to determine physician competence. Ex. 17; Ex. 18; Ex. 73 at 18.

33. AMA Policy H-275.916, "Guiding Principles and Appropriate Criteria for Assessing the Competency of Physicians Across the Professional Continuum," provides that "[r]esearch suggests that the effect of age on an individual physician's competency can be highly variable. Since wide variations are seen in cognitive performance with aging, age alone should not be a precipitating factor."

Ex. 18; Ex. 73 at 18: Moore Rept. at 7.

34. AMA Policy H-275.959 provides that "It is the policy of the AMA to oppose the use of cognitive exams as the major means of evaluating a physician's clinical competence."  Ex. 17.

    **B.**    **The History of** ██████████████████ **do Not Support the LCPP**

35. Dr. Balcezak identified issues that occurred with two older practitioners, Dr. ██████████████ as being the impetus for the adoption of the LCPP. 30(b)(6) Dep., 11/2/21, 183:15-184:13, 217:3-218:23, 30(b)(6) Dep., 7/12/22, 58:24-59:6.

    **1.**    **YNHH Ignored Evidence of** ████████ **Incompetence; He Then Passed a Neuropsychological Exam.**

36. Prior to February 2010, █ ████████ made an error during surgery, unintentionally severing the spermatic cord of a four-year-old while performing an inguinal hernia repair. Ex. 10 at YNHH 122220; 30(b)(6) Dep., 11/2/21, 227:2-16.

37. February 2010 IPQPRC minutes discussing the severance of the spermatic cord noted that there had been "other concerns about ████████ expressed in the past." Ex. 10 at YNHH 122200; 30(b)(6) Dep., 7/12/22, 64:11-65:17.

38. Prior to the March 2010 IPQPRC meeting, a Focused Professional Practice Evaluation ("FPPE") found that ████████ had an 18% complication rate (compared to 2-5% rates in the rest of the department), which raised concerns. Ex. 10 at YNHH 122200; Herbert Dep., 116:19-117:10; 30(b)(6) Dep., 7/12/22, 69:7-69:19.

39. This 18% complication rate was sufficient basis upon which to conclude that ████████ had a "quality problem" in his delivery of care, and it should have been flagged by the OPPE system prior to the incident with the spermatic cord. Herbert Dep., 118:19-120:23.  That it is was not, was a breakdown of the system. *Id.*

40. In May 2010, the results of ████ ████████ FPPE were referred to the Credentials Committee for Review. Ex. 10 at YNHH 122200.  Nursing and other members of ████████████ section expressed concerns that ████████████ practice had been deteriorating, but these concerns were not considered by the Committee because they were raised anonymously. Ex. 10 at YNHH 122200.

41. Disregarding anonymously raised concerns is inconsistent with YNHH's policy. 30(b)(6) Dep., 7/12/22, 82:21-83:7.

42. ████████████ privileges were not removed in connection with the May 2010 review.  Ex. 10 at YNHH 122200; 30(b)(6) Dep., 7/12/22, 76:15-80:18, 84:10-85:2.

43. Several weeks later, in mid-June, 2010, ████████████ operated on an infant over the objections of other practitioners, and accidentally cut into the baby's bowel during the surgery. Ex. 13 at YNHH 122330-34, Herbert Dep., 165:16-168:2, 177:22-179:22; 30(b)(6) Dep., 7/12/22, 83:8-83:19.

44. The baby died two days later, and ████████████ error and issues in judgment were contributing factors in the baby's death. Ex. 13 at YNHH 122334, 30(b)(6) Dep. 7/12/22, 104:7-105:9; Ex. 10 at YNHH 122202.

45. Dr. Herbert testified there was "so much evidence of bad judgment in ████ ████████████ case," it this was "a disaster in the care of this child."  Herbert Dep., 177:22-179:22.

46. In August and September 2010, a nurse and a pediatric surgical fellow in ████ ████████████ department each expressed concerns to the Chief of Pediatric Surgery regarding ████████████ mental acuity, each citing multiple examples. Ex. 11 at YNHH 122388, YNHH 122390; Ex. 12; Herbert Dep., 116:15-116:18.

47. The Chief relayed these concerns to the CMO, and suggested ███████████ may have early signs of cognitive impairment. Ex. 11 at YNHH 122386-88; Ex. 12.

48. In October 2010, three doctors in ██████████████ department were interviewed about his performance. All three doctors expressed concerns about ████████████████ ability to continue practicing medicine, in addition to the anonymous concerns previously expressed. Herbert Dep., 176:18-178:1;  30(b)(6) Dep., 7/12/22, 88:9-90:19; Ex. 13 at YNHH 122331-32.

49. In December 2010, the IPQPRC had serious concerns about the adequacy of ██████████████████ patient care. Ex. 10 at YNHH 122202.

50. By mid-December 2010, Dr. Herbert had directed ██████████████ to undergo a neuropsychological and ophthalmological exams—the same type of exams later required by the LCPP. Ex. 10  at YNHH 122202; 30(b)(6) Dep., 7/21/22, 91:12-93:5.

51. In retrospect, Dr. Herbert believed that as of December 2010, he should have told ██████████ to "[s]top [practicing] from this point on until the evaluation is done." Herbert Dep., 180:19-181:10.  However, ████████████ was not removed from practice at that time. 30(b)(6) Dep., 7/12/22, 85:3-85:18.

52. By January 2011 the IPQPRC found that ██████████████ had made an error in treating and had harmed a third patient. Ex. 10 at YNHH 122202; 30(b)(6) Dep. 7/12/22, 93:20-95:6, 95:7-95:17.

53. As revealed in June 2011, the results of ██████████████ neuropsychological examination were "average to above average" and "normal," with "no evidence of any organic brain disease or memory impairment." Ex. 14 at YNHH 122126-28. His ophthalmologic results were also "entirely within normal limits." Id.

54. Based on ███████████ neuropsychological exam results, he satisfied the criteria the YNHH credentials committee had set forth to be reappointed to the medical staff.  30(b)(6) Dep., 7/12/22, 98:6-100:17; Ex. 14 at YNHH 122126-28.

55. In June 2011, YNHH renewed ████████████ clinical privileges, including to perform the inguinal hernia repair surgery in which he previously severed a child's spermatic cord.  Ex. 14 at YNHH 122126, 30(b)(6) Dep., 7/12/22, 98:6-100:17; Ex. 15 at YNHH 135586, Balczak Dep., 9/27/22, 185:1-21.

56. From June 2011 through February 2012, ███████████ diagnosed over 400 patients and performed over 130 procedures at YNHH.  Ex. 15; Balczak Dep. 9/27/22, 185:1-17.

   2.   YNHH Failed to Act on Concerns Relating to ████████████

57. In the Spring of 2013, █████████ a Radiation Oncologist in his 80s, made a procedural error that resulted in a patient having a non-lethal stroke. Ex. 16 at YNHH 122057; 30(b)(6) Dep., 11/2/21, 180:11-181:12; 30(b)(6) Dep., 7/12/22, 48:11-48:22.

58. For several years before the incident with the seeds, there were known signals that █████████ practice had been deteriorating, and his Chief knew he was practicing poorly. 30(b)(6) Dep., 7/12/22, 55:17-56:19; 30(b)(6) Dep., 11/2/21, 180:11-181:12, 217:8-218:6, 223:8-223:22.

59. █████████ chief had a responsibility to ensure the competence of the practitioners in his department, but said he did not act on his concerns about ████ ████ because he did not know how to evaluate him.  30(b)(6) Dep., 11/2/21, 44:12-44:20, 23:13-23:23, 183:20-184:13.

60 ▆▆▆▆▆ did not retire as a result of the incident with the seeds, but continued to see patients in the YNHH clinic, remaining an active member of the medical staff for approximately two more years.  30(b)(6) Dep., 7/12/22, 54:5-54:15.

### III.   DEVELOPMENT OF THE LCPP NEUROPSYCHOLOGICAL SCREENING

61. The LCPP that ultimately came into effect was accepted by YNHH in 2015. ECF. Nos. 119, ¶¶ 18, 125; Ex. 19; Ex. 32 at YNHH 000913.

62. The LCPP's purposes included "confirm[ing] current competence to perform requested privileges, or an appropriate sub-set of privileges, with acceptable skill and safety," and "protect[ing] [patients] from harm."  Ex. 19 at YNHH 000924.

63. Any practitioner aged 70 or older with privileges at YNHH is subject to the LCPP; it does not apply to practitioners under age 70. Zinck-Lederer Dep., 378:12-378:14; Balcezak Dep. 7/25/22, 301:7-301:12; ECF. Nos. 119 ¶ 20, 125 ¶ 20.

64. The ophthalmologic and neuropsychological exams administered in connection with YNHH's LCPP are "medical examinations" within the meaning of the ADA. Dkt. No. 119, ¶ 29; Dkt. No. 125, ¶ 29.

65. As practitioners are reappointed to the YNHH medical staff on a two-year cycle, these examinations were required at least once every two years under the LCPP.  30(b)(6) Dep., 11/2/21, 54:4-54:21; Ex. 19 at YNHH 000924.

66. YNHH has no data supporting the necessity of administering the LCPP exams every two years.  30(b)(6) Dep., 11/2/21, 289:9-289:12.

67. While direct employees of YNHH, Dr. Balcezak and Ms. Zinck-Lederer told practitioners that they were required to comply with the LCPP. 30(b)(6) Dep., 7/12/22, 114:12-22, 40:1-5; Zinck-Lederer Dep., 42:24-45:5, 415:24-417:23; Ex. 21.

68. Multiple practitioners who refused to take the LCPP's neuropsychological exam have been asked to relinquish their clinical privileges, or have not had their privileges renewed due to failure to comply with the LCPP. 30(b)(6) Dep. 7/12/22, 115:1-5; Brown Dep., 31:14-32:6, 44:6-46:16, 78:2-80:12; Ex. 72, at entries Connair, Michael and Meyer-Lustman, Nancy (Reason Code 67, and Action Code 1); Zinck-Lederer Dep., 290:17-291:5, 365:21-366:7, 377:24-378:5 (Action Code 1 defined as "deleting" from staff); Ex. 57 (Reason Code 67 = "Did Not Comply with LCP Requirements"); Ex. 58 at YNHH 122034 (p. 71); Ex. 50 at YNHH 146380, YNHH 146490, YNHH 146376-77; Ex. 55; Ex. 56; Ex. 87 (hereinafter, "Hawkins Dep., 5/12/22"), 30:5-32:9.

69. Via Yale University, YNHH contracted with neuropsychologist Dr. Keith Hawkins, who has YNHH privileges, to prepare the neuropsychological screening exam, extended screening exam, and comprehensive exam, and to administer the LCPP neuropsychological exams. Hawkins Dep., 5/12/22, 202:12-18; Ex. 32.

   A.   The LCPP Neuropsychological Screening Exam

70. The first LCPP neuropsychological screening exam took place on September 26, 2016.  30(b)(6) Dep., 11/2/21, 276:6-276:21.

71. The LCPP screening exam generally takes 50-90 minutes to administer. 30(b)(6) Dep., 11/2/21, 120:5-121:6; Ex. 51 at YNHH 125437; Ex. 60 at YNHH 018416.

72. Prior to administering the LCPP screening exam, Dr. Hawkins asks the practitioner whether they have or have had certain medical conditions, including but not limited to hypertension, diabetes, stroke, epilepsy, ADHD, a learning disability, cancer, or a psychiatric condition; this information is then passed on to

medical leadership. Ex. 27; Hawkins Dep., 7/29/22, 55:8-56:8, 61:18-62:20.

73. When developing the LCPP neuropsychological test battery, Dr. Hawkins did not review a list of all of the positions covered by the LCPP, and the screening battery and the thresholds Dr. Hawkins uses to determine if a practitioner has passed do not change based on the specialty of the practitioner. 30(b)(6) Dep., 11/2/21, 280:19-280:22; Hawkins Dep., 5/12/22, 76:10-76:19, 126:1-126:4.

74. In the LCPP screening exam, Dr. Hawkins administers to all practitioners a battery of neuropsychological tests referred to as the "core" screening battery, which is designed to cover "all aspects of cognitive ability."  Hawkins Dep., 5/12/22, 181:23-182:5, 221:19-222:5; Hawkins Dep., 7/29/22, 66:1-8; 30(b)(6) Dep., 11/2/21, 120:5-121:6, 280:19-281:15.

75. The neuropsychological tests currently used in the LCPP core screening battery are accurately listed in Appendix C of Dr. Kramer's report, attached as Exhibit 64.  Hawkins Dep., 5/12/22, 167:19-168:11, 170:6-182:15; Ex. 29; Ex. 31.

76. Appendix C of Dr. Kramer's report, attached as Exhibit 64, accurately describes the tasks required by the tests in the core screening battery.  Hawkins Dep., 5/12/22, 167:19-168:11, 170:6-182:15; Ex. 29; Ex. 31.

77. . In the ████████████████████████████████ trials, the practitioner is shown the geometric figure at page YU013272 of Ex. 29, asked to copy it while viewing the figure, then at least ten minutes later draw it from memory, and identify it from several choices. Ex. 64 at C-1; Hawkins Dep., 5/12/22, 163:4-163:13, 171:9-172:16; Ex. 29 at YU013272-73, YU013285-86; Ex. 31 at YU021646-7.

78. In the ████████████████ test, the practitioner has one minute to

name as many words as possible starting with a certain letter of the alphabet, and in the ██████ ██████ test, must name as many members of a category (e.g., animals) as possible in that time. Hawkins Dep., 5/12/22, 177:16-177:23; Ex. 29 at YU013298-301; Ex. 64 at C-1.

79. In the ██████████████████████████, there are four conditions: 1) rapidly name the colors of squares on a page; 2) rapidly read the names of colors written in black ink (*i.e.*, green blue); 3) looking at colored text (*i.e.,* red blue), rapidly name the color of the ink the word is printed in; 4) when looking at colored text (*i.e.,* red blue), some words are in a box and others are not—read the text of the word or name the color of the ink based on whether the word is in a box or not. Ex. 64 at C-1, YNHH 005147-53; Hawkins Dep., 5/12/22, 172:22-176:16; Ex. 29 at YU013289-92.

80. In the ██████████████████████████ test, a practitioner has twenty seconds to identify the missing part in each picture shown, which becomes harder to identify in later images.  Hawkins Dep., 5/12/22, 177:3-177:5; Ex. 29 at YU013293; Ex. 64 at C-2, YNHH 005759-807 (Ex. 9 to Kramer Report).

81. Dr. Cooney described the battery as "sort of like an IQ test." Ex. 59 at YNHH 123608.

82. Dr. Joel Kramer authored the expert report at Ex. 64, and co-authored the ██████████████████████████████████ Ex. 64.

83. Neuropsychological tests, including the ██████████████████ test, often do not predict real world behavior.  Ex. 64 at 1-4.

84. Dr. Kramer asserts that neuropsychological tests, including ██████████████ ██████████████ often do not predict real world behavior and that the ██████████

████ █████ test has poor test-retest reliability over one year. Ex. 64 at 1-4.

85. The tests included in the core screening battery have changed over time. Hawkins Dep., 5/12/22, 156:13-157:22; 186:4-186:22.

86. Dr. Hawkins calculated a "global score" for a practitioner, based on a weighted average of their "across the board" performance on the LCPP core screening battery, with the exception of the ██████████████████████ ██████████████ Hawkins Dep., 5/12/22, 280:4-19, 281:22-283:6, 193:17-193:20, 199:11-200:11, 262:9-21; Ex. 53 at YNHH 004379.

87. If a practitioner "struggle[es]" on part of the core screening battery and there seems to be a "reasonable need," Dr. Hawkins administers the "extended screening battery," to a practitioner, almost always in the same session. Hawkins Dep., 5/12/22, 147:4-147:15, 149:20-150:6, 167:19-168:11, 182:16-183:6; Ex.  89 (hereinafter "Papinchock Dep., 5/5/22"), 82:18-21; Ex. 32 ¶ 2(b)(i); Ex. 51 at YNHH 125437.

88. The extended screening battery includes neuropsychological exams not in the core screening battery. Hawkins Dep., 5/12/22, 180:20-181:18, 172:14-172:20, 177:9-177:15; Ex. 29 at YU013314-17, YU013287-88, YU013295-97; Ex. 69 at YNHH 125437.

89. Dr. Hawkins' contract requires that he relay the results of the neuropsychological screening to YNHH using the designations: "(i) Pass; (ii) Qualified Pass, with a recommendation for re-assessment in one year; (iii) borderline deficient, with a comprehensive neuropsychological examination and written report of findings to be submitted by [Dr. Hawkins] to the YNHH Chief

Medical Officer; (iv) Deficient, with a brief written report of the screening assessment results submitted by [Dr. Hawkins] to [YNHH's CMO]." Ex. 32 ¶ 2(b)(ii).

90. The contract provided that "[Dr. Hawkins] apply professional judgment in setting 'pass' thresholds for the screening exam."  Ex. 32, ¶ 2(b)(iii).

91. Dr. Hawkins' proposed "pass" thresholds have changed multiple times between 2015 to present. Ex. 30, at YNHH125437, 12543930; Hawkins Dep., 5/12/22, 86:19-94:12, 223:15-23, 234:10-234:23; Ex. 46, at YNHH2930; Ex. 47, at YU21644; Ex. 48, at YNHH2813. *See* also Scherbaum Rept., at p. 9 & Table 1 (at p. 11).

92. There is no scientific literature establishing at what level a practitioner needs to perform on a neuropsychological test battery in order to be considered safe to practice medicine.  Hawkins Dep., 5/12/22, 271:5-273:6; Ex. 59 at YNHH 123609.

93. It is impossible to establish a performance threshold on a neuropsychological test battery, above which a practitioner will generally be safe to practice medicine, and below which they are generally not considered safe to practice medicine.  Hawkins Dep., 5/12/22, 271:5-273:6.

94. YNHH created a Late Career Practitioner committee ("LCP Committee") that reviewed the results of some LCPP exams.  Balcezak Dep., 7/12/22, 216:16-216:24; Ex. 58 at YNHH 119673 (p. 1); Cooney Dep., 209:24-211:6; Ex. 53 at YNHH 004381.

95. The original members of the LCP Committee included Dr. Balcezak, Dr. Cooney, and Dr. Herbert, supported by Zinck-Lederer or Larkin. Ex. 53 at YNHH 004381.  Dr. Hawkins attended LCP Committee meetings. Cooney Dep., 209:24-211:6; Balcezak Dep., 9/27/22, 104:2-104:12; Hawkins Dep. 7/29/22, 44:21-45:7.

96. If Dr. Hawkins categorized a practitioner as a "Pass," their results are not

reviewed by the LCP committee. Hawkins Dep., 5/12/22, 206:24-207:25; 30(b)(6) Dep., 11/2/21, 281:3-281:6.

97. With respect to practitioners whose neuropsychological screening exam results were reviewed by the LCP committee, the practitioner's performance on the LCPP examination informed what category the committee placed that practitioner into.  Hawkins Dep. 5/12/22, 188:12-189:16; Balcezak Dep. 7/12/22, 207:9-208:9.

98. If a practitioner is placed into the "pass" category, their application for privileges proceeds as normal, and they are not subject to LCPP neuropsychological testing for two years.  The majority of practitioners received a "pass." Ex. 19, at YNHH 000926; Ex. 20, at YNHH 11806; Hawkins Dep. 5/12/22, 206:24-207:25; Zinck-Lederer Dep., 228:8-228:19; Papinchock Dep., 1/6/23, 91:9-92:2.

99. According to several individuals involved in the administration of the LCPP and the standards set forth Dr. Hawkins' results form, Dr. Hawkins' contract, and LCPP proposal submitted to the YNHH MEC, if a practitioner is placed into the "qualified pass" category by LCP committee, they are required to undergo the LCPP neuropsychological exams again within one year of their last exam instead of two. Ex. 31 at YU021644; Ex. 21 at YU021811; Ex. 32, ¶2(b(ii)(ii);  Ex. 21; Hawkins Dep. 5/12/22,  208:15-21; Brown Dep. 21:11-21:23; Cooney Dep. 12/9/2021, 242:17-242:24.

100.   In practice, the LCP Committee did not always require individuals who got a "qualified pass" to re-test in one year. Balcezak Dep. 9/27/22, 104:13-21.

101.   According to standards set forth in documents describing the LCPP

including Dr. Hawkins' results form, Dr. Hawkins' contract, and the proposal for the LCPP submitted to the YNHH Medical Executive Committee, if a practitioner is placed into the "borderline deficient" category, there is a recommendation that the practitioner undergo the LCP comprehensive exam. Ex. 31 at YU 021644; Ex. 32, ¶2(b(ii)(iii); see also Hawkins Dep. 5/12/22, 208:22-209:4, 213:7-214:4; Hawkins Dep. 7/29/22, 16:7-17:16.

102.    In practice, the LCP Committee did not always require individuals who received a "borderline deficient" result to complete the comprehensive exam. Balcezak Dep., 7/12/22, 238:4-238:15; Balcezak Dep., 9/27/22, 104:13-104:21.

103.    YNHH does not suspend a practitioner's clinical privileges pending their completion of the comprehensive exam.  Balcezak Dep., 9/27/22, 107:5-107:12.

104.    Multiple practitioners were allowed to continue practicing at YNHH for over five months without completing the comprehensive exam, after being directed to complete it.  Ex. 21 at YU 021811-12; Balcezak Dep., 7/12/22, 234:16-235:20; Balcezak Dep., 9/27/22, 120:3-120:19, 127:11-128:5; Brown Dep., 39:23-41:13, 95:19-96:15; Ex. 58 at YNHH 118797 (p. 55) (entry for █████████

105.    █████████ took the LCPP screening exam on February 5, 2018, receiving the 12th lowest global score out of over 350 exam administrations, and was directed to take the comprehensive exam, but continued practicing through December 2018 without completing it. Ex. 21 at YU 021811; Balcezak Dep., 7/12/22, 234:16-235:20; Balcezak Dep., 9/27/22, 120:3-120:19.

106.    █████████ took the LCPP screening exam on August 16, 2019, receiving the 17th lowest global score out of over 350 exam administrations, and was

directed to take the comprehensive exam, but continued practicing through January 24, 2022 without completing it. Ex. 21 at YU 021811; Brown Dep., 39:23-41:9; Ex. 58 at YNHH 118797 (p. 55).

107.  ██████████ took the LCPP screening exam on July 11, 2018, was directed to take the comprehensive exam, but continued practicing through January 3, 2019 without completing it. Ex. 21 at YU 021812; Balczak Dep. 9/27/22, 127:11-128:5.

**B.**    **LCPP Comprehensive Exam**

108.  The LCPP comprehensive exam is several hours long, and often spread across multiple sessions. Hawkins Dep., 5/12/22, 148:8-148:21; Ex. 36 at YNHH 018960; Balczak Dep., 7/12/22, 193:10-193:12, 30(b)(6) Dep., 11/2/21, 291:2-291:15.

109.  Dr. Hawkins also requests information about a practitioner's medical history before administering the LCPP comprehensive exam. At least once, Dr. Hawkins collected this information using the medical history form at Ex. 28, which includes questions such as whether a practitioner's mother used alcohol, non-prescription drugs, or suffered morning sickness when pregnant with the practitioner whether the practitioner wet the bed after the age of five, had been diagnosed with an eating disorder or HIV/AIDS, or had been hospitalized for emotional or psychiatric problems (including the approximate dates). Hawkins Dep., 7/29/22, 72:5-74:13; Ex. 28 at YNHH 002963-65.

110.  The LCPP comprehensive exam includes at least six tests not in the screening battery.   Hawkins Dep., 5/12/22, 147:16-148:3; Ex. 36 at YNHH 018960; Ex. 39 at YNHH 122851-52; Ex. 38 at YNHH 122829-30; Ex. 69 at YNHH 125437.

111.  By July 21, 2022, Dr. Hawkins had given the comprehensive exam to

between 19 and 25 practitioners. See generally Ex. 22, *id.* at YU021812-14, YU021816-18; Ex. 58 at YNHH 118790 (p. 52); Ex. 49 at YNHH 119035; Ex. 36; Ex. 38; Ex. 39; Ex. 49; Ex. 41; Ex. 53.

### C.  The Impact of the LCPP

112.   As of July 21, 2022, there were more than 350 administrations of the LCPP neuropsychological screening battery, and approximately 280 practitioners had taken that battery. Hawkins Dep., 5/12/22, 314:22-315:7; Ex. 21.

113.   As of November 2, 2021, YNHH asserted that there were at least a dozen practitioners whose LCPP neuropsychological examination results "were clear fails or in the middle," whom YNHH asked to relinquish some or all of their privileges.   30(b)(6) Dep., 11/2/21, 247:6-247:18.; Balcezak Dep., 7/12/22, 129:3-130:5, 139:12-140:13;  Cooney Dep., 247:12-248:16; Ex. 61.

114.   YNHH has asked practitioners to relinquish some or all clinical privileges based on LCPP neuropsychological exam results. 30(b)(6) Dep., 11/2/21, 282:5-283:21, 247:6-18.; Balcezak Dep., 7/12/22, 129:3-130:5, 139:3-140:13, 141:1-17.

115.   Practitioners have relinquished their clinical privileges after the LCP Committee asked them to complete the comprehensive neuropsychological exam. Ex. 22 at YU021812-14, YU021816-17.

116.   Based on their LCPP neuropsychological examinations, YNHH has told practitioners that they would not be recredentialed.  Ex. 22 at YU021812.

117.   YNHH asserts that the purpose of the LCPP is to prevent patient harm. 30(b)(6) Dep., 11/2/21, 250:22-251:1, 239:3-239:23; ECF No. 135 at 3.

118.   There is no evidence that the adoption of the LCPP has prevented patient

harm.  30(b)(6) Dep., 11/2/21, 249:16-249:21, 247:19-248:7.

119.   The LCPP has not had a measurable impact on patient safety at YNHH. 30(b)(6) Dep., 11/2/21, 249:16-249:21, 247:19-248:7.

120.   YNHH measures the impact of multiple programs designed to prevent patient harm with metrics and data.  Ex. 76 (hereinafter, "Choi Dep., 6/20/22"), 35:6-38:12; *see* Ex. 35.

121.   A Serious Safety Event is an action or inaction that constitutes a deviation from generally accepted performance standards, the effect of which reaches a patient and results in moderate to severe harm to a patient, or a patient's death.  Ex. 34; 30(b)(6) Dep., 11/2/21, 200:1-201:20.

122.   In approximately 2014, YNHH adopted the High Reliability Organization initiative, aimed at reducing patient harm. YNHH measured the success of this iniative with metrics and attributed an 80% reduction in the Serious Safety Events metric to this iniative.  Ex. 35 at YNHH 135858-61; Choi Dep., 6/20/22, 38:17-39:23; 39:6-40:6, 66:10-67:4; 30(b)(6) Dep., 11/2/21, 186:24-187:15, 189:9-190:5.

123.   Dr. Hawkins believes that if the LCPP did little else than prompt some late career practitioners to consider retiring, it has performed a real service.  Ex. 45.

124.   Dr. Herbert testified that practitioners retiring to avoid LCPP exams was widespread and should have been included in the JAMA article published by Balcezak and Cooney as an impact of the LCPP.  Herbert Dep., 260:15-262:4.

125.   In 2020, the LCPP was amended to make practitioners who stated that they would retire within six months after their next reappoinment date exempt from the LCPP examinations.  Ex. 20 at YNHH 118804; Balcezak Dep., 7/12/22, 40:6-41:1.

126.    A practitioner's statement that they will retire within six months after their reappointment date does not make that practitioner any safer to practice today. 30(b)(6) Dep., 7/12/22, 41:10-41:17.

127.    From 2017 until at least 2019, YNHH considered whether to amend the LCPP to apply to individuals in the "Refer & Follow" category—individuals who did not have YNHH clinical privileges, and could not practice at YNHH, and in June 2018, the YNHH Medical Executive Committee considered a proposal to this effect. Zinck-Lederer Dep., 357:20-358:8, 418:10-422:4, 430:2-430:9; Ex. 23; Ex. 24 at YNHH 146666; Brown Dep., 157:6-157:12, 219:10-219:17.

128.    Refer & follow practitioners posed no risk to YNHH patients.  Zinck-Lederer Dep., 430:10-430:14.

129.    In an email sent in connection with this proposed amendment, Ms. Zinck-Lederer said that "Based on experience to date, if the change to the policy passes to include these folks in late career testing, I would estimate that we would have 15-25% just drop off and go to Honorary"—which is the retired staff—"w[ith]out undergoing testing."  Ex. 23, Zinck-Lederer Dep., 290:17-291:5, 418:10-422:4.

130.    Connecticut state law requires YNHH report to the Department of Public Health anytime it has "any information that appears to show that a health care professional is, or may be, unable to practice his or her profession with reasonable skill or safety for any of the following reasons: (A) Physical illness or loss of motor skill, including, but not limited to, deterioration through the aging process …".  Conn. Gen. Stat. Ann. § 19a-12e(b)(1); Balcezak Dep., 9/27/22, 14:18-14:24.

131.    YNHH asserted that as of January 14, 2020, 18 practitioners

"demonstrated cognitive deficits that were likely to impair their ability to practice medicine independently." Ex. 52; Cooney Dep. 12/9/21, at 244:10-15, 245:9-246:1; *see also* Ex. 53 at YNHH 004389.

132.    Since the inception of the LCPP, YNHH has reported only one practitioner to the Connecticut Department of Health based on their performance on the LCPP exams. Balcezak Dep., 7/12/2022, 126:20-127:16; Zinck-Lederer Dep., 385:6-385:14.

IV. <u>THE LCPP EXAMS ARE UNRELATED TO JOB PERFORMANCE</u>

133.    There is no correlation between a practitioner's LCPP neuropsychological exam performance and any YNHH measures of patient safety or practitioner performance.  30(b)(6) Dep., 11/2/21, 293:18-294:2, 286:6-286:10.

134.    YNHH has hundreds of metrics to measure patient safety.  30(b)(6) Dep., 11/2/21, 201:24-202:3.

135.    YNHH reviewed data regarding practitioners who performed poorly on the LCPP neuropsychological screening exam, and found no correlation between performance on the LCPP neuropsychological screening exam and any of the Hospital's measures of patient safety.  30(b)(6) Dep., 11/2/21, 293:18-294:2.

136.    Dr. Hawkins believed that it was important, with regard to possible legal challenges to the LCPP, to evaluate the LCPP neuropsychological battery against measures of physician competence in order to determine if the battery was serving its purposes.  Ex. 33 at YU011211-12; Hawkins Dep., 5/12/22, 65:17-66:6.

137.    Dr. Hawkins did not evaluate the LCPP battery against other measures of practitioner competence. Hawkins Dep., 5/12/22, 114:12-114:17.

138.    As of September 27, 2022, the LCPP neuropsychological screening

battery had not been validated as a screening instrument to identify the function of older physicians.  Balczak Dep., 9/27/22, 33:18-33:24.

139.   To date, the LCPP neuropsychological screening battery has not been validated as a screening instrument to identify the function of older physicians. Balczak Dep., 9/27/22, 33:18-33:24.

140.   The LCPP neuropsychological exam is not designed to determine if a practitioner is fit to practice medicine, or if they are making errors in their jobs. Hawkins Dep., 5/12/22, 132:22-133:4, 303:5-303:10.

141.   A practitioner making errors on the LCPP neuropsychological exams does not mean that practitioner will make comparable errors when performing their job.  Hawkins Dep., 5/12/22, 300:15-301:13, 303:5-303:10.

142.   The LCPP neuropsychological exam cannot predict the likelihood that a practitioner will harm a patient.  Hawkins Dep., 5/12/22, 119:11-120:1.

143.   Dr. Joanne Papinchock, YNHH's expert I/O psychologist, testified that the LCPP neuropsychological examinations do not predict competence to perform privileges safely and effectively. Ex. 92 (hereinafter "Papinchock Dep., 2/22/23"), 91:9-92:24.

144.   The LCPP neuropsychological examinations do not predict competence to perform privileges safely and effectively. Papinchock Dep., 2/22/23, 91:9-92:24.

145.   Dr. Papinchock testified that the LCPP neuropsychological examinations do not measure impairment in the ability of a practitioner to perform their privileges safely and effectively.  Papinchock Dep., 2/22/23, 91:9-92:24.

146.   The LCPP neuropsychological examinations do not measure impairment

in the ability of a practitioner to perform their privileges safely and effectively. Papinchock Dep., 2/22/23, 91:9-92:24.

147. YNHH made inquiries regarding practitioners who had had real challenges performing on the LCPP neuropsychological exams, including seeking feedback from the chair of the practitioner's department, speaking with the Director of the clinic the practitioner worked in, looking at the practitioner's quality metrics and patient complaints, interviewing medical staff members the practitioner worked with, interviewing the practitioner's partners in their private office, and looking at notes the practitioner wrote.  30(b)(6) Dep., 11/2/21, 283:22-286:10.

148. With respect to most of these practitioners, these other sources of information did not indicate that the practitioner was impaired.  30(b)(6) Dep., 11/2/21, 283:22-286:10.  However, Dr. Balczak believed these individuals were impaired because of the results of their neuropsychological exams.  *Id.*

149. Dr. Hawkins stated on each LCPP results form that neuropsychological findings should not be used as the sole factor in YNHH's determination of a practitioner's capacity to exercise clinical responsibilities. Ex. 32 at YNHH 000915; Ex. 31 at YU021644, n.1; 30(b)(6) Dep., 11/2/21, 281:23-282:4.

150. Even after administering the comprehensive examination, in multiple instances Dr. Hawkins could not tell whether a practitioner's exam performance resulted from age-related cognitive decline or other causes, such as personality, a poor response to testing, or "intellectual abilities" that "may have always been below those of most physician peers." Hawkins Dep., 5/12/22, 299:25-300:4; Ex. 36 at YNHH 018959; Ex. 36 at YNHH 009438 (Dr. Herbert: one "cannot tell which

[results] are caused by ███████ ditzy personality which has not changed in 30 years."); Herbert Dep., 253:8-255:5, 255:16-255:18; Ex. 39 at YNHH 122850-51.

151.    For at least four practitioners who underwent the LCPP comprehensive exam, Dr. Hawkins advised YNHH that, to determine whether the practitioners would make errors on the job, YNHH should monitor their on-the-job performance. Ex. 36 at YNHH 018960; Hawkins Dep., 5/12/22, 301:15-303:10; Ex. 36 at YNHH 009438; Ex. 40 at YU004684; Ex. 38 at YNHH122829; Ex. 39 at YNHH 122851.

152.    For multiple practitioners, Dr. Hawkins recommended that YNHH analyze a practitioner's specific job duties to determine whether the neuropsychological weaknesses he perceived would have any effect on their job performance. Ex. 36 at YNHH 018960; Ex. 38 at YNHH 122829; Ex. 41 at YNHH 017282.

153.    The impact of cognitive decline on whether a practitioner may safely practice medicine is dependent on a variety of factors, including whether the practitioner works alone or with peers, and the number of procedures the practitioner performs.  Hawkins Dep.,  5/12/22, 271:5-272:12.

154.    Dr. Papinchock testified that the LCPP neuropsychological screening exam is job-related for nearly every job in America.  Papinchock Dep., 5/5/23, 236:3-9; 250:11-23; Papinchock Dep., 1/6/23, 201:20-202:2; 193:10-193:14.

155.    The relevance of particular neuropsychological strengths, or weaknesses, to competence in the practice of medicine varies across medical specialties, settings, and specific tasks and responsibilities.  Ex. 31 at YU021644; Ex. 32 at YNHH 000915; Hawkins Dep., 5/12/22, 125:16-125:25.

156.    To date, there has been no job analysis conducted of all the positions

subject to the LCPP to determine if the LCPP measures abilities actually required for each position.  Hawkins Dep., 5/12/22, 78:19-79:3; Ex. 36 at YNHH 018960.

157.   Practitioners in at least 44 positions have been subject to the LCPP. Papinchock Dep., 5/5/22, 198:21-24; Papinchock Dep., 1/6/22, 184:9-10.

158.   Practitioners with the same job title may exercise different privileges. Papinchock Dep., 5/5/22, 223:23-224:22;  Balcezak Dep., 7/25/22, 276:6-11.

159.   Pathologists in 10 different subspecialties perform different tasks. Balcezak Dep., 7/25/22,  273:15-274:9.

160.   Certain tests in the LCPP neuropsychological screening battery seek to measure abilities which are not necessary for every practitioner with clinical privileges at YNHH.  Hawkins Dep., 5/12/22, 304:24-305:18.

161.   YNHH recognizes that "It's one thing to fail on a test for visuospatial deficits.  It's another thing altogether to not be able to look at a chest x-ray and see a mass.  The two are logically very related, but unless you show a direct correlation, you can't say that there is a validated correspondence or correlation between your failure to be able to put two pieces of an airplane together and your ability to read a chest x-ray." Balcezak Dep., 9/27/22, 186:13-187:1.

162.   The LCPP neuropsychological screening battery includes tests seeking to measure a practitioner's visuospatial abilities and short-term memory. 30(b)(6) Dep., 11/2/21, 79:13-79:18, 120:5-121:4; Hawkins Dep., 5/12/22, 181:4-18; Hawkins Dep., 7/29/22, 25:13-21; Balcezak Dep., 7/25/22, 274:10-275:15.

163.   YNHH's expert Dr. Papinchock asserts that other tests in the LCPP core battery seek to measure language production, attention, concentration, visual

memory, visual perception, processing speed, and visual-motor coordination (a.k.a. eye-hand coordination).  ECF No. 202-3 at Table 1 & Appx. G.

164.    YNHH found that a practitioner who was "severely memory impaired" and whose "short-term memory [wa]s impaired" could still perform his teaching duties safely. 30(b)(6) Dep., 11/2/21, 301:7-19.

165.    According to Dr. Papinchock, some practitioners' jobs require them to do one or more of the following: (a) make quick decisions; (b) deal with distractions; (c) use rapid movement relying on eye hand coordination; (d) use fine motor skills; (e) perform mental math; (f) analyze visually presented information; (g) work directly with patients; (h) work alone with patients at least some of the time with no one to monitor their performance. ECF No. 202-3 at 79, at 32 & Table 6 & Appx. G.

166.    Some practitioners' jobs do not require them to do one or more of the following: (a) make quick decisions; (b) deal with distractions; (c) use rapid movement relying on eye hand coordination; (d) use fine motor skills; (e) perform mental math; (f) analyze visually presented information; (g) work directly with patients; (h) work alone with patients at least some of the time with no one to monitor their performance. Ex. 86 Musto Dep. at 28:6-29:4; 34:17-35:1, 42:15-43:8; Ex. 85 at 46:11-17, 61:8-15;  Ex. 84 (hereinafter, "Nash Dep., 9/1/21"), 98:14-99:9; Pinto Dep., 11/6/21, 43:10-12; Ex. 82 at 75:21-76:1; Ex. 97 (hereinafter, "Kashgarian Dep., 9/9/21"), 61:9-11, 33:20-34:4, 23:13-19; Ex. 81 at 42:4-8, 63:4-19; Ex. 80 at 51:12-20; ECF No. 202-3 at Table 6 & Appx. G.

**V.**     **YNHH LACKS EVIDENCE THE THE LCPP IS NECESSARY TO ITS BUSINESS.**

   **A.**     **YNHH's Data Does Not Show that Practitioners Age 70+ are Higher Risk**

167.    YNHH asserts that the LCPP is necessary because practitioners aged 70 and older, as a group, are more likely to experience cognitive impairment, and cognitive impairment is linked to worse patient outcomes. 30(b)(6) Dep., 11/2/21, 112:18-113:24, 218:24-219:16, 264:15-266:5.

168.    Not all practitioners aged 70 and older are at risk of cognitive impairment. The risk of an individual 70-year-old practitioner developing cognitive impairment may not be higher than that of an individual 65-year-old practitioner. 30(b)(6) Dep., 11/2/21, 264:15-266:5, 270:1-270:6.

   **B.**     **YNHH Practitioners Aged 70+ are Not Peer Reviewed at Higher Rates**

169.    YNHH has two peer review committees: the Professional Practice Evaluation Committee ("PPEC"), which oversees matters concerning professional competency; and the Medical Staff Professionalism Committee ("MSPC"), which handles Code of Conduct violations and issues of professionalism.  Ex. 25, at 113597. See 30(b)(6) Dep., 11/2/21, 40:10-16 ("PPEC handles questions of individual physician . . .  competence based on errors that have occurred or near misses that have occurred."); Zinck-Lederer Dep., 119:5-9.

170.    PPEC was formerly the Institutional Practice Quality and Peer Review Committee ("IPQPRC"), before YNHH split off the MSPC to handle professionalism deportment. Issues of professionalism are concerning to YNHH because they can lead to patient harm occurring. 30(b)(6) Dep., 11/2/21, 38:11-39:15.

171.    PPEC receives reports from RL solutions, the Chief Medical Officer's

office, chair chiefs, or issues raised out of OPPE or peer review within a department, that relate to concerns regarding an individual practitioner's competence. "[I]f there is a concern about whether or not that practitioner's is somehow in question, the PPEC – the PPEC will evaluate that." 30(b)(6) Dep., 11/2/21, 33:4-36:5; 147:12-23; Zinck-Lederer Dep., 57:10-58-25; *see* Ex. 9.

172.    YNHH's OPPE Policy states that practitioner specific issues identified as a result of OPPE that demonstrate patterns of concern or serious matter are referred to the PPEC. Ex. 25, at 113602.

173.    Collegial intervention, which is any interaction between one practitioner and another with the objective of improving patient safety is also part of peer review. Zinck-Lederer Dep., 88:24-89:17.

174.    The excel file at Exhibit 9 is intended to track peer review committee discussions of individual practitioners ("peer review spreadsheet"), and its information is drawn from contemporaneous notes of peer review committee minutes after each meeting.  Each entry lists: the date of the committee meeting; the name of the committee; the practitioner's first and last name; the practitioner's department; the practitioner's practice status; a summary of the issue discussed; an associated medical record number (if applicable); and what conclusion, if any, was reached by the committee and any action or follow up items. Ex. 9; Zinck-Lederer Dep., 328:1-21, 328:1-332:13.   YNHH relies on the spreadsheet "[t]o keep track of issues related to particular practitioners so that we can trend them and have an easy way of looking back to see what their history was" for peer review and Zinck-Lederer represented that YNHH uses the spreadsheet to similarly trend

departments. Zinck-Lederer Dep., 328:1-21, 328:1-332:13.

175.   YNHH's Morrisey database practitioner privileges information, and their date of birth. Zinck-Lederer Dep., 24:23-26:21, 350:20-352:22; Ex. 72.

176.   A statistical analysis that compared the proportion of practitioners with clinical privileges aged 70 and older at YNHH who appear on the peer review spreadsheet, against the proportion of practitioners with clinical privileges younger than 70 at YNHH who appear on the peer review spreadsheet, found no statistically significant difference between those two proportions. This analysis used the Morrissey spreadsheet to determine the age of those practitioners. Ex. 69 (George Rept.) ¶¶ 8, 11, 14, 16-21, 33 & Appx. A, at Table 5-6.

177.   Further statistical analysis looking only at peer review spreadsheet entries with a unique MR number was consistent with Dr. George's main finding. Ex. 69 (George Rept.) ¶¶ 23-32 & Appx. A, at Table 7.

### C.   YNHH Practitioners Under Age 70 Keep their Privileges after Making the Types of Errors the LCPP is Intended to Prevent

178.   YNHH asserts that the intent of the LCPP is to "find people who have a potential, that is important, to not be able to practice safely because of some impairment in their cognitive ability."   30(b)(6) Dep., 11/2/21, 291:16-292:6.

179.   YNHH itself does not administer any proactive examinations to identify practitioners under age 70 who have the potential to not be able to practice safely. 30(b)(6) Dep., 11/2/21, 114:1-116:1.

180.   A pathologist misreading a slide and missing a cancer diagnosis, a surgeon performing surgery on the wrong body part of a patient, and a surgeon performing the wrong procedure on a patient, are examples of the type of patient

harm that the LCPP is intended to prevent. Balcezak Dep., 9/27/2022, 36:23-37:18.

181.   Multiple pathologists under the age of 70 missed diagnoses and were not asked to relinquish their privileges. Ex. 9, at entries 2/26/13, ███████████████, 9/2/2020, ███████████, and 4/27/2021, ████████████; *see* Ex. 72.

182.   While under the age of 50, ████████████ performed the wrong surgery on a patient; unintentionally punctured the vena cava and abdominal aorta of a patient during surgery, who died; was subject to peer review in connection with the deaths of four patients who died while or shortly after ████████████ operated on them; and had nine of his cases reviewed by the YNHH legal department due to "excessive malpractice claims." YNHH did not ask ████████████ to relinquish his privileges based on these matters. Ex. 9, entries 2/25/2014, 3/20/2012, 6/25/2019, 1/25/11, 10/25/2016, 6/25/2019, 2/23/2021; Ex. 72; Balcezak Dep., 9/27/22, 50:1-51:11, 47:21-48:7, 49:18-24, 63:11-15; 46:22-47:20, 51:12-55:7, 65:5-16.

183.   ████████████ a neurosurgeon, twice performed surgery on the wrong location (including performing spinal surgery on the wrong side of a patient) while she was under age 60.  YNHH did not ask ████████████ to relinquish her privileges.  Ex. 9, entries 5/27/2014 and 12/27/2017; Balcezak Dep., 9/27/22, 69:6-71:8, 74:23-75:3; Ex. 72.

184.   While under the age of 50, ████████████ injured a patient's portal vein during surgery, who then died; deviated from the standard of care by operating on a patient without a diagnosis, who died; was subject to peer review in connection with the deaths of four patients on whom he had operated; and was the subject of multiple complaints from medical students about his behavior.  YNHH did not ask

██  ██ to relinquish his privileges. Ex. 9, entries 5/27/2014, 11/26/2019, 12/18/2019, 1/28/2020, 7/14/2020, 5/17/2016. *See* Balcezak Dep., 9/27/22, 88:21-89:2, 89:17-19; Ex. 72.

### D.   YNHH Does Not Examine Other "High Risk" Groups

185.   With respect to medical practitioners under the age of 70, YNHH does not assess the risk of the practitioner having a "cognitive flaw" until peer review reveals a possible competence concern. 30(b)(6) Dep., 11/2/21, 142:22-143:18.

186.   Physicians are at an extremely high risk of mental health and substance abuse issues.  30(b)(6) Dep., 11/2/21, 321:13-321:18.

187.   YNHH has not implemented a random drug or alcohol testing program for its medical staff. Ex. 73 at 28; Herbert Dep., 215:11-215:13.

188.   Risk of cognitive impairment is increased by experiencing multiple concussions, suffering a stroke, COVID-19.  Hawkins Dep., 7/29/22, 56:13-58:18.

189.   YNHH has no policy requiring that all practitioners who suffer concussions, a stroke, or COVID-19 undergo a neuropsychological examination before returning to practice at YNHH.  Instead, impairment from these issues is governed by the MSHP.  30(b)(6) Dep., 7/12/22, 180:17-182:4, 191:23-192:5.

190.   From March 17, 2020, through March 19, 2021, Dr. Hawkins did not administer any LCPP neuropsychological examinations (the "COVID pause"), other than one administered to Dr. Cooney in November 2020 over Zoom.  Ex. 21; Balcezak Dep., 7/12/22, 200:3-200:13; Balcezak Dep., 7/12/22, 201:15-203:8, 208:9-208:17; Hawkins Dep. 5/12/22, 26:21-27:23.

## VI. <u>INCONSISTENT APPLICATION OF THE LCPP</u>

191.    YNHH continued to operate between March 2020 and March 2021.  30(b)(6) Dep., 7/12/22, 166:6-166:8.

192.    During the COVID pause, the YNHH Credentials Committee renewed the clinical privileges of over 35 practitioners for two full years, without those practitioners completing the LCPP examinations for that credentialing cycle.  Ex. 50 at YNHH 146464, YNHH 146469-70.

193.    When YNHH resumed LCPP testing in March 2021, it had a backlog of practitioners to schedule for LCPP testing. Brown Dep., 80:18-82:5.

194.    From 2021 to present, Dr. Hawkins has been the only neuropsychologist administering the LCPP exams. Brown Dep., 80:22-83:14; ECF No. 202-3 at 17.

195.    YNHH initially provided six months for practitioners to complete their LCPP testing after the end of the COVID pause.  However, multiple practitioners were not able to secure an appointment with Dr. Hawkins within that amount of time. Brown Dep., 111:24-112:20, 80:22-83:14.

196.    YNHH did not engage additional neuropsychologists to more quickly examine practitioners who were not able to complete their neuropsychological examinations within this six-month period, but provided another six-month extension, for a total of one year after the end of the COVID pause to complete testing. Brown Dep., 80:22-83:14.

197.    The chart attached hereto as Exhibit 41 accurately reflects the credentialing deadline or deadline for a practitioner to re-take the LCPP exams after receiving a qualified pass, and date that practitioner took the LCPP screening exam

for that testing cycle, or relinquished their clinical privileges.  Ex. 41.

198.  Dr. Balcezak had concerns about ▉▉▉▉▉▉ practicing due to "confusion and visualization" problems, after ▉▉▉▉▉▉ received the seventh lowest global score on the LCP screening exam, but YNHH allowed ▉▉▉▉▉▉ to keep practicing until her retirement in May 2018, without any additional examinations.   Balcezak Dep., 7/12/22, 229:13-230:9, 231:3-232:14;  Ex. 22 at YU021811;  Ex. 58 at 6 (YNHH 004226).

199.  After receiving a qualified pass on the LCP screen examination in March 2018, ▉▉▉▉ had an original deadline to undergo the LCPP neuropsychological screening exam again on March 26, 2019.  ▉▉▉▉ did not complete the examination but was allowed to continue practicing through January 31, 2021.  Ex. 22 at YU021814; Ex. 21; Ex. 61 at 43 (July 2020 sheet); Ex. 72;  Ex. 42.

## VII.  YNHH COULD USE LESS DISCRIMINATORY ALTERNATIVES

200.  YNHH medical staff members and patients report concerns about YNHH practitioners' performance and/or suspected impairment to YNHH.  Moore Rept. 31-33; Herbert Dep. 39:22-40:2; 41:11-14; 42:15-43:1; 43:24-44:10; 44:19-45:3; id. at 157:14-18,21:3-8; 42:19-43:1; 30(b)(6) Dep., 11/2/21, 176:15-177:4.

201.  YNHH received approximately 16,000 patient complaints in 2021. Ex. 78 (hereinafter, "Mallozzi Dep."), 57:22-58:13.

202.  YNHH employees and medical staff file approximately 15,000 complaints per month.  30(b)(6) Dep., 11/2/21, 177:20-178:8.

203.  Academic literature shows that most practitioners feel prepared to and do report suspected impaired colleagues.  Ex. 73, 31-36; id. at n. 223.

204.    Based on coworkers' reported concerns, YNHH has requested neuropsychological testing of practitioners under age 70, including for ██ ████████████████████ 30(b)(6) Dep., 11/2/21, 296:22-298:23; 299:8-18; Ex. 9, at entries 4/14/2015 (████████ id. entry 9/25/2018 (██████ Ex. 72.

205.    Medical practitioners at YNHH report concerns about their colleagues' performance and/or suspected impairment through a number of avenues, including, RL Solutions, the compliance hotline, or by notifying leadership.  Ex. 9; 30(b)(6) Dep., 7/12/22, 174:19-175:2; 30(b)(6) Dep., 11/2/2021, 176:15-177:4.

206.    There is an association between number of patient complaints regarding a practitioner and malpractice claims. Ex. 73 at 49.

207.    There is an association between number of patient complaints regarding a practitioner and adverse outcomes. Ex. 73 at 46 (citing Cooper WO, Guillamondegui O, Hines OJ, *et al., Use of unsolicited patient observations to identify* surgeons with increased risk for postoperative complications. JAMA Surg. 2017;152(6):522-529.).

208.    Automatically analyzing the frequency of patient complaints relating to a practitioner can identify underlying practice issues.  *See* Ex. 73 at 35 (citing Hickson GB and Pichert JW. *Identifying and addressing physicians at high risk for medical malpractice claims.* In Patient Safety Handbook. 347-368, 357 (Barbara J. Youngberg, ed. 2013)).

209.    YNHH does not conduct an automated analysis of the frequency of patient complaints about its practitioners. Mallozzi Dep. 191:2-11, 192:11-193:15 195:22-197:19.

210.   Language analysis of patient complaints about practitioners can differentiate practitioners with neurocognitive disorders from those without such disorders.  See Ex. 73 at 35 (citing Cooper WO, Martinez W, Domenico HJ, et al., *Unsolicited patient complaints identify physicians with evidence of neurocognitive disorders*. Am J Geriatr Psychiatry. 2018;26(9):927-936)).

211.   YNHH does not conduct language analysis of its patient complaints. Mallozzi Dep. 192:11-193:15 195:22-197:19; Balcezak Dep., 11/2/21, 198:4-10.

212.   A system that analyzes and codes patient complaints regarding practitioners, like the Vanderbilt Patient Advocacy Reporting System, can create reports comparing one practitioner to their peers in terms of patient complaints to identify practitioners who are outliers, similar to how the Vizient system allows YNHH to identify practitioners who are outliers on certain safety metrics.  30(b)(6) Dep. 11/2/21, 196:5-196:19; Ex. 73 at 49; Ex. 25 at YNHH 113604.

213.   YNHH does not use a system that analyzes and codes patient complaints to generate reports comparing a practitioner to their peers; instead, YNHH generates and reviews reports showing practitioners with three or more patient complaints in the prior 24 months. Mallozzi Dep. 191:2-11, 192:3-7, 195:22-197:19.

214.   If YNHH utilized a drop-down menu of practitioner names in RL Solutions to identify subject of the complaint for staff complaints, it could run reports easily identifying all staff complaints relating to a particular practititoner.  YNHH could do so.  Mallozzi Dep., 173:22-175:24.

215.   With respect to staff complaints, YNHH does not use a drop-down menu of practitioners' names in RL Solutions, and currently cannot run a report showing

all staff complaints relating to a particular practitioner.  Choi Dep., 6/20/22, 162:11-163:4; Choi Dep., 6/14/22, 89:11-90:7.

216.   Through OPPE, YNHH identified ███████████ approximate age 58, as an outlier using OPPE.  YNHH required ██████ submit to neuropsychological testing, which revealed a visuospatial deficit that was impacting her job performance.  Ex. 9, entries 4/25/2017, 5/23/2017, 9/19/2017, 10/24/2017; Ex. 50, at YNHH 146407-08; 30(b)(6) Dep., 11/2/21, 294:15-20; 294:21-296:15; Ex. 72; Balcezak Dep., 9/27/22, 162:6-163:22, 168:6-171:8.

217.   YNHH does not train its medical staff on how to identify signs of cognitive impairment. According to Dr. Balcezak and Dr. Herbert, YNHH does not provide staff with training on identifying coworkers with a cognitive impairment.  30(b)(6) Dep., 11/2/21 185:15-185:21; Herbert Dep., 64:1-64:19.

## VIII.   THE LCPP'S OPHTHALMOLOGICAL EXAM

218.   YNHH had no basis, other than consistency with the LCPP neuropsychological screening, for selecting age 70 as the age at which to require completion of an ophthalmological exam in order to receive clinical privileges at YNHH.   Balcezak Dep., 7/25/22, 287:18-288:19.

219.   Legally blind practitioners have practiced at YNHH. Balcezak Dep., 7/25/22, 289:24-290:8; Herbert Dep. 214:7-214:12.

220.   Having unimpaired vision is not a requirement for all medical practitioners at YNHH to perform their jobs.  Balcezak Dep., 7/25/22, 290:10-290:16; 30(b)(6) Dep., 11/2/21, 294:15-294:18, 298:6-299:7; Herbert Dep. 214:7-214:12.

221.   YNHH does not know why it is appropriate to rely on self-report to identify

vision impairments in practitioners under age 70, but not for practitioners aged 70 and over. Balcezak Dep., 7/25/22, 294:12-294:18.

222.    YNHH could rely on self-report to identify vision impairments in practitioners age 70 and older.  Ex. 5; Balcezak Dep., 7/25/22, 294:12-294:18.

223.    Since the implementation of the LCPP, no practitioner's ophthalmologic evaluation results have every been found to preclude them from safely exercising their privileges.  Balcezak Dep., 7/25/22, 296:10-296:14.

224.    The ophthalmologic exam requirement of the LCPP has had no impact on patient safety at YNHH. Balcezak Dep., 7/25/22, 296:10-296:14.

225.    The ophthalmologic exam requirement of the LCPP has had no measurable impact on YNHH patient safety. Balcezak Dep., 7/25/22, 296:10-296:14.

Dated:    March 24, 2023

Respectfully submitted,

s/ Caitlin D. Brown
*Attorneys for Plaintiff*
Caitlin D. Brown
Trial Attorney
Bar No. phv11110
Tel: (929) 506-5277
caitlin.brown@eeoc.gov

Kimberly A. Cruz
Supervisory Trial Attorney
Bar No. phv10827
Tel: (929) 506-5345
kimberly.cruz@eeoc.gov

Daniel Seltzer
Trial Attorney
Bar No. phv20678233
Tel: (929) 506-5308
Daniel.Seltzer@eeoc.gov

U.S. Equal Employment

Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004
Fax: (212) 336-3623

Anastasia Doherty
Trial Attorney
Bar No. phv206963
Tel: (617) 865-3685
anastasia.doherty@eeoc.gov

U.S. Equal Employment
Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
15 New Sudbury St., Rm. 457
Boston, MA 02203

Andres F. Puerta
Trial Attorney
Bar No. phv207157
Newark Area Office
Two Gateway Center, 17th Floor
Newark, NJ 07023
andres.puerta@eeoc.gov