**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | **Civil Action No. 3:20-CV-00187-VLB** |
| **Plaintiff,** | |
| **v.** | **The Hon. Vanessa L. Bryant** |
| **YALE NEW HAVEN HOSPITAL, INC.,** | **June 12, 2023** |
| **Defendant.** | |

**BRIEF OF *AMICUS CURIAE* IN SUPPORT OF YALE NEW HAVEN HOSPITAL, INC.**

## TABLE OF CONTENTS

**Page**

I.  STATEMENT OF INTEREST OF *AMICUS CURIAE* ........................................... 1

II.  SUMMARY OF ARGUMENT ............................................................................ 2

III.  AGE HAS ALWAYS BEEN USED IN MEDICINE FOR CLINICAL GUIDELINES AND PRACTICES ........................................................................... 5

IV.  THE ADEA AND ADA HAVE ALWAYS RECOGNIZED THAT CERTAIN OTHERWISE QUALIFIED INDIVIDUALS MAY BE UNABLE TO MEET THE DEMANDS OF A PARTICULAR JOB BECAUSE OF AGE OR DISABILITY ..... 7

V.  THE GROWING POPULATION OF OLDER PHYSICIANS ............................... 10

VI.  LIMITATIONS IN PEER REVIEW SYSTEMS .................................................... 12

VII.  BY SEEKING TO EXCLUDE AGE AS THE HEALTHCARE INDUSTRY SUPPORTS THE NEED FOR AGE-BASED SCREENING AS PART OF PEER REVIEW PROCEDURES .................................................................................. 16

VIII.  THE YNHH POLICY DOES NOT MANDATE RETIREMENT AND PROVIDES MULTIPLE LAYERS OF REVIEW FOR THE PHYSICIANS.............................. 18

IX.  CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Diaz v. Pan Am. World Airways, Inc.*
  442 F.2d 385 (5th Cir. 1971) ................................................................. 8

*Equal Employment Opportunity Commission v. Commonwealth of*
  *Massachusetts*
  987 F.2d 64 (1st Cir. 1993) ................................................................... 7

*Equal Employment Opportunity Commission v. State of New Jersey*
  631 F.Supp. 1506 (D.N.J. 1986) ......................................................... 18

*Hodgson v. Greyhound Lines, Inc.*
  499 F.2d 859 (7th Cir.1974) ............................................................ 8, 9

*KD ex rel. Dieffenbach v. U.S.*
  715 F. Supp. 2d 587 (Dist. Delaware 2010) ...................................... 14

*Maki v. Commissioner of Educ. Of State of New York*
  568 F. Supp. 252 (N. D. New York 1983) ............................................. 8

*Murnane v. American Airlines, Inc.*
  667 F.2d 98 (D.C. Cir. 1981) ................................................................ 8

*Usery v. Tamiami Trail Tours, Inc.*
  531 F.2d 224 (5th Cir. 1976) ............................................................ 2, 8

*Western Air Lines v. Criswell*
  472 U.S. 409 (1985) ............................................................................. 7

FEDERAL STATUTES, REGULATIONS, AND RULES

14 C.F.R.
  § 61.23 ................................................................................................. 9
  § 61.23(d) ........................................................................................... 18
  § 67.1 ................................................................................................... 9
  § 67.103(a) ......................................................................................... 18
  § 67.103(b) ......................................................................................... 18
  § 67.111(b) ......................................................................................... 18

42 U.S.C.
  § 11101 ............................................................................................... 14
  § 11101 *et seq.* ................................................................................. 19

Patient Safety and Quality Improvement, 73 Fed. Reg. 8112 (Feb. 12, 2008)
(to be codified at 42 C.F.R. Part 3)........................................................................ 15

<u>C</u>ALIFORNIA <u>S</u>TATUTES, <u>R</u>EGULATIONS, AND <u>R</u>ULES

Cal. Gov. Code
§ 12941 et seq................................................................................................ 7
§ 12942(c)(2) ................................................................................................. 7

<u>C</u>ONNECTICUT <u>S</u>TATUTES, <u>R</u>EGULATIONS, AND <u>R</u>ULES

19 C.G.S.
§ 19a-17b ....................................................................................................... 19

<u>F</u>EDERAL <u>L</u>EGISLATIVE <u>M</u>ATERIALS

House Committee on Education and Labor, H.R. Rep. No. 99-756 at 5632 ............... 8

House Committee on Education and Labor, H.R. Rep. No. 99-756 at 5638 ............... 8

<u>O</u>THER <u>A</u>UTHORITIES

California Public Protection and Physician Health, Inc., *Assessing Late
Career Practitioners: Policies and Procedures for Age-based Screening*
(2014) ............................................................................................................ 2

Catherine M. DesRoches, et al., Physicians' Perceptions, Preparedness for
Reporting, and Experiences Related to Impair and Incompetent
Colleagues, 304 JAMA 2, 187 (2010) ......................................................... 4

Cedars Sinai, Mild Cognitive Impairment, at https://www.cedars-
sinai.org/health-library/diseases-and-conditions/m/mild-cognitive-
impairment-
mci.html#:~:text=Brain%20changes%20associated%20with%20MCI,pati
ent%20ages%2C%20their%20risk%20increases ...................................... 6

Celestina Radogno, Throwing in the Towel (literally): The Risks of Aging
Surgeons and Why Individualized Medical Testing is the Best Solution,
29 Elder L.J. 463, 473 (2022) ................................................................... 16

David W. Bates, M.D., et al., The Safety of Inpatient Health Care, N. Engl. J.
of Med. 388, 142 (2023) ............................................................................ 13

Dinesh Vyas and Ahmed E. Hozain, Clinical peer review in the United
States: History, legal development and subsequent abuse, 20 World J.
Gastroenterol 6357, 6358 (June 2014).................................................... 12

Donald M. Berwick, M.D. M.P.P., *Constancy of Purpose for Improving Patient Safety - Missing in Action*, N. Engl. J. Med. 388, 181 (2023).................. 15

E.G. Campbell, et al., *Professionalism in Medicine: Results of a National Survey of Physicians*, 147 Annals of Internal Med. 795 (2007) ........................... 4

Institute of Medicine Committee on the Quality of Health Care in America, *To Err is Human: Building a Safer Health System*, (National Academy of Sciences, National Academy Press, 2000) ........................................................ 14

Jennifer L. Hunt, *Assessing physician competency: an update on the joint commission requirement for ongoing and focused professional practice evaluation*, 19 Advances in Anatomic Pathology 6, 388 (2012) ........................ 12

John Hopkins Medicine, Despite New Recommendations, Women in 40s Continue to Get Routine Mammograms at Same Rate (2013) at https://www.hopkinsmedicine.org/news/media/releases/despite_new_re commendations_women_in_40s_continue_to_get_routine_mammogram s_at_same_rate.......................................................................................... 6

John T. Fortunato and Daniel Londyn Menkes, *The aging physician: A practical approach to protect our patients*, 14 Clinical Ethics 1, 46 (SAGE Journals, 2019) .............................................................................. 16

John T. James, *A new, evidence-based estimate of patient harms associated with hospital care*, 9 Journal of Patient Safety 3, 122 (2013) .......... 14

Joint Commission, Standard MS 11.01.01; Bylaws and Rules and Regulations of the Yale New Haven Hospital, Inc. for the Medical Staff, Article VI, Section O (2020) ...................................................................... 3

Joint Commission, *What are the key organizations need to understand regarding the Focused Professional Practice Evaluation requirements,* at https://www.jointcommission.org/standards/standard-faqs/critical-access-hospital/medical-staff-ms/000001485/?p=1 ............................................ 13

Kaveh G. Shojania and Mary Dixon-Woods, *Bad apples': time to redefine as a type of systems problem?*, 22 BMJ Qual Saf 7, 528 (2013) ............................ 15

Leo Cooney, MD and Thomas Balcezak, MD, *Cognitive Testing of Older Clinicians Prior to Recredentialing*, 323 JAMA 14, 179, 180 (2020) ................... 12

M. A. Makary & M. Daniel, *Medical error-the third leading cause of death in the US*, 353 BMJ i2139 (2016)................................................................ 14

M. Panagioti, et al., Prevalence, severity, and nature of preventable patient harm across medical care settings: systematic review and meta-analysis, 366 BMJ l4185 (2019).......................................................... 14

**Medical Examinations for FAA Employees and Air Traffic Applicants Requiring Medical Clearance and Certification, FAA Order 3930.14 CHG 1 (FAA August 19, 2020)** ............................................................................................ 9

**Niranjan Rao, MD, Report 1 of the Council on Medical Education:** *Guiding Principals and Appropriate Criteria for Assessing the Competency of Physicians Across the Professional Continuum*, **(CME Report 01-N-21) (American Medical Association, 2021) ("AMA CME 2021 Report")** . 10, 11, 16, 17

*Report of the Council on Medical Education Guiding Principles* ............................ 17

**Robert T. Sataloff, MD, DMA, FACS, et al.,** *The aging physician and surgeon*, **ENT Journal (2018)** .............................................................................. 11

**Tania Haddad, DMD, MD,** *Cognitive Assessment in the Practice of Medicine - Dealing with the Aging Physician*, **39 Physician executive 4, 14 (2013)** ......... 11

**Todd K. Rosengart, et al.,** *Transition Planning for the Senior Surgeon: Guidance and Recommendations from the Society of Surgical Chairs*, **154 JAMA Surgery 7, 647 (2019)** ........................................................................... 17

**UCLA Health, Preventative Health Screenings, By Age at https://www.uclahealth.org/sites/default/files/documents/NewPatientGuide-PrevHealth_FINAL_091721.pdf** ....................................................................... 5

**William A. McDade, MD, Report 5 of the Council on Medical Education:** *Competency and the Aging Physician* **(CME Report 5-A-15) (American Medical Association, 2015) ("AMA CME 2015 Report")** ................................. 16, 17

**William MacNee, et al., Ageing the Border Between Health and Disease, 44 Eur. Respir. J. 1332, 1345 (2014)** ....................................................................... 6

**YNHH Department of Physician Services Medical Staff Policy & Procedure Late Career Practitioner, Section 9, Review of Information** ................................ 19

I.   **STATEMENT OF INTEREST OF *AMICUS CURIAE***

The Amici are an individual and healthcare organizations dedicated to supporting, protecting patient safety and enhancing professional development and education. Each shares a commitment to ensuring that the systems in place for evaluating the quality of care provided by practitioners are able to appropriately identify and respond to any deficiencies in the knowledge, skill, health and other qualifications which directly impact the delivery of safe care. These organizations and individuals have provided guidance on the entire spectrum of health issues affecting practitioners, including the cognitive and physiologic changes that occur in the natural aging process. Some have recommended and/or developed and implemented screening programs for late career practitioners or know of health care systems or entities that would like to implement such programs and therefore have a direct interest in the outcome of any legal process which addresses the availability of such a program.

The practice of medicine carries great responsibility and pressures, and Amici are part of the extensive network of professionals and organizations in the US that assist over 1 million physicians and other health professionals every day in maintaining their wellbeing. Many Amici have participated in an intensive effort to examine the implications of, and find solutions for, the extraordinary growth of the number of healthcare providers working at, and beyond, the age of 70, and therefore wish the Court to have the benefit of their experience and findings in this very important matter.

The Amici are: John A. Fromson, M.D.; the National Academy of Neuropsychology; Medical Quality & Peer Review, LLC dba MDReview, a wholly owned subsidiary of Hardenberg, Inc.; the California Public Protection & Physician Health; and the National Association of Medical Staff Services.

## II.   SUMMARY OF ARGUMENT

"Priceless as is a single life in our concept of the value of human life and our undoubted unwillingness ever to approve a practice which might kill one but not, say, twenty, we think the safety factor should be evaluated in terms of the possibility or likelihood of injury/death." *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 238 (5th Cir. 1976).

Yale New Haven Hospital's ("YNHH") adoption of a staff policy and procedure for late career practitioners that includes a neurocognitive screen for members of its medical staff beginning at age 70 (the "Policy") did not occur in a vacuum. In the past 50 years, hundreds of articles and studies have been published globally demonstrating the effects of the natural aging process on physician performance and its implications for safe patient care. This effort has been in direct response to the growing numbers of physicians practicing beyond the traditional age of retirement, many well into their 70's and 80's. *See* California Public Protection and Physician Health, Inc., *Assessing Late Career Practitioners: Policies and Procedures for Age-based Screening* (2014) ("The implications of greater human longevity and rapidly increasing work-life expectancy are complex and the subject of intense study, particularly as they relate to the delivery of health care. . . The studies cited in the appendix necessitate an examination of how to

2

evaluate and address any decline in levels of function that might impact patient care and a consideration of whether using age as a factor in our evaluation mechanisms is an effective way of protecting patients.").

YNHH is but one of many healthcare institutions and organizations that have adopted or recommended programs that include age-based screening as part of the mandated process of evaluating the qualifications of physicians seeking appointment or reappointment to the hospital medical staff. Like all hospitals, YNHH must maintain an individual health and well-being function to identify and manage health-related issues of members of the Medical Staff that may impact their ability to safely care for patients. *See e.g.*, The Joint Commission, Standard MS 11.01.01; Bylaws and Rules and Regulations of the Yale New Haven Hospital, Inc. for the Medical Staff, Article VI, Section O (2020). In screening for neurocognitive and ophthalmologic changes in clinicians, YNHH has followed the science and the law, both of which have supported policies and practices addressing the impact of age-related decline in occupations and industries directly responsible for the safety of the public.

The movement toward screening older physicians is also driven by science demonstrating the limitations of existing hospital peer review and quality improvement systems. Notwithstanding the good faith and extraordinary effort of physician leaders who participate in the review of the quality of care of those providing care in hospitals, these systems are reactive in nature, many times addressing concerns with impairment or poor quality only after patients have suffered injury or death. Longstanding ethical standards that obligate clinicians to

3

maintain their own health and to individually and collectively address the health of colleagues have been very clearly shown to be limited by the reluctance of practitioners to report themselves and others even when an impairment is suspected. One study determined that 17 per cent of physicians surveyed had direct personal knowledge of a physician colleague who was incompetent to practice medicine in their hospital, group, or practice. Of those with knowledge, only 67% reported this colleague to the relevant authority." Catherine M. DesRoches, et al., *Physicians' Perceptions, Preparedness for Reporting, and Experiences Related to Impair and Incompetent Colleagues*, 304 JAMA 2, 187 (2010). A similar study found 45 percent of those with direct personal knowledge of an impaired or incompetent colleague did not always report that physician. *See e.g.,* E.G. Campbell, et al., *Professionalism in Medicine: Results of a National Survey of Physicians*, 147 Annals of Internal Med. 795 (2007).

Amici are aware of many hospitals and health systems that have considered and/or adopted similar screening programs but have delayed implementation because they have been directly threatened by similar EEOC actions or because of the fear of a future action. Amici question an EEOC action that treats YNHH patients undergoing lifesaving medical care in hospitals as less deserving of protection through a screening program than members the public utilizing services in industries long recognized as requiring more onerous retirement mandates.  Amici further question why YNHH and the many hospitals, health systems and medical groups that have adopted similar screening tools as part of their late career practitioner programs should not be afforded the same deference in interpreting

4

the extensive science regarding aging and its impact on patient care as courts have shown Congress, state legislatures, and regulatory agencies that have imposed more onerous hiring and retirement mandates utilizing the same science.

Finally, Amici do not argue that age-based screening for physicians should be mandatory for all hospitals. Indeed, a review of cases examining age-based policies in occupations responsible for public safety reveals great variation in their particular requirements. Amici respectfully urge, however, that this Court refrain from a holding that prohibits physician leadership responsible for the safety of patients from implementing an evidenced-based program to measure neurocognitive and other changes as a component of its legally mandated quality oversight function.

## III.   AGE HAS ALWAYS BEEN USED IN MEDICINE FOR CLINICAL GUIDELINES AND PRACTICES

Medicine has always looked to age in determining approaches to prevention and treatment because it has never been feasible or made sense to screen every person for every possible malady. In every instance, cost and benefits have been at the center of recommendations for preventative health screenings and have dictated the age at which a person and the system will most benefit from vaccines; breast, prostate, colon, lung, osteoporosis, abdominal aortic aneurism and prostate cancer screenings;  osteoporosis screening; and abdominal aortic aneurism screening. UCLA Health, Preventative Health Screenings, By Age at https://www.uclahealth.org/sites/default/files/documents/NewPatientGuide-PrevHealth_FINAL_091721.pdf.  The reason for age based preventative screening

is simple, "[a]geing is among the most important known risk factor for most chronic conditions and results from a range of intrinsic phenomena that affects the whole organism." William MacNee, et al., Ageing and the Border Between Health and Disease, 44 Eur. Respir. J. 1332, 1345 (2014). For older women, "screening mammograms are recommended because breast cancer, like most cancer, is a disease of aging, and a woman's risk of breast cancer increases as she grows older." John Hopkins Medicine, Despite New Recommendations, Women in 40s Continue to Get Routine Mammograms at Same Rate (2013) at https://www.hopkinsmedicine.org/news/media/releases/despite_new_recommend ations_women_in_40s_continue_to_get_routine_mammograms_at_same_rate

The YNHH Policy focuses on neurocognitive changes for an important reason. As a person ages, there is an increased risk of Mild Cognitive Impairment (MCI), a memory condition more severe than memory loss associated with typical aging. Cedars Sinai, Mild Cognitive Impairment, at https://www.cedars-sinai.org/health-library/diseases-and-conditions/m/mild-cognitive-impairment-mci.html#:~:text=Brain%20changes%20associated%20with%20MCI,patient%20ag es%2C%20their%20risk%20increases. MCI results from "buildup of plaque throughout the brain, shrinkage of the hippocampus, and enlargement of the brain's fluid-filled sacs (ventricles)." *Id.* "Symptoms of [MCI] are often subtle and patients may not even notice them because they often develop coping methods." *Id.* Symptoms include, but are not limited to, increasing forgetfulness, including forgetting important appointments or events, losing trains of thought, and difficulty navigating familiar environments. *Id.* Diagnosis of MCI may involve a neurological

6

exam. *Id.* Notably, "[p]atients with MCI are at an increased risk of developing dementia later in life." *Id.*

Contrary to the EEOC position, age-based considerations for physicians in the employment context are nothing new. For decades, medical groups throughout the US, like other professions, have included clauses in physician employment contracts that require that physicians retire at varying ages beyond 60 years old. Indeed, California's statutory prohibition of age discrimination in employment (Cal. Gov. Code § 12941 et seq.) contains a specific exception for physician-medical group contracts mandating retirement at age 70, stating that nothing in the Section shall be interpreted "[t]o prohibit compulsory retirement of any employee who has attained 70 years of age and is a physician employed by a professional medical corporation, the articles or bylaws of which provide for compulsory retirement." Cal. Gov. Code § 12942(c)(2).

IV.   <u>**THE ADEA AND ADA HAVE ALWAYS RECOGNIZED THAT CERTAIN OTHERWISE QUALIFIED INDIVIDUALS MAY BE UNABLE TO MEET THE DEMANDS OF A PARTICULAR JOB BECAUSE OF AGE OR DISABILITY**</u>

The ADEA was enacted in large part to prevent mandatory retirement based on "innocent" misperceptions as to the abilities of older employees, as well as more insidious "business" judgments as to their cost. *Equal Employment Opportunity Commission v. Commonwealth of Massachusetts*, 987 F.2d 64, 71 (1st Cir. 1993) (citing *Western Air Lines v. Criswell*, 472 U.S. 400, 410 (1985). The Bona Fide Occupational Qualification (BFOQ) "provision recognizes that certain mental or physical capabilities may decline with age, so that in some jobs with unusually

7

high demands, age can be a factor in hiring and retaining employees." House Committee on Education and Labor, H.R. Rep. No. 99-756 at 5632 (1986). Congress, state legislatures, regulatory agencies and industries long ago concluded that the safety of the public utilizing certain services is "of such humane importance, that the employer must be afforded substantial discretion in selecting specific standards which, if they err at all, should err on the side of preservation of life and limb." *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d at 238. Thus, "[t]he BFOQ exception simply means that an employer must demonstrate a link between the aging process and the demands of a particular job." H.R. Rep. No. 99-756 at 5638.

From the inception of the Age Discrimination in Employment Act and the Americans with Disabilities Act, mandatory retirement and more frequent health screening for commercial pilots, air traffic controllers, law enforcement, bus drivers, firefighters and other occupations have been legislatively mandated and upheld by courts. Thus, in cases in which "'the primary function of an [industry] is to transport passengers safely from one point to another,'" courts have held that "the overwhelming safety consideration… lowers the burden of proof, or the quantum of evidence to be adduced by the employer," in justifying mandatory retirement provisions. *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859, 862 (7th Cir.1974) (quoting *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir. 1971); *Maki v. Commissioner of Educ. Of State of New York*, 568 F. Supp. 252, 255 (N. D. New York 1983).

The deference afforded employers in this context is best captured by the D.C. Circuit in *Murnane v. American Airlines, Inc.*, 667 F.2d 98 at p. 101: "in our

judgment, the airline industry must be accorded great leeway and discretion in determining the manner in which it may be operated most safely. . . . others do not possess the expertise with which, in a cause presenting safety as the critical element, to supplant their judgments for those of the employer." In *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d at 863, the Court addressed the applicable burden of proof in evaluating the BFOQ defense finding, "Greyhound need only demonstrate… a minimal increase in risk of harm for it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice."

The BFOQ exceptions in the ADEA, and the jurisprudence arising therefrom, rests entirely on the recognition that age-based physiologic and cognitive decline are inevitable for all of us, *and* that the variability in age-related changes justifies a multi-layered approach to older employees. While much of the BFOQ caselaw has been focused on compulsory retirement laws and policies, those mandates co-exist with sophisticated quality improvement and peer based oversight systems, *and* the regular health screening of employees. For commercial airline pilots and air traffic controllers over the age of 40, Congress has mandated that health screening take place more frequently precisely because age-related changes are in no way uniform or predictable. See e.g., 14 C.F.R. Sections 61.23 and 67.1 *et seq.*; Medical Examinations for FAA Employees and Air Traffic Applicants Requiring Medical Clearance and Certification, FAA Order 3930.14 CHG 1 (FAA August 19, 2020).

9

It is noteworthy that in the seminal cases challenging  compulsory retirement, the courts have never embraced the argument EEOC advances here – that the existence of peer-based evaluation systems and  health/performance monitoring systems for pilots, air traffic controllers, bus drivers and law enforcement renders age-based hiring and retirement mandates unnecessary or improper. Like those industries, YNHH and other hospitals have concluded that the safety of their patients demand proactive measures to reduce the risks of age-related changes as a component of their traditional quality improvement and performance monitoring systems.

Most important is that the YNHH Policy in no way mandates that clinicians identified with potential neurocognitive changes retire. To the contrary, and as will be discussed below, in mandating a robust, multi-layered review process  in response to any significant findings in the screening process, the YNHH Policy incorporates protections for YNHH medical staff members that guard against the arbitrary exclusion of those demonstrating age-related changes. These include  the same hearing rights afforded to any practitioner subject to a  suspension or restriction of privileges.

## V.    THE GROWING POPULATION OF OLDER PHYSICIANS

In  2021, the American Medical Association Council on Medical Education ("AMA CME") reported that the total number of physicians 65 years and older had increased from 50,993 in 1975 to 343,694 in 2019. Niranjan Rao, MD, Report 1 of the Council on Medical Education: *Guiding Principals and Appropriate Criteria for Assessing the Competency of Physicians Across the Professional Continuum*,

(CME Report 01-N-21) (American Medical Association, 2021) ("AMA CME 2021 Report") at 1. The report further provides, "physicians 65 and older currently represent 29.8 percent of all physicians in the United States" and, within this age group, 43.6 percent were actively engaged in patient care. *Id.*

In current healthcare delivery models, the vast majority of hospitalized patients will be treated by an increasing number of older practitioners they will not select and will never meet. In the overwhelming majority of today's hospitals, physicians providing services in emergency medicine, surgery, radiology, interventional cardiology, anesthesia, pathology and other departments directly contract, either individually or through medical groups. Those contracted providers are hospital based or serve on call panels and are thus selected for individual patients by the hospital with no input from patients. Like passengers boarding a plane or a bus, hospital patients are entirely reliant on medical staff quality improvement and peer review systems to ensure providers are capable of providing safe and appropriate care.

The area of cognitive and physical decline of clinicians with age has been under intense scrutiny and review for many years with many researchers and thought leaders looking to the aviation industry as a guide. *See e.g.* Robert T. Sataloff, MD, DMA, FACS, et al., *The aging physician and surgeon*, ENT Journal (2018). A number of studies of the correlation of age and its impact on patient safety have very clearly demonstrated a link between age and poor outcomes for patients. *See e.g., id.*; *see also* Tania Haddad, DMD, MD, *Cognitive Assessment in the*

11

*Practice of Medicine - Dealing with the Aging Physician*, 39 Physician executive 4, 14 (2013); see also AMA CME 2021 Report, *supra*, at 5-8.

The results of the YNHH Policy itself supports the rationale for screening. Of the 141 providers screened, 19 (or 13.4%) were identified as having cognitive impairment sufficient to cause concerns about their clinical performance. Leo Cooney, MD and Thomas Balcezak, MD, *Cognitive Testing of Older Clinicians Prior to Recredentialing*, 323 JAMA 14, 179, 180 (2020). 13.4% of providers showing evidence of cognitive impairment is a *significant* number – even with reduced patient workloads, the 19 practitioners identified by the YNHH Program would see hundreds, if not thousands, of YNHH patients in a given year.

## VI.     LIMITATIONS IN PEER REVIEW SYSTEMS

Peer review "has its roots dating back to the early 20th century when the American College of Surgeons began using peer review as a means of defining minimum standard of care requirements for hospitals and their medical staff." Dinesh Vyas and Ahmed E. Hozain, *Clinical peer review in the United States: History, legal development and subsequent abuse*, 20 World J. Gastroenterology 21, 6357, 6358 (2014). In 1952, the Joint Commission "began requiring physician peer review across all [US]" hospitals. *Id.* In 2008, the Joint Commission formalized the *retrospective* peer review approach by requiring all hospital medical staffs to employ Ongoing Professional Practice Evaluation (OPPE) of all practitioners holding membership and privileges in the hospital. See Jennifer L. Hunt, *Assessing physician competency: an update on the joint commission requirement for*

12

*ongoing and focused professional practice evaluation*, 19 Advances in Anatomic Pathology 6, 388 (2012).

Under the Joint Commission standards, identification of issues in a clinician's care and treatment in the OPPE program are to be referred for a Focused Professional Practice Evaluation (FPPE).[1] The reality of these systems is that it is only when substandard care and potential injury have been identified that a corrective action process can be initiated. Indeed, studies demonstrate that "[a]dverse events were identified in nearly one in four admissions, and approximately one fourth of the events were preventable. These findings underscore the importance of patient safety and the need for continuing improvement." David W. Bates, M.D., et al., *The Safety of Inpatient Health Care*, 388 N. Engl. J. of Med. 2, 142 (2023). Such studies thereby give rise to the question, how can we make peer review, a traditionally retrospective and reactionary process, proactive and preventative?

---

[1] "The Focused Professional Practice Evaluation (FPPE) is a process whereby the medical staff evaluates the privilege-specific competence of the practitioner that lacks documented evidence of competently performing the requested privilege(sat at the organization. This process may also be used when a question arises of a currently-privileged practitioner's ability to provide safe, high quality patient care." See Joint Commission, *What are the key organizations need to understand regarding the Focused Professional Practice Evaluation requirements,* at https://www.jointcommission.org/standards/standard-faqs/critical-access-hospital/medical-staff-ms/000001485/?p=1

The 1991 Harvard Medical Practice Study (HMPS) was conducted in a large sample of patients hospitalized in New York State.  Key findings in the study "included an adverse event rate of 3.7 events per 100 admissions, of which 28% were judged to have been caused by negligence; 16% led to death or permanent disability." Bates, M.D., *supra*, at 143. The 1999 report "To Err is Human: Building a Safer Health System" by the Institute of Medicine ("IOM") followed the Harvard study and drew international attention to gaps in the ability of traditional hospital peer review systems to identify and respond to deficiencies in the care provided by physicians practicing in hospitals. Institute of Medicine Committee on the Quality of Health Care in America, *To Err is Human: Building a Safer Health System*, (National Academy of Sciences, National Academy Press, 2000). The report estimated that 44,000–98,000 Americans die each year due to preventable harm in hospitals. *Id.* at 1. The 2001 IOM report "Crossing the Quality Chasm: A New Health System for the 21st Century" and subsequent studies resulted in what is referred to as the Patient Safety movement, which advocates for a fundamental redesign of the U.S. health care system. *See* John T. James, *A new, evidence-based estimate of patient harms associated with hospital care*, 9 Journal of Patient Safety 3, 122 (2013); M. A. Makary & M. Daniel, *Medical error-the third leading cause of death in the US*, 353 BMJ i2139 (2016); M. Panagioti, et al., *Prevalence, Severity, and Nature of Preventable Patient Harm Across Medical Care Settings: Systematic Review and Meta-Analysis*, 366 BMJ  I4185 (2019).

Congress, state legislatures, accreditation and regulatory agencies, and healthcare organizations have responded to the above findings with a series of

initiatives designed to strengthen multiple aspects of hospital quality oversight systems. *See e.g.*, 42 U.S.C. §§ 11101 *et seq.*; *KD ex rel. Dieffenbach v. U.S.*, 715 F. Supp. 2d 587, 594 (D. Del. 2010).The issues motivating the initiatives are best captured in the Notice of Proposed Rule Making issued by the Department of Health and Human Services (HHS) and the Center for Medicare and Medicaid Services (CMS) in February 12, 2008 proposing regulations to implement certain aspects of the Patient Safety Rule, 42 C.F.R. Part 3:  "As compared to other high-risk industries, the health care system is behind in its attention to ensuring basic safety. . . . Providers are often reluctant to participate . . . for fear of liability, professional sanctions, or injury to their reputations . . . state-based legal protections for such . . . quality improvement activities . . . are limited in scope[.] Patient Safety and Quality Improvement, 73 Fed. Reg. 8112 (Feb. 12, 2008) (to be codified at 42 C.F.R. Part 3).

Notwithstanding these efforts, more recent studies suggest that the many initiatives have been slow to make a difference.  Donald M. Berwick, M.D. M.P.P., *Constancy of Purpose for Improving Patient Safety – Missing in Action*, N. Engl. J. Med. 388, 181 (2023). Other studies have described the persistence of the challenges of relying exclusively on doctors to report impairment in themselves or their peers- "Relying on colleagues to report poor conduct or performance is also unreliable." Kaveh G. Shojania and Mary Dixon-Woods, *Bad apples': time to redefine as a type of systems problem?*, 22 BMJ Qual Saf 7, 528 (2013).  "In one survey of physicians, 96% of respondents agreed that physicians should report impaired or incompetent colleagues to relevant authorities, but only about half who

had actually encountered such colleagues had in fact reported them." *Id.* "In another study, 17% physicians reported direct personal knowledge of a colleague whom they regarded as incompetent . . . ." *Id.* Yet, they also "acknowledged that they had taken no action cite[ing] the belief that someone else was taking care of the problem, the belief that nothing would happen as a result of the report, and fear of retribution." *Id.*; *see also* AMA CME 2021 Report, *supra*, at 6; *see also* Celestina Radogno, *Throwing in the Towel (literally): The Risks of Aging Surgeons and Why Individualized Medical Testing is the Best Solution*, 29 Elder L.J. 463, 473 (2022).

The YNHH Policy relies in good faith on widely accepted data in an attempt simply to identify colleagues that may be suffering changes they themselves or their colleagues have not yet recognized. It further attempts to close a persistent gap in the peer based system to identify and act upon these changes before patients suffer injury or death. *See* Sataloff, *supra* ("It seems self-evident that if we wait to take action until after a previously excellent surgeon has been sued repeatedly for bad outcomes, then we have waited too long and have failed the patients, hospital, and the aging surgeon."); *see also* John T. Fortunato and Daniel Londyn Menkes, *The aging physician: A practical approach to protect our patients*, 14 Clinical Ethics 1, 46 (SAGE Journals, 2019).

VII. <u>BY SEEKING TO EXCLUDE AGE AS THE HEALTHCARE INDUSTRY SUPPORTS THE NEED FOR AGE-BASED SCREENING AS PART OF PEER REVIEW PROCEDURES</u>

In response to the science and literature, hospitals and health systems across the country have adopted or considered late career practitioner screening

16

policies. Medical organizations throughout the US have adopted strong statements reinforcing the concern for patients and accepting the broad principles for identifying and reacting to age-related physiologic and cognitive decline. William A. McDade, MD, Report 5 of the Council on Medical Education: *Competency and the Aging Physician* (CME Report 5-A-15) (American Medical Association, 2015) ("AMA CME 2015 Report"); *see also* Todd K. Rosengart, et al., *Transition Planning for the Senior Surgeon: Guidance and Recommendations from the Society of Surgical Chairs*, 154 JAMA Surgery 7, 647 (2019).

In 2015, the AMA CME undertook a comprehensive review of the issue and declared its support for screening of physicians to assess their competence. AMA CME 2015 Report, *supra*. After surveying colleagues, the AMA CME reported that "[a]mong the respondents, which included staff from physician assessment centers, attorneys and state medical board members, 72 percent recommended that screening begin at age 65 or 70." *Id.* at 4.  The report concluded, "[s]elf-regulation is an important aspect of medical professionalism, and helping colleagues recognize their declining skills is an important part of self-regulation. Therefore, physicians must develop guidelines/standards for monitoring and assessing both their own and their colleagues' competency." *Id.* at 4.

In 2021, the AMA CME issued its "*Report of the Council on Medical Education Guiding Principles and Appropriate Criteria for Assessing the Competency of Physicians Across the Professional Continuum.*" AMA CME 2021 Report, *supra*. The report documented the extensive effort undertaken by the working group and concluded, "data and anecdotal information support guidelines for the screening

17

and assessment of late career physicians. The variations in cognitive skills as physicians age, as well as the changing demographics of the physician workforce, are key factors contributing to this need." *Id.* at 12.

VIII.   THE YNHH POLICY DOES NOT MANDATE RETIREMENT AND PROVIDES MULTIPLE LAYERS OF REVIEW FOR THE PHYSICIANS

The focus of  the YNHH Policy is on identifying potential health deficits in practitioners that may impact patient safety. The Policy and Bylaws set forth procedures for medical staff leadership to engage in an interactive process with the clinician to address any health issues *and* patient safety concerns resulting from an identified impairment. These include, but are not limited to, a leave of absence, additional supervision, non-disciplinary means of accommodating a health need, or a modification to the physician's scope or manner of practice. *See e.g.*, Bylaws, Article VI, Section P (relating to leaves of absence). As such, the YNHH policy itself is less onerous than other age-based mandates in other industries addressed herein. It neither mandates retirement nor imposes regular medical screening every six months or every year. *See e.g.*, *Equal Employment Opportunity Commission v. State of New Jersey* 631 F.Supp. 1506, 1514 (D.N.J. 1986) (upholding a mandatory retirement age of 55 for new jersey state police officers and citing to the fact that the state had implemented a program, "under which  all sworn officers receive a complete medical examination every year"); 14 C.F.R. Section 61.23(d); e.g., 14 C.F.R. Sections 67.103(a) and (b); 14 C.F.R. 67.111(b); *see also* Medical Examinations for FAA Employees and Air Traffic Applicants Requiring Medical Clearance and Certification, FAA Order 3930.14 CHG 1 (FAA August 19, 2020).

18

Under YNHH's Policy, further review is only undertaken regarding a practitioner "[i]f it is concluded that results of the neuropsychologic, ophthalmic, or any other medical examination suggest that the Member may not be able to safely exercise all or a sub-set of the requested privileges." YNHH Department of Physician Services Medical Staff Policy & Procedure Late Career Practitioner, Section 9, Review of Information. The process then requires that the Chief Medical Officer or his/her designee notify the relevant Department Chief, Section Chief or Associate Chief and request "him/her to review the requested privileges with the Member and discuss appropriate modifications." *Id.* There is no mandate for any further action. Any requested modifications to privileges or imposition of proctoring or other forms of oversight must then be reviewed consistent with the "routine procedure and the review and approval process" set forth in the Medical Staff Bylaws. (*Id.*) Any action that would be adverse to the physician's medical staff membership and ability to freely provide care to patients at the hospital entitles the physician to a fair hearing (i.e., due process). *Id.*

The YNHH Fair Hearing process set forth in the Medical Staff Bylaws is consistent with federal and state laws mandating that practitioners be provided with fair hearing rights to challenge any medical staff or hospital actions "adversely affecting" their ability to provide care in the hospital. *See* 42 U.S.C. § 11101 *et seq.*; *see also* 19 C.G.S. § 19a-17b. These procedures, which are unique to the healthcare industry, help ensure that no arbitrary or unreasonable action is taken against a provider's privileges, including action resulting from a late career neuropsychological screening.

19

## IX.   <u>CONCLUSION</u>

Amici submit this in support of YNHH and hospitals and health systems responsible for ensuring patient safety in an ever-changing healthcare system. The aging population in the United States has been at the forefront of important policy discussions across the entire spectrum of our society. If affirmed by this Court, the EEOC position would limit the measures with which health care facilities and medical staffs are able to prevent patient harm. It moreover would give rise to important questions about the extent to which and how peer review can be conducted in a preventative proactive manner when age, health, and wellbeing are an inherent part of systems for keeping patients safe. Quality of care and patient safety are cornerstones of health care and limiting a health care facility's or medical staff's ability to improve quality of care and promote patient safety would be contrary to public policy and the laws and regulations that govern peer review. Amici therefore oppose the EEOC's attempt to use the ADEA and ADA to prohibit late career provider policies and age-based screenings for healthcare providers.

DATED:  June 12, 2023          By:  **/s/ Arnold Ira Menchel**
                                         **Arnold Ira Menchel (ct07348)**
           **menchel@halloransage.com**
           **Halloran & Sage LLP**
           **One Goodwin Square, 225 Asylum Street**
           **Hartford, CT 06103-4303**
           **Tel: 860.297.4656**
           **Fax: 860.548.0006**

           *Of Counsel*
           **Richard D. Barton (CA SBN 102613)**
           **rick.barton@procopio.com**
           **Melinda M. Morton (CA SBN 209373)**
           **mindy.morton@procopio.com**
           **Rachael Harrington (CA SBN 298894)**
           **rachael.harrington@procopio.com**
           **Procopio, Cory, Hargreaves & Savitch, LLP**
           **525 B Street, Suite 2200**
           **San Diego, CA 92101**
           **Tel: 619.238.1900**
           **Fax: 619.235.0398**

## CERTIFICATION

This is to certify that on this 12th day of June, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

                                                           **/s/ Arnold Ira Menchel**
                                                       **Arnold Ira Menchel**

8682259v.1