**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY** | ) | |
| **COMMISSION** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Civil Action No. 3:20-CV-** |
| | ) | **00187-VLB** |
| **YALE NEW HAVEN HOSPITAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | **July 14, 2023** |

**BRIEF OF AMICI CURIAE AARP AND AARP FOUNDATION
SUPPORTING MOTION FOR SUMMARY JUDGMENT
OF PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Joshua R. Goodbaum (ct28834)
GARRISON, LEVIN-EPSTEIN,
      FITZGERALD & PIRROTTI, PC
405 Orange Street
New Haven, CT 06511
Phone: (203) 777-4425
Fax: (203) 776-3965
jgoodbaum@garrisonlaw.com

*Of Counsel*
Daniel B. Kohrman
William Alvarado Rivera
AARP FOUNDATION
601 E Street N.W
Washington, DC 20049
Phone: (202) 434-2064
Fax: (202) 434-6424
dkohrman@aarp.org

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................. iii

STATEMENT OF INTEREST OF AMICI CURIAE ....................................... 1

SUMMARY OF ARGUMENT ......................................................... 2

ARGUMENT ........................................................................ 6

I.   Amici Supporting YNHH Rely on Overbroad Generalizations About
     Cognitive Decline Among Older Physicians and, Thus, Do Not
     Follow the Science. ........................................................... 6

II.  Judicial Deference to YNHH's Age-Based, Disability-Revealing
     Exams Is Not Justified by Inapt Analogies to Age-Based
     Retirement Laws, and Disease Prevention Steps; Calls for Such
     Deference Amount to Asking This Court, Not Congress, to
     Amend the ADEA and ADA. ............................................... 12

     A.   The Medical Community's Use of Age to Prioritize Which At-Risk
          Patients Receive Tests or Treatments Does Not Support YNHH
          Imposing Significant Extra Burdens on Older Medical Staff in Order
          to Continue Their Employment. ..................................... 13

     B.   Legislatively Authorized Exceptions to the ADEA's Ban
          on Mandatory Retirement Provide No Support for YNHH's
          Unilateral Imposition of Age-Based Testing Requirements
          on Doctors Age Seventy and Over. ................................. 14

     C.   Mandatory Retirement Ages in the Employment Contracts
          of Physicians and Other Professionals Elsewhere Do Not
          Support YNHH's Imposition of Significant Additional
          Burdens on Doctors Age Seventy and Over and, In Many
          Cases, May Be Unlawful. .......................................... 15

     D.   YNHH Amici Do Not Adequately Address Facts Relevant
          to the ADA "Business Necessity" Proof Standard
          Articulated in *Conroy*. ............................................ 16

     E.   YNHH Amici Also Fail to Address Asserted Facts Which,
          If Deemed to be Undisputed and Favorable to the EEOC,
          Would Seriously Undermine the Defense That the LCPP Is
          a BFOQ or a Business Necessity. .................................. 18

i

**CONCLUSION** ......................................................................................................... **20**

**CERTIFICATE OF CORPORATE DISCLOSURE** ...........................................................

**CERTIFICATE OF SERVICE** ............................................................................................

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Clackamas Gastroenterology Assocs.,*
    *P.C. v. Wells*, 538 U.S. 440 (2003) ................................................................ 16

*Conroy v. N.Y. State Dep't Corr. Servs.,* 333 F.3d 88 (2d Cir. 2003) ............. 3, 16-18

*E.E.O.C. v. Com. of Mass.*,
    987 F.2d 64 (1st Cir. 1993) ........................................................................ 7

*E.E.O.C. v. Sidley Austin Brown & Wood*,
    315 F.3d 696 (7th Cir. 2002)........................................................................ 16

*Fountain v. N.Y. State Dep't of Corr. Servs.*,
    190 F. Supp. 2d 335 (N.D.N.Y. 2002), *aff'd in part and vacated in*
    *part sub nom. Conroy v. N.Y. State Dep't Corr. Servs.,* 333 F.3d 88
    (2d Cir. 2003) ............................................................................................. 2

*Hazen Paper v. Biggins*,
    507 U.S. 604 (1993) .................................................................................... 12

*Western Airlines v. Criswell*,
    472 U.S. 400 (1985) ..................................................................... 3, 4, 6-8, 18-19

<u>**Statutes**</u>

The Age Discrimination Act of 1975, 42 U.S.C. §§ 6101-07...................................... 14

    42 U.S.C. § 6104(b)  ................................................................................... 14

The Age Discrimination in Employment Act of 1967, as amended,
    29 U.S.C. §§ 621-634 ("ADEA")................................1, 3, 4, 5-7, 12, 14-16, 18-20

    29 U.S.C. § 623(f)(1). .................................................................................. 3, 4

    29 U.S.C. § 623(j)........................................................................................ 16

    29 U.S.C. § 631(c)(1) .................................................................................. 16

The Americans with Disabilities Act of 1990, as amended,
    42 U.S.C. §§ 12101, et seq. ("ADA")............................ 1, 2, 3, 5-6, 12, 16-18, 20

**Legislation**

The Age Discrimination in Employment Act of 1967,
  Pub. L. No. 90-202, 81 Stat. 602 (1967)..............................................16

  Pub. L. No. 90-202, 12(a) ................................................................16

The ADEA Amendments of 1978, Pub. L. No. 95-256, 92 Stat. 189 (1978) ..............16

The ADEA Amendments of 1986, Pub. L. No. 99-572, 100 Stat. 334 (1986). ...........16

**Other Authorities**

Bosma, H., et al., *Mental Work Demands Protect Against
  Cognitive Impairment*: MAAS Prospective Cohort Study,
  29 Experimental Aging Research 33 (2003)........................................9

Br. Amicus Curiae of AARP in Supp. of Plaintiff-Appellee,
  *Fountain v. N.Y. State Dep't Corr. Servs.,* No. 02-7415,
  2002 WL 32387881 (C.A.2 Sept. 29, 2002)........................................2

Br. Amicus Curiae of AARP in Supp. of Respondents,
  *Western Air Lines, Inc. v. Criswell*, No. 83-1545,
  1984 WL 565646 (Dec. 15, 1984) . ...............................................1

Centers for Disease Control and Prevention, "Stay Up
  to Date with COVID-19 Vaccines" Updated June 7, 2023,
  available at https://www.cdc.gov/coronavirus/
  2019-ncov/vaccines/stay-up-to-date.html. ....................................13

Comm. on the Pub. Health, Dimensions of Cognitive Aging, Bd. on Health Scis.
  Policy, Inst. of Med., *Cognitive Aging: Progress in Understanding and
  Opportunities for Action* (Dan G. Blazer, et al. 2015), available for download
  via https://pubmed, ncbi.nlm.nih. gov/25879131 ("Committee on Public
  Health Study")...................................................................7-8

Global Council on Brain Health, *Engage Your Brain: GCBH Recommendations on
  Cognitively Stimulating Activities*, 3 (2017), available at
  https://doi.org/10.26419/pia.00001.001 ........................................8-9

Lock, Sarah Lenz, et al., *Equity Across the Life Course
  Matters for Brain Health*, 3 Nature Aging 466 (2023) ..........................7

Marquie, J.C., et al., *Higher Mental Stimulation at Work Is
  Associated With Improved Cognitive Functioning In
  Both Young and Older Workers*, 53 *Ergonomics* 1287 (Nov. 2010)..............9

iv

Potter, G.G., et al., *Occupational Characteristics and Cognitive
        Performance Among Elderly Male Twins,* 67 *Neurology* 1377 (2010*) ............ 9

Schooler, et al., *The Continuing Effects of Substantively
        Complex Work on the Intellectual Functioning of Older
        Workers*, 14 Psychology and Aging 483, 491 (1999) .................................. 9-10

Pursuant to the Court's Order of June 9, 2023,[1] AARP and AARP Foundation hereby submit this brief of amici curiae supporting the motion for summary judgment filed by plaintiff Equal Employment Opportunity Commission ("EEOC").

<u>STATEMENT OF INTEREST OF AMICI CURIAE</u>

AARP is the nation's largest nonprofit, nonpartisan organization dedicated to empowering Americans 50 and older to choose how they live as they age. With a nationwide presence, AARP strengthens communities and advocates for what matters most to the more than one hundred million Americans 50-plus and their families: health security, financial stability, and personal fulfillment. AARP's charitable affiliate, AARP Foundation, works to end senior poverty by helping vulnerable older adults build economic opportunity and social connectedness.

Amici, among their other activities, advocate for sound interpretation and vigorous enforcement of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-34 ("ADEA"), and the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq. ("ADA"), the two laws at issue in this case. Amici regularly file amicus briefs and are actively engaged in litigation on behalf of older workers in federal and state courts.

In particular, Amici have a longstanding commitment to opposing mandatory age-based retirement, consistent with public safety concerns. *See, e.g.*, Br. Amicus Curiae of AARP in Supp. of Respondents, *Western Air Lines, Inc. v. Criswell*, No. 83-1545, 1984 WL 565646 (U.S. Dec. 15, 1984). Accordingly, Amici

---

[1]   ECF no. 291: "Should an established organization like to file an amicus brief [support]ing the Plaintiff's position, they may do so within 35 days of th[is] order."

have regularly challenged employer policies and practices that may unjustifiably pressure older workers who are performing their jobs well to retire or otherwise discontinue successful employment. One such practice has been employers' use of age-based, intrusive, and poorly justified disability-related exams and inquiries having the same effect, as the EEOC alleges in this case. In particular, Amici participated in the *Conroy/Fountain* case, which is highly relevant here, as it properly articulated an employer's burden of proof under the ADA in establishing the "business necessity" defense for  allegedly unlawful disability-related inquiries. *See Fountain v. N.Y. State Dep't of Corr. Servs.*, 190 F. Supp. 2d 335 (N.D.N.Y. 2002), *aff'd in part and vacated in part sub nom. Conroy v. N.Y. State Dep't Corr. Servs.*, 333 F.3d 88 (2d Cir. 2003); Br. Amicus Curiae of AARP in Supp. of Plaintiff-Appellee, *Fountain v. N.Y. State Dep't Corr. Servs.,* No. 02-7415, 2002 WL 32387881 (2d Cir. Sept. 29, 2002). The Late Career Practitioner Policy ("LCPP") adopted by defendant Yale New Haven Hospital, Inc. ("YNHH") raises important issues related to these concerns of Amici.

## SUMMARY OF ARGUMENT

AARP and AARP Foundation seek to assist the Court principally by addressing contentions in YNHH's amicus brief that, we respectfully submit, omit key findings on the science of aging, misstate applicable ADEA and ADA standards, and engage in generalizations that, on inspection, fail to support YNHH's burden of proof in this case. Br. Amicus Curiae in Supp. of Yale New Haven Hospital, Inc., ECF No. 294 ("YNHH Am. Br.").

YNHH Amici ask why YNHH and countless other private medical employers "should not be afforded the same deference . . . as courts have shown Congress, state legislatures, and regulatory agencies that have imposed more onerous hiring and retirement mandates[.]" YNHH Am. Br. at 4-5. Although that might be YNHH's preference, the fact remains that Congress and other government entities have chosen *not* to exempt YNHH's physician population from ADEA and ADA protections. That being the case, YNHH Amici's generalizations about cognitive decline, and their plea for a relaxed standard of proof to support age-based cognitive testing, bear close scrutiny with respect to the high standards of proof that in fact apply here. That includes proof, in accordance with the ADEA's "bona fide occupational qualification" ("BFOQ") affirmative defense: (1) that this specific age-based testing regime is "reasonably necessary" to promote the goal of safer patient care, *and* (2) that all or substantially all physicians in the over-age-seventy class otherwise would pose a performance risk unless tested, or that it would have been impossible or highly impractical to assess performance on an individualized basis. *Western Air Lines v. Criswell*, 472 U.S. 400, 412 (1985); 29 U.S.C. § 623(f)(1). Likewise, the ADA imposes on employers such as YNHH the burden to satisfy a high standard of "business necessity" to justify subjecting current employees to mandatory disability-revealing tests and inquiries. *See Conroy v. N.Y. State Dep't Corr. Servs.,* 333 F.3d 88, 97-98 (2d Cir. 2003) ("The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal.").

First, the broad generalizations offered by YNHH's Amici about the inevitability and consistency of cognitive decline add no meaningful evidentiary support to answer *Criswell*'s first question: is the LCPP cognitive testing of all medical practitioners age 70 and older at YNHH, and only those practitioners, "reasonably necessary to the normal operation of [YNHH's] business." 472 U.S. at 411 (quoting 29 U.S.C. § 623(f)(1)). Nor are defense Amici's generalizations helpful in answering *Criswell*'s equally important  questions at the second stage of the ADEA's BFOQ analysis: i.e., would all or substantially all YNHH practitioners in the over-age-seventy class pose a greater performance risk that would actually be identified by this specific test? And, is there no practical alternative means of identifying such risks by focusing on individualized assessments rather than testing all persons above a certain age? *Id*. at 422–23.

The scientific literature on cognitive decline shows the peril of relying on broad generalizations, showing huge individual variability in the incidence and scope of cognitive impairment among workers of all ages and older workers generally. Further literature shows that persons in "cognitively stimulating" professions such as medicine may suffer less cognitive decline, and even experience increased cognitive capability as they grow older. Defense Amici admit that this "variability . . . justifies a multi-layered approach to older employees." YNHH Am. Br. at 9. Yet, what they urge on this Court is an initial "layer"—involving, by all accounts, a substantial investment of institutional resources and focus—based solely on age. Thus, only in the most superficial sense is it accurate for defense Amici to observe—in the context of assessing the

LCPP—that "cognitive decline [is] inevitable for all of us[.]" *Id.* YNHH's position also ignores the substantial unknowns that persist in this field of science. Relying on broad generalizations about cognitive decline is equally questionable with respect to YNHH satisfying its burden of proof on the ADA's "business necessity" defense.

Second, defense Amici's plea for this Court to grant YNHH the same deference and relaxed ADEA and ADA standards that Congress and other levels of government have granted other safety-related occupations ignores key distinctions. YNHH Am. Br. at 4. Those industries recognized as allowing "more onerous retirement mandates" either have been specifically designated by Congress for special treatment under federal civil rights laws, or have proven, over time, their ability to carry their burden of proof on ADEA and ADA defenses given the circumstances peculiar to those occupations. YNHH cannot persuasively rely on either rationale for special treatment.

Amici AARP and AARP Foundation, with respect to YNHH Amici's more specific contentions, further submit: (1) that YNHH Amici's analogy to the use of age in disease prevention (e.g., for COVID testing) is inapt on numerous grounds, including the lower stakes of affected older individuals being placed in an age-based class for *recommended* testing and the common use of older age *in conjunction with non-age factors* in prioritizing eligibility for treatment (e.g., also testing younger individuals with risk factors); (2) that YNHH Amici, by omission, undervalue key pieces of evidence offered by EEOC (e.g., the fact that none of the other hospitals in YNHH's network view the LCPP as necessary and admissions

regarding the predictive value of the LCPP test); and (3) that mandatory retirement ages in employment contracts for physicians—"like other professions"—does not support YNHH's case for numerous reasons (e.g., the absence of a "patient safety" rationale for hospitals following other professions in routinely imposing mandatory retirement ages).

Undersigned Amici respectfully urge this Court not to relieve YNHH of its evidentiary burdens under controlling ADEA and ADA decisions.

## ARGUMENT

I.  **Amici Supporting YNHH Rely on Overbroad Generalizations About Cognitive Decline Among Older Physicians and, Thus, Do Not Follow the Science.**

A review of relevant scientific research, including a 2017 report that AARP helped assemble, indicates why broad generalizations about linkages between age and cognitive decline cannot suffice to meet the high burdens of proof imposed by the ADEA and the ADA.[2]

Research results show great variability of cognitive functioning—throughout the age spectrum—with differences in life experiences and various personal characteristics, clashing with YNHH's decision to screen all practitioners based solely on their reaching age seventy.[3] In other words:

---

[2]  YNHH Amici assert that aging *generally* "is among the most important known risk factors for most chronic conditions"; that "[a]s a person ages, there is an increased risk of Mild Cognitive Impairment (MCI)"; and that "[p]atients with MCI are at increased risk of developing dementia later in life." YNHH Am. Br. at 6-7. *See also id.* at 11 (citing a generalized link "between age and poor outcomes"— far from indicating specific danger of cognition-related errors by doctors age seventy and above).

[3]  This research reaffirms findings by Congress in enacting the ADEA, repeated in *Criswell*, 472 U.S. at 409: "psychological and physiological degeneration

> There is tremendous inter-individual and intra-individual variability in age-related changes in cognitive abilities. This vast heterogeneity among older adults increases the challenges associated with understanding cognitive aging. . . . Differences in the degree to which individuals' cognitive function changes with age are due in part to a lifetime of differences in experiences, health status, lifestyles, education, attitudinal and emotional factors, socioeconomic status, and genetics. The trajectory also varies for different cognitive functions. Some aspects of cognition decline with age while others show improvement or remain stable until the much later decades of life.[4]

Thus, despite contrary assertions of defense Amici, "cognitive decline is not inevitable as we age, and the rate of decline is not the same for all individuals." Lock, Sarah Lenz, et al., *Equity Across the Life Course Matters For Brain Health,* 3 Nature Aging, 466, 466 (2023).[5]  In particular, cognitive functioning in older age varies with "social determinants" of health, including conditions in early childhood, and with "personal modifiable factors" such as "hypertension, smoking, [and] obesity." *Id.* at 466–467.

     While YNHH Amici admit that such "variability . . . justifies a multi-layered approach to older employees[,]" YNHH Am. Br. at 9, what they actually urge on this Court is an initial "layer" based solely on age. The foregoing literature not only raises the burden of proof for choosing an age-only basis for the LCPP, but also begs the question of tradeoff where fewer finite resources are spent on the

---

caused by aging varies with each individual." *Accord: E.E.O.C. v. Comm. of Mass.*,  987 F.2d 64, 71 (1st Cir. 1993) (quoting *Criswell*).

[4]  *See* Comm. on the Pub. Health, Dimensions of Cognitive Aging, Bd. on Health Scis. Policy, Inst. of Med., *Cognitive Aging: Progress in Understanding and Opportunities for Action 32*–33 (Dan G. Blazer, et al. 2015), available for download via https://pubmed, ncbi.nlm.nih. gov/25879131 ("Committee on Public Health Study").

[5]  Sarah Lenz Lock is AARP's Senior Vice-President for Policy and Brain Health.

individualized alternatives spoken of in *Criswell*. YNHH amici do not address this issue.

Research results also offer evidence that YNHH physicians are better situated than many other older workers to maintain robust cognitive functioning—and in some instances, perhaps, to experience improvements in cognitive functioning—into older age and well beyond age seventy. For instance, cognitive functioning *increases* for some individuals in their 80s and 90s. *See* Committee on Public Health Study at 32-33.  In addition, there is great variability in where individuals start, such that some individuals score higher than others for life, so even though their scores decline, such scores remain at a very high level with regard to most of the population. *Id*. As will be seen, a likely contributing factor in such cases—being involved in intellectually challenging professions—suggests that doctors would be overrepresented in this older, high-functioning sub-population.

That is so because "[c]ognitively stimulating activities over the life course, such as engaging in formal or self-initiated informal educational activities, [and] continuing to engage in work experiences . . . provide benefits for adults' brain health."[6] Also, "cognitively stimulating activities may enhance a person's

---

[6]   Global Council on Brain Health, *Engage Your Brain: GCBH Recommendations on Cognitively Stimulating Activities*, 3 (2017), available at https://doi.org/10.26419/pia.00001.001 (listing "Consensus Statements"); *see id.* at 1 ("The Global Council on Brain Health (GCBH) is an independent collaborative of scientists, health professionals, scholars and policy experts from around the world working in areas of brain health to human cognition. The GCBH focuses on brain health relating to people's ability to think and reason as they age, including aspects of memory, perception and judgment. The GCBH is convened by AARP

cognitive reserve [and doing so] may allow people to cope better with age-related brain changes[.]"[7]

Indeed, a considerable body of research supports the proposition that "greater intellectual demand at work"—presumably, a fair summary of working conditions for physicians at YNHH and elsewhere—"result[s] in more stable cognitive performance in old age." Marquie, J.C.*, et al., *Higher Mental Stimulation at Work is Associated With Improved Cognitive Functioning In Both Young And Older Workers*, 53 *Ergonomics* 1287, 1287 (Nov. 2010) (citing Potter, G.G., et al., *Occupational Characteristics And Cognitive Performance Among Elderly Male Twins,* 67 *Neurology* 1377 (2010*)); see also id.*, Marquie, et al., at 1287 (citing Bosma, H., et al., *Mental Work Demands Protect Against Cognitive Impairment*: *MAAS Prospective Cohort Study,* 29 Experimental Aging Research 33 (2003), for "obtain[ing] results suggesting that the mental demands of work protected a population of men and women aged between 50 and 80 years against cognitive impairment").

Another longitudinal study—a 30-year study of adults between the ages of 55 and 85—reported as its "central finding" that as those studied "grew older, the level of complexity of their paid work continued to affect the level of their intellectual functioning as it had when they were 20 and 30 years younger." Schooler, et al., *The Continuing Effects of Substantively Complex Work on the*

---

with support from Age UK to offer the best possible advice about what older adults can do to maintain and improve their brain health.").

[7]  *Id.*

*Intellectual Functioning of Older Workers*, 14 Psychology and Aging 483, 491 (1999). The authors added that "the positive effect on intellectual functioning of doing substantively complex paid work appears even greater for older than for somewhat younger workers." *Id.* These studies at least raise serious questions as to the need for YNHH's decision to conduct across-the board cognitive screening of its medical practitioners, regardless of other risk factors, and regardless of the extent to which they interact directly with patients, every two years, starting at age seventy.[8]

One final lesson of relevant research considering the possible interplay of age, disability, and cognitive functioning is that there is much that we do not yet understand. Virtually all of the studies cited above include at the end a reflection on the need for further examination of the ways and extent to which age and cognitive functioning may be related. *See, e.g.*, Schooler, et al., supra at 42 ("Obviously, much more research, ranging from the sociological to the neurobiological, must be done before we can fully comprehend the generalizability of our findings or understand the mechanisms through which substantively complex work has its cognitive effect."). Absent greater certainty, and given legal standards requiring proof that age-based, disability-related employee exams must be "reasonably necessary," Amici submit that YNHH must show that its specific regime of cognitive testing is narrowly tailored to objective

---

[8]   Among other issues these studies raise is the LCPP's limited reflection of research and data on the variability of cognitive functioning. For instance, a test score indicating "normal" (or even high) cognitive functioning apparently does not alter the requirement to be tested every two years.

evidence of significant cognitive decline among its medical staff and of linkage between such impairment and concrete risks to patient safety.

In this regard YNHH Amici's reference to the position of the American Medical Association ("AMA") is noteworthy. Defense Amici discuss certain AMA actions and documents concerning "screening of physicians to assess their competence," and conclude by quoting a 2021 report stating that "data and anecdotal information support guidelines for the screening and assessment of late career physicians." YNHH Am. Br. at 17–18. The AMA, YNHH Amici argue, noted "variations in cognitive skills as physicians age" and "the changing demographics of the physician workforce" as "key factors contributing to *this need.*" *Id.* (emphasis supplied). The implication, of course, is that the AMA favors plans like the LCPP. Not so, apparently. Defense Amici fail to address the EEOC's assertion that the AMA has declared that "the effect of age on an individual physician's competency can be highly variable," and, accordingly, that "it is the policy of the AMA to oppose the use of cognitive exams as the major means of evaluating a physician's clinical competence." Mem. of Law Supp. EEOC's Mot. Summ. J., ECF No. 289 ("EEOC Br.") at 23.

In short, the broad generalizations of the YNHH Amici suggest that the LCPP was based on mere assumptions about the cognitive state of YNHH's older medical practitioners rather than a carefully considered analysis of the full range of patient safety risks posed by staff doctors of all ages, backgrounds, and medical conditions. The danger, of course, is unfounded age- and disability-based stereotypes holding sway in decisions affecting workers' employment. As

11

the Supreme Court said in *Hazen Paper v. Biggins*, "Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes"—that is, "stereotypes unsupported by objective fact." 507 U.S. 604, 610-11 (1993). Amici urge the Court to review the record to ensure such improper influences do not carry the day.

II.     **Judicial Deference to YNHH's Age-Based, Disability-Revealing Exams Is Not Justified by Inapt Analogies to Age-Based Retirement Laws, and Disease Prevention Steps; Calls for Such Deference Amount to Asking This Court, Not Congress, to Amend the ADEA and ADA.**

YNHH Amici press this Court to accord YNHH great deference in regard to its decision to adopt the LCPP, just as other courts have deferred to judgments by Congress, federal agencies, and state legislators, in upholding medical tests of various public and private sector workers. YNHH Am. Br. at 4–5. As will be seen, YNHH Amici ignore the fact that medical institutions have never been granted wholesale exemption from federal civil rights laws as have some government employers. Moreover, industries in which employers have been granted greater deference—in regard to certain kinds of employees—either have been expressly exempted from the ADEA and ADA by legislative or regulatory fiat or have earned greater deference in the courts by actually carrying their proper burden of proof under those laws. YNHH cannot point to these rationales as bases for a relaxed standard of proof, and their Amici's efforts to justify different treatment fall short.

### A. The Medical Community's Use of Age to Prioritize Which At-Risk Patients Receive Tests or Treatments Does Not Support YNHH Imposing Significant Extra Burdens on Older Medical Staff in Order to Continue Their Employment.

Amici supporting YNHH suggest that YNHH deserves great deference in deciding to impose greater testing requirements on senior physicians, based on their older age, by drawing an inapt analogy. "Medicine has always looked to age[,]" defense Amici say, at least in regard to screening persons who "will most benefit from vaccines" and from other treatments for serious conditions (e.g., cancers, osteoporosis) that affect mostly older persons. YNHH Am. Br. at 5–6. This ignores important distinctions between the use of age in medical care, and YNHH's rigid age employment rules in the LCPP.

Age-based "recommendations" as to who should—if they so choose—seek "preventative health screenings," *id.* at 5, obviously have less severe consequences than the potential employment-threatening tests of the LCPP. YNHH Amici also ignore the fact that age-based restrictions on medical treatments that favor (or disfavor) older persons usually are administered in a manner far more flexible with respect to age than the LCPP. For example, preferential access to COVID-19 vaccines for persons age 65 and older have virtually always included exceptions for younger persons with high-risk conditions such as immune system compromise.[9] But the LCPP does not

---

[9]   *See* Centers for Disease Control and Prevention, "Stay Up to Date with COVID-19 Vaccines" (Updated June 7, 2023) ("<u>People aged 65 and older</u> may get a second dose . . . <u>People who are moderately or severely immunocompromised</u>

analogously demand testing of younger YNHH doctors with high-risk conditions. EEOC Br. at 33. There is also the simple fact that health-related age restrictions and preferences—outside the context of conditions of employment—are not covered by the ADEA.[10]

### B. Legislatively Authorized Exceptions to the ADEA's Ban on Mandatory Retirement Provide No Support for YNHH's Unilateral Imposition of Age-Based Testing Requirements on Doctors Age Seventy and Over.

Amici supporting YNHH conflate age-based employment rules that are "legislatively mandated" and those that are otherwise "upheld by courts" under the ADEA's BFOQ affirmative defense. While the latter are relevant to this case, legislatively-mandated rules (or those promulgated by agencies pursuant to legislative authorization) are not, as they reflect Congress's judgment to give extra weight to safety considerations and to expand the leeway of certain employers—mostly federal, state, or local government employers—to consider age in setting a ceiling on an applicant's age when hired or in establishing mandatory retirement ages. *See* YNHH Am. Br. at 8 (referring to "firefighters"); 29 U.S.C. § 623(j) (ADEA exceptions regarding "[e]mployment as [a] firefighter or law enforcement officer"); *see also* YNHH Am. Br. at 9 (referencing congressionally mandated "health screening" for "commercial airline pilots and air traffic

---

may get additional doses . . . ."), available at https://www.cdc.gov/coronavirus/ 2019-ncov/vaccines/stay-up-to-date.html.

[10]   To be sure, the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101-07, bars a few age restrictions outside the employment context by recipients of federal funds, including most health care institutions. Yet, it has very broad exceptions, *see id.* § 6104(b), is rarely invoked, and suggests that *outside the employment arena*, Congress has chosen to be *far more deferential* in regard to different treatment based on age.

controllers" and regulations to that effect issued by the Federal Aviation Administration).

Although YNHH may prefer to be treated like a government safety agency, Congress has chosen not to similarly invest the medical profession with the same authority to weigh safety concerns against employee civil rights. For one, medical institutions like YNHH, unlike congressionally created agencies, are not accountable in the same manner, through governmental checks and balances, for their decisions as employers.

### C. Mandatory Retirement Ages in the Employment Contracts of Physicians and Other Professionals Elsewhere Do Not Support YNHH's Imposition of Significant Additional Burdens on Doctors Age Seventy and Over and, In Many Cases, May Be Unlawful.

In further support of the LCPP, YNHH's Amici cite text in "employment contracts" of physicians in "medical groups throughout the US," that imposes mandatory retirement ages. YNHH Am. Br. at 7. Presumably, this is meant as further evidence that "[m]edicine has always looked to age," *id.* at 5, and should be allowed to continue to do so. Again, defense Amici fall short of showing that in adopting the LCPP, YNHH simply "has followed . . . the law." *Id.* at 3.

The existence of mandatory retirement clauses in physician contracts elsewhere in the medical community is especially weak evidence that the LCPP's different treatment of older physicians is justified, because the ADEA may prohibit many such clauses. Indeed, it may also bar similar clauses in contracts of partners or principals in firms in "other professions." YNHH Am. Br. at 7. The

ADEA prohibits mandatory retirement of "employees" at any age.[11] However, some physician groups, like some law and other professional firms, claim that "partners" or "principals" are owners or "employers" and, thus, not "employees" subject to the ADEA, the ADA, or other federal employment laws. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 451 (2003) (remanding for district court to determine whether "physician-shareholders" were owners or employees of a medical clinic); *E.E.O.C. v. Sidley Austin Brown & Wood*, 315 F.3d 696, 701–02 (7th Cir. 2002) (discussing whether, and for what purpose, law firm partners are "employers" or "employees"). Unlike the small medical clinic in *Clackamas*, however, YNHH apparently has many older physicians, and YNHH Amici do not contend that these doctors are unprotected by the ADEA and, thus, susceptible to mandatory retirement ages and other age-based policies like the LCPP because they are not "employees." *See Clackamas*, 538 U.S. at 449–51.

### D. YNHH Amici Do Not Adequately Address Facts Relevant to the ADA "Business Necessity" Proof Standard Articulated in *Conroy*.

Amici supporting YNHH do not advance arguments sufficient to address a key component of the "business necessity" test articulated by the Court of Appeals in *Conroy*. While patient safety plainly qualifies as a goal satisfying the

---

[11] The ADEA originally barred mandatory retirement below age 65. Pub. L. No. 90-202, 81 Stat. 602 (1967), §12(a). Congress amended § 12(a) by eliminating mandatory retirement at ages between 65 and 70 in the ADEA Amendments of 1978, Pub. L. No. 95-256, 92 Stat. 189 (1978), and by eliminating mandatory retirement altogether, at least generally, in the ADEA Amendments of 1986, Pub. L. No. 99-572, 100 Stat. 334 (1986). The ADEA retains exceptions for some firefighters and law enforcement officers, 29 U.S.C. § 623(j), and some "bona fide executives and high policymakers," *29* U.S.C. § 631(c)(1).

business necessity test, the *Conroy* court declared: "we emphasize that the examination of whether a policy actually contributes to the business necessity is vital."  33 F.3d at 100. In short, invoking a key objective to be served by a policy mandating disability-revealing tests is not enough; it is just the first step:

> The adoption of a generally applicable policy does not allow the employer to escape scrutiny as to whether the policy is consistent with business necessity. We agree with the body of case law holding that a district court must carefully analyze whether an employer's requested inquiry of an individual employee falls within the business necessity exception; we hold today that the court must give equal attention to determining whether an employer's subjection of a particular class of employees to a general policy of inquiry is consistent with business necessity.

*Id.* at 101. YNHH Amici's offer of broad generalizations implies that specific proof that the LCPP "actually contributes to" patient safety at YNHH is of secondary importance; it is, in fact, a major undertaking under *Conroy*.

Defense Amici also claim the LCPP is relatively benign, *see e.g.*, YNHH Am. Br. at 18 (asserting it is "less onerous than other age-based mandates"), and procedurally guarantees "that no arbitrary or unreasonable action is taken," *id.* at 19. But such assurances, according to *Conroy*, must be put to the test to make sure, inter alia, that flexibility is not an opening to unfairness. That is:

> [even a] policy that is "designed to be humane" and to prevent "staff [from being] caught up in this process without reasonable justification" is certainly laudable in the abstract. However, the danger of such a flexible policy is that it could be used to target individuals with actual or perceived disabilities.

333 F.3d at 102. "Accordingly," the Second Circuit concluded, it would be "particularly helpful [for] the district court" to ensure "factual development as to what criteria [the employer] uses to identify" which of its employees whom it subjects to disability-related inquiries it deems to be at-risk of being dismissed

based on the results of such inquiries. *Id.* Undersigned Amici are confident the Court will hold YNHH to the standards articulated in *Conroy*.

### E.  YNHH Amici Also Fail to Address Asserted Facts Which, If Deemed to be Undisputed and Favorable to the EEOC, Would Seriously Undermine the Defense That the LCPP is a BFOQ or a Business Necessity.

Though defense Amici admit that YNHH is an outlier in implementing the LCPP, they strongly imply that, but for the EEOC, a so-called "movement toward screening older physicians" would take root. YNHH Am. Br. at 3. This amounts to asking the Court to draw precisely the opposite inference from the status quo that the *Criswell* Court drew.

In *Criswell*, the Court said the employer argued, like defense Amici here,

[i]n the absence of persuasive evidence supporting its position … that the [Court] should have [decided] to defer to '[its] selection of job qualifications for the position [at issue] that are reasonable in light of the safety risks.'

472 U.S. at 419. The Court declined, partly based on the fact that comparable employers had taken a different approach, relying on an individualized assessment of job qualifications, rather than age-based policies imposing extra burdens on older workers. *Id*. at 423. The Court concluded:

When an employee covered by the Act is able to point to reputable businesses in the same industry that choose to eschew reliance on mandatory retirement earlier than age 70, when the employer itself relies on individualized testing in similar circumstances, and when the . . . agency with primary responsibility for maintaining [industry] safety has determined that individualized testing is not impractical for the relevant position, the employer's attempt to justify its decision on the basis of the contrary opinion of experts—solicited for the purposes of litigation—is hardly convincing on any objective standard short of complete deference. Even in cases involving public safety, the ADEA plainly does not permit the trier of fact to give complete deference to the employer's decision.

*Id*. Since most other hospitals, including all four in YNHH's network, do not impose intrusive testing for older workers only, that fact certainly is highly relevant to whether such testing is a BFOQ for YNHH. EEOC Br. at 24. This conclusion is buttressed by *Criswell*'s observation—equally applicable here—that the defendant employer, "in similar circumstances," "itself relies on individualized testing." *Id.* That is, virtually all of YNHH's patient safety measures and doctor competence assessments—other than the LCPP—rely on "individualized" evidence of risk or poor performance.[12] Nor has the "agency" responsible for maintaining industry safety indicated an individualized approach

---

[12]   YNHH Amici also fail to address other key record facts which, if deemed to be undisputed and favorable to EEOC, would seriously undermine the case that the LCPP is a matter of "need." YNHH Am. Br. at 18. First, YNHH Amici ignore evidence that cognitive testing is not required of doctors under age 70 (i) who may be at-risk of having cognitive issues, *see* EEOC Br. at 33 (noting no testing is required for doctors at risk of cognitive impairment for reasons *other* than age like "stroke . . . multiple concussions . . . COVID-19, or high blood pressure"); or (ii) who fall short of clinical care standards.  S*ee* YNHH Am. Br. at 13-14 (noting, regardless of the age of physicians involved, that hospitals face "[a]dverse events . . . in nearly one in four admissions . . . one fourth of [which] were preventable" and "an adverse event rate of 3.7 events per 100 admissions, of which 28% were judged to have been caused by negligence"). Further, YNHH Amici beg the question before the Court by citing as fact YNHH's claim that LCPP test failure data show that 13.4% of age 70+ practitioners "hav[e] cognitive impairment sufficient to cause concerns about their clinical performance." YNHH Am. Br. at 12. This fails to rebut, inter alia, EEOC's contention that the YNHH exam's designer concedes—and an EEOC expert opines—that YNHH's cognitive tests were not designed to and, thus, could not predict whether a practitioner is fit to practice medicine or is likely to harm a patient.  EEOC Br. at 46. Nor do YNHH Amici answer EEOC's assertion that investigations of doctors who struggled with cognitive testing show no impairment in their performance. *Id.* at 7–8. Finally, while YNHH Amici raise serious questions whether peer review is adequate to protect patient safety *prospectively*, as opposed to retrospectively, YNHH Amici do not make a convincing case that this shows age-restricted, disability-revealing tests are *necessary*.

to patient safety is "impractical." *See* EEOC Br. at 22–24, 44–45 (discussing State Department of Health and "Joint Commission").

<u>CONCLUSION</u>

Amici AARP and AARP Foundation urge this Court to resolve the EEOC's Motion for Summary Judgment in accordance with science and the law as set forth above and in accordance with settled precedent under the ADEA and the ADA, which imposes on employers such as YNHH heavy burdens to justify age-restricted and disability-revealing examinations of incumbent employees such as are called for under the LCPP.

RESPECTFULLY SUBMITTED,
AMICI CURIAE

By:    /s/ Joshua R. Goodbaum
       Joshua R. Goodbaum (ct28834)
       GARRISON, LEVIN-EPSTEIN,
           FITZGERALD & PIRROTTI, PC
       405 Orange Street
       New Haven, CT 06511
       Phone: (203) 777-4425
       Fax: (203) 776-3965
       jgoodbaum@garrisonlaw.com

       *Of Counsel*
       Daniel B. Kohrman
       William Alvarado Rivera
       AARP FOUNDATION
       601 E Street N.W
       Washington, DC 20049
       Phone: (202) 434-2064
       Fax: (202) 434-6424
       dkohrman@aarp.org

## <u>CERTIFICATE OF CORPORATE DISCLOSURE</u>

The Internal Revenue Service has determined that AARP is organized and operated exclusively for the promotion of social welfare pursuant to Section 501(c)(4) of the Internal Revenue Code and is exempt from income tax. The Internal Revenue Service has determined that AARP Foundation is organized and operated exclusively for charitable purposes pursuant to Section 501(c)(3) of the Internal Revenue Code and is exempt from income tax. AARP and AARP Foundation are also organized and operated as nonprofit corporations under the District of Columbia Nonprofit Corporation Act.

Other legal entities related to AARP and AARP Foundation include AARP Services, Inc., and Legal Counsel for the Elderly. Neither AARP nor AARP Foundation has a parent corporation, nor has either issued shares or securities.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2023, I submitted the foregoing Brief of Amici Curiae AARP and AARP Foundation Supporting  Motion for Summary Judgment of Plaintiff EEOC to the CM/ECF system, which will send notice of electronic filing to counsel of record.

<u>*/s/*Joshua R. Goodbaum</u>
Joshua R. Goodbaum