**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *Plaintiff*, | ) | CASE NO. 3:20-CV-00187 (KAD) |
| v. | ) | |
| | ) | October 23, 2026 |
| YALE NEW HAVEN HOSPITAL INC., *Defendant*. | ) | |

**MEMORANDUM OF DECISION**
**RE: [251] PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND [247] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Kari A. Dooley, United States District Judge:

This action, commenced by the Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") against Yale New Haven Hospital, Inc. ("YNHH," "Yale," or "Defendant") on behalf of physicians over the age of 70 employed by YNHH, alleges discrimination under the Age Discrimination in Employment Act ("ADEA") and unlawful employment practices under the Americans with Disabilities Act ("ADA"). Specifically, Plaintiff asserts that Defendant's "Late Career Practitioner Policy ("LCPP"), the manner and method by which YNHH screens certain of its physicians for signs of mental or cognitive decline, is discriminatory under the ADEA and is an unlawful employment practice under the ADA. After almost three years of discovery,[1] both the EEOC and YNHH have moved for summary judgment. ECF Nos. 247, 251. For the reasons that follow, both motions are DENIED.

---

[1] This case was originally assigned to Judge Bolden when filed on February 11, 2020. It was subsequently transferred to Judge Bryant on September 14, 2020, after which, a preliminary scheduling order was entered. During the discovery period, on October 25, 2021, the case was transferred to then-District Judge Merriam. Thereafter, Magistrate Judge Farrish resolved a variety of discovery disputes, and discovery was extended at various times to January 10, 2023. *See* ECF No. 212. On October 4, 2022, the case was once again reassigned to Judge Bryant. Summary judgment motions were filed on March 24, 2023, and they were fully briefed on May 2, 2023. On July 17, 2023, the case was transferred to the undersigned.

**Facts and Procedural History**

The parties' familiarity with the pleadings, motions and record evidence is presumed. And the Court draws from the parties' respective Local Rule 56(a) statements of undisputed material facts and record evidence in setting forth the underlying dispute.[2] Generally, the parties agree as to the nature of Defendant's employment practices. And the parties' motions for summary judgment will turn on the mixed question of law and fact as to whether the practices are permissible under the law. Although both parties argue otherwise, the Court concludes that there are genuine issues of material fact which preclude summary judgment in favor of either party.[3]

Yale New Haven Hospital is a private, non-profit hospital in New Haven, Connecticut, with approximately 13,000 employees. YNHH's SMF, ECF No. 247-19, ¶ 2. YNHH established the Late Career Practitioner Policy, which requires physicians and other practitioners aged 70 and over who wish to obtain or renew clinical privileges to undergo "ophthalmic and neuropsychological testing" prior to their appointment or reappointment. EEOC's SMF, ECF No. 251-2, ¶ 2; YNHH's Counter SMF, ECF No. 269-16, ¶ 2. Yale asserts that the LCPP is one of many overlapping policies and practices for quality control of their medical practitioners. YNHH's SMF ¶¶ 7–8.

The LCPP applies to all YNHH practitioners and staff who are required to have clinical medical privileges at YNHH; those privileges are what allow practitioners and staff to come to Yale's hospital and take care of patients there. *See* EEOC's SMF ¶ 9. Further, the LCPP is only applied at the time of the practitioner's initial appointment and every two years thereafter during

[2] The Court has previously observed that the parties' failure to comply with Local Rule 56(a) renders the statements of little use in identifying areas of factual disagreement. *See,* ECF No. 334 at 2-5. Nonetheless, the Court can discern several areas where, nitpicking aside, the parties appear to agree.

[3] The parties also moved to preclude several of the disclosed experts, which, for the most part, the Court denied. Although relying in part on the motions to preclude in the summary judgment briefing, at oral argument on the cross motions, the parties asserted that the expert testimony at issue, even if considered, did not create a genuine issue of material fact. As discussed *infra.,* the Court disagrees.

their reappointment. *Id.* ¶ 11; Ex. O to YNHH's MSJ, ECF No. 247-17, at 3. The LCPP requires practitioners to "undergo ophthalmic and neuropsychological examinations" pursuant to the following procedures[4]:

> 1. Based upon the Member's date of birth, the Medical Staff Administration will identify practitioners who are subject to the terms of this Policy.
>
> 2. Applicants for initial appointment who are age seventy (70) at the time their application is submitted, or anticipated to reach the age of seventy (70) prior to completion of the application process, will be informed of this Policy and its requirements by the Credentialing Specialist who is processing the application.
>
> 3. Upon reaching the age of seventy (70), Members shall be required to fulfill the requirements listed above [(the ophthalmic and neuropsychological tests)] at the time of their next, and all subsequent, re-appointments. They shall be notified of the requirements of this Policy at the time that their application for re-appointment is mailed.
>
> 4. The Opthalmic evaluation form will be provided to the Member and he/she will be expected to make arrangements for this examination[].
>
> 5. The completed ophthalmic examination form, and the results of any supplemental examinations that may be indicated, must be returned by the ophthalmic practitioner who conducts the examination directly to the Medical Staff Administration.
>
> 6. Members will schedule their neuropsychologic examination with the individual identified by YNHH. The contact number will be provided by Medical Staff Administration.
>
> 7. Practitioners who conduct the examinations noted above are asked to consider the results of the exam relative to the Medical Staff Member['s] ability to practice medicine and to identity any issues from the examination that may affect, or have the ability to affect, this ability.
>
> 8. Completion of both the neuropsychologic and ophthalmic examinations are required in order for applications for initial or re-appointment to be considered "complete" as defined in the Medical Staff Bylaws.

[4] Where Court includes information provided to the Court through a sealed submission, to the extent so included, the submission is *sua sponte* unsealed.

Ex. O at 3. If a practitioner's tests do not result in any significant findings, no action is taken; however, if the tests reveal signs of alleged impairment, more tests may be recommended, and a decision about the practitioner's clinical privileges is thereafter made by members of Yale's Medical Staff, after several layers of further review. YNHH's SMF ¶¶ 50–52, 55; *see* EEOC's Counter SMF, ECF No. 274-1, ¶ 55. Additional facts and a summary of the record evidence shall be set forth as necessary.

**Standard of Review**

The standard under which courts review motions for summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he

party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002)(citation omitted).

***Age Discrimination Under the ADEA***

"Under the ADEA, it is 'unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age [or] to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age[.]'" *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 337 (D. Conn. 2016) (alterations and omission in original) (quoting 29 U.S.C. § 623(a)).

As relevant here, under 29 U.S.C. § 623(f)(1), it is *not* unlawful under the ADEA to make age-based employment decisions "where age is a bona fide occupational qualification reasonably necessary to the normal operations of the particular business.[5]" The standard is not one of

[5] This is commonly referred to as the BFOQ defense.

reasonableness, but of reasonable necessity. *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 419 (1985). An employer may invoke the BFOQ exception in one of two scenarios: (1) where the employer "had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all [persons over the age qualifications] would be unable to perform safely and efficiently the duties of the job involved"; or (2) where the employer "could establish that age was a legitimate proxy for the safety-related job qualifications by proving that it is impossible or highly impractical to deal with the older employees on an individualized basis." *Id.* at 414 (1985) (internal quotation marks omitted)[6]; *see also Ferrara v. City of Yonkers*, No. 13-CV-1221 (KBF), 2015 WL 2414542, at *3 (S.D.N.Y. May 21, 2015) (discussing *Criswell* decision). Yale relies upon the second scenario.

***Unlawful Employment Practices Under the ADA***

The ADA provides, in relevant part: "A covered entity shall not require a medical examination . . . of an employee . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(D)(4). In order to meet the business necessity exception to the prohibition against medical examinations, an employer "cannot simply demonstrate that an inquiry is convenient or beneficial to its business," but instead, it must show that the reason for conducting the examination is "vital to the business." *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003).[7] "For example, business necessities may

---

[6] The Court notes that *Criswell* involved a challenge to the jury instructions delivered at trial regarding the requirements of the BFOQ defense, which, in the Court's view, underscores the fact intensive nature of the defense.

[7] In *Conroy,* both parties had moved for summary judgment. The district court granted plaintiff's motion, denied defendant's motion and both parties appealed. The Court of Appeals reversed the district court's grant of summary judgment in favor of plaintiff. After reviewing the showing required to establish the "business necessity" defense, the Court concluded that issues of material fact precluded the granting of summary judgment *for either party*. *Conroy,* 333 F.3d at 99. Indeed, the Second Circuit in *Conroy* stated that factual development from both lay and expert witnesses on the efficacy of the policy at issue was necessary and forewarned that "[i]f genuine issues of material fact remain" after that discovery, "*a trial will be necessary*." *Id.* (emphasis added). As set forth below, such is the case here.

include ensuring that the workplace is safe[.]" *Id.* The employer "must also show that the examination . . . genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary." *Id.* at 98. The employer need not show that the examination . . . is the only way of achieving a business necessity, but the examination . . . must be a reasonably effective method of achieving the employer's goal." *Id.* "[C]ourts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties[.]" *Id.* And when a policy applicable to a class of employees is at issue, as here, the court must carefully analyze whether an employer's policy is consistent with business necessity. *Id.* at 101.

> In defining a class subject to a general policy, the employer must show that it has reasons consistent with business necessity for defining the class in the way that it has. The court should grant some deference to the employer in determining how to define a class subject to a general policy. . . . The fact that a policy will require medical certification from some individual employees who do not pose a health or security risk does not undermine the policy if the employer has defined the class of employees reasonably . . . .

*Id.*

**Discussion**

In the operative complaint, EEOC asserts that Yale's procedures, outlined above, amount to age discrimination in violation of the ADEA, as well as an unlawful employment practice under the ADA. Yale contends, *inter alia*, that the practice does not violate the ADEA because the LCPP falls within the BFOQ exception to the prohibitions contained therein, and that the practice does not violate the ADA because the LCPP is both "job-related and consistent with business

necessity."[8] The instant motions, and the case, will turn on Yale's BFOQ and "business necessity" affirmative defenses. And the parties' arguments notwithstanding, these inquiries are fact intensive and cannot be resolved on the record evidence.

As to both defenses, Yale asserts that patient safety is the foundational purpose of the LCPP; that there is no dispute that age is the single greatest indicator of cognitive decline; that the LCPP is designed to identify cognitive decline that might otherwise go unnoticed; that the safe exercise of clinical privileges can be affected by cognitive decline; that this proactive process is therefore a bona fide occupational qualification under the ADEA and similarly is job-related and consistent with business necessity for purposes of the ADA. Thus, Yale posits, EEOC's motion for summary judgment should be denied and its own motion for summary judgment should be granted. For its part, EEOC asserts that Yale cannot, as a matter of law, establish either affirmative defense because there is no evidence that the LCPP achieves (or even serves) the purpose for which it was implemented; it is far too broad in its design; Yale already has multiple metrics by which practitioner competencies are measured and has an established exemplary safety record, rendering the LCPP wholly unnecessary; and Yale's inconsistent enforcement of the LCPP belies any claim as to its necessity. Thus, EEOC posits, its motion for summary judgment should be granted, and Yale's cross-motion denied. The undisputed facts on which each party relies will be identified as necessary to the decision.

Both affirmative defenses can be implicated, and are here, when the purpose for the employment practice is safety related. *See e.g. EEOC v. Exxon Corp.*, 203 F.3d 871 (5th Cir. 2000) (recognizing that "safety-based" job qualification standards are implicated in both the ADA

---

[8] This Court previously determined that the EEOC established a prime facie case of age discrimination under the ADEA insofar as the LCPP creates a change in the terms and conditions of employment and is triggered only by a practitioner's age.

and the ADEA). There is no dispute that the purpose of the LCPP is identified as patient safety. And the EEOC acknowledges that "safety matters." And in the record evidence, there is no genuine dispute among the experts that the single greatest indicator of cognitive decline is age and that cognitive decline is often difficult to detect. This is, unfortunately, where the agreement ends.

In order to meet the business necessity exception to the prohibition against medical examinations under the ADA, an employer must show that the reason for conducting the examination is "vital to the business." *Conroy*, 333 F.3d at 97. "For example, business necessities may include ensuring that the workplace is safe[.]" *Id.* The employer must "show that the examination . . . genuinely serves the asserted business necessity and the request is no broader or more intrusive than necessary." *Id.* In other words, the required examination cannot be deemed "vital to the business" if the examination does not serve the purpose of ensuring patient safety. Although EEOC agrees that patient safety is important, there are significant factual disputes as to whether the LCPP "genuinely serves" the business necessity of keeping patients safe. EEOC relies on, *inter alia,* the opinion of Dr. Kramer who opines that "[t]here is insufficient evidence that the LCPP Neuropsychological Testing Battery is Sensitive or Specific enough to be used to determine whether a practitioner can safely exercise their privileges." ECF No. 202-6 at 5. He renders this opinion based upon his experience as well as his own research (including a study of the LCPP on patients in a clinical setting). He further asserts that there are too many variables at play with respect to the accuracy and import of the testing thus rendering any interpretation of test scores unreliable. *Id.* at 6–7. He opines that "[n]europsychologic tests often do not accurately predict real-world behavior." *Id.* at 6.

Yale, on the other hand, offers the testimony of Dr. Hawkins, who developed and administered the test battery in the LCPP, as well as Dr. Papinchock, an Industrial/Organizational

Psychologist. Dr. Hawkins testified extensively as to the genesis and purposes of the LCPP test battery and why, in his opinion, the battery of tests is an important and reliable first step in the process by which practitioners are assessed. ECF No. 247-9. Dr. Popinchock opines that the LCPP provides critical information on the question of Yale's "business necessity[9]" of keeping patients safe. ECF No. 202-3 at 7. She opined that the battery of tests used in the LCPP "are well-accepted within the field of psychometrics," and that they "have established levels of reliability and validity." *Id.*[10] Assuming that keeping patients safe is a "business necessity" as contemplated under the ADA, there is a genuine issue of material fact as to whether the LCPP serves that purpose and is thus vital to Yale's business.

Even if the LCPP serves the business necessity of patient safety, the parties also dispute, as a factual matter, whether the LCPP is overly broad and not sufficiently tailored to serve this business necessity. EEOC relies on the fact that the LCPP does not take into account the specific job responsibilities of the practitioners, which can vary significantly, thus rendering the LCPP overly broad in its application. As one example, employees who merely teach but who do not see or care for patients are required to maintain their privileges and are thus subject to the LCPP.[11]

---

[9] Dr. Papinchock uses the term "business necessity" not as a legal term contemplated under the ADA, but as a term of art in the field of Industrial/Organizational Psychology.

[10] Although EEOC agrees that the tests selected for the LCPP are well accepted in the neuropsychology field for clinical use and are designed to identify deficiencies or trends in certain cognitive abilities, i.e. learning, memory, executive function and others, EEOC Counter SMF ¶ 46, it does not agree that the tests are an adequate means to measure practitioner competency. *Id.* ¶ 46–47.

[11] EEOC also argues that Yale's failure to rigorously enforce the LCPP defeats any claim of business necessity. It offers a myriad of examples of practitioners being given extensions or being permitted to practice notwithstanding troubling scores on the test battery. In advancing this argument, EEOC relies upon *Wright v. Ill. Dep't of Child & Fam. Servs.,* 798 F.3d 513, (7th Cir. 2015) which held that when an examination is purportedly required due to safety concerns, permitting an employee to work without completing the examination is *evidence* that the "fitness-for-duty examination was not, *in fact*, consistent with business necessity." *Id.* at 526 (emphasis added). This underscores the intensely factual nature of the issue. As is well-established, it is not for the Court to weigh the evidence on summary judgment. *Anderson*, 477 U.S. at 250.

Yale responds that detecting cognitive decline in these employees is just as important insofar as they are teaching others who will be responsible for patient care. While "the fact that a policy will require medical certification from some individual employees who do not pose a health or security risk does not undermine the policy if the employer has defined the class of employees reasonably," *Conroy,* 333 F.3d at 101, the reasonableness of Yale's defined class (employees 70 and older), will require assessment of the factual record upon a trial of this matter. Indeed, whether the LCPP is sufficiently tailored to a reasonably defined class may turn on, and will at the very least include, a quantitative assessment. How many non-treating physicians are subject to the LCPP? Do those non-treating physicians impact, indirectly or otherwise, patient care? If so, how?[12]

Similar factual disputes arise under the BFOQ defense to the ADEA charge. To establish the BFOQ defense, Yale relies upon the second scenario contemplated thereunder, where an employer can establish that age is a legitimate proxy for the safety-related job qualifications insofar as it is "impossible or highly impractical to deal with the older employees on an individualized basis." *Criswell,* 472 U.S. at 414. As discussed, there remain disputes of material fact as to the extent to which the LCPP's ability to identify cognitive decline serves YNHH's safety-related purposes for the examination. As relevant to the ADEA, there are also questions of fact as to whether age is a legitimate proxy for the safety related job qualifications measured by the LCPP.

Yale relies upon the undisputed fact that age is the single best indicator of a risk of cognitive decline, rendering age a legitimate proxy for safety related job qualifications. They offer

[12] The Court recognizes that the answers to some of these questions may be contained in the thousands of pages of materials submitted with the motions for summary judgment and accompanying motions to preclude expert testimony. But the largely unusable Rule 56(a) Statements, *see* ECF No. 334 at 3-5, have left the Court with the unenviable and arguably impossible task of scouring the record evidence in search of undisputed material facts. This is not however, the Court's job. *CILP Assocs. LP v. PriceWaterhouse Coopers LLP,* 735 F.3d 114, 125 (2d Cir. 2013) (when deciding a motion for summary judgment, the trial court is not required to "scour the record on its own in a search for evidence" where the parties have not properly or adequately presented it).

the expert opinion Dr. Gallagher who, relying on a 2021 study, opines that the "prevalence of mild cognitive impairment . . . and dementia . . . may be as high as 28% in physicians aged 70 years and older." ECF No. 247-6 at 5. EEOC challenges the value of this opinion and offers its own expert, Dr. Kramer, who opines:

> While age is certainly a risk factor for cognitive impairment, the reported extrapolations [by Dr. Gallagher] have no bearing on the issue at hand. First, while prevalence rates of mild cognitive impairment and dementia may be as high as 28% in the general population aged 70 and older, these prevalence studies are for ages 70 and higher, including 80 and 90-year-olds who do experience much higher rates of cognitive decline. **Estimates of cognitive impairment and dementia in the general population of 70-year-olds, the age at which YNHH is mandating cognitive assessment, is much lower, probably below 5%**.

ECF No. 202-6, at 6 (emphasis added).[13]

EEOC also relies upon the opinion of expert Erin George, PhD, an economist with the EEOC. Dr. George is expected to testify that an analysis of Yale's Peer Review Data reveals that there is no statistical significance between Yale physicians who are below 70 years of age and those who are above 70 years of age in terms of prevalence of instances involving peer review at YNHH.[14] ECF No. 251-72 at 16. Yale offers, in response, the testimony of Dr. Michaelyn Corbett, who will testify that Dr. George's testimony is unreliable to the point of not being probative of essentially, anything. ECF No. 249-3.

Accordingly, whether Yale's cutoff age of 70 is a legitimate proxy for safety related job qualifications presents a genuine issue of material fact.

EEOC also argues that Yale cannot establish that it is "impossible or highly impractical to deal with the older employees on an individualized basis." *Criswell,* 472 U.S. at 414. EEOC

---

[13] The Court denied Yale's motion to preclude this opinion. ECF No. 335.

[14] A more detailed discussion of Dr. George's opinion was included in the Court's memorandum of decision denying Yale's motion to preclude Dr. George's testimony. *See* ECF No. 334.

argues that Yale cannot meet this requirement because of the multiple metrics they already have in place to assess physician competence which are designed to identify legitimate competency concerns on an individual basis, which is what the law requires. EEOC also relies upon Yale's exceptional safety record. The multiple metrics on which EEOC relies are largely undisputed. However, Yale responds that the LCPP is proactive and forward looking, whereas the current competency metrics are only designed to identify a competency issue after the fact, and perhaps after a patient has been harmed. Yale also relies upon the undisputed fact that "age-based cognitive decline is not always obvious to those who work with a practitioner or even the practitioner themself." Yale SMF ¶ 13; EEOC Counter SMF ¶ 9. Thus, Yale posits, it is impossible to address all physicians 70 years or older *as a proactive matter*, on an individualized basis. It is thus a fundamental factual dispute as to whether the current methods for assessing physician competence are adequate to protect against future harm. Or, as the EEOC has posited, whether the LCPP is a "solution in search of a problem."

**Conclusion**

The Court will finish by reiterating what it has said many times. This case cannot be tried on the papers. The Court cannot, even recognizing Yale's significant interest in patient safety, decide on the present record whether the effort to proactively address patient safety comports with the ADEA or the ADA. Nor can the Court, as requested by the EEOC, dismiss Yale's effort as age-based discrimination or an ADA violation untethered to the purposes for which the LCPP was established. To be sure, there is much the parties agree upon.[15] The factual dispute arises in the details of the LCPP; its purpose; its function; its implementation; its efficacy; its impact. However,

[15] The Court has not endeavored to identify all of the facts in dispute and only identifies a few significant disputes which demonstrate that summary judgment is not appropriate.

these are the very disputes that are determinative of the claims. Summary judgment in favor of either party is therefore not appropriate.

The parties have made clear that this case is of significance to the health care industry generally as well as other industries where age is arguably a "legitimate proxy" for safety related job qualifications. If ultimately the EEOC prevails, that will tell these industries next to nothing — only that the specific processes contemplated under the LCPP do not pass ADEA or ADA muster. Such an outcome will not provide much, if any, guidance, on what *might* withstand scrutiny under these statutes. If Yale ultimately prevails, such a determination would afford some guidance on these issues, but given the multi-faceted nature of the LCPP, the guidance will be, necessarily, of limited assistance when attempting to craft a similar approach across industries, and even within health care industry itself. This makes the parties' inability or unwillingness to work together to devise an appropriate, perhaps even age-based, plan or process that serves its intended purpose of protecting patients from physicians who may be suffering from cognitive decline, but which is sufficiently tailored to comport with the ADEA and ADA, extraordinarily and frustratingly unfortunate.

For all of the foregoing reasons, Yale's [247] Motion for Summary Judgment is DENIED and EEOC's [251] Motion for Summary Judgment is DENIED. The Court will convene a conference to schedule the trial of this matter in the coming weeks.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of October, 2026.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE